**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| APRIL SCARLOTT | § | |
| | § | |
| | § | Civil Action No. 4:10−cv−04865 |
| v. | § | |
| | § | |
| NISSAN NORTH AMERICA, INC., | § | |
| NISSAN MOTOR ACCEPTANCE | § | |
| CORP., CLEAR LAKE NISSAN, and | § | |
| HURRICANE AUTO CARE & | § | |
| ACCESSORIES, INC. | § | |
| | § | |

**PLAINTIFF'S RESPONSE TO NISSAN'S MOTION FOR SUMMARY JUDGMENT.**

**I.      SUMMARY OF ARGUMENT.**

**A.      Breach of Express Warranty.**

In order to prove that a manufacturer breached its written limited warranty under the Magnuson-Moss Warranty Act ("MMWA"), a consumer must show: (1) the existence of a defect in the automobile covered by the warranty; (2) compliance with the terms of the warranty by the consumer; (3) that the consumer afforded the warrantor a reasonable opportunity to repair the defect; and (4) that the warrantor was unable to repair the defect after a reasonable time or a reasonable number of attempts.

Nissan does not contest that that the defective parts that Clear Lake made repairs to under Nissan's basic warranty were materials, parts, and components supplied by Nissan. Rather, Nissan simply argues that the "problems" that Ms. Scarlott experienced in the Murano were "caused by an aftermarket part" – a contention neither supported by the record evidence, nor material to the elements that Ms. Scarlott must prove to prevail on her claim for breach of express warranty. Nonetheless, that defects existed in materials or workmanship of parts and components supplied by Nissan is evidenced by Nissan's affirmative decision to cover repairs to correct those defects under its written warranty – which covers only repairs needed to correct

1

defects in materials or workmanship – as well as its Security+Plus® Vehicle Protection Plan – which covers repairs needed due solely to defects in Nissan materials or faulty workmanship for which Nissan is responsible, and not repairs to due to negligence.  What's more, Stephen V. Weaver Jr., an ASE certified master technician, confirmed the existence of defects in materials or workmanship of parts and components supplied by Nissan.

Nissan does not contest that Ms. Scarlott complied with all of the terms of Nissan's written warranty.  In fact, not only does Clear Lake concede that Ms. Scarlott did not cause the defects that she experienced in the Murano, but Nissan admits that Ms. Scarlott neither abused nor misused the Murano.  Nissan additionally acknowledges that Ms. Scarlott provided Nissan a reasonable opportunity to cure defects in materials or workmanship of parts and components warranted by Nissan.

Whether Nissan was unable and/or failed to repair defects in manufacturing parts and workmanship that manifested in the Murano, following a reasonable opportunity or a reasonable number of attempts, is a question of fact for the jury.  The MMWA does not define "reasonable number of repair attempts," and the committee comments to the MMWA, a well a federal courts spanning the country, indicate that the same is an issue of material fact to be decided by the trier.

### B.   Breach of Implied Warranty.

Under the MMWA, a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief.  Nissan – a supplier – impliedly warranted under Texas state law that the Murano would be fit for the ordinary purpose for which new automobiles are used.  It was not.  Important, pursuant to the plain language of MMWA, any attempted disclaimer of the implied warranty of merchantability is prohibited.

**C.     Nissan's Informal Dispute Resolution Program.**

Ms. Scarlott need not have participated in Nissan's informal dispute resolution program prior to filing suit against Nissan under the MMWA.  Nissan has the burden of proving that its informal dispute resolution program complies with applicable federal regulations.  It neither has, nor can, meet such a burden.  In particular, not only must a warrantor comply with all federal regulations applicable to informal dispute resolution programs established under the MMWA, but a warrantor, as the creator of the process, must also prove compliance with deliberately crafted rules.  Stated otherwise, the MMWA requires proof of compliance with applicable federal regulations before a warrantor may require participation as a pre-requisite to filing suit. Nissan has failed to present any evidence that its informal dispute resolution program complies with applicable federal regulations.  In fact, Nissan refused to respond to Ms. Scarlott's discovery requests crafted to elicit information regarding its informal dispute resolution program.

**D.     Texas Deceptive Trade Practices Act.**

The Texas Deceptive Trade Practices Act explicitly provides that a consumer may maintain an action under it where a breach of an express or implied warranty is the producing cause of economic damages or damages for mental anguish.  Because Ms. Scarlott has demonstrated Nissan's breach of its express and implied warranties, and where Ms. Scarlott has presented evidence that Nissan's breach constitutes a producing cause of economic damages, Ms. Scarlott is entitled to compensation under Texas Deceptive Trade Practices Act.

**E.     Breach of Contract.**

Nissan entered in contractual agreements with Ms. Scarlott in connection with Ms. Scarlott's purchase from Nissan of a Nissan Security+Plus® Vehicle Protection Plan and a Nissan Maintenance+Plus® Vehicle Service Plan.  Nissan's contractual obligation, in part, included the performance of repairs to the Murano at factory authorized dealerships, by way of factory trained technicians, using genuine Nissan parts.  While Ms. Scarlott tendered monetary

compensation in connection with her purchase of a Nissan Security+Plus® Vehicle Protection Plan and a Nissan Maintenance+Plus® Vehicle Service Plan, Nissan failed live up to its contractual obligations – refusing to perform repairs to the Murano at factory authorized dealerships, by way of factory trained technicians, using genuine Nissan parts.  Nissan's breach directly resulted in injury to Ms. Scarlott.

### F.    Liability Resulting From Nissan's Delegation Of Duties.

Nissan stands in the shoes of Clear Lake with respect to all work performed on the Murano, and as such has conceded liability in attempting to shift blame to Clear Lake.  As a general rule – embodied by both the Texas Business and Commerce Code, as well as the MMWA – a party who assigns its contractual rights and duties to a third party remains liable unless expressly or impliedly released by the other party to the contract.  Here, Nissan delegated to Clear Lake it obligations under not only its basic limited warranty, but also its Security+Plus® Vehicle Protection Plan and its Nissan Maintenance+Plus® Vehicle Service Plan.  Significant, Nissan suggests – via its counsel, as well as its designated corporate representative – that Clear Lake's negligent workmanship was the cause of the defects that Ms. Scarlott experienced in the Murano.  In other words, Nissan admits that Clear Lake breached its delegated obligations. Because Nissan has now chosen to declare Clear Lake the cause of any and all problems that Ms. Scarlott experienced in the Murano, it has conceded liability for breach of express warranty, breach of implied warranty, violation of the Texas Deceptive Trade Practices Act, and breach of contract.

## II.    STATEMENT OF FACTS.

### A.    Ms. Scarlott Purchased A 2006 Nissan Murano From Clear Lake Nissan.

On or about December 26, 2006, Ms. Scarlott purchased from Clear Lake Nissan ("Clear Lake") a 2006 Nissan Murano ("Murano").  (Motor Vehicle Retail Installment Contract, Affidavit of Dennis Kurz ("Aff. D.K."), ¶1); (Buyers Order and Invoice, Aff. D.K., ¶2).  The

price of the Murano, including registration charges, document fees, sales tax, and collateral

charges, totaled $39,289.00.  (Motor Vehicle Retail Installment Contract, Aff. D.K., ¶1).

### B. In Connection With Her Purchase Of The Murano, Nissan Issued And Supplied To Ms. Scarlott Its Three-Year Or 36,000-Mile Basic Warranty.

In consideration for the purchase of the Murano, Nissan North America, Inc. ("Nissan")

issued and supplied to Ms. Scarlott its written warranty, which includes three-year or 36,000-

mile bumper to bumper coverage, as well as other warranties fully outlined in Nissan's

Manufacturer's Warranty Information Booklet.  (Manufacturer's Warranty Information Booklet,

Aff. D.K., ¶3).

Nissan's Manufacturer's Warranty Information Booklet explains:

> **This warranty covers any repairs needed to correct defects in materials or workmanship** of all parts and components of each new Nissan vehicle supplied by Nissan except for the exclusions listed under the caption "WHAT IS NOT COVERED" or as indicated below.

(Manufacturer's Warranty Information Booklet at 4, Aff. D.K., ¶3) (emphasis added).

To obtain service under Nissan's basic warranty "you must take the vehicle to an

authorized Nissan dealer in the United States or Canada during regular business hours at your

expense . . . ."  (Manufacturer's Warranty Information Booklet at 5, Aff. D.K., ¶3).[1]

### C. Ms. Scarlott Purchased A Nissan Security+Plus® Vehicle Protection Plan And A Nissan Maintenance+Plus® Vehicle Service Plan.

Contemporaneous to her purchase of the Murano, Ms. Scarlott purchased, for a cost of

$1,430.00, a Nissan Security+Plus® Vehicle Protection Plan.  (Nissan Security+Plus® Vehicle

Protection Plan Agreement, Aff. D.K., ¶4).  Regarding the Nissan Security+Plus® Vehicle

Protection Plan, Nissan's Manufacturer's Warranty Information Booklet states:

---

[1] Nissan admits that it does not perform any work (repair, replacement, maintenance, or otherwise) on the vehicles that it warrants, but rather relies on its network of authorized dealerships and repair centers to do so.  (Nissan's Response to Plaintiff's Initial Request for Admission 21, Aff. D.K., ¶31) ("**NNA admits it did not personally perform repairs, since it relies on technicians employed by its independently owned and operated dealers to do so**.  NNA reimburses its dealers for repairs covered under warranty.") (emphasis added).

For extra peace of mind you can add **Nissan's own Security+Plus® Vehicle Protection Plan** which provides you with long term mechanical protection. **Backed by Nissan**, and designed exclusively for Nissan owners, Security+Plus® is available from your Nissan dealer in a variety of comprehensive coverages.

\*      \*      \*

Repairs at these dealerships are performed by factory trained technicians[2] using Genuine Nissan Parts, to keep your vehicle in top running condition.

(Nissan Security+Plus® Vehicle Protection Plan Agreement at 46, Aff. D.K., ¶4) (emphasis added).

The Nissan Security+Plus® Vehicle Protection Plan reads, in part:

In return for your payment, Nissan Extended Services North America, GP will arrange for a Nissan Dealer to repair or replace all covered parts of your vehicle (see Section "This Service Agreement Covers" below) when such a repair or replacement is due to a "MECHANICAL BREAKDOWN", as defined below, and when all other terms and conditions of this Agreement are met. The deductible which you must pay is listed in the Vehicle/Agreement Information section of this Agreement.

**MECHANICAL BREAKDOWN means the inability of a covered part(s) to perform the function(s) for which it was designed, due solely to defects in Nissan materials or faulty workmanship for which Nissan is responsible. MECHANICAL BREAKDOWN does not include damage due to negligence, damage caused by an accident, or the gradual reduction in operating performance due to wear and tear.** In addition, this Agreement does not provide any benefit for any mechanical failure or breakdown caused by a non-covered part.

(Nissan Security+Plus® Vehicle Protection Plan Agreement at 46, Aff. D.K., ¶4) (emphasis added).[3]

---

[2] Nissan's Dealer Technical Specialist ("DTS"), and designated corporate representative, Neal Barnes, testified: "To be certified as Nissan master technician, [mechanics] have to complete all the requirements for the curriculum for [Nissan's] training program in addition to being an ASE certified mechanic." (Deposition Transcript of Neal Barnes ("T. N.B.") at p.57, lines 10-13, Aff. D.K., ¶5). Nissan master technicians are privy to "Nissan specific materials" that non-Nissan certified technicians do not have access to. (T. N.B. at p.57, lines 21-25; p.58, line 1, Aff. D.K., ¶5). "Nissan offers training curriculum to train technicians on [Nissan's] specific products, and [Nissan's] curriculum is based on [Nissan's] products." (T. N.B. at p.60, lines 18-20, Aff. D.K., ¶5). Nissan master technicians are "set apart from their peers." (T. N.B. at p.60, lines 22-25, p.61, lines 1-2, Aff. D.K., ¶5). Nissan master technician formalized training is outlined in a manual authored by Nissan. Clear Lake's service director, Bob Gore, testified that Nissan would "absolutely" argue that a Nissan master technician is quite different than an ASE certified mechanic. (Deposition Transcript of Bob Gore ("T. B.G.") at p. 49, lines 1-8, Aff. D.K., ¶6).
[3] The Nissan Security+Plus® Vehicle Protection Plan Agreement also states: "Obligations of NESNA under this service contract are backed by the full faith and credit of the provider."

Also contemporaneous to her purchase of the Murano, Ms. Scarlott purchased from Nissan a Nissan Maintenance+Plus® Vehicle Service Plan. (Nissan Maintenance+Plus® Vehicle Service Plan, Aff. D.K., ¶7). Regarding the Nissan Maintenance+Plus® Vehicle Service Plan, the Nissan Murano Maintenance and Service Guide reads in part:

> With Maintenance+Plus **you'll be hiring Nissan** to maintain your vehicle to factory specification by factory trained technicians. Like Security+Plus, you'll benefit from Nationwide Coverage, Genuine Nissan Parts, Factory Trained Technicians, and you'll be protected against future inflation (rising costs and of parts and labor)."

(Nissan Murano Maintenance and Service Guide at 5, Aff. D.K., ¶8).

### D. The Murano, As Delivered To Ms. Scarlott, Was Not Equipped With Options Represented By Clear Lake At The Time Of Sale.

On December 27, 2010 – the day after Ms. Scarlott purchased the Murano – she returned it to Clear Lake upon discovering that the Murano was not equipped with options that Clear Lake represented at the time of sale. "He asked me why I was bringing it back, and I told him . . . . I was told that it had the Homelink system, and when I got home last night, I realized that it did not."[4] (Deposition Transcript of April Scarlott ("T. A.S.") at p. 27, lines 18-22, Aff. D.K., ¶9). Clear Lake immediately took possession of the Murano, and informed Ms. Scarlott that it would install the Homelink system on the Murano. (T. A.S. at p. 28, lines 3-25; p. 29, line 1-7, Aff. D.K., ¶9). Clear Lake assured Ms. Scarlott that the installation would occur at a "factory-authorized installation center." (T. A.S. p. 28, lines 3-25; p. 29, line 1-7, Aff. D.K., ¶9).

### E. Clear Lake Entered Into An Agreement With A Third Party, Non-Nissan Authorized Facility – Hurricane Auto Care & Accessories, Inc. – To Install A Homelink System On The Murano.

Referencing work performed on the Murano by Hurricane Auto Care & Accessories, Inc. ("Hurricane"), Mr. Barnes notes: "The dealership – according to what I can see here, the dealership entered into an agreement with a sublet facility to install a Homelink system on the

---

[4] Clear Lake acknowledges that the price of the Homelink system was included in the financing agreement that Ms. Scarlott entered into in connection with her purchase of the Murano. (T. B.G. at p. 102, lines 21-25; p. 103, lines 1-9, Aff. D.K., ¶6).

car."  (T. N.B. at p.114, lines 14-17, Aff. D.K., ¶5); (January 24, 2007 Repair Order, Aff. D.K.,

¶26) ("'NEW CAR WE OWE' INSTALL REAR VIEW MIRROR WITH HOMELINK . . .

INSTALL HOMELINK SYSTEM"); (Clear Lake "We Owe" Slip, Aff. D.K., ¶27) ("Frank

Pierce Jr.[5] . . WE OWE . . . Homelink – Installed by Hurricane Auto").[6]

> **F.     Ms. Scarlott Experienced In The Murano Numerous Defects In Materials Or Workmanship Of Parts And Components Warranted By Nissan.**

Shortly after taking possession of the Murano, Ms. Scarlott experienced numerous

defects in the Murano.  As evidenced by no less than ten individual repair orders, Ms. Scarlott

tendered the Murano to Nissan's authorized dealerships, in effort to have defects in materials or

workmanship of parts and components warranted by Nissan corrected, on repeated occasion.

Nissan was unable and/or failed to repair defects in manufacturing parts and workmanship that

manifested in the Murano following a reasonable opportunity or a reasonable number of attempts

to do so.

> **1.     February 20, 2007 Repair Order.**

On February 20, 2007, with 1,987 miles registered to the odometer of the Murano, Ms.

Scarlott tendered the Murano to Clear Lake for repair.  The according February 20, 2007 repair

order reads, in part:

> **ELECTRICAL**
>
> CUST STATES REAR WINDOW INOP
> REAR WIPER ARM LOSE
> REMOVE AN REINSTALL REAR WIPER ARM

(February 20, 2007 Repair Order, Aff. D.K., ¶10) (emphasis added).

---

[5] Mr. Pierce was, but no longer is, employed by Clear Lake as a sales manager.  (T. B.G. at p. 14, lines 14-18, Aff. D.K., ¶6).  ).
[6] Clear Lake also entered into agreements with other third party, Non-Nissan authorized facilities, to perform work on the Murano other than installation of a Homelink system.  Clear Lake's May 30, 2006 repair order reads: (May 30, 2006 Repair Order, Aff. D.K., ¶28) ("SUBLET . . . TEXAS AUTO TRIM . . . BUCKETS HEADRESTS SUNROOF").

The referenced repairs were stamped "WARRANTY."  (February 20, 2007 Repair Order, Aff. D.K., ¶10).

### 2.      March 9, 2007 Repair Order.

On March 9, 2007, with 2,730 miles registered to the odometer of the Murano, Ms. Scarlott tendered the Murano to Clear Lake for repair.  The according March 9, 2007 repair order reads, in part:

> CUP HOLDER
>
> CUST STATES REAR CUP HOLDER BROKEN SOP HERE
> TABS ON REAR CUPHOLDER BROKEN
> REPLACED TABS

(March 9, 2007 Repair Order, Aff. D.K., ¶11).

The referenced repairs were stamped "WARRANTY."  (March 9, 2007 Repair Order, Aff. D.K., ¶11).  Nissan's Vehicle Claims History[7] confirms that Nissan reimbursed Clear Lake for the March 9, 2007 repairs made pursuant to Nissan's basic warranty.  (Nissan's Vehicle Claims History, Aff. D.K., ¶12).

### 3.      September 12, 2007 Repair Order.

On September 12, 2007, with 9,602 miles registered to the odometer of the Murano, Ms. Scarlott tendered the Murano to Clear Lake for repair.  The according September 12, 2007 repair order reads, in part:

> **CHECK ENGINE LIGHT**
>
> CUSTOMER STATES THAT THE CHECK ENGINE LIGHT IS ON.
> PLEASE ADVISE
> **PREVIOUS BATT FAILURE**
> EL9AA
> CONSULT TESTED.  GOT 0603.  TEST BATT VOLTAGE AT ECM.
> GOOD.

---

[7] Nissan's Vehicle Claims History "show[]s what's been paid in the case of a warranty."  (T. N.B. at p.30, lines 22-24, Aff. D.K., ¶5).  "[I]f it was claimed by a dealer under warranty, it had to be actually submitted to [Nissan] as a claim."  (T. N.B. at p.31, lines 1-4, Aff. D.K., ¶5).  "The warranty system doesn't show anything that the customer would have paid out of pocket or that was a dealer internal expense."  (T. N.B. at p.30, lines 24-25; p.31, line 1, Aff. D.K., ¶5).

        *    *        *

**ELECTRICAL**

CUSTOMER STATES NON OF THE DOME LIGHTS WORK
INSTALL DOME FUSE

        *    *        *

**ELECTRICAL**

CUSTOMER STATES AIR BAG LIGHT WAS FLASHING . . . NOT
ON NOW.
NO PROBLEM FOUND
CONSULT TESTED. AIR BAD SYS. NO CODES FOUND. RESET

(September 12, 2007 Repair Order, Aff. D.K., ¶13) (emphasis added).

The referenced repairs were stamped "WARRANTY."  (September 12, 2007 Repair Order, Aff. D.K., ¶13).  Nissan's Vehicle Claims History confirms that Nissan reimbursed Clear Lake for the September 12, 2007 repairs made under the Nissan Security+Plus® Vehicle Protection Plan.  (Nissan's Vehicle Claims History, Aff. D.K., ¶12).

### 4.      October 2, 2007 Repair Order.

On October 2, 2007, with 10,104 miles registered to the odometer of the Murano, Ms. Scarlott tendered the Murano to Clear Lake for repair.  The according October 7, 2007 repair order reads, in part:

**MISCELLANEOUS ENGINE**

**CUSTOMER STATES THAT VEHICLE SPUTTERS AND RUNS
ROUGH
INTERNAL FAILURE
REPLACED MASS AIR FLOW SENSOR**

(October 2, 2007 Repair Order, Aff. D.K., ¶14) (emphasis added).

The referenced repairs were stamped "WARRANTY."  (October 2, 2007 Repair Order, Aff. D.K., ¶14).  Nissan's Vehicle Claims History confirms that Nissan reimbursed Clear Lake

for the October 2, 2007 repairs made under Nissan's basic warranty.  (Nissan's Vehicle Claims History, Aff. D.K., ¶12).

**5.      October 6, 2008 Repair Order.**

On October 6, 2008, with 19,702 miles registered to the odometer of the Murano, Ms. Scarlott tendered the Murano to Clear Lake for repair.  The according October 6, 2008 repair order reads, in part:

> **NO START**
>
> **BATTERY TESTED AND CHARGED BUT HAS INTERNAL FAILURE**
> **REPLACED BATTERY**

(October 6, 2008 Repair Order, Aff. D.K., ¶15) (emphasis added).

**6.      December 16, 2008 Repair Order.**

On December 16, 2008, with 20,705 miles registered to the odometer of the Murano, Ms. Scarlott tendered the Murano to Clear Lake for repair.  The according December 16, 2008 repair order reads, in part:

> **NO START**
>
> **CUSTOMER STATES THE VEHICLE WILL NOT CRANK**
> **BATTERY GOES DEAD @ TIMES AFTER SITTING HAS TO JUMP START**
> SEE BOB GORE
> LOAD TESTED AND CHARGED BATTERY
> **INTERNAL FAILURE OF BATTERY**
> REPLACED BATTERY
> PARTS WARRANTY REF RO#89890
> **WORKING WITH TECH LINE**[8] ALL SYSTEMS OK
> **PARASITIC DRAIN**[9] **23 MILLIAMPS** OK ON 3 DIFFERENT DAYS

---

[8] Mr. Barnes explains that Tech Line is a service provided by Nissan to assist authorized dealerships in correcting hard to fix problems.  (T. N.B. at p. 142, lines 17-19, Aff. D.K., ¶5).  "And, you know, we do have Tech Line. We did have Tech Line involvement with this. I called them personally, I remember. . . . There never was a DTS, but we worked with Tech Line on it the whole time -- yeah, I think it was.  Last time it was. I think it was.  But it was by phone.  And we're just dealing with Engineering over the phone.  We give them information, they tell us to "Check this, try that," give them readings about this, and then they get back with us on different things. . . .I mean, this just isn't -- so, actually -- and you can look where I've got on here I'm working with Tech Line.  That's actually my direct line to Nissan Engineering."  (T. B.G. at 54, lines 12-14, p.56, lines 14-23; p.140, 21-23, Aff. D.K., ¶6).

[9] Mr. Barnes explained that "[a] parasitic drain is any drain on the battery when the engine and the ignition system is turned off that's over and above what would be considered normal amount of drain."  (T. N.B. at p.155, lines 14-17,

UNABLE TO DUPLICATE ANY DRAIN ON BATTERY

(December 16, 2008 Repair Order, Aff. D.K., ¶16) (emphasis added).

The referenced repairs were stamped "WARRANTY." (December 16, 2008 Repair Order, Aff. D.K., ¶16). Nissan's Vehicle Claims History confirms that Nissan reimbursed Clear Lake for the December 16, 2008 repairs made under Nissan's basic warranty. (Nissan's Vehicle Claims History, Aff. D.K., ¶12).

### 7.      September 16, 2009 Repair Order.

On September 16, 2009, with 25,540 miles registered to the odometer of the Murano, Ms. Scarlott tendered the Murano to Clear Lake for repair. The according September 16, 2009 repair order reads, in part:

> **ELECTRICAL**
>
> **CUSTOMER STATES THE BATTERY IS DEAD . . . . AGAIN**
> ATTENTION BOB GORE
> **BCM NOT FALLING ASLEEP**
> **INSTALLED BCM AND RECONFIG**

(September 16, 2009 Repair Order, Aff. D.K., ¶17) (emphasis added).

The referenced repairs were stamped "WARRANTY." (September 16, 2009 Repair Order, Aff. D.K., ¶17). Nissan's Vehicle Claims History confirms that Nissan reimbursed Clear Lake for the September 16, 2009 repairs made under both Nissan's basic warranty and the Nissan Security+Plus® Vehicle Protection Plan. (Nissan's Vehicle Claims History, Aff. D.K., ¶12) ("Servicing Dealer: 3986 Clear Lake Nissan, RO: 40981, 9/10/09, PNC Code Desc: 28492 **Body Control Module**, Miles: 25540, Claim Type: **Standard Warranty Claim**, Status: Paid *

---

Aff. D.K., ¶5). Mr. Barnes could not state how long it would take to drain a battery to the point of a no start condition where the parasitic drain was measured to be 23 milliamps.

> Q.  How long would it take to drain a battery to the point of a no start condition with 23 milliamp -
>
> A.  I have no idea.

(T. N.B. at p.157, lines 16-19, Aff. D.K., ¶5).

* * Servicing Dealer: 3986 Clear Lake Nissan, RO: 40981, 9/10/09, PNC Code Desc: 28492

**Body Control Module**, Miles: 25540, Claim Type: **Service Contract Claim,** Status: Paid")

(emphasis added).

### 8.      September 18, 2009 Repair Order.

On September 18, 2009, with 25,581 miles registered to the odometer of the Murano, Ms.

Scarlott tendered the Murano to Clear Lake for repair.  The according September 18, 2009 repair

order reads, in part:

> **ELECTRICAL**
>
> CUSTOMER STATES TWO OF THE KEYS WILL NOT START THE
> VEHICLE
> KEYS WERE NOT PRESENT DURING BCM REPLACEMENT
> PROGRAMMED KEYS ... NO CHARGE TO CUSTOMER
>
> *    *       *
>
> **ELECTRICAL**
>
> CUSTOMER STATES NEITHER REMOTE WORKS
> PROGRAMMED REMOTES
>
> *    *       *
>
> **ENGINE CONTROL DIAG**
>
> **CUSTOMER STATES THE VEHICLE DIES AT A STOP SIGN
> AFTER SHE LEFT HERE LAST**
> NO PROBLEM FOUND

(September 18, 2009 Repair Order, Aff. D.K., ¶29) (emphasis added).

### 9.      September 28, 2009 Repair Order.

On September 28, 2009, with 25,664 miles registered to the odometer of the Murano, Ms.

Scarlott tendered the Murano to Clear Lake for repair.  The according September 28, 2009 repair

order reads, in part:

> **NO START**
>
> **CUSTOMER STATES THE VEHICLE WILL NOT CRANK
> THE BATTERY IS DEAD**

> **TESTED BAD**
> **REPLACE BATTERY**

(September 28, 2009 Repair Order, Aff. D.K., ¶18) (emphasis added).

The referenced repairs were stamped "WARRANTY."   (September 28, 2009 Repair Order, Aff. D.K., ¶18).  Nissan's Vehicle Claims History confirms that Nissan reimbursed Clear Lake for the September 28, 2009 repairs made under Nissan's basic warranty.  (Nissan's Vehicle Claims History, Aff. D.K., ¶12).

> **10.     November 25, 2009 Repair Order.**

On November 25, 2009, with 25,951 miles registered to the odometer of the Murano, Ms. Scarlott tendered the Murano to Clear Lake for repair.  The according November 25, 2009 repair order reads, in part:

> **NO START**
>
> **CUSTOMER STATES THE VEHICLE WILL NOT CRANK**
> TRACED WIRING TO FIND CURRENT DRAW ON BATTERY
> FOUND AFTERMARKET REAR VIEW MIRROR CAUSING DRAW
> SENT OUT TO BE REPAIRED
> VEHICLE RETURNED WITH NO ELECTRICAL DRAW ON SYSTEM
> . . . RETURN TO CUSTOMER

(November 25, 2009 Repair Order, Aff. D.K., ¶19) (emphasis added).

The referenced repairs were stamped "WARRANTY."   (November 25, 2009 Repair Order, Aff. D.K., ¶19).

> **G.     Nissan Never Denied A Request Submitted By Clear Lake For Reimbursement Regarding Warranty Repairs Performed On The Murano.**

Nissan's basic warranty covers "**defects in materials or workmanship** of all parts and components of each new Nissan vehicle supplied by Nissan."   (Manufacturer's Warranty Information Booklet at 4, Aff. D.K., ¶3) (emphasis added).  Nissan may deny a dealership's request for reimbursement for a warranty repair.  (T. N.B. at p.37, lines 17-21, Aff. D.K., ¶5). Nissan never refused to reimburse Clear Lake for repairs performed on Ms. Scarlott's vehicle.

Q. Throughout that – those repairs, Clear Lake was performing repairs and later submitting those repairs as warranty claims to Nissan, right?

A. Yes, sir.

Q. And did Nissan pay for all those repairs?

A. Yes, they did.

Q, Did Nissan ever refuse to cover anything that you submitted under warranty for –

A. No.

Q. – Ms. Scarlott?

A. No.

(T. B.G. at p. 24, lines 7-16, Aff. D.K., ¶6).

### H. Nissan Never Did – Nor To Date Has – Sought Repayment From Clear Lake For Any Sum Paid Regarding Warranty Claims.

Nissan's Assurances Products Resource Manual[10] provides guidelines to dealerships regarding "what is not covered, what is not covered, what can be reimbursed, [and] what cannot be reimbursed" under Nissan's standard warranty.  (T. N.B. at p.39, lines 18-24, Aff. D.K., ¶5). Mr. Barnes testified:

Q. If Nissan reimbursed the dealership for a repair and that repair should not have been covered under warranty, is there a way for Nissan to go back and ask the dealership for its money back?

A.  Yes.

(T. N.B. at p.124, lines 23-25, p.125, lines 1-2, Aff. D.K., ¶5).

Despite the existence of specific procedures that Nissan could have utilized to request the return of funds "improperly" or "accidentally" paid to Clear Lake in connection with warranty repairs, it never made any such request to Clear Lake.

---

[10] Ms. Scarlott has requested, on repeated occasion, that Nissan produce its Assurances Products Resource Manual. (Correspondence Regarding Nissan Assurances Resource Manual, Aff. D.K., ¶22).  Nissan has yet to produce the same.

> Q. [Y]ou are not aware of any information that would lead you to believe that Nissan requested the funds paid back from the dealership specific to a warranty repair performed on Ms. Scarlott's vehicle?
>
> A. I am not aware of anything.

(T. N.B. at p.126, lines 18-23, Aff. D.K., ¶5).

**I.   Stephen V. Weaver Jr., An ASE Certified Master Technician, Confirmed The Existence Of Defects In Manufacturing Parts Or Workmanship In The Murano.**

Following inspection of the Murano, Stephen V. Weaver Jr., an ASE certified master automobile technician, concluded in part:

> The vehicle had multiple defects since purchase, and the dealer has needed multiple attempts to repair said defects. The manufacturer recognized these defects by issuing bulletins relative to each. The owner has lost confidence in the vehicle's safety and reliability. If these issues had been factored into the sale at the time of purchase, the vehicle would have been $7,970.25 less than the purchase price of $31,881. The figure was arrived at using a formula derived from the value of each [of the] vehicle's operating systems' value, relative to the whole vehicle's value.

(Report of Stephen V. Weaver Jr., Aff. D.K., ¶20).

Upon examination by Nissan's counsel, Mr. Weaver stated that the Murano "had defects from the factory and they should have been covered by warranty."  (Deposition Transcript of Stephen V. Weaver, Jr. ("T. S.W.") at p. 7, lines 7-8, Aff. D.K., ¶21).  Similarly, Mr. Weaver testified:

> Q. Under No. 2 [it] says your opinion with the defect is that the vehicle was defective at the time of sale, and is that your opinion?
>
> A Yes, it is.

(T. S.W. at p. 110, lines 5-8, Aff. D.K., ¶21).

Mr. Weaver further noted that the defects that Ms. Scarlott experienced in the Murano existed at the time of sale – the date on which Ms. Scarlott purchased the Murano. (T. S.W. at p. 9, lines 7-9, Aff. D.K., ¶21.).

**J.      Ms. Scarlott Was Without The Murano For No Less Than Fifty-Three Days.**

Ms. Scarlott was without use of the Murano for no less than fifty-three (53) days.  At one point, the Murano remained at Clear Lake for no less than twenty-eight (28) consecutive days for repair.  (February 20, 2007 through November 25, 2009 Repair Orders, Aff. D.K., ¶¶10-19, 29).

What's more, Ms. Scarlott was stranded by the Murano on more than a dozen occasions, including, but not limited to supermarket parking lots, airports, and her own driveway.  (T. A.S. at p. 247, lines 8-15; p. 248, lines 1-25; p.249, lines 1-17, Aff. D.K., ¶9)

**K.      Clear Lake Concedes That Ms. Scarlott Did Not Cause The Defects That She Experienced In The Murano.**

Mr. Gore made clear that Ms. Scarlott did nothing to cause the defects that she experienced in the Murano:

Q. [By counsel for Nissan]. Do you blame Ms. Scarlott for any of this?

A. No.

Q. And Nissan doesn't either, right?

A. I'm empathetic to it, you know.

*    *       *

Q. Now, that wasn't April Scarlott's fault, right?

A.  No, sir.

(T. B.G at p. 28, lines 7-10; p.35, lines 22-23, Affidavit of Denniz Kurz, ¶6).

Mr. Gore further testified:

Q. Is there any indication that Ms. Scarlott drove this vehicle so as to make it worse?

A. No, sir.  It's nothing that she did.

*    *       *

A. It was tough deal.  You take the good and the bad, and this just happened to be one of the ones that was hard to fix.

*    *       *

17

A.  . . . I knew it was a problem, but we just couldn't find it.  You know, it wasn't – it wasn't rearing its ugly head.

(T. B.G. at p. 84, lines 14-16, p. 123, lines 24-25; p.154, line1, p.155, lines 4-6, Aff. D.K., ¶6).

Mr. Gore continued:

So here it is about the fourth time, and -- and at this point, Ms. Scarlott is very upset.  At this point she is. You know, she's coming in, "Bob, I'm done with this.  I'm tired of it," dah, dah, dah.  **Rightly so.  I mean, if I had one that left me sitting on the road that many times, I'd be mad, too**.

(T. B.G. at p. 141, lines 8-13, Affidavit of Denniz Kurz, ¶6) (emphasis added).

**L.      Nissan Admits That Ms. Scarlott Neither Abused, Not Misused The Murano.**

Mr. Barnes testified that he is unaware of anything indicating that Ms. Scarlott abused or misused her vehicle.

Q. [D]id you see anything in the repair orders that we reviewed noting that Ms. Scarlott misused or abused her Murano in any way?

A. There was not anything I could say – I could pin to abuse by Ms. Scarlott.

(T. N.B. at p.181, lines 12-18, Aff. D.K., ¶5).

**M.      To Date, Nissan Has Neither Inspected The Murano, Nor Discussed The Defects That  Ms. Scarlott Experienced In The Murano With Clear Lake.**

Despite that Mr. Barnes inspects hundreds of vehicles per year in his capacity as a DTS (T. N.B. at p.43, lines 21-25, p.42, lines 1-11, Aff. D.K., ¶5), Mr. Barnes did not inspect the Murano.  (T. N.B.at p.202, lines 20-22, Aff. D.K., ¶5).  Mr. Barnes did not discuss the circumstances surrounding the defects that Ms. Scarlott experienced in the Murano with anyone at Clear Lake.   "I have not spoken to anyone at the dealership regarding any of this documentation."  (T. N.B.at p.153, line 25, p.154, lines 1-2, Aff. D.K., ¶5).  "I have not talked to the dealership people at all regarding this case."  (T. N.B.at p.154, lines 19-20, Aff. D.K., ¶5).

**N.      Nissan's Dealer Technical Specialist, And Designated Corporate Representative, Affirmed That He Is Unable To Testify As To The Cause Of The Electrical Defects That Ms. Scarlott Experienced In The Murano.**

Mr. Barnes admits that he cannot testify as to the cause of the parasitic drain specific to

Ms. Scarlott's vehicle.

> Q.  Do you have any reason to believe that the installation of this Homelink mirror was or was not the cause of this 23 milliamp drain?
>
> A.  It is very hard to know with this small amount of information provided what those devices are that collectively may be causing a drain without knowing what all they checked.  So could the – could the mirror have caused it, yes.
>
> Q.  Your point being it's very difficult to make any determination as to what caused this drain because there could be any number of reasons for this drain?
>
> A.  There's not enough information here to tell me what all – the only thing I can say is this is a small amount of drain, 23 milliamps.
>
> *    *       *
>
> Q.  Just as it would be possible, possible for the mirror to cause that drain, it's also possible that something like a sunroof, an electrical sunroof, could cause that drain?
>
> A.  Anything that's wired to the electrical system.

(T. N.B. at p.160, lines 8-21, p.161, lines 10-15, Aff. D.K., ¶5).

**O.      Notwithstanding, Nissan's Dealer Technical Specialist, And Designated Corporate Representative, Testified That The Factory Installed Body Control Module Could Likely Be A Cause Of The Parasitic Drain Specific To Ms. Scarlott's Vehicle.**

Mr. Barnes concedes that the factory installed body control module could likely be a

cause of the parasitic drain specific to Ms. Scarlott's vehicle.

> Q.  And just below that we see an indication that a BCM [is] not falling asleep.  Do you know what a BCM is?
>
> A.  Yes.
>
> Q.  What is it?
>
> A.  Body control module.

19

Q.  What does the body control module do in this particular car?

A.  It has a lot of components that it controls, turn signals, dome light, other lights in the car.

Q.  Is the BCM a factory installed component?

A.  Yes.

Q.  What does not falling asleep mean?  Do you know what not fall asleep means?

A.   No for sure, I think they're probably saying it did not power down.

*   *       *

Q.  If the BCM did not fall asleep, meaning as you and I take it power down, would that also cause a drain on the battery?

A.  If the BCM was not powering down, if its still powered up like it would be with the ignition switch turned on, yes, it could.[11]

(T. N.B. at p.162, lines 9-21, p.163, lines 8-13, Aff. D.K., ¶5).

**P.**  **Nissan's Dealer Technical Specialist, And Designated Corporate Representative, Stated That He Has No Opinion As To Whether Repairs Performed By Clear Lake Should Have Been, Or Should Not Have Been, Covered Under Nissan's Basic Warranty.**

Mr. Barnes explicitly states that he has no opinion as to whether repairs performed by

Clear Lake should have been, or should not have been, covered under Nissan's basic warranty.

Q.  Mr. Barnes, would you take a look at Exhibit 13. With regard to the repair, the second repair noted electrical and the windshield wipers, do you have an opinion as to whether or not that is a repair that should have been covered under warranty?

A.  **Not really**.

---

[11] Of the utmost significance, Nissan reimbursed Clear Lake for repairs made to the BCM not only under its basic warranty – which covers only "**repairs needed to correct defects in materials or workmanship**," (Manufacturer's Warranty Information Booklet at 4, Aff. D.K., ¶3) – but also under the Nissan Security+Plus® Vehicle Protection Plan – which covers only repairs to correct a "mechanical breakdown" defined as an "**inability of a covered part(s) to perform the function(s) for which it was designed, due solely to defects in Nissan materials or faulty workmanship for which Nissan is responsible**," and which explicitly does not cover repairs necessitated by "**damage due to negligence**, damage caused by an accident, or the gradual reduction in operating performance die to wear and tear." (Nissan Security+Plus® Vehicle Protection Plan Agreement at 46, Aff. D.K., ¶4).

\*     \*        \*

Q. Would you turn to Exhibit 14. Do you have an opinion as to whether or not the notation under cup holder should or should not have been covered under warranty?

A. I believe that's the same cup holder that was on the previous one.

Q. So it's no opinion?

A. **No, I don't**.

\*     \*        \*

Q. Okay. Number 18. Do you have an opinion as to whether or not any of these issues and/or repairs should or should not have been covered under the three-year/36,000-mile Nissan warranty?

A. **No opinion.**

\*     \*        \*

Q. Let's go to -- no. Let's go to 20. Let's go to 21. Document 21, 10/6/08 repair order, do you have any opinion as to whether or not any of these issues, repairs and/or notations should or should not have been covered under the Nissan three-year/36,000-mile limited basic warranty?

A. **No opinion**.

Q. 22. This is the 12/15/08 repair order. Do you have any opinion as to whether or not any of the repairs performed, the work performed by the dealership on this date with respect to this repair order should or should not have been covered under the Nissan three-year/36,000-mile limited warranty?

A. Let me -- if you would not mind, I need to read it to answer the question.

Q. Okay. Take your time. Take your time.

A. (Reading.) **No, I don't have an opinion**.

Q. No opinion. Would you flip to Number 23. Nope. Flip to 24. This is a 9/10/09 repair order. The invoice date is 9/16/09. Do you have any opinion as to whether or not any repair work or issues noted on this particular repair order should or should not have been covered under the Nissan three-year/36,000-mile limited warranty?

A. No.

21

Q. That's no opinion?

A. **No opinion**.

Q. Okay. 25, same question. We're looking at 9/18/09 repair order. Do you have any opinion as to whether or not any of the repairs or work noted on this repair order should or should not have been covered under the Nissan three-year/36,000-m*i*le limited warranty?

A. **No opinion**.

Q. Okay. 26, this is a 9/24/09 repair order. Do you have any opinion as to whether or not this no start condition and the condition that is underneath it, repairs, work performed by the dealership, should or should not have been covered under the Nissan three-year/36,000-mile limited warranty?

A. **No, I have no opinion**.[12]

(T. N.B. at p.183, lines 16-22;  p.184, lines 9-16; p.185, line 22-25, p.186, line 1-25, p. 187, lines

1-17, Aff. D.K., ¶5).

> **Q.    Nissan's "Expert," Ryan Schooley, Testified That The Defective BCM Could Have Resulted In The Electrical Problems That Ms. Scarlott Experienced In The Murano.**

Mr. Schooley testified that the defective BCM could have caused a draw on the batteries

that Clear Lake replaced under Nissan's basic warranty and Security+Plus® Vehicle Protection

Plan:

> Q. And if I understand your testimony correctly, a malfunctioning BCM can cause a draw on the battery?
>
> A. Correct.
>
> *    *       *

---

[12] Only after Mr. Barnes and his attorney took a "break" did he offer any opinion testimony whatsoever – at the request of his attorney – regarding whether certain repairs performed by Clear Lake should have, or should not have, been covered under Nissan's basic warranty.  (T. N.B. at p.190, lines 22-25; p.191, lines 14-15, Aff. D.K., ¶5) ("Mr. Barnes, you've been testifying for several hours today, and I just want to ask you a few questions to clarify or correct some of your testimony. . . . During a break did we find out that your answers weren't exactly correct?").  Mr. Barnes proceeded to "clarify" his testimony by noting that his answers were merely his "interpretation of the dealer documents as best [he could] do."  (T. N.B. at p.193, lines 4-7, Aff. D.K., ¶5).  Continuing, Mr. Barnes then testified – again in response to his attorney's questions – that he was "comfortable" that he "now" knew the cause of electrical problems that Ms. Scarlott experienced in the Murano, and that the according repairs should not have been covered under warranty.  Mr. Barnes opined in such a manner despite his admission that he has "no personal firsthand experience with respect to the issues . . . . other than just reading [the repair orders]."  (T. N.B. at p.202, lines 22-25, Aff. D.K., ¶5).

22

Q. Mr. Schooley, you're aware that the BCM unit was replaced in Ms. Scarlott's Murano, correct?

A. Yes.

Q. Do you know why the BCM unit was replaced?

A. Mr. Gore had stated that he got a tip from one of the DTSs that they were having a problem on a GTR, and it was known on the Murano from time to time that a BCM not falling asleep could cause a battery drain issue.

(T. R.S. at p.54, lines 2-5; p.96, lines 25-25; p.98, lines 1-8, Aff. D.K., ¶23).

> **R.** **Mr. Schooley Testified That That Basis Of His Contradictory Opinion – That The Cause Of The Electrical Problems That Ms. Scarlott Experienced In The Murano Was An Aftermarket Homelink System – Rests Solely Upon His Purported Observation That After Hurricane Installed A Diode On The Aftermarket Homelink System, Ms. Scarlott Did Not Experience Further Electrical Problems In The Murano.**

Mr. Schooley testified that the electrical problems that Ms. Scarlott experienced with the Murano were caused by an "aftermarket Homelink system." (Document 34 at 7). Mr. Schooley bases his opinion entirely on his purported observation that after Hurricane installed a diode on the aftermarket Homelink system, Ms. Scarlott did not experience further electrical problems in the Murano. (Deposition Transcript of Ryan Schooley ("T. R.S.") at p.19, lines 4-7 Aff. D.K., ¶23). ("Finally -- with a final root cause that the mirror was causing the electrical drain on the battery, sent it back to Hurricane Auto, had the diode installed"); (T. R.S. at p.19, lines 8-10, Aff. D.K., ¶23) ("Ever since, going on 15, 16 months now, the vehicle has not had a problem since the diode was installed"); (T. R.S. at p.54, lines 16-18, Aff. D.K., ¶23) ("And then when ultimately the diode was installed with the mirror, then the current drain went away and the vehicle has not been back since"); (T. R.S. at p.106, lines 3-5, Aff. D.K., ¶23) ("It has not been back to the dealership for another faulty battery or starting problem since the diode was installed"); (T. R.S. at p.122, lines 12-14, Aff. D.K., ¶23) ("All evidence shows that after that diode was installed, there has not been another report of a battery failure"); (T. R.S. at p.122,

lines 21-23, Aff. D.K., ¶23) ("After he sent the vehicle back to Hurricane and installed the diode, that fixed the problem").

In fact, Mr. Schooley agreed:

> Q. It seems like to me that your report says because the diode was installed and allegedly no more problems; therefore, whatever diode was installed, the cure was the problem; is that correct?
>
> A. Correct.

(T. R.S. at p.54, lines 22-25; p.55, lines 1-2, Aff. D.K., ¶23).

Important, Mr. Schooley made clear that his opinion – "that based on a reasonable degree of engineering certainty that the battery replacements were caused by an intermittent drain on the battery due to the improper installation of the aftermarket HomeLink mirror" (Document 34 at 11) – would change if no diode was installed.

> Q. If no diode was installed, would that change your opinion of the problem in this case?
>
> A. I'm sorry?  Can you rephrase that?
>
> Q. If, in fact, no diode was installed in the mirror, but a diode was installed somewhere else, would that change your opinion in this case?
>
> A. If the current draw went away, then yes, but there's no evidence to show that.

(T. R.S. at p.92, lines 2-9, Aff. D.K., ¶23).

Accordingly, Mr. Schooley averred that "besides the simple fact that it appeared to fix the problem when they replaced the diode," he does not have "any reasons or bases" to support his belief that "the mirror was the cause of the problem":

> Q. So were there any other reasons that you had -- besides the simple fact that it appeared to fix the problem when they replaced the diode, do you have any reasons or bases other than that for your belief the mirror was the cause of the problem?
>
> A. I have nothing else that shows that anything else would be causing any electrical problems.

Q. So for instance, your understanding of how the diodes functioned, did that factor into your decision?

A. Very much so.  It only allows -- yes, you're correct.

(T. R.S. at p.145, lines 12-25, Aff. D.K., ¶23).

**S.**     **Srinivasa "Sam" Gogineni – Owner Of Hurricane – Testified That Hurricane Never Installed A Diode On The Homelink System, Nor Was The Homelink System The Cause Of The Electrical Problems That Ms. Scarlott Experienced In The Murano.**

Hurricane never installed a diode on the Homelink system:

Q. [By Counsel for Nissan] And did you put a diode in that mirror so that it would stop draining the battery?

A. No.

Q. You didn't put a diode in that battery?

A. No.

\*     \*        \*

Q. Did you install a diode in that vehicle?

A. No.

\*     \*        \*

A. No, I didn't install a diode, I already told you that.

\*     \*        \*

A. Yeah, I can tell for myself that there is no diode in the mirror.

(Deposition Transcript of Srinivasa Gogineni ("T. SG.") at p. 79, lines 8-12; p.96, lines 20-21; p.97, lines 14-21; p.98, lines 10-11, Aff. D.K. ¶34).

What's more, Mr. Gogineni testified that the Homelink mirror was correctly installed:

Q. Do you think that the mirror was installed correctly?

A. Yes.

(T. SG. at p. 93, lines 10-11, Aff. D.K. ¶34).

Moreover, Mr. Gogineni testified that "the mirror doesn't have anything to do with any other issues." (T. SG. at p. 100, lines 10-11, Aff. D.K. ¶34).

> **T.  Nissan Acknowledges – Via Issuance Of Technical Service Bulletins – The Existence Defects In Materials Or Workmanship Of Parts And Components Supplied By Nissan.**

In November of 2004 Nissan issued a Technical Service Bulletin ("TSB")[13] titled: "ENGINE WILL NOT START NVIS / NATS SYSTEM DESCRIPTION / KEY REGISTRATION." (November 11, 2004 Technical Service Bulletin, Aff. D.K., ¶24).

> **U.  Among Other Conflicting Contentions, Nissan Suggests That Clear Lake's "Negligent Workmanship" Was The Cause Of The Defects That Ms. Scarlott Experienced In The Murano.**

Nissan suggests that Clear Lake's "negligent workmanship" was the cause of the defects that Ms. Scarlott experienced in the Murano. (March 2, 2010 Correspondence from Jeffrey S. Patterson, Aff. D.K., ¶30) ("Since your cause of action seems to be against the dealer for negligent workmanship . . . . NNA has no responsibility for the workmanship of its dealer . . . .").

## III.  SUMMARY JUDGMENT STANDARD.

Summary judgment is proper where the pleadings and materials demonstrate "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986). The court must review the record as a whole and draw all reasonable inferences in favor of the non-moving party. *Hernandez v. Spacelabs Med. Inc.*, 343 F. 3d 1107, 1112 (9th Cir. 2003).

---

[13] Mr. Barnes confirmed that TSBs are authored by Nissan to address known issues or problems, and to provide dealerships with a procedure to fix, correct, or repair those known issue or problems. (T. N.B. at p.167, lines 7-12. Aff. D.K., ¶5).

**IV.    NISSAN BREACHED ITS EXPRESS WRITTEN WARRANTY.**

"The MMWA creates a statutory cause of action for consumers 'damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation [imposed by the Act] or [established by] a written warranty, implied warranty, or service contract.'"  *Walton v. Rose Mobile Homes LLC*, 298 F. 3d 470, 474 (5th Cir. 2002); *see also Owens v. Mercedes-Benz USA, LLC*, 541 F. Supp. 2d 869, 874-75 (N.D. Tex. 2008) (quoting *Milicevic v. Fletcher Jones Imports, Ltd.,* 402 F.3d 912, 918 (9th Cir. 2005) ("T]he Magnuson-Moss Warranty Act creates a private cause of action for a warrantor's failure to comply with the terms of a written warranty . . . . [W]hether the written warranty is full or limited makes no difference.").

The MMWA was enacted to provide consumers with a remedy against warrantors who failed to live up to obligations set forth in their respective warranties.  Against the backdrop of already existing state law, the MMWA was drafted to remedy a Federal Trade Commission finding that there not only existed a spreading plague of warrantors refusing to live up to their written promises on the goods they sold, but that "[t]he consumer does not have a readily available or practical means of compelling the manufacturer or the retailer from whom he purchased the appliance or the servicing agency responsible for its maintenance to perform their respective warranty obligations."  H.R. Rep. No. 93-1107, at 24, 26-27 (1974), reprinted in 1974 USCCAN 7705, 7707, and 7709-10.  Accordingly, Congress deemed existing state law remedies insufficient and created a separate federally mandated cause of action to end the very type of warranty abuses at issue in this matter.[14]

In order to prove that a manufacturer breached its written limited warranty under the MMWA, a consumer must show: "(1) the existence of a defect in the automobile covered by the warranty; (2) compliance with the terms of the warranty by plaintiff; (3) [that] plaintiff afforded defendant a reasonable opportunity to repair the defect; and (4) [that] defendant was unable to

---

[14] Contrary to Nissan's apparent understanding, Plaintiff did not file her claim for beach of warranty under pre-MMWA Texas state law, but rather under the MMWA.

repair the defect after a reasonable time or a reasonable number of attempts." *Pearson v. DaimlerChrysler Corp.*, 349 Ill. App. 3d 688, 697 (Ill. App. Dist. 1, 2004).

> ### A.   Ms. Scarlott Has Demonstrated The Existence Of Defects In The Murano Covered By Nissan's Written Limited Warranty.

"In a car warranty case, the consumer must offer credible evidence that the defect is materials or workmanship related.  Such evidence establishes a prima facie case of breach of an express warranty." *Universal Motors, Inc. v. Waldock*, 719 P. 2d 254, 259 (Alaska. 1986).  Once the consumer offers credible evidence that the defect is materials or workmanship related, the burden shifts to the warrantor to prove otherwise. *Id.*  "[A] requirement that the consumer prove that the defect is caused by materials or workmanship makes the burden of proof language in the Magnuson-Moss Act basically irrelevant." *Id.*

Nissan, through its motion for summary judgment, does not contest that the defective "REAR WIPER ARM," the defective "DOME FUSE," the defective "BCM," the defective "REMOTE[S] and [KEYS], the five (5) defective "BATTERY[S]," and the defective "MASS AIRFLOW SENSOR" – all of which Clear Lake made repairs to under Nissan's basic warranty – were materials, parts, and components supplied by Nissan.  Rather, Nissan simply argues that the "problems" that Ms. Scarlott experienced in the Murano were "caused by an aftermarket part."  Notwithstanding that the record evidence does not support Nissan's theory as to the cause of the "problems" that Ms. Scarlott experienced with the Murano, Nissan's argument lacks materiality.[15]

---

[15] Notably, despite that Ms. Scarlott has done so, she need **not** demonstrate the existence of  defects in materials or workmanship of all parts and components supplied by Nissan, but rather **defects in materials or workmanship of all parts and components of each new vehicle supplied by Nissan** . . . ."  (Document 63-8 at 13 of 55).  Suggestions identical to Nissan's implicit arguments otherwise have been repudiated by the only United States Circuit Court  of appeals to weigh in on the issue:

> For reasons that we cannot fathom, the parties have stipulated that the warranty is limited to the materials and workmanship *of parts* supplied by Freightliner rather than of the vehicle as a whole, although no such limitation appears in the warranty itself.  Even if such a limitation had appeared there, the warranty would not necessarily be so narrow as Freightliner's lawyer argues.  He argues that all that is warranted by a parts warranty is each part taken by itself; if they don't work together, tough luck.  We can imagine a case

Nonetheless, Nissan impliedly conceded the existence of defects in materials or workmanship of parts and components warranted by Nissan, by attempting to repair those defects under warranty.  In particular, that defects existed in materials or workmanship of parts and components supplied by Nissan is evidenced by Nissan's affirmative decision to cover repairs to correct those defects under its written warranty – which covers only repairs needed to correct defects in materials or workmanship – as well as its Security+Plus® Vehicle Protection Plan – which covers repairs needed due solely to defects in Nissan materials or faulty workmanship for which Nissan is responsible, and not repairs to due to negligence.

Furthermore, Stephen V. Weaver Jr., an ASE certified master technician, confirmed the existence of defects in materials or workmanship of parts and components supplied by Nissan.

1.    **Nissan Does Not Contest That There Existed In The Murano Defects In Materials Or Workmanship Of Parts And Components Supplied By Nissan.**

Nissan concedes the existence defects in materials or workmanship of parts and components that it supplied.  (*See* Document 63-3).  Through its amended motion for summary judgment, Nissan admits that Clear Lake performed repairs to correct defects in the Murano's electrical system, including but not limited to a defective "REAR WIPER ARM," a defective "DOME FUSE," a defective "BCM," defective "REMOTE[S] and defective [KEYS], as well as five (5) defective "BATTERY[S]," and that that Clear Lake performed repairs to correct defects in the Murano's engine system, including but not limited to a defective "MASS AIRFLOW SENSOR." (*See* Document 63-3).  Nissan does not contest that the defective "REAR WIPER

---

in which though every component of the power train was nondefective viewed in isolation, the power train as a whole did not work: delivered zero horsepower to the wheels, so that when the driver turned on the ignition, shifted into drive, released the brakes, and depressed the accelerator, the truck did not move a millimeter.  It would be curious if the buyer had no remedy in such a case, if not under the lemon law then under ordinary principles of sales law.  We need not pursue the issue.  **The warranty was of the whole product, not just of individual parts, and when the product turns out to be a lemon the buyer can recover under the express warranty of materials and workmanship even if the remedy under the warranty is limited to repair or replacement of individual parts and no parts are found to be defective**.

*Bushendorf v. Freightliner Corp*., 13 F. 3d 1024, 1027 (7th Cir. 1993) (italics in original) (bold added).

ARM," the defective "DOME FUSE," the defective "BCM," the defective "REMOTE[S] and [KEYS], the five (5) defective "BATTERY[S]," and the defective "MASS AIRFLOW SENSOR," were all materials, parts, and components supplied by Nissan.

> ### 2.   Nissan Impliedly Conceded The Existence Of Defects In Materials Or Workmanship Of Parts And Components Warranted By Nissan, By Attempting To Repair Those Defects Under Warranty.

It is well established that the defective condition of an automobile, for purposes of establishing a breach of warranty, can be shown by circumstantial evidence.  *See Franks v. National Dairy Products Corp.*, 414 F.2d 682, 686-687 (5th Cir. 1969) (compiling cases establishing that "a defect can be inferred from unexplained occurrences"); *Holcumb v. Cessna Aircraft Co.*, 439 F. 2d 1150, 155 (5th Cir. 1971) (existence of a defect can be shown by circumstantial evidence); *Alvarez v. American Isuzu Motors*, 321 Ill. App. 3d 696, 703 (Ct. App. Ill. 2001) (defect may be proven inferentially by direct or circumstantial evidence); *Severn v. Sperry Corporation*, 538 N.W. 2d 50, 54 (Ct. App. Mich. 1995) (in actions for breach of warranty, jury may infer existence of defective condition from circumstantial evidence alone); *Firestone Tire & Rubber Co.  v. King,* 145 G.A. App. 840 (Ct. App. Ga 1978) (existence of a manufacturing defect may be inferred from circumstantial evidence).   Significant, "[t]he evidence need not negate all other possible causes."  *Porter v. American Optical Corp.,* 641 F. 2d at 1142; *see also Weber v. Fidelity & Cas. Inc. Co. of New York*, 250 So. 2d 754, 757 (La. 1971) (circumstantial evidence need not negate all other possible causes).

As recognized by the United States Court of Appeals for the Ninth Circuit, a manufacturer impliedly admits to the existence of defects in a subject vehicle by making repairs to such defects under warranty.  *Milicevic v. Fletcher Jones Imports, Ltd. and Mercedes Benz USA*, 402 F. 3d 912 (9th Cir. 2005).  In particular, the Ninth Circuit held that "[b]y attempting to repair the rear window seal and the brakes under warranty [which covered only defects in

materials or workmanship], Mercedes admitted the defective nature of these conditions." *Id*. at 919.

Nissan, via its authorized repair center[16] – Clear Lake – made repairs to correct defects in the Murano's electrical and engine systems, including but not limited to a defective "REAR WIPER ARM," a defective "DOME FUSE," a defective "BCM," defective "REMOTE[S] and defective [KEYS], five (5) defective "BATTERY[S]," and a defective "MASS AIRFLOW SENSOR" – all under its written warranty. Nissan's Manufacturer's Warranty Information Booklet explains:

> **This warranty covers any repairs needed to correct defects in materials or workmanship** of all parts and components of each new Nissan vehicle supplied by Nissan except for the exclusions listed under the caption "WHAT IS NOT COVERED" or as indicated below.

(Manufacturer's Warranty Information Booklet at 4, Aff. D.K., ¶3) (emphasis added).

Noteworthy, Nissan may deny a dealership's request for reimbursement for a warranty repair.  (T. N.B. at p.37, lines 17-21, Aff. D.K., ¶5).  However, Nissan never refused to reimburse Clear Lake for repairs performed on Ms. Scarlott's vehicle.  (T. B.G. at p. 24, lines 7-16, Aff. D.K., ¶6).  What's more, despite the existence of specific procedures that Nissan could have utilized to request the return of funds improperly or "accidentally" paid to Clear Lake in connection with warranty repairs, it never made any such request to Clear Lake.  (T. N.B. at p.39, lines 18-24; p.124, lines 23-25; p.125, lines 1-2; p.126, lines 18-23, Aff. D.K., ¶5).

Nissan additionally made repairs to correct defects in the Murano's electrical system, including but not limited to a defective "BCM," under its Security+Plus® Vehicle Protection Plan. The Nissan Security+Plus® Vehicle Protection Plan reads, in part:

> In return for your payment, Nissan Extended Services North America, GP will arrange for a Nissan Dealer to repair or replace all covered parts of your vehicle (see Section "This Service Agreement Covers" below) when

---

[16] To obtain service under its basic warranty, Nissan requires that a consumer take his or her vehicle to an authorized Nissan dealer in the United States or Canada during regular business hours at your expense . . . ."  (Manufacturer's Warranty Information Booklet at 5, Aff. D.K., ¶3).

such a repair or replacement is due to a "MECHANICAL BREAKDOWN", as defined below, and when all other terms and conditions of this Agreement are met.  The deductible which you must pay is listed in the Vehicle/Agreement Information section of this Agreement.

**MECHANICAL BREAKDOWN means the inability of a covered part(s) to perform the function(s) for which it was designed, due solely to defects in Nissan materials or faulty workmanship for which Nissan is responsible.  MECHANICAL BREAKDOWN does not include damage due to negligence, damage caused by an accident, or the gradual reduction in operating performance due to wear and tear**.  In addition, this Agreement does not provide any benefit for any mechanical failure or breakdown caused by a non-covered part.

(Nissan Security+Plus® Vehicle Protection Plan Agreement at 46, Aff. D.K., ¶4) (emphasis added).

Thus, where Nissan's written warranty covers **only repairs needed to correct defects in materials or workmanship,** and where Nissan's Security+Plus® Vehicle Protection Plan covers repairs **due solely to defects in Nissan materials or faulty workmanship for which Nissan is responsible, and not repairs to due to negligence**, any suggestion asserted by Nissan that Ms. Scarlott has not demonstrated the existence of defects in the Murano covered by Nissan's written limited warranty is belied by Nissan's own actions.  That defects existed in materials or workmanship of parts and components supplied by Nissan is evidenced by Nissan's affirmative decision to cover repairs to correct those defects under its written warranty, as well as its Security+Plus® Vehicle Protection Plan.

### 3.    Stephen V. Weaver Jr., An ASE Certified Master Technician, Confirmed The Existence Of Defects In Materials Or Workmanship Of Parts And Components Supplied By Nissan.

Following inspection of the Murano, Stephen V. Weaver Jr., an ASE certified master automobile technician, concluded in part: "The vehicle had multiple defects since purchase, and the dealer has needed multiple attempts to repair said defects.  The manufacturer recognized these defects by issuing bulletins relative to each."  (Report of Stephen V. Weaver Jr., Aff. D.K., ¶20).

Upon examination by Nissan's counsel, Mr. Weaver stated that the Murano "had defects from the factory and they should have been covered by warranty." (T. S.W. at p. 7, lines 7-8, Aff. D.K., ¶21). Similarly, Mr. Weaver testified:

> Q. Under No. 2 [it] says your opinion with the defect is that the vehicle was defective at the time of sale, and is that your opinion?
>
> A Yes, it is.

(T. S.W. at p. 110, lines 5-8, Aff. D.K., ¶21).

Mr. Weaver further noted that the defects that Ms. Scarlott experienced in the Murano existed at the time of sale – the date on which Ms. Scarlott purchased the Murano. (T. S.W. at p. 9, lines 7-9, Aff. D.K., ¶21.).[17]

**4.      Notwithstanding That Nissan Does Not Contest The Existence Of Defects In Materials Or Workmanship Of Parts And Components Supplied By Nissan, Its Newly-Asserted Contention – That The Electrical "Problems" That Ms. Scarlott Experienced In The Murano Were Caused By An "Aftermarket Part" – Is Contradicted By Record Evidence.**

Unable to contest the existence of defects in materials or workmanship of parts and components supplied by Nissan, discussed *supra* at Sections IV.A.1-2, Nissan attempts to draw attention away from the same by suggesting that "an aftermarket, non-Nissan accessory component caused the electrical problems" that Ms. Scarlott experienced in the Murano. (Document 63-1 at 6-11 of 52). Despite that the purported cause of a "problem" cannot serve to cure Nissan's inability to contest the existence of defects in materials or workmanship of parts and components of the Murano – the operative standard in this matter – its suggestion is nonetheless belied by (1) testimony of its own "expert," (2) testimony of its own designated corporate representative, and (3) testimony of Hurricane's designated corporate representative.

---

[17] Mr. Weaver's testimony regarding defects that manifested in the Murano does not involve new scientific principles or methods, and need not meet the stringent requirements of general acceptance. Rather, Mr. Weaver's testimony is developed from inductive reasoning and based upon his professional inspection of the Murano, his experience as developed through years of automotive work and training, his acquired knowledge, as well as his own research.

       **i.**      **The Testimony Of Nissan's Expert Demonstrates That It Is A Mathematical Impossibility That The Homelink Mirror Was The Sole Cause Of The Electrical Defects That Ms. Scarlott Experienced In The Murano.**

Mr. Schooley testified that a draw of 500 milliamps would be required over the course of one week to drain a battery installed on the Murano. (T. R.S. at p.93, lines 7-25; p. 94, lines 1-10, Aff. D.K., ¶23). Mr. Schooley testified that he did not know what "level of draw" Clear Lake found in the Murano. (T. R.S. at p.94, lines 11-17, Aff. D.K., ¶23). Mr. Schooley additionally testified that although he could have, he did not perform a simple calculation that would allow him to determine whether "it was only this mirror, if the mirror was (inaudible), or if it was something else" that caused the electrical problems that Ms. Scarlott experienced in the Murano. (T. R.S. at p.95, line 25; p.96 lines 1-15, Aff. D.K., ¶23).

Significant, specifications regarding the Homelink mirror – a "GEN-K51 model manufactured by Mito Corporation" (Document 63-1 at 2) – show that the Homelink mirror would require more than a full week to drain a battery, per Ms. Schooley's testimony. (Specification for Homelink Mirror, Aff. D.K. ¶35). Quite noteworthy, on at least one occasion a new battery installed on the Murano was drained completely just three days after being replaced/installed. (January 28, 2009 Correspondence to Clear Lake, Aff. D.K. ¶36). Thus, according to Mr. Schooley, it is a mathematical impossibility that the Homelink mirror was the cause of the electrical defects that Ms. Scarlott experienced in the Murano.

       **ii.**     **Nissan's Expert Testified That That Defective BCM Could Have Resulted In The Electrical Problems That Ms. Scarlott Experienced In The Murano.**

Mr. Schooley testified that the defective BCM could have caused a draw on the batteries that Clear Lake replaced under Nissan's basic warranty and Security+Plus® Vehicle Protection Plan:

        Q. And if I understand your testimony correctly, a malfunctioning BCM can cause a draw on the battery?

A. Correct.

*   *      *

Q. Mr. Schooley, you're aware that the BCM unit was replaced in Ms. Scarlott's Murano, correct?

A. Yes.

Q. Do you know why the BCM unit was replaced?

A. Mr. Gore had stated that he got a tip from one of the DTSs that they were having a problem on a GTR, and it was known on the Murano from time to time that a BCM not falling asleep could cause a battery drain issue.

(T. R.S. at p.54, lines 2-5; p.96, lines 24-25; p.97, lines 1-8, Aff. D.K., ¶23).

> ### iii.   Nissan's Dealer Technical Specialist, And Designated Corporate Representative, Testified That The Factory Installed Body Control Module Could Likely Be A Cause Of The Parasitic Drain Found In The Murano.

Mr. Barnes – whose testimony "binds [Nissan] to the explanation given," *U.S. ex rel Fago M&T Mort. Corp.*, 235 F.R.D. 11, 24 (D. D.C. 2006)[18] – concedes that the factory installed body control module could likely be a cause of the parasitic drain found in the Murano:

Q. And just below that we see an indication that a BCM [is] not falling asleep. Do you know what a BCM is?

A. Yes.

Q. What is it?

A. Body control module.

Q. What does the body control module do in this particular car?

A. It has a lot of components that it controls, turn signals, dome light, other lights in the car.

Q. Is the BCM a factory installed component?

A. Yes.

---

[18] "[T]he testimony of a Rule 30(b)(6) deponent binds the corporation to the explanation given. *U.S. ex rel Fago M&T Mort. Corp.*, 235 F.R.D. at 24.

Q.  What does not falling asleep mean?  Do you know what not fall asleep means?

A.   No for sure, I think they're probably saying it did not power down.

*     *        *

Q.  If the BCM did not fall asleep, meaning as you and I take it power down, would that also cause a drain on the battery?

A.  If the BCM was not powering down, if its still powered up like it would be with the ignition switch turned on, yes, it could.

(T. N.B. at p.162, lines 9-21, p.163, lines 8-13, Aff. D.K., ¶5).[19]

> ### iv.   Nissan's Dealer Technical Specialist, And Designated Corporate Representative, Affirmed That Nissan Is Unable To Establish The Cause Of The Electrical Problems That Ms. Scarlott Experienced In The Murano.

Mr. Barnes admits that Nissan cannot confirm the cause of the parasitic drain found in the Murano:

Q.  Do you have any reason to believe that the installation of this Homelink mirror was or was not the cause of this 23 milliamp drain?

A.  It is very hard to know with this small amount of information provided what those devices are that collectively may be causing a drain without knowing what all they checked.  So could the – could the mirror have caused it, yes.

Q.  Your point being it's very difficult to make any determination as to what caused this drain because there could be any number of reasons for this drain?

A.  There's not enough information here to tell me what all – the only thing I can say is this is a small amount of drain, 23 milliamps.

*     *        *

---

[19] Indeed, on February 15, 2011, counsel for Nissan acknowledged in writing:

> In September 2009, Ms. Scarlott returned to Clear Lake with a dead battery.  **Clear Lake Nissan had learned that in some model years vehicles, the body control module was not "falling asleep" and thus may be draining the vehicle's battery**.  The BCM was replaced.  The battery ultimately needed replacement two weeks later.

(Document 63-9 at 3 of 8) (emphasis added).

Q.  Just as it would be possible, possible for the mirror to cause that drain, it's also possible that something like a sunroof, an electrical sunroof, could cause that drain?

A.  Anything that's wired to the electrical system.

(T. N.B. at p.160, lines 8-21, p.161, lines 10-15, Aff. D.K., ¶5).

> **v.    Nissan's Dealer Technical Specialist, And Designated Corporate Representative, Previously Refuted Nissan's Now Asserted Statement That "NNA's Express, Limited New Vehicle Warranty Does Not Cover The Murano's Electrical Problems."**

Mr. Barnes explained that Nissan has no opinion as to whether the repairs performed by Clear Lake, to correct defects in the Murano's electrical and engine systems, should have been, or should not have been, covered under Nissan's basic warranty.  (T. N.B. at p.183, lines 16-22; p.184, lines 9-16; p.185, line 22-25, p.186, line 1-25, p. 187, lines 1-17, Aff. D.K., ¶5) (discussed *supra* at Section. II.N).

> **vi.   The Only "Evidence" Presented By Nissan Purporting To Establish The Cause Of The Electrical Problems That Ms. Scarlott Experienced In The Murano Is Explicitly Refuted By Testimony Of Hurricane's Owner.**

Mr. Schooley testified – contrary to his concurrent statements that the defective BCM could have caused a draw on the batteries that Clear Lake replaced under Nissan's basic warranty and Security+Plus® Vehicle Protection Plan –  that the cause of the electrical problems that Ms. Scarlott experienced with the Murano were caused by an "aftermarket Homelink system."  (Document 34 at 7).  Mr. Schooley bases his opinion entirely on his purported observation that after Hurricane installed a diode on the aftermarket Homelink system, Ms. Scarlott did not experience further electrical problems in the Murano.  (T. R.S. at p.19, lines 4-7, Aff. D.K., ¶34) ("Finally -- with a final root cause that the mirror was causing the electrical drain on the battery, sent it back to Hurricane Auto, had the diode installed"); (T. R.S. at p.19, lines 8-10, Aff. D.K., ¶34) ("Ever since, going on 15, 16 months now, the vehicle has not had a problem since the diode was installed"); (T. R.S. at p.54, lines 16-18, Aff. D.K., ¶34) ("And then when

ultimately the diode was installed with the mirror, then the current drain went away and the vehicle has not been back since"); (T. R.S. at p.106, lines 3-5, Aff. D.K., ¶34) ("It has not been back to the dealership for another faulty battery or starting problem since the diode was installed"); (T. R.S. at p.122, lines 12-14, Aff. D.K., ¶34) ("All evidence shows that after that diode was installed, there has not been another report of a battery failure"); (T. R.S. at p.122, lines 21-23, Aff. D.K., ¶34) ("After he sent the vehicle back to Hurricane and installed the diode, that fixed the problem").

      In fact, Mr. Schooley agreed:

> Q. It seems like to me that your report says because the diode was installed and allegedly no more problems; therefore, whatever diode was installed, the cure was the problem; is that correct?
>
> A. Correct.

(T. R.S. at p.54, lines 22-25; p.55, lines 1-2, Aff. D.K., ¶34).

      Important, Mr. Schooley made clear that his opinion – "that based on a reasonable degree of engineering certainty that the battery replacements were caused by an intermittent drain on the battery due to the improper installation of the aftermarket HomeLink mirror" (Document 34 at 11) – would change if no diode was installed.

> Q. If no diode was installed, would that change your opinion of the problem in this case?
>
> A. I'm sorry?  Can you rephrase that?
>
> Q. If, in fact, no diode was installed in the mirror, but a diode was installed somewhere else, would that change your opinion in this case?
>
> A. If the current draw went away, then yes, but there's no evidence to show that.

(T. R.S. at p.92, lines 2-9, Aff. D.K., ¶34).

      Accordingly, Mr. Schooley averred that "besides the simple fact that it appeared to fix the problem when they replaced the diode," he does not have "any reasons or bases" to support his belief that "the mirror was the cause of the problem":

Q. So were there any other reasons that you had -- besides the simple fact that it appeared to fix the problem when they replaced the diode, do you have any reasons or bases other than that for your belief the mirror was the cause of the problem?

A. I have nothing else that shows that anything else would be causing any electrical problems.

Q. So for instance, your understanding of how the diodes functioned, did that factor into your decision?

A. Very much so.  It only allows -- yes, you're correct.

(T. R.S. at p.145, lines 12-25, Aff. D.K., ¶34).

Of the utmost significance to this matter, **Hurricane never installed a diode on the Homelink system**:

Q.  [By Counsel for Nissan] And did you put a diode in that mirror so that it would stop draining the battery?

A. No.

Q. You didn't put a diode in that battery?

A. No.

*     *       *

Q.  Did you install a diode I that vehicle?

A. No.

*     *       *

B.  No, I didn't install a diode, I already told you that.

*     *       *

B.  Yeah, I can tell for myself that there is no diode in the mirror.

(T. SG. at p. 79, lines 8-12; p.96, lines 20-21; p.97, lines 14-21; p.98, lines 10-11, Aff. D.K. ¶34).

What's more, Mr. Gogineni testified that the Homelink mirror was correctly installed:

Q.  Do you think that the mirror was installed correctly?

39

A. Yes.

(T. SG. at p. 93, lines 10-11, Aff. D.K. ¶34).

Moreover, Mr. Gogineni testified that the Homelink "the mirror doesn't have anything to do with any other issues.  (T. SG. at p. 100, lines 10-11, Aff. D.K. ¶34).

**B.      Ms. Scarlott Complied With All Terms Of Nissan's Written Warranty.**

Nissan does not contest that Ms. Scarlott complied with all of the terms of Nissan's written warranty.  Nonetheless, all record evidence establishes that Ms. Scarlott complied with all terms of Nissan's written warranty.

**1.      Clear Lake Concedes That Ms. Scarlott Did Not Cause The Defects That She Experienced In The Murano.**

Mr. Gore made clear that Ms. Scarlott did nothing to cause the defects that she experienced in the Murano:

Q. [By counsel for Nissan]. Do you blame Ms. Scarlott for any of this?

A. No.

Q. And Nissan doesn't either, right?

A. I'm empathetic to it, you know.

*      *      *

Q.  Now, that wasn't April Scarlott's fault, right?

A.  No, sir.

(T. B.G at p. 28, lines 7-10; p.35, lines 22-23, Affidavit of Denniz Kurz, ¶6).

Mr. Gore further testified:

Q. Is there any indication that Ms. Scarlott drove this vehicle so as to make it worse?

A. No, sir.  It's nothing that she did.

*      *      *

A. It was tough deal.  You take the good and the bad, and this just happened to be one of the ones that was hard to fix.

40

           \*      \*        \*

        A.  . . . I knew it was a problem, but we just couldn't find it.  You know, it wasn't – it wasn't rearing its ugly head.

(T. B.G. at p. 84, lines 14-16, p. 123, lines 24-25; p.154, line1, p.155, lines 4-6, Aff. D.K., ¶6).

        Mr. Gore continued:

        So here it is about the fourth time, and -- and at this point, Ms. Scarlott is very upset.  At this point she is. You know, she's coming in, "Bob, I'm done with this.  I'm tired of it," dah, dah, dah.  Rightly so.  I mean, if I had one that left me sitting on the road that many times, I'd be mad, too.

(T. B.G. at p. 141, lines 8-13, Affidavit of Denniz Kurz, ¶6).

### 2. Nissan Admits That Ms. Scarlott Neither Abused, Not Misused The Murano.

        Mr. Barnes testified that he is unaware of anything indicating that Ms. Scarlott abused or

misused her vehicle.

        Q. [D]id you see anything in the repair orders that we reviewed noting that Ms. Scarlott misused or abused her Murano in any way?

        A. There was not anything I could say – I could pin to abuse by Ms. Scarlott.

(T. N.B. at p.181, lines 12-18, Aff. D.K., ¶5).

### C. Ms. Scarlott Provided Nissan A Reasonable Opportunity To Cure Defects In Materials Or Workmanship Of Parts And Components Warranted By Nissan.

        15 U.S.C. §2310(e) provides in part:

        No action . . . may be brought under subsection (d) of this section for failure to comply with any obligation under any written warranty or implied warranty or service contract, … unless the person obligated under the warranty or service contract is afforded a reasonable opportunity to cure such failure to comply.

15 U.S.C. §2310(e).

### 1.   Ms. Scarlott Tendered The Murano To Nissan's Authorized Repair Facility On Repeated Occasion.

Plaintiff's only obligation under 15 U.S.C. §2310(e) is to allow the warrantor a reasonable opportunity to cure a failure to comply with the warranty.  A consumer's tender of a vehicle to a manufacturer's authorized dealer satisfies requirements imposed by 15 U.S.C. 2310(e).  *See Ventura v. Ford Motor Corporation,* 433 A.2d 801, 810 (N.J. 1981) ("Marino Auto was Ford's representative for the purpose of making repairs to plaintiff's vehicle under the warranty. . . .  The opportunities given to Marino Auto to repair the vehicle satisfied the requirements of 15 U.S.C. § 2310(e)."

In this case, to obtain service under Nissan's basic warranty "you must take the vehicle to an authorized Nissan dealer in the United States or Canada during regular business hours at your expense . . . ."  (Manufacturer's Warranty Information Booklet at 5, Aff. D.K., ¶3).  Nissan admits that it does not perform any work (repair, replacement, maintenance, or otherwise) on the vehicles that it warrants, but rather relies on its network of authorized dealerships and repair centers to do so.  (Nissan's Response to Plaintiff's Initial Request for Admission 12, Aff. D.K., ¶31) ("NNA admits it did not personally perform repairs, since it relies on technicians employed by its independently owned and operated dealers to do so.  NNA reimburses its dealers for repairs covered under warranty.").

As evidenced by no less than ten (10) individual repair orders, Ms. Scarlott tendered the Murano to Nissan's authorized dealership – Clear Lake – in effort to have defects in manufacturing parts and workmanship corrected on repeated occasion.  (Combined Repair Orders, Aff. D.K., ¶10-11, 13-19, 29).  Nissan was unable and/or failed to repair defects in manufacturing parts and workmanship that manifested in the Murano following a reasonable opportunity or a reasonable number of attempts to do so.  Discussed *infra.*

**2.     Ms. Scarlott Need Not Identify The Cause And Source Of The Defects That She Experienced In The Murano.**

A consumer need not correctly identify the cause and source of alleged defects.  *Larry J. Soldinger Assoc., Ltd. v. Aston Martin Lagonda of North Am., Inc.*, 1999 WL 756174, *6 (N.D. Ill. 1999); *see also Mason v Porsche Cars North America, Inc.*, 688 So. 2d 361, 367 (Fla. 5th DCA 1997) ("Identifying the particular component part is unnecessary.  In light of the technological complexity of most automobiles currently on the market, forcing consumers to identify the cause, rather than the effect, of a defect would be unrealistically burdensome to the very persons the Warranty Act was meant to aid.").

In *Soldinger Assoc., Ltd. v. Aston Martin Lagonda of North Am., Inc.*, the court looked to the committee comments to the MMWA in opining:

> The warranty requires the purchaser to report all defects.  The defect in the Volante was that the driver's door would not open.  Soldinger reported this to Lake Forest.  The court will not read the Act to require that the purchaser of a vehicle must correctly identify the cause and source of all automotive defects.  The average consumer should not be expected to acquire the expertise of an automotive mechanic in order to receive protection under a written warranty.

1999 WL 756174, *6 (citing H.R. REP. NO. 93-1107 (1974).

**D.     Ms. Scarlott Has Established That Nissan Was Unable And/Or Failed To Repair The Defects That She Experienced In The Murano After A Reasonable Time Or A Reasonable Number Of Attempts.**

The plain language of the MMWA, in addition to case law spanning the country, provides that a warrantor must effectuate repairs within a "reasonable" amount of time or within a "reasonable" number of attempts.  *See* 15 U.S.C. § 2310(e).  Nissan was unable and/or failed to repair defects in manufacturing parts and workmanship that manifested in the Murano following a reasonable opportunity or a reasonable number of attempts to do so.

1.   **Section 2310(e) Of The MMWA Dictates That A Warrantor Must Only Be Afforded A "Reasonable Opportunity" To Repair.**

The plain language of the MMWA makes it clear that a consumer is only required to give a warrantor a "reasonable" opportunity to cure.  15 U.S.C. § 2310(e); *see also Cunningham v. Fleetwood Homes of Georgia, Inc.*, 253 F. 3d 611, 618 (11th Cir. 2001) ("First, prior to bringing suit for breach of warranty, a consumer must give persons obligated under the warranty a reasonable opportunity to 'cure' the failure to comply with the obligations at issue."). Specifically, section 2310(e)[20] reads:

> No action (other than a class action or an action respecting a warranty to which subsection (a)(3) of this section applies) may be brought under subsection (d) of this section for failure to comply with any obligation under any written or implied warranty or service contract, and a class of consumers may not proceed in a class action under such subsection with respect to such a failure except to the extent the court determines necessary to establish the representative capacity of the named plaintiffs, unless the person obligated under the warranty or service contract is afforded a **reasonable opportunity to cure** such failure to comply.

15 U.S.C. § 2310(e) (emphasis added).

2.   **Courts Throughout The Nation Have Consistently Incorporated A Reasonableness Standard Into The MMWA.**

Courts throughout the nation hold that a reasonableness standard exists under the MMWA for "limited" warranty claims.  *See, e.g., Pearson v. DaimlerChrysler*, 349 Ill. App. 3d at 698  ("A manufacturer does not have an unlimited time or an unlimited number of attempts to repair an automobile; rather, the limited warranty is breached and/or fails of its essential purpose if successful repairs are not made within a reasonable time or within a reasonable number of attempts.");  *Jones v. Fleetwood Motor Homes*, 127 F. Supp. 2d 958, 963-64 (N.D. Ill. 2000) (describing the inquiry as focusing on "whether the number of attempts is unreasonable"); *Webco Industries, Inc. v. Thermatool Corp.*, 278 F. 3d 1120, 1131 (10th Cir. 2002) (explaining

---

[20] Although class actions are discussed in section 2310(e) the section is not limited to just class actions.  The title to section 2310(e) and the plain language of the section as incorporated herein make this clear.  The title to section 2310 (e) reads: "Class actions; conditions; procedures applicable."  Each of subjects listed in the title are separated by semi-colons and the title is not limited to simply class actions as Defendant may contend.

that under Michigan law pertaining to "repair or replace" warranties, seller is obligated to effect successful repairs "within a reasonable time"); *Orange Motors of Coral Gables v. Dade County Dairies*, 258 So. 2d 319, 321 (3rd DCA Fla. App. 1972) ("The buyer of an automobile is not bound to permit the seller to tinker with the article indefinitely in the hope that it may ultimately be made to comply with the warranty.

### 3. The MMWA's Incorporation Of The Uniform Commercial Code Also Imposes On Defendant A Duty To Repair Within A Reasonable Amount Of Time.

Pursuant to section 2-719(2) of the Uniform Commercial Code, Nissan's limited warranty has "a provision limiting the liability of the manufacturer or seller to repair or replacement of defective parts."[21]   Annot., *Construction and Effect of New Motor Vehicle Warranty Limiting Manufacturer's Liability to Repair or Replacement of Defective Parts*, 2 ALR 4th 576, 580 (1980).  The "sole obligation or liability of the warrantor under the warranty is the repair or replacement of defective parts."  *Id.*

As it is literally written, the standard new car warranty only requires the manufacturer to undertake to perform a repair or replacement of parts (without charge to the buyer) whenever it is called upon to do so as regards a defective condition in the vehicle associated with the materials in the product or the way it was put together.  The warranty, when construed literally, would not be breached if, for example, a buyer tendered for repair his car's defective engine to the warrantor a thousand times, provided that the warrantor attempted to repair the car's engine each time, and provided it did so without charging for the repair during the warranty period.

---

[21] The MMWA has long been held to incorporate state law remedies into causes of action under the Act.  *See MacKenzie v. Chrysler Corp.*, 607 F. 2d 1162, 1166 (5th Cir. 1979) ("[T]he legislative history clearly implies that a resort to state law is proper in determining the applicable measure of damages under the Act");  *and see* Am Jur 2d New Topic Service, Consumer Product Warranty Acts § 47 (1984) ("The applicable law for the determination of damages under the Magnuson-Moss Warranty Act can be found by reference to state law");  *Walsh v. Ford Motor Co.*, 807 F. 2d 1000, 1016 (D.C. Cir. 1986) ("state warranty law lies at the base of all warranty claims under Magnuson-Moss"), *cert. denied,* 482 U.S. 915 (1987); *Bartow v. Ford Motor Company*, 342 Ill. App. 3d 480 (Ill. App. 2003) ("[w]here the Act does not conflict with state law governing the sales of consumer products, state law-- the second tier--then governs").

It is important to remember that this was the way automobile manufacturers in America intended for the warranty to be understood.   It was a "limited" warranty, one permitted by Uniform Commercial Code § 2-719(1)(a), which states that a seller may limit the buyer's remedies to the "repair or replacement of non-conforming goods or parts."[22]   The history of the new car warranty has been one of judicial constructions that aim at making the warranty conform to the reasonable expectations of buyers.   *See generally* Goren, *Buyer's Right to Revoke Acceptance Against The Automobile Manufacturer For Breach of Its Continuing Warranty of Repair or Replacement*, 7 Ga. L. Rev. 711, 719 (1973) ("These courts have effectively construed the parts warranty as one of performance and have extinguished the limiting aspects originally intended by the warrantor.").

John Goren accurately summarized the judicial treatment of the limited automobile materials and workmanship warranty in stating:

> The new car warranty essentially provides that the manufacturer warrants the vehicle against defects in material and workmanship for a limited period of time and that the manufacturer at its own option will repair or replace any parts found to be defective.   The warranty includes disclaimer and limitation of remedies provisions which state that repair or replacement is expressly in lieu of all other warranties and shall be the sole and exclusive obligation of the warrantor. . . .
>
> **The manufacturer and dealer do not have an unlimited time to repair, and they may not continuously tinker with their product in an effort to remedy the defect**.   Most courts limit repair efforts to a reasonable period of time, and one court has even held that the express warranty creates an "implied warranty" for reasonably prompt and timely repair. Hence, in order to ensure escape from liability, the dealer must effect repairs which are both timely and permanent.

---

[22]   The warranty was originally drafted in the 1960's by the Automobile Manufacturers' Association and subsequently adopted, with minor variations, by all U.S. car makers.  For a discussion of the history of the origins of the standard automobile "repair or replace" warranty, see Goren, *Buyer's Right to Revoke Acceptance Against The Automobile Manufacturer For Breach of Its Continuing Warranty of Repair or Replacement*, 7 Ga. L. Rev. 711, 712 & n. 2 (1973).

Goren, *Buyer's Right to Revoke Acceptance Against The Automobile Manufacturer For Breach of Its Continuing Warranty of Repair or Replacement*, 7 Ga. L. Rev. 711, 714, 717-718 (1973) (footnotes omitted).

In a passage that explains the operation of Section 2-719(2) of the UCC in this context, the American Law Reports annotation reads:

> The typical motor vehicle warranty warrants the vehicle or its parts to be free from defects in materials or workmanship within specific time and mileage limits, and then further provides that the sole obligation or liability of the warrantor under the warranty is the repair or replacement of defective parts. . . .
>
> Section 2-719(2) of the Uniform Commercial Code provides that where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in the Code.  Because the purpose of an exclusive remedy of replacement or repair of defective parts is to give the seller an opportunity to make the goods conform while limiting the risk to which it is subject and is also to give the buyer goods that conform to the contract within a reasonable time after a defective part is discovered, the courts have held that the failure to repair or replace causes the limitation of remedy to fail of its essential purpose.  On the other hand, it has been held that when a manufacturer or seller of a motor vehicle does repair and replace defective parts, the manufacturer or seller has not broken its warranty nor has the limited remedy failed of its essential purpose.  **However, repair or replacement of defective parts must take place within a reasonable time after the warrantor has been given an opportunity to remedy the defect, or else the warranty will be held to have been broken.**

Annot., *Construction and Effect of New Motor Vehicle Warranty Limiting Manufacturer's Liability to Repair or Replacement of Defective Parts*, 2 ALR4th 576, 580-581 (1980) (emphasis supplied).

Therefore, not only does the plain language of the MMWA and case law incorporating the Act impose a duty of reasonableness on warrantors, but so too does the Uniform Commercial Code.  As this Court is directed by the MMWA to look to the Uniform Commercial Code to fill in any gaps in the Act, grounds additional to the plain language of the MMWA exist to impose a duty of reasonableness on Nissan.

**4.    It Cannot Be Said, As A Matter Of Law, That Nissan Repaired The Murano Within A Reasonable Time Or After A Reasonable Number Of Attempts.**

Even though the MMWA does not define "reasonable number of repair attempts," the committee comments to the Act indicate that the number of repair attempts that are reasonable under the circumstances is an issue of material fact to be decided by the trier of fact.  H.R. Rep. No. 93-1107 (1974); H.R. Rep. No. 93-1606 (1974).  Nonetheless, federal courts recognize that a "reasonable number of attempts" under the Warranty Act is at least two (2) and possibly three (3) attempts.  *Marchionna v. Ford Motor Company*, 1995 WL 476591, *11 (N.D. Ill. 1995).[23]

Additionally, the Committee Comments to the MMWA demonstrate that a "reasonable number of attempts" applies to defects in general, rather than to each individual defect that arises.  In other words, the "reasonable number of attempts" language of the MMWA refers to the product as a whole.  Such proper interpretation of the MMWA was expounded upon by the court in *Soldinger v. Aston Martin Lagonda of North America, Inc.*:

> The plural form of "attempts" indicates that a warrantor is entitled to make, at the very least, two repair attempts. . . . **The plural form of "defects or malfunctions in such product" appears to refer to the product as a whole**. . . . If the warrantor cannot provide the purchaser with a defect-free product after a reasonable number of repair attempts, the consumer may request a refund or replacement.

*Soldinger v. Aston Martin Lagonda of North America, Inc.,* 1999 WL 756174 at *4 (emphasis added); *see also* H.R. Rep. No. 93-1107 (1974); H.R. Rep. No. 93-1606 (1974).

As evidenced by no less than ten individual repair orders, Ms. Scarlott tendered the Murano to Nissan's authorized dealership – Clear Lake – in effort to have defects in manufacturing parts and workmanship corrected on repeated occasion.  (Combined Repair Orders, Aff. D.K., ¶10-11, 13-19, 29).  Nissan does not have an unlimited time to make effective

---

[23] A duty of reasonableness prevents a consumer from running to the courthouse the very first time a warrantor fails to repair.  If Nissan's sole obligation was to repair with Nissan not being afforded a reasonable opportunity or number of attempts to do so, then Nissan's warranty would be breached the first time it failed to repair.  It is inherently for this reason that Congress enacted section 2310(e) of the MMWA and why courts and commentators for decades have imposed a duty of reasonableness on a warrantor and consumer pertaining to the repair of automobiles.

repairs, and may not continuously tinker with the Murano in effort to remedy the defective condition. Rather, Nissan's failure or inability to repair defects in the Murano following a reasonable opportunity to cure demonstrates its breach. Nissan was unable and/or failed to repair defects in manufacturing parts and workmanship that manifested in the Murano following a reasonable opportunity or a reasonable number of attempts to do so. Notwithstanding, whether Nissan timely repaired the Murano remains, at the very least, an issue of fact for the trier.

## V.     NISSAN BREACHED ITS IMPLIED WARRANTY OF MERCHANTABILITY.

Section 2310(d)(1) of the MMWA provides: "[A] consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under . . . a written warranty, **implied warranty**, or service contract, may bring suit for damages and other legal and equitable relief." 15 U.S.C. § 2310(d)(1) (emphasis added).

Under the MMWA, an action for breach of implied warranty arises under state law in connection with the sale of a consumer product, by a supplier of a consumer product. 15 U.S.C. § 2301(7); *see also* 16 C.F.R. § 701.1(d). A supplier is defined as "any person engaged in the business of making a consumer product directly or **indirectly** available to consumers." 15 U.S.C. § 2301(4) (emphasis added). Nissan is a "supplier," as it manufactured, warranted, and injected the subject vehicle into the stream of commerce. Accordingly, Nissan impliedly warranted the subject vehicle to be merchantable.

To be merchantable, goods must be at least such as are fit for the ordinary purposes for which such goods are used. Tex. Bus. & Com. Code Ann. § 2.314(b)(3). To establish a breach of an implied warranty of merchantability, a plaintiff may show that the product has a defect[24]

---

[24] A plaintiff may use circumstantial evidence to prove that there is a defect in the goods. Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 444, n.5 (Tex. 1989). Also significant, there is a difference between a "defect" necessary to establish a breach of implies warranty o merchantability and a "defect" necessary to establish strict liability. *Id*. at 444. For breach of implied warranty, a "defect" means the good is unfit for its ordinary purposes for which its used, whereas for strict liability a "defect" means a condition of the product that renders it unreasonably dangerous. *Id*.

that renders it unfit for its ordinary purpose; that is, that the product lacks something necessary for it to be adequate.  *General Motors Corp. v. Garza*, 179 S.W.3d 76 (Tex. App. – San Antonio 2005) (citing *Gen. Motors Corp. v. Brewer,* 966 S.W. 2d 56, 57 (Tex. 1998); *Polaris Indus., Inc. v. McDonald,* 119 S.W. 3d 331, 336 (Tex. App.-Tyler 2003, no pet.)).  A good lacks something necessary for adequacy when it does not accomplish the purpose for which it was manufactured or when it is not constructed in a manner that allows it to accomplish its purpose safely.  *Hyundai Motor Co. v. Rodriguez*, 995 S.W. 2d 661, 665 (Tex. 1999).  A specific designation of goods by the buyer does not exclude the seller's obligation that they be fit for the general purposes appropriate to such goods.  Official U.C.C. Comment 3 to Tex. Bus. & Com. Code Ann. § 2.314.

Breach of an implied warranty of merchantability may occur whether the goods contain one big manufacturing defect such as a faulty transmission, or a multitude of smaller defects that, in sum, render the goods virtually unusable.  Barkley Clark and Christopher Smith, The Law of Product Warranties (Nov. 2008).  In either case, the manufacturing glitch separates the unit in question from other units of the same class, thus making the goods not fit for their ordinary purposes.  *Id*.

Shortly after taking possession of the Murano, Ms. Scarlott experienced numerous defects in the Murano.  In fact, Ms. Scarlott was stranded by the Murano on more than a dozen occasions, including, but not limited to supermarket parking lots, airports, and her own driveway. (T. A.S. at p. 247, lines 8-15; p. 248, lines 1-25; p.249, lines 1-17, Aff. D.K., ¶9).  As evidenced by no less than ten individual repair orders, Ms. Scarlott tendered the Murano to Nissan's authorized dealership – Clear Lake – in effort to have defects in manufacturing parts and workmanship corrected on repeated occasion.  In all, Ms. Scarlott was without use of the Murano for no less than fifty-three days.  At one point, the Murano remained at Clear Lake for twenty-eight consecutive days for repair.  (Combined Repair Orders, Aff. D.K., ¶10-11, 13-19, 29).

The ordinary purpose for which a $40,000 new vehicle is used is, at an absolute minimum, to get from point A to point B.  The Murano was not adequate to accomplish even such a minimal purpose.

Significant, pursuant to the plain language of MMWA, any attempted disclaimer of the implied warranty of merchantability is prohibited.  Specifically, 15 U.S.C. § 2308, under the heading "Implied Warranties," provides:

(a)     Restrictions on disclaimers or modifications

**No supplier may disclaim or modify** (except as provided in subsection (b) of this section) **any implied warranty to a consumer** with respect to such consumer product **if (1) such supplier makes any written warranty to the consumer with respect to such consumer product**, or (2) at the time of sale, or within 90 days thereafter, such supplier enters into a service contract with the consumer which applies to such consumer product.  15 U.S.C. § 2308 (a) (emphasis added).

(b)     Limitation on duration

For purposes of this chapter (other than section 2304(a)(2) of this title), implied warranties may be limited in duration to the duration of a written warranty of reasonable duration, if such limitation is conscionable and is set forth in clear and unmistakable language and prominently displayed on the face of the warranty.  15 U.S.C. § 2308 (b).

(c)     **Effectiveness of disclaimers, modifications, or limitations**

**A disclaimer, modification, or limitation made in violation of this section shall be ineffective for purposes of this chapter and State law.**

15 U.S.C. § 2308 (c) (emphasis added).

# VI.   MS. SCARLOTT NEED NOT HAVE PARTICIPATED IN NISSAN'S "INFORMAL DISPUTE RESOLUTION PROGRAM" PRIOR TO FILING HER CLAIMS AGAINST NISSAN UNDER THE MMWA.

The MMWA encourages warrantors to establish informal dispute settlement procedures whereby warranty disputes are "fairly and expeditiously settled." 15 U.S.C. §2310(a)(1). Although Congress intended informal dispute resolution ("IDR") mechanisms to be an efficient way of resolving warranty disputes without litigation, Congress did not intend to sacrifice fairness for speed.  Rather, to ensure the fairness of IDR mechanisms, Congress empowered the

Federal Trade Commission ("FTC") to promulgate certain "minimum requirements" a warrantor's IDR program must meet before that warrantor could require an aggrieved consumer to resort to IDR as a prerequisite to legal action. 15 U.S.C. §2310(a)(3)(2).  Regulations specific to IDR, which must be strictly followed, were designed to ensure that IDR programs "not only look good on paper, but function effectively and fairly in practice" and that a given IDR mechanism "is fair and effective [and] does not just represent another hurdle that the consumer is forced to surmount before being provided a meaningful avenue of redress."  Cong. Rec., S. 21976, 21977 (December 18, 1974). IDR regulations are to be strictly enforced.  *See Ford Motor Credit Company v Cenenace*, 101 S. Ct. 2239, 2241 (1981) (holding regulations promulgated by governmental bodies responsible for interpreting or administering statutes are entitled to "considerable respect").

### A.   This Court Is Empowered To Make A Determination As To Whether Nissan's IDR Program Complies With Applicable Regulations.

Although the FTC is empowered under the MMWA to review IDR programs for compliance, "[t]his provision is not intended to require the commission to review individual disputes but only to require them to oversee generally dispute settlement mechanisms."  S. Rep. 93-151 at 22 (1973).  In fact, "the courts would be free to determine that a given dispute settlement procedure need not be exhausted because it was not fair . . . or did not comply with the FTC rules" as the "limited resources of the [Federal Trade] Commission and the fact its other responsibilities may preclude it from acting in some cases where private dispute settlement procedures may not comply with the legislation or the Commission's rules thereunder."  1974 U.S.C.C.A.N. 7755, 7759.  *See* Cong. Rec., H. 12052, 12059 (December 16, 1974).  Courts are empowered to determine compliance even where the FTC "has not acted to disapprove" a given IDR program.

**B.      Nissan Has The Burden Of Proving That Its IDR Program Complies With Applicable Regulations.**

"Consumer laws and the FTC regulations promulgated to guide providers of alternative dispute resolution mechanisms are slanted toward the consumer: consumers must comply with only minimal requirements, while the warrantors must follow more elaborate and more burdensome rules." 16 C.F.R. § 703.2 . . . " *Harrison v Nissan Motor Corp. in U.S.A.*, 111 F.3d 343, 351 (3d Cir. 1997).   Not only must a warrantor comply with the 16 C.F.R. § 703 regulations, but a warrantor, as the creator of the process, must also prove compliance with deliberately crafted rules. 1974 U.S.C.C.A.N 7755, 7759 (stating "**[s]ince the supplier creating the procedure would have more knowledge about it than the plaintiff-consumer, the initial burden of showing that the procedure complies with this legislation and any FTC rules would be on the part seeking to require exhaustion of such procedure**") (emphasis added);. *See also* Senate Conference Report 93-1408 (same); Cong. Rec., H. 12052, 12059 (December 16, 1974 (same); Cong. Rec., S. 21976, 21977 (December 18, 1974) (same).

The reasoning underlying the intricate and "elaborate and burdensome rules" regarding IDR mechanisms is twofold.  First, warrantors fund IDR mechanisms, and as such, are likely to exert great influence on said mechanisms to ensure that the interests of the warrantors are met. *See Generally* Braucher, *An Informal Resolution Model of Consumer Product Warranty Law*, 1985 Wis. L. Rev. 1405.  Regulations are intended to prevent such pressure by ensuring the IDR mechanisms "are sufficiently insulated from the warrantor and the sponsor, so that the decisions of the members and the performance of the staff are not influenced by either the warrantor or the sponsor." 16 C.F.R. § 703.3.  Second, the complex rules are required to level the playing field in light of the inherent inequity in the knowledge of the participating parties (e.g., a consumer with no knowledge of the law participating in the process for the first time versus a trained professional on the warrantor's side whose sole responsibility is to represent the warrantor in

these proceedings).  The inherent inequity caused one member of the FTC to remark, when informal dispute resolution was nothing more than an "experiment" between General Motors and the Better Business Bureau:

> The comments from consumers and consumer groups across the country provide eloquent testimony that case-by-case arbitration, in place of automatic redress to injured consumers, is a bitterly unpopular as well as unfair feature of this settlement.  Consumer fury and frustration over the felt injustice of this burdensome remedy explodes from the letters.  The hundreds of consumer comments that we received, most of them spontaneous expressions of outrage from unorganized individuals, are to my knowledge unprecedented in Commission history.  Over 70% of them are opposed to the arbitration agreement, which they view as a repudiation of their right to automatic redress ... Moreover, many despair that they will ever recover their losses under this deal, since they feel individual arbitration with an adversary like GM could never be a fair fight.  One person, an attorney from Michigan experienced in dealing with GM, the consumer's chances this way: It will be like sending a team of Chinese, who have never seen or studied or played the game of football, into a contest with the Dallas Cowboys! Comments from consumer groups, such as the Center for Auto safety and Consumers Against GM, passionary [sic] criticized the arbitration settlement as unjust ... State attorneys general collectively voiced 'grave reservations' about the fairness and workability of the Better Business Bureau arbitration system under the agreement ... Only a handful of individuals and organizations—e.g., GM and the BBB themselves, the American Arbitration Association, and two Attorneys General—took exception to this overwhelming expression of public opposition by favoring the settlement . . . .

*In the Matter of General Motors Corporation*, 102 F.T.C. 1741 at page 1 (1983).[25]

### C.   Nissan Has Not Made Any Showing That Its IDR Program Complies With Applicable Regulations.

The MMWA requires compliance with the 16 C.F.R. § 703 regulations before a warrantor may require participation as a pre-requisite to filing suit.  15 U.S.C. § 2310(10)(3)(B); 16 C.F.R. § 703.2.  In the matter hand, Nissan has not made the slightest effort to demonstrate that its IDR program complies with federal regulations.   Nissan has failed to present **any** evidence in an attempt to demonstrate that its IDR program complies with 16 C.F.R. § 703.

---

[25] The Consent Order is neither an FTC opinion nor IDR arbitration.  Rather, it was an agreement between the FTC and General Motors to resolve one particular class action lawsuit.  *General Motors Corp. v Abrams*, 897 F .2d 34, 37 (N.Y. 1990).  The excerpted portion herein simply exemplifies the problems with IDR.

In fact, in response to Ms. Scarlott's initial discovery requests, Nissan remarked:

> 4. If you answered Interrogatory 16 "Yes" (that Defendant's informal dispute resolution program complies in all respects with 16 C.F.R §703 et. seq) provide all evidence you plan to offer to prove compliance with 16 C.F.R. §703, including by way of example, but not limited to, a copy of the face of the warranty as Defendant defines it (please provide this separately from the rest of the warranty); a copy of the results of the audit required by 16 C.F.R. §703.6 for each of the past five years; and, a copy of your agreement with your Informal Dispute Resolution provider (E.g., "BBB", "DSB," "NCDS", etc.).

> RESPONSE: NNA objects to this Request as worded.  NNA assumes Plaintiff is referring to Interrogatory 15,  NNA asserts its informal dispute resolution program does comply with the provisions of the Magnuson Moss Warranty Act.

> To the extent that this Request asks for more, NNA objects because its is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence.  **NNA also objects because this request impermissibly seeks to have NNA Marshal its evidence. Plaintiff has not alleged that she failed to undergo NNA's informal dispute resolution program because NNA's informal dispute resolution program did not meet federal regulations.  Therefore, NNA objects to this Request because it seeks irrelevant information.**[26]

(Nissan's Response to Plaintiff's Initial Request for Production 4, Aff. D.K. ¶32).

Indeed, in accord with FTC requirements, it is a factual impossibility that Nissan has made the necessary showing that its IDR mechanism complies with applicable FTC regulations.

### D.      Ms. Scarlott Need Not Participate In Nissan's IDR Program Where Nissan Has Not Demonstrated That It Complies With Applicable Regulations.

A consumer need not participate in an IDR program that does not comply with FTC regulations, and instead may go directly to the court and challenge compliance.  Cong. Rec., S. 21976, 21977 (December 18, 1974) (stating "[c]ourt review would occur would occur when a consumer . . . . goes directly to court under section 110 and alleges unfairness").  Nissan knows

---

[26] A "plaintiff is not required to negate an affirmative defense in his complaint." *Tregenza v. Great Am. Commc'ns Co.,* 12 F. 3d 717, 718 (7th Cir. 1993); *see also Gomez v. Toledo,* 446 U.S. 635, 640 (1980) (finding "no basis for imposing on the plaintiff an obligation to anticipate [an affirmative] defense by stating in his complaint" its negative); 5 Charles Alan Wright & Arthur R. Miller, Federal Practice And Procedure § 1276 (3d ed.2004) (explaining that "allegations that seek to avoid or defeat a potential affirmative defense . . . are not an integral part of the plaintiff's claim for relief and lie outside his or her burden of pleading").

full well that, by its own strategic choice, its IDR program does not comply with the regulations

set forth in 16 C.F.R. § 703, which act as a prerequisite to Ms. Scarlott's initial resort to such a

process.  Ms. Scarlott is not, and was not, required to submit to Nissan's IDR program.  *See* 15

U.S.C. § 2310(a); *Muller v. Winnebago Industries, Inc*. 318 F. Supp .2d 844 (D. Ariz. 2004)

(holding that the Better Business Bureau Autoline program, which is wholly funded by the

automotive industry, is non-compliant with federal law based on failure to award incidental

damages such as loss of use and aggravation and inconvenience damages, and that the plaintiff

was not obligated to participate in Autoline program before filing suit).[27]

## VI.    NISSAN VIOLATED THE TEXAS DECEPTIVE TRADE PRACTICES ACT AT SECTION 17.50(a)(2).

Tex. Bus. & Com Code Ann. § 17.50(a)(2) provides:

> a) A consumer may maintain an action where any of the following
> constitute a producing cause of economic damages or damages for mental
> anguish:
>
> *     *       *
>
> (2) breach of an express or implied warranty.

Tex. Bus. & Com Code Ann. § 17.50(a)(2).

Discussed *supra* at Sections IV-V, Nissan breached both its written and implied

warranties extended to Ms. Scarlott in connection with her purchase of the Murano.  Mr. Weaver

correspondingly opined:

> The vehicle had multiple defects since purchase, and the dealer has needed
> multiple attempts to repair said defects.  The manufacturer recognized
> these defects by issuing bulletins relative to each.  The owner has lost
> confidence in the vehicle's safety and reliability.  If these issues had been
> factored into the sake at the time of purchase, the vehicle would have been
> $7,970.25 less than the purchase price of $31,881.  The figure was arrived

---

[27] Should this Court chose to consider Nissan's argument, Plaintiff requests, pursuant to Rule 56(f), that this Court order a continuance to permit affidavits to be obtained, depositions to be taken, and other discovery to be had, to afford Plaintiff a reasonable opportunity to discover relevant information essential to justify her opposition to Nissan's contention – regarding which Nissan previously refused to provide answers and responses to Plaintiff's discovery requests.  Plaintiff hereby submits a conforming declaration should this Court require the same. (Declaration of Aaron D. Radbil, Aff. D.K., ¶33).

at using a formula derived from the value of each [of the] vehicle's operating systems' value, relative to the whole vehicle's value.

(Report of Stephen V. Weaver Jr., Aff. D.K., ¶20) (discussed *supra* at Section II.H).

Therefore, Nissan's breach of its express and implied warranties constitute a producing cause of economic damages, for which Ms. Scarlott is entitled to compensation for under Tex. Bus. & Com Code Ann. § 17.50(a)(2).

## VI.   NISSAN BREACHED CONTRACTUAL AGREEMENTS ENTERED INTO WITH MS. SCARLOTT.

Nissan entered in contractual agreements with Ms. Scarlott in connection with Ms. Scarlott's purchase of a Nissan Security+Plus® Vehicle Protection Plan and a Nissan Maintenance+Plus® Vehicle Service Plan.  Nissan's contractual obligation, in part, included the performance of repairs to the Murano at factory authorized dealerships, by way of factory trained technicians, using genuine Nissan parts.  While Ms. Scarlott tendered monetary compensation in connection with her purchase of a Nissan Security+Plus® Vehicle Protection Plan and a Nissan Maintenance+Plus® Vehicle Service Plan, Nissan failed live up to its contractual obligations – refusing to perform repairs to the Murano at factory authorized dealerships, by way of factory trained technicians, using genuine Nissan parts.  Nissan's breach directly resulted in injury to Ms. Scarlott.

### A.   Ms. Scarlott Purchased A Nissan Security+Plus® Vehicle Protection Plan And A Nissan Maintenance+Plus® Vehicle Service Plan From Nissan.

Contemporaneous to her purchase of the Murano, Ms. Scarlott purchased, for a cost of $1,430.00, a Nissan Security+Plus® Vehicle Protection Plan.  (Nissan Security+Plus® Vehicle Protection Plan Agreement, Aff. D.K., ¶4).  Regarding the Nissan Security+Plus® Vehicle Protection Plan, Nissan's Manufacturer's Warranty Information Booklet states:

> For extra peace of mind you can add Nissan's own Security+Plus® Vehicle Protection Plan which provides you with long term mechanical protection.  **Backed by Nissan, and designed exclusively for Nissan owners**, Security+Plus® is available from your Nissan dealer in a variety of comprehensive coverages.

\*    \*      \*

> **Repairs at these dealerships are performed by factory trained technicians using Genuine Nissan Parts, to keep your vehicle in top running condition.**

(Nissan Security+Plus® Vehicle Protection Plan Agreement, Aff. D.K., ¶4) (emphasis added).

Also contemporaneous to her purchase of the Murano, Ms. Scarlott purchased from Nissan a Nissan Maintenance+Plus® Vehicle Service Plan. (Nissan Maintenance+Plus® Vehicle Service Plan, Aff. D.K., ¶7). The Nissan Murano Maintenance and Service Guide reads in part: "With Maintenance+Plus **you'll be hiring Nissan to maintain your vehicle to factory specification by factory trained technicians**. Like Security+Plus, you'll benefit from Nationwide Coverage, Genuine Nissan Parts, Factory Trained Technicians, and you'll be protected against future inflation (rising costs and of parts and labor)." (Nissan Murano Maintenance and Service Guide at 5, Aff. D.K., ¶8) (emphasis added).

### B. Clear Lake Entered Into Agreements With Third Party Private Businesses To Perform Repairs To The Murano.

Referencing repair work to the Murano performed by parties other than Nissan's authorized repair facilities, Mr. Barnes noted: "The dealership – according to what I can see here, the dealership entered into an agreement with a sublet facility to install a Homelink system on the car." ." ." (T. N.B. at p.114, lines 14-17, Aff. D.K., ¶5); (January 24, 2007 Repair Order, Aff. D.K., ¶26) ("'NEW CAR WE OWE' INSTALL REAR VIEW MIRROR WITH HOMELINK . . . INSTALL HOMELINK SYSTEM"); (Clear Lake "We Owe" Slip, Aff. D.K., ¶27) ("Frank Pierce Jr.[28] . . WE OWE . . . Homelink – Installed by Hurricane Auto"). Additionally, Clear Lake's May 30, 2006 repair order regarding the Murano reads: "SUBLET . . . TEXAS AUTO TRIM." (May 30, 2006 Repair Order, Aff. D.K., ¶28).

---

[28] Mr. Pierce was, but no longer is, employed by Clear Lake as a sales manager. (T. B.G. at p. 14, lines 14-18, Aff. D.K., ¶6). ).

**C.    Repair Work Performed By Nissan Certified Technicians Differs Materially From Repair Work Performed By Independent Non-Nissan Repair Facilities.**

Nissan's Dealer Technical Specialist ("DTS"), and designated corporate representative, Neal Barnes, testified: "To be certified as Nissan master technician, [mechanics] have to complete all the requirements for the curriculum for [Nissan's] training program in addition to being an ASE certified mechanic."  (Deposition Transcript of Neal Barnes ("T. N.B.") at p.57, lines 10-13, Aff. D.K., ¶5).  Nissan master technicians are privy to "Nissan specific materials" that non-Nissan certified technicians do not have access to.  (T. N.B. at p.57, lines 21-25; p.58, line 1, Aff. D.K., ¶5).  "Nissan offers training curriculum to train technicians on [Nissan's] specific products, and [Nissan's] curriculum is based on [Nissan's] products."  (T. N.B. at p.60, lines 18-20, Aff. D.K., ¶5).  Nissan master technicians are "set apart from their peers."  (T. N.B. at p.60, lines 22-25, p.61, lines 1-2, Aff. D.K., ¶5).  Nissan master technician formalized training is outlined in a manual authored by Nissan.  Clear Lake's service director, Bob Gore, testified that Nissan would "absolutely" argue that a Nissan master technician is quite different than an ASE certified mechanic.  (Deposition Transcript of Bob Gore ("T. B.G.") at p. 49, lines 1-8, Aff. D.K., ¶6).

Thus, Ms. Scarlott has demonstrated (1) the existence of two separate and distinct contracts that are both valid an enforceable – the Nissan Security+Plus® Vehicle Protection Plan and the Nissan Maintenance+Plus® Vehicle Service Plan, (2) that she is a party to those contracts, (3) that she performed under those contracts, (4) that Nissan breached those contracts, and (5) that the Nissan's breach caused her injury.

**D.    Mr. Barnes Testified That The Nissan Security+Plus® Vehicle Protection Plan Is A Service Offered By Nissan, And Backed By Nissan.**

Nissan now suggests that it "is not even the party obligated to perform under the Security Plus contract, and therefore, NNA is entitled to judgment as to any alleged breach thereof." (Document 63-1 at 28).  Mr. Barnes, however, previously testified otherwise – that the Nissan

Security+Plus® Vehicle Protection Plan is a service offered by Nissan, and backed by Nissan.

(T. N.B. at p.87, lines 3-5, 15-16, Aff. D.K. ¶5).  Mr. Barnes further stated:

> Q. We talked about Nissan backing the security plus service agreement and the maintenance plus service agreement.  Do you remember that?
>
> A. Yes.
>
> Q. Those are Nissan programs, correct?
>
> A. That's correct.
>
> \*    \*        \*
>
> Q. Those aren't dealership service agreements?
>
> A. That's correct?

(T. N.B. at p.131, lines 19-24, p.132, lines 1-3, Aff. D.K. ¶5).

> Of great consequence, the Nissan Security+Plus® Vehicle Protection Plan reads:
>
> Texas:
>
> **Obligations of NESNA under this service contract are backed by the full faith and credit of the provider.**

(Document 63-12 at 7) (emphasis added).

> ### E.    Ms. Scarlott's Acceptance Of The Murano Is Immaterial To Her Claim Against Nissan For Breach Of Contract.

Nissan announces that "Plaintiff's breach of contract action must fail because Plaintiff accepted delivery of the good."  (Document 63-1 at 40).  Ms. Scarlott's claim for breach of contract against Nissan stems from Ms. Scarlott's purchase of a Nissan Security+Plus® Vehicle Protection Plan and a Nissan Maintenance+Plus® Vehicle Service Plan.  Thus, where Ms. Scarlott's claim for breach of contract against Nissan is based upon its failure to provide services as represented under the Nissan Security+Plus® Vehicle Protection Plan and a Nissan

Maintenance+Plus® Vehicle Service Plan, Nissan's objection to Ms. Scarlott's claim for breach of contract is misplaced.[29]

## VII. NISSAN STANDS IN THE SHOES OF CLEAR LAKE WITH RESPECT TO ALL WORK PERFORMED ON THE MURANO, AND AS SUCH HAS CONCEDED LIABILITY IN ATTEMPTING TO SHIFT BLAME TO CLEAR LAKE.

A party cannot escape its obligations under a contract merely by assigning the contract to a third party. *Farah v. Mafrige & Kormanik, P.C.,* 927 S.W. 2d 663, 677 (Tex. App. - Houston [1st Dist.] 1996, no writ); *Univ. of Tex. Med. Branch at Galveston v. Allan,* 777 S.W. 2d 450, 453 (Tex. App. - Houston [14th Dist.] 1989, no writ).   As a general rule, a party who assigns its contractual rights and duties to a third party remains liable unless expressly or impliedly released by the other party to the contract.  *See W. Oil Sales Corp. v. Bliss & Wetherbee,* 299 S.W. 637, 638 (Tex. Comm'n App. 1927, judg't adopted); *Cauble v. Hanson,* 249 S.W. 175, 178 (Tex. Comm'n App. 1923, judg't adopted); *see also* 29 Richard A. Lord, Williston on Contracts § 74.30, at 436-38 (4th ed. 2003).   Such a principle is recognized by the *Restatement*.  *See* Restatement (Second) of Contracts § 318(3) (unless the obligee agrees to delegation of performance, the delegation does not effect a discharge of the delegating obligor).

Section 2.210 of the Texas Business and Commerce Code provides:

> (a) A party may perform his duty through a delegate unless otherwise agreed or unless the other party has a substantial interest in having his original promisor perform or control the acts required by the contract.  **No delegation of performance relieves the party delegating of any duty to perform or any liability for breach**.

Tex. Bus. & Com. Code § 2.210(a) (emphasis added).

Similarly, the MMWA reads:

> Nothing in this chapter shall be construed to prevent any warrantor from designating representatives to perform duties under the written or implied

---

[29] Similarly, it has never been the law in Texas that mere acceptance of defective goods with knowledge of their defects cuts off a buyer's right of action for breach of an express warranty.  *See. e.g., Stark v. George*, 252 S.W. 1053, 1055-56 (Tex. Com App. 1923) (failure to complain of the condition of machinery within three days held not a waiver of the purchaser's claim for replacement of defective parts, which were warranted for one year).

> warranty: *Provided*, That such warrantor shall make reasonable arrangements for compensation of such designated representatives, but no such designation shall relieve the warrantor of his direct responsibilities to the consumer or make the representative a cowarrantor.

15 U.S.C. § 2307 (emphasis in original).

### A.   A Manufacturer Cannot Delegate To Its Purchaser Responsibility For The Final Inspection, Corrections And Adjustments Necessary To Make The Product Ready For Use

Significant to the instant matter, "the obligation of a manufacturer to the ultimate user is such that it cannot delegate to its purchaser responsibility for the final inspection, corrections and adjustments necessary to make the product ready for use, and that the manufacturer cannot escape liability on the ground that the defect in the product was caused by something the purchaser did or failed to do." *Springmeyer v. Ford Motor Co.*, 60 Cal. App. 4th 1541 (1562-63) (Cla. App. 1 Dist. 1998) (quoting *Southern Pac. Co. v. Unarco Industries,* Cal. App. 3d 142, 151 (Cal. App. 2 Dist. 1974)).

### B.   Nissan's Basic Written Warranty, As Well As Its Nissan Security+Plus® Vehicle Protection Plan And Nissan Maintenance+Plus® Vehicle Service Plan, Direct That Should Ms. Scarlott Need Any Work Performed On The Murano That She Is To Tender It To A Nissan Authorized Dealership – Such As Clear Lake.

Nissan's written warranty begins:

> Both Nissan and your Nissan dealer are dedicated to serving all you automotive needs.  Your complete satisfaction with your vehicle and your Nissan dealer are our primary concerns.  **Your Nissan dealer is always available to assist you with all of your automobile service requirements**.

> If, however, a situation arise that you believe has not been addressed to your satisfaction, we ask that you take the following steps:

> STEP 1:
> Discuss the situation with the dealership's manager.  If the problem still exists, contact the dealership's Consumer Affairs Manager or owner. They are best equipped to resolve the matter for you.

> STEP 2:

> If the concern has still not been addressed to your satisfaction, please contact our (Nissan's) Consumer Affairs Department using our toll free number:

(Manufacturer's Warranty Information Booklet at 2, Aff. D.K., ¶3) (emphasis added).

### C.    Nissan Delegated To Clear Lake It Obligations Under Not Only Its Basic Limited Warranty, But Also Its Nissan Security+Plus® Vehicle Protection Plan And Nissan Maintenance+Plus® Vehicle Service Plan.

In consideration for the purchase of the Murano, Nissan issued and supplied to Ms. Scarlott its basic written warranty.  To obtain service under Nissan's basic warranty "you must take the vehicle to an **authorized Nissan dealer** in the United States or Canada during regular business hours at your expense . . . ."  (Manufacturer's Warranty Information Booklet at 5, Aff. D.K., ¶3) (emphasis added).

Contemporaneous to her purchase of the Murano, Ms. Scarlott purchased from Nissan a Nissan Security+Plus® Vehicle Protection Plan, and a Nissan Maintenance+Plus® Vehicle Service Plan.  Regarding the Nissan Security+Plus® Vehicle Protection Plan, Nissan's Manufacturer's Warranty Information Booklet states: "**Repairs at these dealerships** are performed by factory trained technicians using Genuine Nissan Parts, to keep your vehicle in top running condition.  (Nissan Security+Plus® Vehicle Protection Plan Agreement at 46, Aff. D.K., ¶4) (emphasis added).

Accordingly, Nissan concedes that it did not perform any work (repair, replacement, maintenance, or otherwise) on the Murano, but rather relied on its network of authorized dealerships and repair centers to do so.

> **NNA admits it did not personally perform repairs, since it relies on technicians employed by its independently owned and operated dealers to do so**.  NNA reimburses its dealers for repairs covered under warranty.

(Nissan's Response to Plaintiff's Initial Request for Admission 12, Aff. D.K. ¶31) (emphasis added).

**D.      Nissan Concedes That Clear Lake Breached Its Delegated Obligations Under Nissan's Basic Limited Warranty.**

Nissan, via Clear Lake, made repairs to correct defects that manifested in the Murano's electrical and engine systems.  Nissan covered the repairs made by Clear Lake under its basic written warranty.  (Combined Repair Orders, Aff. D.K., ¶10-11, 13-19, 29).  In fact, at no point did Nissan ever refuse to reimburse Clear Lake for repairs performed on Ms. Scarlott's vehicle, under Nissan's basic warranty.  (T. B.G. at p. 24, lines 7-16, Aff. D.K., ¶6).  Nor did Nissan ever request the return of funds "accidentally" paid to Clear Lake in connection with those warranty repairs, despite its ability to do so.  (T. N.B. at p.39, lines 18-24; p.124, lines 23-25; p.125, lines 1-2; p.126, lines 18-23, Aff. D.K., ¶5).

Of the utmost significance, Nissan suggests that Clear Lake's "negligent workmanship" was the cause of the defects that Ms. Scarlott experienced in the Murano.  (March 2, 2010 Correspondence form Jeffrey S. Patterson, Aff. D.K., ¶30) ("Since your cause of action seems to be against the dealer for negligent workmanship . . . . NNA has no responsibility for the workmanship of its dealer . . . .").

Similarly, Mr. Barnes concedes that Clear Lake made several "improper repair[s]" – which he defines as "a repair that was done that did not correct the problem or may have created another problem" (T. N.B. at p.80, lines 5-7, Aff. D.K. ¶5) – to the Murano.  (*See, e.g.* T. N.B. at p.78, lines 12-29; p.80, lines 16-19, Aff. D.K. ¶5).

**E.      Nissan Admits That Clear Lake Breached Its Delegated Obligations Under Nissan's    Security+Plus®    Vehicle    Protection    Plan    And    Nissan's Maintenance+Plus® Vehicle Service Plans.**

Nissan entered in contractual agreements with Ms. Scarlott in connection with Ms. Scarlott's purchase from Nissan of a Nissan Security+Plus® Vehicle Protection Plan and a Nissan Maintenance+Plus® Vehicle Service Plan.  Nissan's contractual obligation, in part, included the performance of repairs to the Murano at factory authorized dealerships, by way of factory trained technicians, using genuine Nissan parts.  (Nissan Security+Plus® Vehicle

Protection Plan Agreement, Aff. D.K., ¶4); (Nissan Maintenance+Plus® Vehicle Service Plan, Aff. D.K., ¶7).

Nissan admits that Clear Lake failed live up to its delegated obligations. Specifically, Clear Lake refused to perform repairs to the Murano at a factory authorized dealership, failed to perform repairs by way of factory trained technicians, and chose not to perform repairs using genuine Nissan parts. (T. N.B. at p.114, lines 14-17, Aff. D.K., ¶5); (January 24, 2007 Repair Order, Aff. D.K., ¶26) ("'NEW CAR WE OWE' INSTALL REAR VIEW MIRROR WITH HOMELINK . . . INSTALL HOMELINK SYSTEM"); (Clear Lake "We Owe" Slip, Aff. D.K., ¶27) ("Frank Pierce Jr. . . WE OWE . . . Homelink – Installed by Hurricane Auto").

### F.   Nissan Now Asserts That Clear Lake's Actions Were The Cause Of The Defects That Ms. Scarlott Experienced In The Murano.

Nissan suggests that Clear Lake's "negligent workmanship" was the cause of the defects that Ms. Scarlott experienced in the Murano. (March 2, 2010 Correspondence from Jeffrey S. Patterson, Aff. D.K., ¶30). Additionally, Nissan asserts that Clear Lake's actions in subletting the installation of the Homelink option was the cause of the defects that Ms. Scarlott experienced in the Murano. (Document 63-1 at 23 of 52) ("Ms. Scarlott's electrical problems were caused by the improper installation of a non-Nissan, aftermarket rearview mirror."). Nissan further suggests that Clear Lake's installation of a leather interior, sunroof, rims and tires was the cause of the defects that Ms. Scarlott experienced in the Murano. (Document 63-1 at 22 of 25). Despite the inconsistent positions that Nissan takes with regard to the cause of the problems that Ms. Scarlott experienced in the Murano, that Nissan blames Clear Lake for those problems is clear.

### G.   Nissan Concedes Liability For Breach Of Express Warranty, Breach Of Implied Warranty, Violation Of The DTPA, And Breach Of Contract, By Way Of Its Now Asserted Attempt To Shift Blame To Clear Lake.

Delegation of performance is a normal and permissible incident of many types of contract. *See* Uniform Commercial Code § 2-210, Comment. In this case, Nissan delegated to

Clear Lake its obligations not only under its basic limited warranty, but also the Nissan Security+Plus® Vehicle Protection Plan and the Nissan Maintenance+Plus® Vehicle Service plans.

By delegating, however, Nissan neither is, nor was, relieved of any duty to perform or of any liability for breach, absent novation.  Tex. Bus. & Com. Code § 2.210(a); 15 U.S.C. § 2307. Quite contrary, by virtue of Nissan's assignment to Clear Lake, it became obligated for Clear Lake's performance.  *See Tennell v. Esteve Cotton Co.*, 546 S.W. 2d 346 (Tex. Civ. App. - Amarillo 1976, writ refused).  Because Nissan has now chosen to declare Clear Lake the cause of any and all problems that Ms. Scarlott experienced in the Murano, it has conceded liability for breach of express warranty, breach of implied warranty, violation of the DTPA, and breach of contract.

## VIII. NISSAN'S SUGGESTION THAT "MS. SCARLOTT HAS EFFECTIVELY ADMITTED SHE HAS NO CLAIM FOR RELIEF AGAINST NNA" IS DISINGENUOUS.

On November 3, 2010 – while the instant matter remained pending before the 281st District Court, Harris County, Texas – Nissan mailed for service, and sent via facsimile for service, "Nissan North America's First Requests for Admission to Plaintiff."  (Document 63-11). Ms. Scarlott's responses to Nissan's first set of requests for admission were therefore due – at the very earliest – on December 6, 2010 before 5:00 pm.  *See* TRCP 198.2 (providing a responding party 30 days to serve responses to requests for admission); TRCP 21a (for a document served by mail a party is considered served on the date that the document is mailed, to which 3 days is added to the relevant time a party is required to answer and or respond to such document; for a document served via facsimile service is complete on the day the document is received if before 5:00 pm, to which 3 days is added to the relevant time a party is required to answer and or respond to such document); *Cehrry v. North Am. Loyds*, 770 S.W. 2d 4, 5 (Tex. App. – Houston

[1st Dist.] 1989, writ denied) (when a party receives requests for admission by mail TRCP 21a adds 3 days to the 30 days permitted by TRCP 198.2).

However, Nissan's delivery confirmation receipt relating to service of its "First Requests for Admission to Plaintiff" shows that the subject request for admissions were not delivered to Plaintiff's counsel until November 8, 2010.  (Document 63-11 at 3).  Thus, because the 3 day grace period afforded by TRCP 21a presumes that the post office delivered the document within 3 days after it was mailed, Ms Scarlott was likely entitled to 30 days from November 8, 2010 – or December 8, 2010 – to serve her responses to Nissan's "First Requests for Admission to Plaintiff."

No matter, on December 6, 2010, at 12:41 pm, this matter was removed from "the 281st District Court, Harris County, Texas to the United States District Court for the Southern District of Texas, Houston Division to this Court to the District Court for the 281st District, Harris County, Texas, so that this Court may assume jurisdiction over the cause as provided by law. . . ." (Document 1).  The electronic docket for the 281st District Court, Harris County, Texas reads: "12/6/2010 REMOVED TO FEDERAL COURT."

"[O]nce a state court action is removed, it is governed by federal, rather than state, procedure."  *Riley v. Walgreem Co.*, 233 F.R.D. 496, 498 (S.D. Tex. 2005) (citing Fed. R. Civ. P. 81(c) ("These rules apply to civil actions removed to the United States district courts from the state courts and govern procedure after removal"); *Willy v. Coastal Corp.,* 503 U.S. 131, 134 (1992) ("This expansive language creates no exceptions")).

The federal procedural rule pertinent here is Rule 26(d), which proscribes "discovery from any source before the parties have conferred as required by Rule 26(f)."  By its express terms, Rule 26(d) bars discovery until after the parties have conferred about a discovery plan as directed by Rule 26(f)."  *Riley v. Walgreem Co.*, 233 F.R.D.at 498.

Against such a backdrop, this Court has explicitly rejected claims such as Nissan's – that Ms. Scarlott's lack of response to Nissan's "First Requests for Admission to Plaintiff" constitute an admission "that she has no claim for relief against NNA" (Document 63-1 at 25):

> Riley's position that state procedural rules continue to govern discovery served but not due prior to removal was rejected by the Fifth Circuit in *McIntyre v. K-Mart Corp.,* 794 F. 2d 1023, 1025 (5th Cir.1986). The court affirmed the lower court's application of its local rule limiting parties to twenty-five interrogatories, rejecting the plaintiffs' contention that because they filed more than twenty-five interrogatories in state court before the case was removed, they were entitled to have all those interrogatories answered as a matter of right. The Fifth Circuit observed that plaintiffs' argument "appears to be wholly without support in the case law," and found it "just barely colorable enough to escape Rule 38 sanctions." *Id.*
>
> FN2. The court is aware that Riley's position is now supported by one district court decision in this circuit. *Bush v. City of Dallas,* 1997 WL 135654 (N.D. Tex.1997). A later district court decision reaches a contrary result. *Cowboy Mouth, L.L.C. v. Monkey Hill Productions, Inc.,* 1998 WL 781234 (E.D. La.1998). The court agrees with Walgreen that the *Bush* decision misreads *McIntyre.*
>
> Riley's position would effectively rewrite Rule 26(d), creating an implied and unwarranted exception to the discovery bar for removed cases. Nothing in the language of the rule permits a party to continue to seek discovery which may have been properly served under state law rules pre-removal. Rule 26(d)'s proscription sweeps broadly: not only may a party not "serve" discovery, it may not even "seek" discovery from any source until after the Rule 26(f) conference. The drafters of the rule believed that "it is desirable that the parties' proposals regarding discovery be developed through a process where they meet in person, informally explore the nature and basis of the issues, and discuss how discovery can be conducted most efficiently and economically." *See* Fed.R.Civ.P. 26(f) 1993 advisory committee note. The discovery bar facilitates the goal of orderly, efficient, and economical discovery by creating an incentive to meet and devise a joint discovery plan at an early stage of the litigation. Allowing uncompleted state court discovery to remain "live" after removal would not serve, and might well undermine, this purpose.

*Riley v. Walgreem Co.*, 233 F.R.D.at 498.

What's more, even in the circumstance that Ms. Scarlott's responses to Nissan's "First Requests for Admission to Plaintiff" were due before removal – they were not – withdrawal of those admissions would be appropriate under Rule 36(b), which permits amendment or

withdrawal of an admission when the merits of the action would be subserved thereby.  The test for allowing withdrawal or amendment of an admission is whether upholding the admissions would eliminate any presentation of the merits, and whether the party opposing the motion has met its burden of showing prejudice.  *Teleprompter of Erie, Inc. v. City of Erie,* 567 F.Supp. 1277, 1287 (W.D. Pa.1983).  In this case, not only does the instant response to Nissan's motion for summary judgment refute the contentions underlying Nissan's "First Requests for Admission to Plaintiff," but Ms. Scarlott's motion for summary judgment on Nissan's counterclaim – which was filed in the 281st District Court, Harris County, Texas before this matter was removed – rebuts each and every proposition that Nissan now asserts as admitted against Ms. Scarlott.

## IX.   MS. SCARLOTT PREVIOUSLY  INFORMED THIS COURT THAT SHE DOES NOT MAINTAIN CLAIMS AGAINST NISSAN FOR NEGLIGENCE, UNJUST ENRICHMENT, OR PROMISSORY ESTOPPEL.

Nissan asserts that Ms. Scarlott's claims against Nissan for negligence, unjust enrichment, and promissory estoppel, must fail.  (Document 63-1 at 40-43, 50-51).  Ms. Scarlott does not maintain a specific claim against Nissan for negligence, unjust enrichment, or promissory estoppel.  (Document 20).

## X.   CONCLUSION.

WHEREFORE, Ms. Scarlott respectfully requests that this Court enter an order denying Nissan's motion for summary judgment.

Respectfully submitted this 11th day of May, 2011.

By: s/ Aaron D. Radbil
     Aaron D. Radbil
     *Pro hac vice*
     aradbil@attorneysforconsumers.com
     WEISBERG & MEYERS, LLC
     5722 S. Flamingo Road, Ste. 656
     Cooper City, FL 33330
     Telephone: (888) 595-9111 ext. 122
     Facsimile: (866) 577-0963

     s/ Noah D. Radbil
     Noah D. Radbil

Texas Bar No. 24071015
noah.radbil@attorneysforconsumers.com
WEISBERG & MEYERS, LLC
Two Allen Center
1200 Smith Street, Sixteenth Floor
Houston, Texas 77002
Telephone:     (888) 595-9111 ext 275
Facsimile:     (866) 317-2674

s/ Dennis R. Kurz
Dennis R. Kurz
Texas Bar No. 24068183
dkurz@attorneysforconsumer.com
WEISBERG & MEYERS, LLC
Two Allen Center
1200 Smith Street, Sixteenth Floor
Houston, Texas 77002
Telephone:     (888) 595-9111 ext 412
Facsimile:     (866) 317-2674
*Attorneys for Plaintiff* APRIL SCARLOTT

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 11, 2011, the foregoing was filed through the Court's EM/ECF system and was served upon all attorneys to be noticed.

Giovanna Tarantino Bingham
Hartline Dacus et al.
6688 N Central Expressway
Ste 1000
Dallas, TX 75206
214-346-3784
Fax: 214-267-4284
Email: gtarantino@hdbdk.com

Jeffrey S Patterson
Hartline Dacus et al.
6688 N Central Expressway
Ste. 1000
Dallas, TX 75206
214-369-3701
Fax: 214-369-2118
Email: jpatterson@hdbdk.com

Leslie Wm. Adams
3900 Essex Lane, Suite 1111
Houston Texas 77027
713-728-6360
Fax: 713-728-6366
Email: LWA@lesliewmadams.com

Paul F Schuster
Locke Lord et al.
2200 Ross Ave
Ste. 2200
Dallas, TX 75201-6776
214-740-8536
Email: pschuster@lockeliddell.com

Christopher Michael Boeck
Locke Lord et al.
2200 Ross Ave
Ste. 2200
Dallas, TX 75201
214-740-8482
Email: cboeck@lockelord.com

Daniel C Pappas
Attorney at Law
4615 S W Fwy
Ste. 600
Houston, TX 77027
713-621-5222
Fax: 713-621-7094
Email: dcp@dcplaw.net