UNITED STATES DISTRICT COURT     SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| April Scarlott § | |
| § | |
| *versus* § | Civil Action 4:10-cv-04865 |
| § | |
| Nissan North America, Inc., et al. § | |

### NISSAN NORTH AMERICA, INC.'S RESPONSE TO PLAINTIFF'S MOTION TO STRIKE IMPERTINENT AND SCANDALOUS MATTER FROM NNA'S REPLY BRIEF AND BRIEF IN SUPPORT THEREOF

TO THE HONORABLE JUDGE OF SAID COURT:

Defendant Nissan North America, Inc. ("NNA") files this Response to Plaintiff's Motion to Strike Impertinent and Scandalous Matter from NNA's Reply Brief [Doc. No. 84] and Brief in Support Thereof, and would respectfully show the Court as follows:

### I.
### PLAINTIFF'S MOTION IS NOTHING MORE THAN A REGURGITATION OF THE MISREPRESENTATIONS MADE IN HER RESPONSE TO NNA'S FIRST AMENDED MOTION FOR SUMMARY JUDGMENT.

Plaintiff's Motion to Strike has no merit. It simply repeats the "numerous false and misleading statements" made by Plaintiff in her Response to NNA's First Amended Motion for Summary Judgment [Doc. No. 73], which NNA properly sought leave to correct with a Reply. Rather than seeking leave to file a Sur-Reply, Plaintiff filed yet another baseless motion as has been her routine throughout this litigation. Plaintiff's Motion to Strike does nothing to advance her argument that NNA's Reply Brief was allegedly "impertinent" and/or "scandalous." In fact, Plaintiff's insistence on reiterating her convoluted and weak arguments reinforce the main theme of NNA's Reply – Plaintiff's only hope of "defeating" NNA's First Amended Motion for Summary Judgment lies in *fabricating* questions of fact. As her Motion to Strike has no basis in law or fact, this Court should deny same.

## II.
## PLAINTIFF IMPROPERLY FOCUSES ON THE FACT THAT A BODY CONTROL MODULE ("BCM") CAN *HYPOTHETICALLY* CAUSE ELECTRICAL PROBLEMS.

Plaintiff continues to erroneously focus on the statements of various witnesses that a BCM *can conceivable* cause electrical problems in vehicles, despite NNA's overwhelming evidence that it did not cause any such problems in this case. It is true that Mr. Schooley, Mr. Barnes and Mr. Gore have stated a BCM not powering down can, *hypothetically*, cause a battery drain.[1] They <u>never</u> testified, however, the <u>subject vehicle's</u> BCM was not powering down and causing the battery to drain. As she is prone to do, Plaintiff has taken their statements out of context and conveniently omitted evidence directly contradicting her baseless contentions regarding the BCM.

For instance, Mr. Schooley offered testimony directly disputing the contention that the BCM was an alleged cause of the intermittent electrical failures.

> Q. And why don't you think that that BCM had anything to do with the battery drain on the 2006 Murano?
>
> A. Because the vehicle came back with an electrical drain after that part was replaced. . .[2]

Likewise, Mr. Gore, Clear Lake's Service Manager, provided an Affidavit filed March 29, 2011, which explains he was "advised that *some* Nissan Muranos . . . experienced a 'phantom

---

[1] Mr. Barnes is not and has never been designated as NNA's expert in this case. *See* Nissan North America, Inc.'s Designation of Expert Witnesses, attached as Exhibit A. NNA has not relied upon Mr. Barnes to provide technical-type testimony. Mr. Barnes's role has been as NNA's designated corporate representative, presented to offer testimony regarding NNA's express, new vehicle limited warranty and warranty exclusions. *See* Nissan North America, Inc.'s Objections and Responses to Plaintiff's Third Amended Notice to Take the Deposition of Defendant's Rule 199(b)(1) Representative, attached as Exhibit B. In preparation for his testimony, Mr. Barnes reviewed the repairs orders and warranty history in this case, and was able to testify as to his understanding of these documents. Recall also that NNA did not participate in selling the Murano to Ms. Scarlott, did not assist her in choosing an aftermarket Homelink rearview mirror to replace the factory mirror, and had no knowledge regarding the modifications until after suit was filed against it.

[2] *See* Deposition of Ryan Schooley ("Schooley Depo."), attached as Exhibit B, at 54.11-15.

battery drain' because the [BCM] was not 'falling asleep' when the vehicle was turned off."[3] His Affidavit expressly states Clear Lake replaced the subject vehicle's BCM "with the hopes of repairing [its] recurring and intermittent electrical problems. . . as other avenues of repair had not been successful."[4] The uncontroverted evidence further shows:

> Clear Lake technicians ultimately replaced the Subject Vehicle's BCM. No one tested the original BCM prior to or after it was replaced, and there is no evidence of which I am aware the BCM in the Subject Vehicle failed to "fall asleep" when the vehicle was in an "off" position. There is no evidence the original BCM in the Subject Vehicle was defective or required replacement.[5]

Plaintiff points to the text of a repair order and Mr. Schooley's reference to that repair order in his report as proof the Murano's BCM was "not falling asleep." She fails to cite to Mr. Gore's testimony regarding this repair order, which is consistent with his affidavit testimony. Clear Lake replaced the BCM hoping it would solve the Murano's battery problem, but did not test the original BCM and has no evidence showing the BCM was, in fact, causing the Murano's battery problem. As Mr. Gore explained during his deposition:

> Q: (BY MR. KURZ) That would be the invoice from -- the RO date is September 10th, 2009?
>
> A: Yes.
>
> Q: What's the mileage?
>
> A: 25,540.
>
> Q: Okay. And -- and explain to me the sum and substance of the work done on P-22?
>
> A: Okay. "Customer states battery is dead 'again,' if you notice that, and "Attention Bob."

---

[3] *See* Affidavit of Robert Gore, attached as Exhibit C, at ¶3 (emphasis added).
[4] *Id*. at ¶ 6.
[5] *Id*. at ¶ 5.

Q: [The Murano] was also towed in, Bob?

A: Yes, sir, it was. The battery is dead again. Got in and, of course, I told her I found the problem with it and -- you know, because that's when my DTS or Nissan – there's no way I can tell what's going on inside a body computer. You know, it's like looking at your tile on your desk computer and saying, "I know what's wrong with it." **So I put a BCM as per Nissan, you know; and this was through a suggestion,** *not really so much working on this particular car.* But I felt real comfortable with this repair.

Q: What -- what -- what was the symptom, again, that was -- that was explained to you, and -- and -- and -- and why -- and why you chose to -- why you chose to replace the Body Control Module?

A: I had a GTR that a battery kept going down on us.[6]

The arguments and evidence introduced by NNA in its Reply proving the BCM did not cause the Murano's electrical problems are neither impertinent nor scandalous. They are merely a reiteration of the truth- a recounting of the actual events that occurred. NNA's Reply did not falsify testimony or make inferences where none existed, as Plaintiff has done. Accordingly, this

---

[6] *See* excerpts of the deposition of Bob Gore ("Gore Depo."), attached as Exhibit D, at 146.14-147.15 (emphasis added). The remaining text of the above quote is as follows:

> Q: Uh-huh.
>
> A: And the GTR is our $100,000 sports car. I'm assuming you're familiar with that car. But I had one that the battery kept going down, just like this. We couldn't find a problem with it. So actually, I've got a direct line or -- like I said, I've got a direct line. I can call these engineers and talk to them. And I was -- and especially being a GTR, because when they come out they were hot commodities or -- they got priority.
>
> And so I called him. I said, "I got this GTR. The battery is going dead." He said, "Bob, if you got a GTR or Murano, we're finding out to put BCMs in them." And then when Ms. Scarlott called me on this time with a battery dead again, I said, "Well" -- and that was just -- you know, with Nissan telling me that -- it's kind of like having a technical service bulletin. There's not a technical service bulletin, but I had a Nissan engineer tell me this. And with me not ever being able to see a drain on this battery, you know, it made sense to me as a technician.

*Id*. at 147.16-148.12.

Court should not strike such arguments and evidence.

## III.
### THE SECURITY + PLUS® PLAN IS INAPPLICABLE SINCE NNA DID NOT MAKE ANY REIMBURSEMENTS UNDER THE SECURITY + PLUS® PLAN.

Ms. Scarlott's insistence that the Security + Plus® Plan contract covered repairs made to the subject Murano highlights her desperate attempt to create a fact issue. Plaintiff inexplicably claims NNA's expert, Ryan Schooley, and Vehicle Claims History support her claim. Such a claim can only be made by misinterpreting evidence and intentionally taking it out of context.

Had Plaintiff disclosed the entirety of Mr. Schooley's testimony regarding repairs allegedly made under the Security + Plus® Plan contract, she would have had to admit the Nissan Vehicle Claims History shows the claims were paid. The Claims History does not, however, indicate whether NNA paid the claim under the basic warranty or NESNA paid the claim under the Security + Plus® Plan contract.

> Q: So the document that indicates that the BCM was covered in the Security Plus agreement is a Nissan document; is that correct?
>
> A: No. The document said that the claim was paid; it does not say who paid it.
>
> Q: And your explanation for why it says that it was covered under the vehicle claims history, under the Security Plus agreement, is what exactly? I'm not following. I'm not trying to give you a hard time, it just doesn't make sense to me right now.
>
> A: It's a part that could or would have been covered under the Security Plus. That's just how the dealership codes it. That is a part that could have been covered under the Security Plus, but since the vehicle had less than three years or 36,000 miles on it, it was covered by the factory warranty.
>
> So even though it shows on the CA file that it was covered under the Security Plus, we did talk with NESNA and

> NESNA did confirm it was not covered under the Security Plus.[7]

Likewise, Plaintiff improperly cited to a snippet of Mr. Schooley's report to further her implausible argument that the Security + Plus® Plan contract applies to her claims. The entirety of the paragraph cited by Plaintiff reads as follows:

> The only repair *potentially* covered under the Security+Plus Plan was the replacement of the body control module in September 2009. The same repair is listed, however, in the warranty claims history as well. **After speaking with NESNA and reviewing the Security+Plus Plan, the BCM claim was covered only under warranty and not under the Security+Plus Plan**. The replacement of the BCM was eligible for coverage under the Security+Plus Plan; however, **since the new vehicle warranty had not expired, the repair was charged under the warranty and not under the service contract.**[8]

NNA has also previously provided an undisputed affidavit which confirms the Nissan Security + Plus® Plan contract did not apply to repairs made to the subject Murano because coverage under the plan does not begin until the expiration of the factory warranty.[9] It also confirms no claims have been covered by NESNA under the Security+Plus Gold Vehicle Protection Plan (Policy Number NCDB02684397) for the Subject Vehicle.[10]

Plaintiff's failure to acknowledge the plain language of the Nissan Security + Plus® Plan contract and clear testimony of multiple witnesses confirming the contract does not apply to her claims does not make NNA's repeated attempts to illuminate this undisputed evidence impertinent or scandalous. As such, this Court should deny Plaintiff's Motion to Strike.

---

[7] *See* Schooley Depo., at 30.12- 31.15 (emphasis added).
[8] *See* Mr. Schooley's Expert Report, attached as Exhibit E (emphasis added).
[9] *See* Affidavit of Henry Yu, attached as Exhibit F.
[10] *Id.*

## IV.
## NNA Has Not Waivered in Its Theory of the Case.

In what can only be characterized as a last-ditch effort to convince this Court NNA is guilty of the same deceitful tactics as she is, Plaintiff claims NNA has waivered in its theory of the case. The crux of Plaintiff's theory seems to be that NNA originally posited that the design and manufacture of the aftermarket Homelink mirror, not the installation, caused the Murano's battery to drain. NNA has since <u>confirmed</u> the installation of the mirror was in fact the cause of the Murano's battery problems. Plaintiff is grasping at straws. Whether the design and manufacture or the installation of the mirror caused the Murano's electrical problems is insignificant. The fact remains the aftermarket mirror, which is neither designed, manufactured nor marketed by NNA, actually caused the Murano's electrical problems.

Ms. Scarlott points to NNA's initial telephone conference with Clear Lake's Service Manager indicating a diode was installed in the aftermarket rearview mirror, and therefore, the design of the mirror caused the Murano's intermittent electrical problems. As this case developed, Mr. Gore, Clear Lake's Service Manager, testified that although a diode was allegedly installed in the aftermarket mirror, its improper installation was causing the Murano's battery to drain.[11]

Now, with the benefit of the deposition of Srinivasa "Sam" Gogineni, the owner and corporate representative of Hurricane Auto,[12] the Parties confirmed the aftermarket mirror <u>was</u> incorrectly installed, and the repair was to swap the wiring receptacles.[13] If Plaintiff did not believe the aftermarket, non-Nissan approved rearview mirror caused the Murano's electrical

---

[11] *See* Gore Depo., at 28.11-29.8.
[12] Recall Hurricane Auto installed the aftermarket mirror at issue.
[13] *See* excerpts of the deposition of Srinivasa "Sam" Gogineni ("Gogineni Depo."), attached as Exhibit G, at 79.13-18, 79.19- 80.4, 80.10-81.6.

problems, she would not have requested leave to join Hurricane Auto as a defendant in this suit.

Ms. Scarlott focuses on the intermittent nature of the drain as alleged evidence the aftermarket mirror could not have caused the Murano's electrical issues. Yet, she has not offered any evidence disputing the proposition that leaving the aftermarket mirror in an "on" position could cause the battery to drain intermittently. In fact, the installation instructions for mirror imply such an intermittent condition can, in fact, occur.

> **NOTE: If mirror remains on at all times, it could _eventually_ drain the car's battery.[14]**

The instructions do not, however, indicate the battery will immediately drain, as Plaintiff now infers.

Ms. Scarlott also failed to inform this Court that she *routinely and on a daily basis* hooked the Murano's battery up to a battery charger in the evening so her battery would have a full charge for the next morning.

> Q: During the first few years, were you using a charger at home to keep the battery charged?
>
> A: After I had taken it in half a dozen or more times, I got very, very frustrated with having to do that. And I went to Wal-Mart, and I purchased a $120 wall plug-in battery charger. And there was a period of time when I had to put it on in the evening and leave it on overnight or it would not start in the morning.
>
> Q: What period of time was that?
>
> A: I can't tell you exactly what period of time, but I know it was anywhere from three to six months. It was a long, long time that I had to do that. . . .[15]

\*\*\*

---

[14] *See* Installation Instructions for the Mito Corporation mirror, attached as Exhibit H, at p. 5
[15] *See* excerpts of the deposition of April Scarlott taken September 9, 2010 ("First Scarlott Depo."), attached as Exhibit I, at 94.3-15.

> Q: And did you continue to use that charger up until the time they fixed it last December?
>
> A: I continued to use it as it was needed.
>
> Q: About how many times a month did you use it?
>
> A: It stayed plugged in. Every time I turned it off, I plugged it in. I had to put it on. If I let it sit more than two or three hours, it would not start.
>
> Q: So you would go home, you'd pop your hood, and you'd hook up the battery?
>
> A: Correct.
>
> Q: **And so this was a daily occurrence?**
>
> A: **Yes.**[16]

Not surprisingly, Plaintiff fails to attribute any portion of the "intermittent" nature of the battery failure to the fact that she was charging the battery in the evenings.

The reality of this case remains that <u>all Parties</u> to this litigation, including Plaintiff, know the aftermarket Homelink rearview mirror caused the Murano's electrical problems. NNA's ability to now clarify exactly how the mirror caused the problems is not an "about-face shift in its theory of this case." Like every other argument advanced in her Motion to Strike, Plaintiff's claim that NNA has dramatically changed its theory of the case lacks candor and is meritless. NNA, therefore, prays this Court deny Plaintiff's Motion to Strike Impertinent and Scandalous Matter from NNA's Reply Brief.

---

[16] *Id*. at 95.3-14 (emphasis added).

# V.
## PRAYER

Plaintiff's Motion to Strike Impertinent and Scandalous Matter from NNA's Reply Brief [Doc. No. 84] is yet another pleading aimed primarily at increasing NNA's defense costs. Like her Motion to Strike New Evidence Submitted in Reply [Doc. No. 83], this Motion to Strike is actually a Sur-Reply filed without leave of Court. Therefore, NNA prays this Court deny Plaintiff's Motion to Strike, and award NNA reasonable costs necessitated by this Motion.

Respectfully submitted,

/s/ *Jeffrey S. Patterson*
**JEFFREY S. PATTERSON (Lead Counsel)**
State Bar No. 15596700
So. District Bar No. 12446
**GIOVANNA TARANTINO BINGHAM**
Texas State Bar No. 24042613
So. District Bar No. 568188
**HARTLINE DACUS BARGER DREYER LLP**
6688 North Central Expressway, Suite 1000
Dallas, TX 75206
(214) 369-2100
(214) 369-2118

**ATTORNEYS FOR DEFENDANT
NISSAN NORTH AMERICA, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM-ECF system on the 29th day of June, 2011.

/s/ *Jeffrey S. Patterson*