| April Scarlott | § | |
| | § | |
| *versus* | § | Civil Action 4:10-cv-04865 |
| | § | |
| Nissan North America, Inc., et al. | § | |

## DEFENDANT NISSAN NORTH AMERICA, INC.'S
## MOTION FOR RULE 11 SANCTIONS

TO THE HONORABLE UNITED STATES DISTRICT COURT:

       Defendant Nissan North America, Inc. ("NNA") files this Motion for Rule 11 Sanctions, and would respectfully show the Court as follows:

## I.
### SUMMARY OF ARGUMENT

       NNA seeks Rule 11 sanctions against Plaintiff's counsel, Mr. Noah Radbil, Mr. Aaron Radbil, and Mr. Dennis Kurz, each of whom has misrepresented material facts in order to mislead this Court and justify Plaintiff's suit against NNA. There is a line between zealous advocacy and the ethical duties of an officer of the Court. Plaintiff's counsel crossed this line when they each signed Plaintiff's Response in Opposition to NNA's First Amended Motion for Summary Judgment, as well as other filings with the Court. It is evident that Plaintiff's counsel is undeterred by the obligations set forth in the Texas Disciplinary Rules of Professional Conduct, the Texas Lawyer's Creed, and the Federal Rules of Civil Procedure, as Plaintiff's counsel continue to sign pleadings before this Court which contain false and misleading arguments.[1]

---

[1] Noah Radbil is an attorney licensed to practice by the State of Texas and the United States District Court for the Southern District of Texas. Dennis Kurz is an attorney licensed by the State of Texas. NNA understands his application to practice before the United States District Court for the Southern District of Texas is currently pending.

For this reason, NNA respectfully requests this Court sanction Mr. Noah Radbil, Mr. Aaron Radbil, Mr. Dennis Kurz, and their law firm Weisberg and Meyers to deter them from future abuse of the justice system, and to compensate NNA for the costs associated with these filings. NNA seeks $50,000.00 in sanctions, and prays this Court suspend Plaintiff's counsel from practicing before this Court, including revoking the *pro hac vice* admission of Mr. Aaron Radbil.

## II.
## STATEMENT OF MATERIAL FACTS

Plaintiff April Scarlott ("Ms. Scarlott") alleges a breach of warranty related to the performance of a 2006 Nissan Murano (VIN JN8AZ08T36W410083) (the "Murano). Ms. Scarlott purchased the Murano on December 26, 2006 from Clear Lake Nissan ("Clear Lake") in League City, Texas,[2] an independently owned and operated dealership.[3] Ms. Scarlott negotiated the purchase price and bought the Murano from Clear Lake.[4] The particular vehicle Ms. Scarlott purchased was the Murano S, a trim level which was not equipped with a Nissan HomeLink Universal Transceiver ("HomeLink mirror").[5]

The day after her purchase, Ms. Scarlott returned to Clear Lake with the Murano, requesting an aftermarket rearview mirror equipped with a HomeLink system. Clear Lake agreed to pay for the installation of the accessory by Hurricane Auto ("Hurricane").[6] Ms. Scarlott took the Murano to Hurricane and chose the aftermarket mirror, which Hurricane installed. NNA did not facilitate, install, warrant, or approve of this aftermarket mirror or its

---

Aaron Radbil is an attorney who has been admitted to practice *pro hac vice* in the United States District Court for the Southern District of Texas [Doc. No. 11].

[2] *See* excerpts of the deposition of Bob Gore ("Gore Depo."), attached as Exhibit A, at 16.17-18.

[3] *Id*. at 19.1-5.

[4] *See* Business Records Affidavit with accompanying Repair Orders and Sales Documents for the subject 2006 Nissan Murano, attached as Exhibit B, at Sales Contract.

[5] At that time, only two trim levels had HomeLink Universal Transceiver as standard equipment: the Murano SE and SL.

[6] *See* Gore Depo., at 16.23-18.21.

installation by third party vendor, Hurricane Auto. In fact NNA knew nothing of this modification until after Ms. Scarlott filed suit.

On September 4, 2007, the Murano began to experience electrical problems, including difficulty starting. Thinking the cause was a bad battery, Clear Lake replaced the vehicle's battery.[7] The Murano continued to experience intermittent electrical problems for the next two years, with Clear Lake replacing the battery on four occasions.[8]

In November 2009, Clear Lake technicians monitored the car for almost thirty days.[9] Finally, they discovered an intermittent electrical draw. They traced the circuits until they found the one responsible, which originated at the aftermarket HomeLink mirror.[10] Clear Lake took the Murano to Hurricane for repair since it was not a Nissan product, and since Hurricane warranted the mirror and its installation.[11]

After reviewing the installation instructions, Hurricane acknowledged the problem and re-wired the mirror to comply with the manufacturer's instructions.[12] Immediately after the repair, Clear Lake told Ms. Scarlott the aftermarket mirror caused the electrical drain.[13] The Murano has not experienced any other electrical problem since that time.[14]

---

[7] *See* Exhibit B, at Repair Orders dated September 4, 2007.

[8] *See* Exhibit B, at Repair Orders dated September 4, 2007, October 6, 2008, December 15, 2008, and September 24, 2009.

[9] Plaintiff was provided a loaner vehicle during all repair attempts at no cost to Ms. Scarlott. *See generally* Exhibit B. *See also* excerpts of the deposition of April Scarlott taken September 9, 2010 ("First Scarlott Depo."), attached as Exhibit H, at 113.5-25.

[10] *See* Exhibit B, at Repair Order dated October 28, 2009.

[11] *See* excerpts of the deposition of Srinivasa "Sam" Gogineni ("Gogineni Depo."), attached as Exhibit C, at 73.21-74.19.

[12] *Id*. at 80.10-81.6.; *see also* Installation Instructions for the Mito Corporation mirror, attached as Exhibit G.

[13] *See* excerpts of the deposition of April Scarlott taken April 14, 2011 ("Second Scarlott Depo."), attached as Exhibit D, at 40.1-19.

[14] *Id*. at 34.2-35.20.

Ms. Scarlott also received a repair invoice from Clear Lake, stating the mirror caused the electrical problems.[15] Ms. Scarlott knew the mirror was not a Nissan part, since she chose the mirror and took the vehicle to Hurricane Glass for its installation. In addition to her actual knowledge of this aftermarket modification, Ms. Scarlott had NNA's New Vehicle Limited Warranty, which explicitly states non-Nissan accessories are not covered. Despite the overwhelming evidence that there was no defect in NNA's materials or workmanship, Ms. Scarlott and her counsel sued NNA, and have continued to prosecute false claims against NNA to this day.[16]

Once served with suit papers, NNA investigated Ms. Scarlott's allegations. As early as December 2009, by telephone, written correspondence, and discovery responses,[17] NNA repeatedly explained to Ms. Scarlott's lawyers the Murano's electrical problems were not a result of defects in materials or workmanship supplied by Nissan and were not covered under Nissan's warranty.[18] Clear Lake had previously informed Ms. Scarlott of this fact. Instead of amending her pleadings to pursue Hurricane, however, Ms. Scarlott maintained her suit against NNA, knowing NNA did not install or warrant the defective product, and knowing NNA had, in fact, paid every warranty claim ever submitted, including a number of claims it should never have paid.[19]

This Motion for Sanctions will delineate each factual and legal misstatement made by Mr. Noah Radbil, Mr. Aaron Radbil, and Mr. Dennis Kurz in Plaintiff's most recent filings. Because the misrepresentations were made with full knowledge of the falsity of the statements

---

[15] *See* Exhibit B, at Repair Order dated October 28, 2009.
[16] NNA has now incurred over $170,000.00 in fees to defend this case.
[17] *See* correspondence from NNA's counsel to Plaintiff's counsel dated February 15, 2010, attached as Exhibit E.
[18] *See* excerpts of NNA's New Vehicle Limited Warranty, attached as Exhibit R, at p. 6.
[19] *See* electronic correspondence from Plaintiff's counsel to NNA's counsel dated February 22, 2010, attached as Exhibit F.

with intent to mislead the Court and to harass NNA, NNA seeks monetary sanctions; requests the Court suspend Plaintiff's counsel, Noah Radbil and Dennis Kurz, from practicing before this Court, and revoke the *pro hac vice* admission of Mr. Aaron Radbil.

### III.
### PLAINTIFF'S COUNSEL SHOULD BE SANCTIONED UNDER FEDERAL RULE OF CIVIL PROCEDURE 11

**A.  Purpose Of Rule 11 Sanctions**

Federal Rule of Civil Procedure 11 provides a district court with the inherent power to regulate cases pending before them. *Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991). This power originates from "'the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Natural Gas Pipeline v. Energy Gathering, Inc.,* 2 F.3d 1397, 1406 (5th Cir. 1993) (quoting *Link v. Wabash R. Co*., 370 U.S. 626 (1962), *cert. denied*, 114 S. Ct. 882 (1994)).

Rule 11 states as follows:

> By presenting to the court a pleading, written motion, or other paper — whether by signing, filing, submitting, or later advocating it — an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

FED. R. CIV. P. 11(b).  Should the Court determine this Rule has been violated, Rule 11(c) allows for the Court to impose sanctions on the party, attorneys, and/or law firm.

If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation.  <u>Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.</u>

FED. R. CIV. P. 11(c) (emphasis added).

Sanctions pursuant to a court's inherent authority serve the "dual purpose of 'vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy.'"  *Chambers, Inc.,* 501 U.S. at 46.  The Advisory Committee to Rule 11 makes clear the Rule is meant to deter counsel from filing improper pleadings:

[T]he word "sanctions" in the caption . . . stresses a deterrent orientation in dealing with improper pleadings, motions or other papers. . . .  And the words "shall impose" in the last sentence focus the Court's attention on the need to impose sanctions for pleading and motion abuses. The court, however, retains the necessary flexibility to deal appropriately with violations of the rule. It has discretion to tailor sanctions to the particular facts of the case, with which it should be well acquainted.

As the Fifth Circuit has noted, Rule 11 "is simple and poses no threat to competent lawyers.  Simply put, a lawyer must have a basis for his pleadings."  *Southern Leasing Partners, Ltd. v. McMullan,* 801 F.2d 783, 789 (5th Cir. 1986). The law is abundantly clear: <u>where an attorney does not have an *objectively reasonable basis* for filing or *continuing to urge* a pleading</u>

before the Court, the Court *must* impose some type of Rule 11 sanctions. *Robinson v. National Cash Register Co.,* 808 F.2d 1119, 1126 n.12 (5th Cir. 1987) (emphasis added).

**B. Counsel's Argument has Crossed the Line of Zealous Advocacy to Dishonesty and Unscrupulousness, and Therefore, Should be Sanctioned.**

In their Response in Opposition to NNA's Motion for Summary Judgment, Plaintiff's counsel, desperate to create a fact issue, used more than creative license in their arguments and restatement of alleged facts. This trend continued through the briefing in Plaintiff's Motion to Strike New Summary Judgment Evidence Submitted in Reply, and Plaintiff's Motion to Strike Impertinent and Scandalous Matter. The following sets forth the false and misleading arguments in Plaintiff's Briefing.

### 1. NNA has always Maintained the Installation of the Aftermarket Mirror Caused Plaintiff's Electrical Problems.

In Plaintiff's Motion to Strike, Ms. Scarlott and her counsel claim that NNA did an "about-face shift in its theory of this case."[20] Their purpose was to set up a straw man in order to knock it down, and to diminish NNA's credibility with the Court. In fact, NNA has maintained the same position since it first heard about the suit: that the installation of the HomeLink mirror caused the electrical problems, and Plaintiff sued the wrong party. Before NNA heard about this suit, Clear Lake had informed Ms. Scarlott of the same.[21]

Plaintiff's counsel directs this Court to correspondence from NNA's counsel at the initiation of suit wherein NNA relays what it was told by the dealer's service manager about the improper installation of the mirror.[22] At that time, Bob Gore related the mirror was installed improperly due to a diode. Later, Hurricane's corporate representative stated the improper

---

[20] *See* Plaintiff's Motion to Strike Impertinent and Scandalous Matter from NNA's Reply Brief [Doc. No. 84], at pp. 7-9.
[21] *See* Exhibit B, at Repair Order dated October 28, 2009. *See also* Second Scarlott Depo., at 40.1-19.
[22] *See* Plaintiff's Motion to Strike Impertinent and Scandalous Matter from NNA's Reply Brief [Doc. No. 84], at p. 7.

installation was due to improper wiring. Either way, the cause was improper installation of a non-Nissan part. Plaintiff told this Court that this technical inconsistency between Clear Lake and Hurricane represents a total about-face shift in NNA's theory of the case.

In May 2010, six months after suit was filed, Mr. Gore testified that although a diode was allegedly installed in the aftermarket mirror, its improper installation was causing the Murano's battery to drain.[23] This was based on his communications with Hurricane, who corrected the problem. In that same testimony, Mr. Gore explained that Clear Lake believed the electrical problems were caused by the improper installation of the HomeLink mirror:

> Q: My question is: As a certified master technician, do you have an opinion as to what caused the electrical problems in Ms. Scarlott's vehicle?
>
> A: What caused it was the mirror itself.[24]
>
> ***
>
> Q: Okay. If you knew that this mirror were installed improperly or was causing failures in the batteries or problems in the electrical system, would you recognize that that would -- would it be your opinion that it would or would not be covered under the Nissan –
>
> A: It would not be covered.[25]

Since Gore's deposition, Hurricane has been added as a defendant in this suit and admitted it incorrectly installed the mirror by reversing two wires.[26] At Ms. Scarlott's second deposition, she too confirmed the installation of the mirror caused the problems.[27]

NNA has maintained since this suit was filed that the installation of the aftermarket HomeLink mirror caused the Murano's electrical problems. This was the position of Clear Lake

---

[23] *See* Gore Depo., at 28.11-29.8.
[24] *Id.* at 35.18-21.
[25] *Id.* at 22.5-11.
[26] *See* Gogineni Depo., at 76.15-22.
[27] *See* Second Scarlott Depo., at 33.24-35.15, 45.22-47.6.

before suit was filed. Regardless of whether the cause was the improper installation of a diode, or the improper reversal of the wires, at no time has NNA done "an about face" in its position. Plaintiff's claim that NNA "did an about face" in its theory is false and misleading.

### 2. *Ms. Scarlott stated that Hurricane Correctly Installed the Mirror.*

Plaintiff's counsel has represented to the Court that Hurricane Auto *correctly* installed the aftermarket mirror. In her Response to NNA's First Amended Motion for Summary Judgment, Ms. Scarlott isolated portions of the oral deposition of Hurricane Auto's corporate representative, attempting to manufacture a fact question as to the cause of the Murano's intermittent electrical problems. Ms. Scarlott, not once, but twice in her Response Brief, quoted Srinivasa "Sam" Gogineni, Hurricane Auto's owner and corporate representative, as having testified the HomeLink mirror was "installed correctly."[28] In fact, he clarified the mirror was installed correctly only *after* it was brought in for the final repair in November 2009.[29] Originally, it was installed with two wires reversed. Plaintiff made this misleading argument to the Court even though she herself sued Hurricane, and testified in her second deposition that Hurricane was responsible.[30]

In its Reply to Plaintiff's Response in Opposition to NNA's First Amended Summary Judgment, NNA questions Plaintiff's counsel's ethics because of their purposeful omission of Hurricane Auto's testimony that the mirror was incorrectly installed. Plaintiff's counsel have made several filings since this time,[31] but have not corrected their false and misleading statements.

---

[28] *See* Plaintiff's Response Brief [Doc. 70], at pp. 25, 39.
[29] *See* Gogineni Depo., at 75.25-76.12.
[30] *See* Second Scarlott Depo., at 33.24-35.15, 45.22-47.6.
[31] *See generally* Plaintiff's Motion to Strike NNA's New Summary Judgment Evidence Submitted in Reply [Doc. No. 83]; and Plaintiff's Motion to Strike Impertinent and Scandalous Matter from NNA's Reply Brief [Doc. No. 84].

NNA has presented this Court with sworn testimony from Mr. Gogineni wherein he admits Hurricane Auto incorrectly installed the aftermarket rearview mirror.

> Q:    So how did you check it?
>
> A:    So I checked it by going through these instructions on the -- **checking this note saying that if it got the -- the power on, the mirror was on all the time, then it could drain the battery. Then we checked the mirror, the -- what you call the display mirror.** ***So it was on. So we thought that's probably draining the battery*** . . . .[32]

To repair this issue and correct the intermittent electrical problems, Hurricane reversed the "constant" and "ignition" wires.[33] Omitting Hurricane's admission of fault, and citing to a singular sentence from Mr. Gogineni's deposition referencing the mirror was correctly wired, was done with Plaintiff's counsels' full knowledge the quotation was misleading.

Hurricane's admission of fault is not the only evidence of causation. Even before suit was filed, Ms. Scarlott believed the mirror was causing the intermittent electrical drain.

> Q:    What happened next in March of 2007?
>
> A:    I can't tell you exactly what days everything happened because they were sporadic. You know, one, two, three things would happen and I would have to keep taking it up there like week after week and then it would stop. And then a month or two or three would go by and I would start having electrical issues again and I'd take it back up there. And every time they'd say, "Well, we don't -- you know, we don't know if it's this; we don't know if it's that. We're going to fix this; we're going to fix that." They changed out batteries. They -- I mean, I can't even tell you all the things they did.
>
> Q:    And what period of time was this?
>
> A:    This went on from like the six months that I owned the vehicle until 2009, until December of 2009.

---

[32] *See* Gogineni Depo., at 76.15-22 (emphasis added).
[33] *Id*. at 79.13-18, 79.19- 80.4, 80.10-81.6.

Q:    So from approximately June or July of 2007 through December of 2009?

A:    Yes.

Q:    And during that period, did you request to have the mirror fixed or replaced?

A:    I asked -- I made the suggestion. **I said, "Do you think maybe it's the mirror causing all these problems?"** And Bob Gore replied to me that they had put something on it -- I can't even remember what the term is -- **but that it had been tested for a draw, like how much amperage it draws, and that it was inconclusive**.[34]

Her suspicions were later confirmed. Ms. Scarlott readily testified that the *aftermarket mirror* caused the Murano to be inoperable.

Q:    Again reading from your complaint, you indicate: "The conduct of Defendants described above constituted gross negligence such that, when viewed objectively, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others" -- well, let's just stop there for a second. Would you describe Hurricane's gross negligence?

***

A:    *I think that the mirror was not installed correctly, and I also think that there were issues with the product itself*.

Q:    **"The product," you mean** --

A:    *The mirror*. And it created a safety hazard.

Q:    Please describe the safety hazard.

***

A:    Getting stuck on the side of the road at dark, getting stuck in the middle of an intersection and not being able to start my vehicle to get out of oncoming traffic, getting stuck in parking lots and not being able to get in my vehicle.

---

[34] *See* Second Scarlott Depo., at 26.18-27.20 (emphasis added).

Q:      So the risks you're referring to -- please clarify if I'm incorrect -- is not that the mirror was inoperable but that the car was inoperable?

                                        ***

A:      *__To my knowledge, the mirror created the problem that made the car inoperable__*.

Q:      And the risks you were just testifying to, the car getting stuck, as you put it, occurred because the car wouldn't operate?

A:      Correct.

Q:      **And you're attributing that to the mirror**?

A:      **I'm attributing it to what the dealership service department said was the issue**.[35]

In fact, Ms. Scarlott suspected the mirror was causing the problems as early as March 2007, and her suspicions were confirmed in November 2009 when Clear Lake technicians ultimately diagnosed the problem.[36]  Despite their own client's testimony, Plaintiff's counsel has failed to withdraw their frivolous pleadings and continues to make this Court believe the mirror was installed correctly.

### 3.   The Security + Plus® Plan does not Cover an Aftermarket Accessory.

Ms. Scarlott and her counsel repeatedly tell the Court the Security + Plus® Plan and/or Maintenance + Plus® Plan cover aftermarket modifications made to the Murano.[37]  They make this false statement because the Plan says it covers defects, so if the Plan paid a claim, it is an admission by NNA of defect, so they argue.  But the Security + Plus® Plan only applies to Nissan products; it does not apply to claims covered by the factory warranty and does not cover

---

[35] *See* Second Scarlott Depo., at 45.22-47.6 (emphasis added).  *See also id*. at 33.24-35.15.
[36] *Id*. at 40.1-19.
[37] *See* Maintenance + Plus® Plan, attached as Exhibit I.  This Maintenance + Plus® Plan covers routine maintenance, such as oil and filter changes, tire rotations, and the like.  *Id*. at § 3.  It does not cover repairs to a vehicle.  *Id*. at § 11.

batteries.[38]  Moreover, a representative of the Plan testified the Security + Plus® Plan has paid no claim on this car.[39]  Plaintiff intentionally avoids telling the Court these things.

The Security + Plus® Plan does not apply the Murano's Homelink mirror.  As clearly conveyed in the terms of the contract, the Security + Plus® Plan only covers "Mechanical Breakdown," which is the "inability of a covered part(s) to perform the function(s) for which it was designed, due solely to <u>defects in Nissan materials</u> or faulty workmanship for which Nissan is responsible."[40]  There is no dispute the original factory mirror installed in the Murano was replaced due to customer preferences.  Ms. Scarlott did not replace the mirror due to "mechanical breakdown," but because she wanted a mirror with additional features,[41] and the trim model Murano she purchased did not have an option for same.  To now claim NNA breached its contractual obligations because Ms. Scarlott replaced a factory-installed component with an aftermarket accessory is disingenuous, at best, and dishonest, at worst. To claim the Security + Plus® Plan paid on any claim on this car is knowingly false.

### 4.  The Security + Plus® Plan Expressly Excludes Battery Failures.

Ms. Scarlott filed her Motion to Strike Impertinent and Scandalous Matter from NNA's Reply Brief, unhappy that NNA had accused her counsel of ethical breaches.  Ms. Scarlott intended to argue that "NNA's considerable allegations of professional misconduct [were] false."[42]  Yet, Ms. Scarlott accomplished just the opposite.  She avers in her Motion to Strike that "[c]overage under the Security + Plus® Plan is exclusively limited to mechanical failures

---

[38] *See* Security + Plus® Plan, attached as Exhibit J, at §§ 3, 4, 8.2.
[39] *See* Affidavit of Henry Yu dated August 23, 2011, attached as Exhibit P.  Note that the Security + Plus® Plan reimbursed a portion of a rental vehicle on one occasion.  *Id*.
[40] *See* Exhibit J, at § 1 (emphasis added).
[41] *See generally* Second Scarlott Depo., at 14.22-16.3.
[42] *See* Plaintiff's Motion to Strike Impertinent and Scandalous Matter from NNA's Reply Brief [Doc. No. 84], at p. 1.

[battery failures for example]. . ."[43]   The Security + Plus® Plan, however, *expressly excludes* coverage for the replacement of batteries.[44]

> 8       **WHAT IS NOT COVERED**
> . . .
> 8.2     Paint, exhaust system, carpet, glass, upholstery, soft trim, weatherstripping, convertible soft top, moldings, bright metal, clutch disc, pressure plate and throw out bearing (manual transmission), any and all in-vehicle communications systems and/or mobile entertainment systems, air bag sensors, conversion of the air conditioning system to operate on R134, audio system components, ***battery***, lenses and bulbs, belts and hoses, tires, brake drums, disc brake rotors, wheels, shock absorbers, MacPherson strut inserts, squeaks, rattles, water leaks, wind noise, immobilizer key, and remote keyless entry switch assembly.[45]

It seems to be a habit with these lawyers to make any argument they want, regardless of the truth.

### 5.  *Nissan-Certified Technicians Repaired the Murano.*

Peppered throughout her Response Brief to NNA's First Amended Motion for Summary Judgment, Ms. Scarlott states NNA "refused" to perform repairs to the Murano at factory authorized dealerships.  In Ms. Scarlott's own words, "Nissan admits that Clear Lake failed live up to its delegated obligations.  Specifically, Clear Lake refused to perform repairs to the Murano at a factory authorized dealership, failed to perform repairs by way of factory trained technicians, and chose not to perform repairs using genuine Nissan parts."[46]  These statements are patently false.

As demonstrated by the warranty history, repair records, and deposition testimony of Bob Gore, Clear Lake's Service Manager, NNA did not deny a single warranty claim.[47]  NNA reimbursed Clear Lake for every warranty repair submitted, even those it should have rejected.

---

[43] *Id.* at p. 6.
[44] *See* Exhibit J, at § 8.2.
[45] *Id.* (emphasis added).
[46] *See* Plaintiff's Response Brief [Doc. No. 70], at p. 65.  *See also id.* at pp. 4, 57, 64.
[47] *See generally* Exhibit B.

Q:     Now, you've taken a look at the repair history for Ms. Scarlott's vehicle, right?

A:     Yes, sir.

Q:     Throughout that -- those repairs, Clear Lake was performing the repairs and later submitting those repairs as warranty claims to Nissan, right?

A:     Yes, sir.

Q:     And did Nissan pay for all those repairs?

A:     Yes, they did.

Q:     Did Nissan ever refuse to cover anything that you submitted under warranty for --

A:     No.

Q:     -- Ms. Scarlott?

A:     No.[48]

The result was Ms. Scarlott has no out-of-pocket expenses associated with repairs made to the Murano.[49]

Ms. Scarlott and her attorneys each know that the repairs made to the Murano were performed by Clear Lake Nissan, an authorized Nissan dealership, by factory trained technicians. Clear Lake used genuine Nissan parts in the repairs to the Murano, and Ms. Scarlott has not identified any facts to the contrary. Ms. Scarlott testified she has no complaints with the service she received from Clear Lake and continues to have her vehicle serviced there.

Q:     Do you continue to have the car serviced at the dealership [Clear Lake Nissan]?

A:     Yes.

Q:     Any complaints with your service since then?

---

[48] *See* Gore Depo., at 24.4-17.
[49] *See* First Scarlott Depo., at 72.2-12.

A:      No.[50]

Plaintiff's accusation that NNA "refused" to perform repairs to the Murano at factory authorized dealerships appears to be based on Clear Lake and Plaintiff's decision to have Hurricane install, and later repair, the aftermarket mirror. This argument is shocking in its dishonesty.

### 6.   The Body Control Module did not Cause the Murano's Intermittent Electrical Problems.

Ms. Scarlott argues from time to time that the factory-installed Body Control Module ("BCM") could have caused the Murano's parasitic drain, rather than Hurricane's mirror.[51] She does this in spite of overwhelming evidence from NNA's representatives/experts, Hurricane's admission, Ms. Scarlott's own testimony, the repair history, as well as the testimony of her own expert. She makes this false argument simply to avoid NNA's counterclaim and its Amended Motion for Summary Judgment.

Ms. Scarlott takes testimony from Bob Gore, Neal Barnes, and Ryan Schooley out of context to create this scenario, quoting summaries from the repair orders.[52] Most prominently, Plaintiff claims in Subtitle O of her Summary Judgment Response Brief that Neal Barnes testified the BCM "could likely be a cause of her electrical problems."[53, 54] Contrary to Plaintiff's assertions, neither Mr. Barnes nor any of these persons ever testified the original BCM

---

[50] *See* Second Scarlott Depo., at 36.15-19.
[51] *See* Plaintiff's Response Brief [Doc. No. 70], at pp. 19-20, 22-23, 34-37.
[52] *See* Plaintiff's Motion to Strike Impertinent and Scandalous Matter from NNA's Reply Brief [Doc. No. 84], at pp. 4-5.
[53] *See* Plaintiff's Response Brief [Doc. No. 70], at p. 19.
[54] Mr. Barnes is not and has never been designated as NNA's expert in this case. *See* Nissan North America, Inc.'s Designation of Expert Witnesses, attached as Exhibit K. NNA has not relied upon Mr. Barnes to provide technical-type testimony. Mr. Barnes's role has been as NNA's designated corporate representative, presented to offer testimony regarding NNA's express, new vehicle limited warranty and warranty exclusions. *See* Nissan North America, Inc.'s Objections and Responses to Plaintiff's Third Amended Notice to Take the Deposition of Defendant's Rule 199(b)(1) Representative, attached as Exhibit L. In preparation for his testimony, Mr. Barnes reviewed the repairs orders and warranty history in this case, and was able to testify as to his understanding of these documents. Recall also that NNA did not participate in selling the Murano to Ms. Scarlott, did not assist her in choosing an aftermarket HomeLink rearview mirror to replace the factory mirror, and had no knowledge regarding the modifications until after suit was filed against it.

was not powering down and was actually causing the Murano's battery to drain. Instead, their deposition testimony shows Mr. Barnes and Mr. Schooley were providing responses to a hypothetical question – if a BCM is not powering down, it can, *hypothetically,* cause a battery to drain.[55] In fact, because of this possibility, Clear Lake replaced the BCM. Unfortunately, this did not fix the problem.

NNA has presented this Court with affidavit testimony from Bob Gore, Clear Lake's Service Manager, who replaced the subject Murano's BCM. Mr. Gore explained that Clear Lake replaced the BCM "with the hopes of repairing the subject Murano's recurring and intermittent electrical problems. . . as other avenues of repair had not been successful."[56] Neither Plaintiff nor Clear Lake tested the original BCM and there is no evidence the BCM was, in fact, causing the Murano's battery problem.[57] This is consistent with Mr. Gore's deposition testimony, which Ms. Scarlott chose not to disclose to the Court.

> Q:      [The Murano] was also towed in, Bob?
>
> A:      Yes, sir, it was. The battery is dead again. Got in and, of course, I told her I found the problem with it and -- you know, because that's when my DTS or Nissan – there's no way I can tell what's going on inside a body computer. You know, it's like looking at your tile on your desk computer and saying, "I know what's wrong with it." **So I put a BCM as per Nissan, you know; and this was through a suggestion, *not really so much working on this particular car*.** But I felt real comfortable with this repair.
>
> Q:      What -- what -- what was the symptom, again, that was -- that was explained to you, and -- and -- and -- and why -- and why you chose to -- why you chose to replace the Body Control Module?
>
> A:      I had a GTR that a battery kept going down on us.[58]

---

[55] *See* Plaintiff's Response Brief [Doc. 70], pp. 19-20, 22-23.
[56] *See* Affidavit of Robert Gore, attached as Exhibit M, at ¶ 6.
[57] *Id.* at ¶ 5.
[58] *See* Gore Depo., at 146.23-147.15 (emphasis added). The remaining text of the above quote is as follows:

Plaintiff does not tell the Court that the replacement did not work, and that Ms. Scarlott returned days later with the same complaints.[59]

Moreover, Ms. Scarlott knows the BCM did not cause these problems. Plaintiff's own testifying expert, Mr. Stephen Weaver, <u>never</u> suggests the BCM caused or contributed to causing the Murano's electrical problems in any of his three expert reports or deposition.[60] Instead, Mr. Weaver opines the BCM required replacement not because it was defective, but because it experienced an alleged voltage spike supposedly caused when the vehicle's battery was replaced.[61]

> Q: So the fact that a module was replaced is evidence to you that somebody at Clear Lake reversed polarity and/or caused the voltage spike?
>
> \*\*\*
>
> A: **I feel that, yeah, those modules don't go bad by themselves**. Usually the state of electronics in this day and age, they are very reliable and very seldom go bad unless abused.

---

Q: Uh-huh.
A: And the GTR is our $100,000 sports car. I'm assuming you're familiar with that car. But I had one that the battery kept going down, just like this. We couldn't find a problem with it. So actually, I've got a direct line or -- like I said, I've got a direct line. I can call these engineers and talk to them. And I was -- and especially being a GTR, because when they come out they were hot commodities or -- they got priority.

And so I called him. I said, "I got this GTR. The battery is going dead." He said, "Bob, if you got a GTR or Murano, we're finding out to put BCMs in them." And then when Ms. Scarlott called me on this time with a battery dead again, I said, "Well -- and that was just -- you know, with Nissan telling me that -- it's kind of like having a technical service bulletin. There's not a technical service bulletin, but I had a Nissan engineer tell me this. And with me not ever being able to see a drain on this battery, you know, it made sense to me as a technician.

*Id*. at 147.16-148.12.

[59] *See* Exhibit B, at Repair Orders dated September 10, 2009 and September 24, 2009.

[60] *See* excerpts of the deposition of Stephen Weaver ("Weaver Depo."), attached as Exhibit N, at 36.4-37.8.

[61] NNA denies there is any evidence Clear Lake allegedly improperly installed a battery replacement, and denies there is any evidence that any alleged voltage spike occurred. NNA submits the testimony of Stephen Weaver to demonstrate Plaintiff has no evidence supporting her allegations that the BCM allegedly caused the Murano's intermittent electrical problems.

Q:     But you don't know what that module is and you've never inspected it, right?

A:     No, I have not inspected it.

Q:     And you've not spoken with the technician at Clear Lake about why that module had to be replaced?

A:     No, I have not.

Q:     So you're basing that opinion strictly on the fact that it had to be replaced, right?

A:     Yes.[62]

The BCM theory is one concocted by Plaintiff's lawyers to justify their continued harassment of NNA, and to attempt to create a fact issue where there is none.

Not only does Plaintiff's expert disagree with Plaintiff's "defect theory," Ms. Scarlott says it was impossible to test the BCM, citing to Schooley's testimony.[63]  Yet, Mr. Schooley did not say the BCM could not be tested once it was removed from the vehicle, and no such testing was ever conducted by Clear Lake to confirm the presence of an alleged "defect."  Plaintiff's counsel argues the BCM caused the Murano's electrical problems without a whit of evidence, and contrary to the evidence in this case.

More recently, Ms. Scarlott filed a Motion to Strike NNA's New Summary Judgment Evidence Submitted in Reply [Doc. No. 83] and a Motion to Strike Impertinent and Scandalous Matter from NNA's Reply Brief [Doc. No. 84].  In both Motions, Ms. Scarlott fails to cite to *any* portion of the record in which *any* person testified the BCM in the subject Murano was *actually*

---

[62] *See* Weaver Depo., at 44.9-45.3 (emphasis added).
[63] *See* Plaintiff's Motion to Strike New Summary Judgment Evidence Submitted in Reply [Doc. No. 83], at p. 5.  Plaintiff specifically avers as follows:

> The portions of testimony that didn't make the cut explain that formal testing is not a function of BCM defectiveness. Rather, a defective BCM cannot be tested while still installed in a car, which is why Clear Lake Nissan replaced it without testing after documenting that the BCM failed to fall asleep.

*Id*.

failing to "fall asleep" and therefore was causing the battery to drain.[64]  Ms. Scarlott's lawyers' strategy is to obfuscate and throw so much mud that the truth will be obscured.  This is not the behavior of a professional or an officer of the court.

### 7.  The Security + Plus® Plan is Inapplicable to Plaintiff's Causes of Action.

Peppered through Plaintiff's Response to NNA's Motion for Summary Judgment, Ms. Scarlott and her counsel repeatedly argue the Security + Plus® Plan covered repairs made to her Murano.[65]  Ms. Scarlott further argues that because the Plan covers "defects in Nissan materials or faulty workmanship," NNA has admitted breach of contract and product defect.[66]

Contrary to Plaintiff's assertions, the Security + Plus® Plan does <u>not</u> apply to repairs made to the subject Murano because coverage does not begin until the expiration of the factory warranty.[67]  Plaintiff knows this because it is clearly stated in the Security + Plus® Plan:

> **MECHANICAL BREAKDOWN** and towing coverage begins when the New Vehicle Warranties described in your Warranty Information Booklet expire.[68]

In addition to the contract itself, Ms. Scarlott and her attorneys also have possession of two previously filed Affidavits from a representative of Nissan Extended Services North America, GP ("NESNA"), proving that "**no claims** for repairs or replacement parts have been covered by NESNA under the Security + Plus® Gold Vehicle Protection Plan (Policy Number NCDB02684397) for the Subject Vehicle."[69]  Yet, Ms. Scarlott and her counsel continue to file

---

[64] *See* Plaintiff's Motion to Strike Impertinent and Scandalous Matter from NNA's Reply Brief [Doc. No. 84], at pp. 2-5.

[65] *See* Plaintiff's Response to Nissan's Motion for Summary Judgment ("Plaintiff's Response Brief"), already on file herein [Doc. No. 70], at pp. 2, 3, 10, 12, 20 fn. 11, 22, 29, 31-32, 34, 37, 57-59, 60-63, 64.

[66] *Id.*

[67] *See* Exhibit J, at § 3.  *See also* Affidavit of Henry Yu, dated March 29, 2011, attached as Exhibit O, at ¶ 2.

[68] *See* Exhibit J, at § 3 (emphasis added).

[69] *See* Affidavit of Henry Yu dated August 23, 2011, attached as Exhibit P, at ¶ 6 (emphasis added); *see also* Exhibit O, at ¶ 4.

false pleadings contrary to this.[70]

### 8. *NESNA did not Make any Reimbursements Under the Security + Plus® Plan.*

Ms. Scarlott represents to the Court that NNA reimbursed Clear Lake under the Security + Plus® Plan when Clear Lake replaced the Murano's mass air flow sensor on October 2, 2007 and the BCM on September 16, 2009.[71]  In support, Ms. Scarlott cites this Court to the Nissan Vehicle Claims History.  However, NNA has provided deposition and affidavit testimony to explain the notations made on the Nissan Vehicle Claims History.  Ms. Scarlott wholly neglected to inform the Court of this evidence.  In particular, the Nissan Vehicle Claims History on which Plaintiff relies, show the claims were "Paid," but does not indicate whether NNA paid the claim under the basic warranty or NESNA paid the claim under the Plan.

> Q:    So the document that indicates that the BCM was covered in the Security Plus agreement is a Nissan document; is that correct?
>
> A:    No.  The document said that the claim was paid; it does not say who paid it.
>
> Q:    And your explanation for why it says that it was covered under the vehicle claims history, under the Security Plus agreement, is what exactly?  I'm not following.  I'm not trying to give you a hard time, it just doesn't make sense to me right now.
>
> A:    It states under both that the claim was paid, but it doesn't say whether the factory warranty paid or the Security+Plan paid.  Since the Security+Plan coverage is not activated until 3 years or 36,000 miles, we now know that the factory warranty paid.  That's just how the dealership codes it.  That is a part that could have been covered under the Security Plus, but since the vehicle had less than three years or 36,000 miles on it, it was covered by the factory

---

[70] A portion of a rental vehicle was covered under the Security + Plus® Plan in a singular visit to the dealership.  *See* Exhibit P, at ¶¶ 9-10.  Ms. Scarlott, however, has had no out-of-pocket expenses for repairs made to the Murano.  *See* First Scarlott Depo, at 72.2-12.  She also did not experience any loss-of-use since she was provided with a rental vehicle when her vehicle was under repair.  *See generally* Exhibit B.  Covering a portion of the cost of a rental vehicle does not equate to repair coverage for mechanical breakdowns under the Security + Plus® Plan.  Any argument to the contrary by Plaintiff is illogical, unsupported by the plain language of the contract, and not based upon the principles of contractual interpretation.

[71] *See* Plaintiff's Response Brief [Doc. No. 70], at pp. 10, 12, 22, 31, 34, 37, 62.

warranty.

>So even though it shows on the CA file that it was covered under the Security Plus, we did talk with NESNA and NESNA did confirm it was not covered under the Security Plus.[72]

Plaintiff's counsel has not corrected their filings to advise the Court that according to Henry Yu, a NESNA representative, all parts and labor associated with repairs to the BCM were paid under the factory warranty.[73] In addition, the expense to tow the Murano to the dealership was covered under the factory warranty.[74] In spite of this uncontroverted testimony, Ms. Scarlott continues to represent to the Court that repairs to the Murano were was paid under the Plan. It is one thing to present only evidence that helps one's cause. It is quite another to present evidence that she knows is false and misleading.

### 9. Repairs Made to the Murano Are not Concessions of Defect.

In direct contravention with every pleading, filing, motion, and correspondence NNA has served in this case, Plaintiff's counsel has represented to this Court that "Nissan concedes the existence [of] defects in materials or workmanship of parts and components that it supplied."[75] Ms. Scarlott then refers the Court to the repair records for the Murano, stating the following:

>Nissan admits that Clear Lake performed repairs to correct defects in the Murano's electrical system, including but not limited to a defective "REAR WIPER ARM," a defective "DOME FUSE," a defective "BCM," defective "REMOTE[S] and defective [KEYS], as well as five (5) defective "BATTERY[S]," and that that Clear Lake performed repairs to correct defects in the Murano's engine system, including but not limited to a defective "MASS AIRFLOW SENSOR."

---

[72] See excerpts of the deposition of Ryan Schooley ("Schooley Depo."), attached as Exhibit Q, at 30.12-31.15 (emphasis added).
[73] See Exhibit P, at ¶ 9.
[74] Id. Ms. Scarlott also received a rental vehicle. A portion of the rental was covered under factory goodwill, and the other portion was paid under the Security + Plus® Gold Vehicle Protection Plan. Id.
[75] See Plaintiff's Response to NNA's First Amended Motion for Summary Judgment [Doc. No. 70], at p. 29.

Plaintiff's theory is that since NNA paid for these repairs, it admitted the parts replaced were defective. Noticeably absent is any legal support or industry standard verifying her argument that a single repair made to a component part indicates that part is *per se* defective. The reason is because Plaintiff's contentions are flatly incorrect, baseless, and made in bad-faith.[76]

Further, the components Ms. Scarlott lists in her Briefing were not replaced because they were "defective." Ms. Scarlott complained the wiper was loose and technicians re-installed it.[77] Similarly, the dome light was not replaced. Instead, technicians simply installed a fuse.[78] That was the only repair related to the dome light.[79] Ms. Scarlott also complained her vehicle keys were "defective."[80] As clearly noted in the repair order, Plaintiff did not leave her extra keys with the dealer, so they were **not available** when Clear Lake replaced the Murano's Body Control Module:

```
       ELECTRICAL                        TECH(S):309
CUSTOMER STATES TWO OF THE KEYS WILL NOT START THE VEHILCE
KEYS WERE NOT PRESENT DURRING BCM REPLACEMENT
PROGRAMED KEYS ....NO CHARGE TO CUSTOMER
```

Replacing the BCM required reprogramming the keys when Ms. Scarlott had them in her possession.[81]

> Q: Explain to me this -- kind of the sum and substance of how this -- the complaints when coming in and the work that was performed.

---

[76] Texas courts have held the mere existence of a product failure does not alone establish a fact issue of defect in the product. *See Rodriguez v. Ed Hicks Imports*, 767 S.W.2d 187 (Tex. App.—Corpus Christi 1989, no writ) (holding the mere fact an automobile overheats, ejecting water from its radiator, was insufficient proof the radiator or its cap was defective); *Kroger Co. v. Betancourt*, 996 S.W.2d 353, 358 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (concluding the straddle stacker, used to stack groceries, was not defective merely because an accident occurred).

[77] *See* Exhibit B, at Repair Order dated February 20, 2007.

[78] *Id*. at Repair Order dated September 12, 2007.

[79] *Id*.

[80] *See* Plaintiff's Response to NNA's First Amended Motion for Summary Judgment [Doc. No. 70], at p. 28.

[81] *See* Exhibit B, at Repair Order dated September 18, 2009.

A:     Okay.  When Ms. Scarlott -- I can explain this one real good, because I remember this one right here.  Ms. Scarlott, of course, when – of course, when she left -- when she brings a car in, she gives us her – I'm going to say valet key.  You know, she keeps her original key, correct?  She's got two keys?

Q:     Sure.

A:     And we put a BCM in this car, so -- which is a body control module; so when we had her key in the shop, we had to reprogram her key to that particular BCM, the one we replaced.[82]

***

Q:     With respect to this complaint here, "Customer states vehicle died at a stop right after she left here" --

A:     Yeah.  She left here --

Q:     -- "last night."

A:     She left here; she's sitting at a red light, cut her car off and -- to put her key in; and put her -- I guess her valet key.  You know, she's just – she's just getting back to her routine, putting her key in her car.  This is what happened, because she told us.

She cut it off and when she went to put her key in, it's not programmed to that BCM and it went to a failsafe.  So she called, and Doug said, "Use the key that's programmed and come back by, and we'll reprogram the key that wasn't here when we put a BCM in."

Q:     Okay.  Did she explain to you basically this whole incident at the traffic light?  Did she explain to you that she cut her car off?

A:     That's the -- well, she didn't tell me.  She told Doug Keith, the service writer.[83]

The keys simply had to be reprogrammed after replacing the BCB, and this was done under warranty.  Telling the Court that NNA has "conceded" the wiper, keys and fuse were defective is knowingly false and another example of counsel's habit of trying to mislead the Court.

---

[82] *See* Gore Depo., at 148.22-149.11.
[83] *Id*. at 149.14-150.9.

Unquestionably, the repair history indicates Ms. Scarlott took her Murano to Clear Lake on multiple occasions for repair. These repairs varied from a single incident involving a cosmetic issue, such as a cup holder, to multiple visits related to the intermittent electrical issues. At all times, NNA met and exceeded its obligations by paying for claims that should not have been covered if NNA had known the battery was failing due to the improper installation of the aftermarket mirror. NNA consistently erred in favor of the consumer and in favor of honoring its warranty. Ms. Scarlott claims NNA conceded the existence of defects in its products because its dealer tried to repair these problems. This is a classic "Catch-22."[84] If NNA had refused to repair those problems, NNA would have been sued for failing to meet its warranty obligations. But because NNA paid for the warranty repairs, Ms. Scarlott argues such is an admission of wrongdoing and defect, and is being sued for failing to meet its warranty obligations. This argument is intellectually dishonest and unsupported by applicable case law. NNA has spent over $170,000.00 defending Plaintiff's meritless claim. For this reason, NNA respectfully requests this Court sanction Plaintiff's counsel in accordance with Federal Rule of Civil Procedure 11.

### IV.
### SANCTIONS ARE WARRANTED

Federal Rule of Civil Procedure 11(b)(3) provides an attorney presenting motions or pleadings to the Court "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the *factual contentions have evidentiary support* or, if specifically so identified, *will likely have evidentiary support* after

---

[84] "A Catch-22, coined by Joseph Heller in his novel *Catch-22*, is a logical paradox arising from a situation in which an individual needs something that can only be acquired by not being in that very situation; therefore, the acquisition of this thing becomes logically impossible. Catch-22s are often spoken with regard to rules, regulations, procedures, or situations in which one has knowledge of being or becoming a victim but has no control over it occurring." *See* http://en.wikipedia.org/wiki/Catch-22_(logic).

a reasonable opportunity for further investigation or discovery." FED. R. CIV. P. 11(b)(3) (emphasis added); *Marlin v. Moody Nat'l Bank NA,* 533 F.3d 374, 378 (5th Cir. 2008). Throughout this litigation, both in state court and now in federal court, Plaintiff's lawyers have engaged in a practice of misleading the Court, either through misconstruing evidence, or through direct and indirect misrepresentations. This motion illustrates only the most recent violations of Rule 11 by Plaintiff's counsel. Once the Court finds Rule 11 has been violated, sanctions *must* be imposed against the lawyer, lawyers, and/or party who signs the pleadings. *Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 126-27(1989).

The issue then becomes what are the appropriate sanctions to impose. In that regard, the Court makes the following inquiry:

> (a) What conduct is being punished or is sought to be deterred by the sanction?
>
> (b) What expenses or costs were caused by the violation of the rule?
>
> (c) Were the costs or expenses "reasonable," as opposed to self-imposed mitigatable, or the result of delay in seeking court intervention?
>
> (d) Was the sanction the least severe sanction adequate to achieve the purpose of the rule under which it was imposed?

*Carroll v. Jaques*, 926 F. Supp. 1282, 1291 (E.D. Tex. 1996). In this case, NNA believes the purpose of the sanctions should be two-fold: first, to compensate NNA for incurring litigation costs directly caused by the misrepresentations and baseless contentions; and second, to deter Plaintiff's counsel from similar conduct in the future.

From the inception of suit, NNA has candidly shown Plaintiff that her problems were caused by the installation of the mirror, and has requested nonsuit/dismissal from this case.[85] NNA presented overwhelming evidence confirming the aftermarket mirror caused the Murano's electrical problems, and yet, Plaintiff still maintains suit against it.[86] Plaintiff's counsel continues to file motions or pleadings designed to mislead the Court, and for each, NNA has had to file a Response. NNA has addressed counsel's ethical violations in its various Responses and Motions, yet Plaintiff has not made any attempt to correct any of her pleadings. What's more, counsel continues to maintain and pursue claims and damages against NNA, even though Ms. Scarlott herself admits the aftermarket mirror caused the Murano's electrical problems.

Plaintiff's counsel has abused the judicial process, wasted judicial and monetary resources, and conducted themselves in a manner not fitting for any lawyer in good-standing in this State. As such, NNA believes monetary sanctions and suspension of counsel from practice before this Court are both appropriate and justified. *See Carroll*, 926 F. Supp. at 1291 (noting it is within the Court's inherent powers to impose sanctions, including an award of reasonable attorneys' fees and expenses, disqualify counsel, dismiss the action, and suspend counsel from practice before the court or disbarment, among others). NNA respectfully requests this Court sanction Mr. Noah Radbil, Mr. Aaron Radbil, and Mr. Dennis Kurz in the amount of $50,000.00 for litigation costs and attorneys' fees, and suspend these three attorneys from practicing before this Court, including revoking the *pro hac* admission of Mr. Aaron Radbil.

---

[85] *See* Exhibit E.
[86] *See generally* Gore Depo.

# V.
## EVIDENCE IN SUPPORT

In support of this Motion for Rule 11 Sanctions, NNA relies on and attaches hereto the following evidence:

**Exhibit A:**    Excerpts of the deposition of Bob Gore;

**Exhibit B:**    Business Records Affidavit with accompanying Repair Orders and Sales Documents for the subject 2006 Nissan Murano;

**Exhibit C:**    Excerpts of the deposition of Srinivasa "Sam" Gogineni;

**Exhibit D:**    Excerpts of the deposition of April Scarlott taken April 14, 2011;

**Exhibit E:**    Correspondence from NNA's counsel to Plaintiff's counsel dated February 15, 2010;

**Exhibit F:**    Electronic correspondence from Plaintiff's counsel to NNA's counsel dated February 22, 2010;

**Exhibit G:**    Installation Instructions for the Mito Corporation mirror;

**Exhibit H:**    Excerpts of the deposition of April Scarlott taken September 9, 2010;

**Exhibit I:**    Maintenance + Plus® Plan Manual;

**Exhibit J:**    Security + Plus® Plan Manual;

**Exhibit K:**    Defendant Nissan North America, Inc.'s Designations of Expert Witnesses;

**Exhibit L:**    Nissan North America, Inc.'s Objections and Responses to Plaintiff's Third Amended Notice to Take the Deposition of Defendant's Rule 199(b)(1) Representative;

**Exhibit M:**    Affidavit of Robert Gore;

**Exhibit N:**    Excerpts of the deposition of Stephen Weaver;

**Exhibit O:**    Affidavit of Henry Yu, dated March 29, 2011;

**Exhibit P:**    Affidavit of Henry Yu dated August 23, 2011;

**Exhibit Q:**    Excerpts of the deposition of Ryan Schooley; and

**Exhibit R:**     Excerpts of NNA's New Vehicle Limited Warranty.


Respectfully submitted,


*s/ Jeffrey S. Patterson*
**JEFFREY S. PATTERSON (Lead Counsel)**
State Bar No. 15596700
So. District Bar No. 12446
**GIOVANNA TARANTINO BINGHAM**
Texas State Bar No. 24042613
So. District Bar No. 568188
**HARTLINE DACUS BARGER DREYER LLP**
6688 North Central Expressway, Suite 1000
Dallas, TX  75206
(214) 369-2100
(214) 369-2118

**ATTORNEYS FOR DEFENDANT
NISSAN NORTH AMERICA, INC.**


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM-ECF system on the 31st day of October, 2011.


*s/ Jeffrey S. Patterson*
**JEFFREY S. PATTERSON**

## CERTIFICATE OF CONFERENCE

Counsel for Defendant hereby certifies that he conferred with Plaintiff's counsel in good faith regarding the merits of this Motion. In accordance with Federal Rule of Civil Procedure 11, counsel provided Plaintiff with a courtesy draft of this Motion months ago, and Plaintiff has failed to correct any of her false, incomplete or misleading pleadings. Plaintiff opposes the relief sought, and therefore, counsel for Defendant submits the Motion for Leave for the Court's consideration.

*s/ Jeffrey S. Patterson*
**JEFFREY S. PATTERSON**