| | | |
|---|---|---|
| **UNITED STATES DISTRICT COURT** | | **SOUTHERN DISTRICT OF TEXAS** |

| | | |
|---|---|---|
| April Scarlott | § | |
| | § | |
| *versus* | § | Civil Action 4:10−cv−04865 |
| | § | |
| Nissan North America, Inc., et al. | § | |

### April Scarlott's Response To Nissan North America's Motion For Sanctions

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff April Scarlott files this response in opposition to Defendant Nissan North America, Inc.'s Motion for Rule 11 Sanctions (Doc. 101).

## I.  Introduction.

Counsel for Nissan North America, Inc. ("NNA"), Mr. Jeffrey Patterson and Ms. Giovanna Bingham, claim that Ms. Scarlott's lawyers "misrepresented material facts in order to mislead this Court and justify Plaintiff's suit against NNA." (Doc. 101, page 1 of 30). Ms. Scarlott respectfully requests that the Court deny NNA's Motion for Rule 11 sanctions on the basis of the evidence outlined below.

## II.  NNA Has Throughout the Course of this Litigation Materially Altered its Causation Defense and its Suggestions Otherwise are Quite Disingenuous.

NNA's chief complaint is: "From the inception of suit, NNA has candidly shown Plaintiff that her problems were caused by the installation of the mirror, and has requested nonsuit/dismissal from this case. NNA presented overwhelming evidence confirming the aftermarket mirror caused the Murano's electrical problems, and yet, Plaintiff still maintains suit against it." (Doc. 101, page 27 of 30).

Since the inception of this case NNA has taken the position that the mirror was so obviously to blame that any suggestion otherwise should be met by the Court with deaf ears. However, since the inception of this case NNA has struggled unsuccessfully in trying to conform its theory of causation to the evidence.

From February 15, 2010, through April 27, 2011, NNA's theory of causation was that "**the installation of the mirror is not the cause of the battery draining; it is the design or manufacture of the mirror itself**."  (Document 50-6, pages 3-4) (February 15, 2010, Letter from Mr. Patterson to Ms. Scarlott's lawyers demanding non-suit under threat of NNA seeking warranty reimbursement, fees and expenses).   On April 14, 2011, NNA's initial theory of causation was proven to be false.

On April 27, 2011, NNA filed its amended motion for summary judgment presenting its current theory of causation:   "**The unequivocal evidence shows that due to Hurricane Auto's improper installation, the mirror remained on at all times**." (Doc. 63-1, page 32 of 52).

A.     **NNA's First Theory:  "The Installation of the Mirror is Not the Cause of the Battery Draining; It is the Design or Manufacture of the Mirror Itself."**

On February 15, 2010, Mr. Patterson wrote a letter to Ms. Scarlott's lawyers demanding that Ms. Scarlott immediately non-suit her claims because "the installation of the mirror is not the cause of the battery draining; it is the design or manufacture of the mirror itself."  In relevant part Mr. Patterson represented:

> Clear Lake Nissan took the Murano back to Hurricane Glass, expecting the mirror to be replaced. Instead, Hurricane Glass installed a diode, allowing electricity to flow to the mirror, but prohibiting the aftermarket mirror to pull electricity from the battery. Clear Lake Nissan understands this is not the first time Hurricane Glass had to install a diode to correct similar problems. **In other words, the installation of the mirror is not the cause of the battery draining; it is the design or manufacture of the mirror itself.**

(Document 50-6 at pages 3-4) (emphasis added).

NNA asserted this theory in its motion for summary judgment.  (Doc. 51, page 12 of 44) ("The cause of the Murano's battery draining was ultimately found to be the aftermarket mirror installed by Hurricane Glass.  Hurricane Glass installed a diode to correct this problem, allowing electricity to flow to the aftermarket rear view mirror, but preventing the mirror from draining the battery.").

> **B.     NNA's New Theory:   "The Unequivocal Evidence Shows That Due To Hurricane Auto's Improper Installation, The Mirror Remained On At All Times."**

On April 14, 2011, Hurricane Auto Care & Accessories, Inc.'s, corporate representative, Mr. Srinivasa Gogineni, established once-and-for-all that no "diode" was ever installed in Ms. Scarlott's Murano.  (*See* Doc. 70, page 25 of 70).  On April 27, 2011, Mr. Patterson and Ms. Bingham filed NNA's Amended Motion for Summary Judgment (Doc. 63).

In stark contrast to Mr. Patterson and Ms. Bingham's earlier representations that "the installation of the mirror is not the cause of the battery draining[,]" NNA now argues:  "**The unequivocal evidence shows that due to Hurricane Auto's improper installation, the mirror remained on at all times**." (Doc. 63-1, page 32 of 52) (emphasis added); (*See also* NNA's reply, Doc. 81, page 4 of 16) ("**Improper installation was causing the mirror to remain on at all times, thereby draining the Murano's battery**.") (emphasis added).

## III.    Neither of NNA's Theories Can Succeed In Light Of The Evidence And Testimony Now Before This Court.

NNA's theory that the mirror caused the electrical problems in Ms. Scarlott's Murano forms the core of its defense against Ms. Scarlott's claims.  The  fact  that  NNA's  theory  of causation has materially changed is important because it illustrates the lack of care exercised by

Mr. Patterson and Ms. Bingham in attempting to bully Ms. Scarlott and her lawyers, for more than a year, based on theory which has since been proven totally false.  Before it was proven false, NNA was so confident in its determination that the design or manufacture of the mirror (as opposed to its installation) was to blame, that it threatened Ms. Scarlott and her lawyers with costs and attorneys' fees unless she immediately non-suited.    (*See* Document 50-6).  Notwithstanding, NNA asks the Court to disregard the about-face shift in its theory of causation as a "technical inconsistency."  (Doc. 101, page 8 of 30).

Setting aside the material abandonment of its first theory of causation, the only point concerning NNA's new position that matters is that it cannot possibly be true.  NNA's defense in this case now depends on NNA's ability to conclusively prove that "improper installation was causing the mirror to remain on at all times, thereby draining the Murano's battery."  (Doc. 81, page 4 of 16).  However, the overwhelming weight of the evidence proves that the mirror did not remain on at all times.

### A.    NNA's Original Theory of Causation Failed Based on the Evidence.

NNA's original theory was that "the installation of the mirror is not the cause of the battery draining; it is the design or manufacture of the mirror itself**."**  (*See* Doc. 51, page 12 of 44) (NNA's motion for summary judgment).  NNA relied upon this theory in moving for summary judgment:  "The cause of the Murano's battery draining was ultimately found to be the aftermarket mirror installed by Hurricane Glass.  Hurricane Glass installed a diode to correct this problem, allowing electricity to flow to the aftermarket rear view mirror, but preventing the mirror from draining the battery."  (Doc. 50-1, page 3 of 44).  (*See also* Doc. 50-1, page 12 of 44) ("To correct this problem, Hurricane Glass installed a diode, allowing electricity to flow to

the aftermarket rear view mirror, but preventing the mirror from draining the battery.  Since that installation, Ms. Scarlott has not experienced any electrical issues.").

This theory failed because the evidence shows that no repairs were ever made to the mirror itself and, in particular, that the "diode" which NNA claimed solved the Murano's electrical problems was in fact never installed by Hurricane.  (*See* Doc. 71, page 25 of 70) (quoting Doc. 71-23) (Deposition Testimony of Hurricane Auto corporate representative Mr. Srinivasa Gogineni).  Because the evidence showed that no repairs were ever made to the manufacture or design of the mirror itself, NNA could no longer claim that "the design or manufacture of the mirror itself**"** was to blame.  (*See* Doc. 51, page 12 of 44).

**B.    NNA's Present Theory of Causation Also Fails Based on the Evidence.**

After its original theory failed, NNA hastily derived its present theory from the installation instructions for the Homelink mirror.  These instructions state in relevant part: "NOTE:  If mirror remains on at all times, it could eventually drain the vehicle's battery."  (Doc. 63-1, page 8 of 52).

NNA's presently argues that "[t]he unequivocal evidence shows that due to Hurricane Auto's improper installation, the mirror remained on at all times." (NNA's amended motion for summary judgment; Doc. 63-1, page 32 of 52) (emphasis added); (*See also* NNA's reply, Doc. 81, page 4 of 16) ("Improper installation was causing the mirror to remain on at all times, thereby draining the Murano's battery.") (emphasis added).  Contrary to NNA's claim, the evidence proves that the mirror did not remain on at all times.

1.  **The Testimony Of Ryan Schooley, NNA's Technical Expert Witness, Demonstrates That Installation Did Not Cause The Mirror To Remain On At All Times.**

Mr. Schooley is an automotive technician and automotive electrical engineer designated as NNA's testifying expert witness in this case.  (*See* Expert Report, Doc. 34, page 1 of 12). Based upon his "unique, formal training and on-the-job experience, which qualifies [him] to analyze and diagnose the problems described in the subject Murano's repair orders, as well as in the deposition testimony given by various witnesses in this case[,]" Mr. Schooley reported: "Ms. Scarlott's Murano experienced problems starting because there was insufficient energy in the battery.  There was nothing wrong with the starter.  **The battery simply did not have enough amperage due to the <u>intermittent drain</u> to operate the starter properly**."  (Doc. 34, Expert Report of Ryan Schooley, at page 11 of 12) (section entitled "Specific Problems"); (*see also* Doc. 34, at page 7 of 12) ("As Mr. Gore learned, **the cause/source of an intermittent electrical draw is difficult to discover given the very nature of an 'intermittent' problem**.  The steps Mr. Gore described in his deposition are exactly the steps that a competent technician should follow, given Ms. Scarlott's description of the issues she was having.  Based on my training and experience, if customer comes in with a no crank/no start issue, the first thing to test is the battery.  From the battery you test the starter and charging system.  After those are checked a diagnosis for parasitic drain should be performed as well.  Unfortunately, following those steps does not always yield a solution to the problem.").

2.  **Neal Barnes, NNA's Corporate Representative, Testified that the "Drain" was Intermittent.**

Neal Barnes is NNA's designated corporate representative.  Mr. Barnes is employed by NNA as a "dealer technical specialist" whose primary function is "to provide technical support to dealer service departments, Nissan dealers."  (*See* Deposition testimony of Neal Barnes, page 7,

lines 14-19; 22-24). "Mr. Barnes reviewed the repairs orders and warranty history in this case, and was able to testify as to his understanding of these documents." (Doc. 101, page 16 of 30, n. 54).

Mr. Barnes testified: "They [Clear Lake Nissan] were not able to actually measure an excessive parasitic draw on some occasions and then later on they did. . . . Since it was an intermittent condition and they did trace it back to the mirror, I can't be certain as to what it was in the mirror because I have not seen that assembly, but **something in that mirror simply was creating a drain that was an intermittent condition** that caused drain enough over a period of time to cause the batteries to go dead."). (Deposition testimony of Neal Barnes at page 196, line 15 – page 197, line 4).

### 3. Bob Gore, Clear Lake Nissan's Service Director, Testified That His Tests Showed That The Mirror Always Fell Asleep Sleep Rather Than Remaining On At All Times As NNA Now Claims.

Bob Gore is employed by Clear Lake Nissan where he serves as Service Director. (Deposition testimony of Bob Gore, page 7, line 18). Mr. Gore was directly involved with attempting to repair the Murano's many electrical defects. (*See generally* Deposition Testimony of Bob Gore).

Mr. Gore testified that he repeatedly tested the Murano for an electrical draw. The results of Mr. Gore's test demonstrate that the mirror always fell asleep: "We're trying to – I mean, we're measuring milliamps. We're letting computers go to sleep. We're watching the – the drain on that battery. It would always go down to 23 milliamps, and that's where it's supposed to – when it goes to sleep, that's where it should be. And it would always go there." (Deposition testimony of Bob Gore, page 90, lines 17-23).

Mr. Gore further testified that the mirror would remain asleep for weeks at a time and that the Murano's battery drain was an "intermittent" rather constant situation: "It was actually the Home Link mirror would come on and it would — it was an **intermittent-type situation**. . . . **It actually went to sleep and had been sitting there probably two weeks**, and a technician just happened to walked by one day and seen that it was draining; and that's how we caught it, because, there again, **it was such an intermittent situation**. . . ."  (Deposition Testimony of Bob Gore, page 12, line 15 – page 13, line 8; page 136 line 23 – page 137 line 6).  (*See also* Deposition Testimony of Bob Gore, page 155, lines 4-6) ("[W]e just couldn't find it.  You know, it wasn't – it wasn't rearing its ugly head.").

> **4.     The Authenticated Business Records of The Tests Performed on the Murano Demonstrate that the Mirror Could Not Have Remained On At All Times.**

In support of its amended motion for summary judgment NNA filed the Business Records Affidavit of Michelle Smith, the custodian of records of Clear Lake Nissan.  (Doc. 63-3).  Ms. Smith's affidavit authenticates Clear Lake Nissan's records "related to the sale and repair history of the 2006 Nissan Murano."  (Doc. 63-1, ¶3).  These were kept by Clear Lake Nissan in the regular course of business, and it was the regular practice of Clear Lake Nissan for an employee with knowledge of the act, event, condition, opinion, or diagnosis recorded, to make the record at or near the time or reasonably soon thereafter.  (*See* Doc. 63-1 ¶3).

Clear Lake Nissan's records show that it performed several tests specifically designed to detect a drain on the Murano's battery.  For example, the December 16, 2008 Repair Order shows that Clear Lake Nissan worked with NNA's techline in testing for parasitic drain, in accordance with Mr. Schooley's expert standards, on three different days, and yet they were "unable to duplicate any drain on battery."  (December 16, 2008 Repair Order, Document 63-3)

(Business Records Affidavit of Michelle Smith) ("UNABLE TO DUPLICATE ANY DRAIN ON BATTERY").

Had the mirror remained "on at all times" as NNA claims, the alleged parasitic drain caused by the mirror would have been simple to duplicate.  In fact, it would have been discovered by each test, rather than as Mr. Schooley reported: "difficult to discover given the very nature of an 'intermittent' problem."  (*See also* Deposition Testimony of Ryan Schooley, page 51, line 7 – page 52, line 5); (Deposition Testimony of Bob Gore, page 26, lines 23-25) ("And in the interim of that when you're looking for dead batteries, you look and make sure the alternator is charging, make sure you don't have any parasitic drains on the system itself. Which, we always run those tests.  And it was always inconclusive.").

## IV.    The Evidence Strongly Supports Ms. Scarlott's Theory that the Murano's Body Control Module was Defective and Causing the Electrical Problems.

NNA claims that Ms. Scarlott's argument that the factory-installed Body Control Module ("BCM") could have caused the Murano's parasitic drain is a "false argument made simply to avoid NNA's counterclaim and its Amended Motion for Summary Judgment." (Doc. 101, page 16 of 30).  NNA further alleges that "Ms. Scarlott takes testimony from Bob Gore, Neal Barnes, and Ryan Schooley out context to create this scenario, quoting summaries from the repair orders." (Doc. 101, page 16 of 30).

The "scenario" about which NNA complains was not created by Ms. Scarlott.  Rather, the testimony of Mr. Gore, Mr. Schooley, and Mr. Barnes establish that defective BCMs which fail to power-down (or "fall asleep"), thereby draining the battery,  is a known problem prevalent in Nissan Muranos.  Each of the foregoing individuals testified that if the BCM in Ms. Scarlott's Murano failed to fall asleep it could drain the battery, causing it to fail.

In turn, Clear Lake Nissan's authenticated business, which were made at or near the time of the event recorded, explicitly state that the BCM in Ms. Scarlott's Murano was replaced because it was not falling asleep.  Furthermore, after reviewing at least twenty eight (28) separate pieces of evidence, including the deposition testimony of Mr. Gore and Mr. Barnes, Mr. Schooley concluded in his expert report that:  "**Technicians found the BCM was not falling asleep** and installed a BCM controller assembly."  (Document 34, page 6 of 12) (Expert Report of Ryan Schooley).

NNA does not contest that a defective BCM could cause the Murano's battery to drain. (*See* Doc. 101, page 17 of 30).  Nor does NNA contest the authenticity of Clear Lake Nissan's business records which state that the BCM in Ms. Scarlott's Murano was not falling asleep.  And while NNA attempted to rewrite the most damaging portions of Mr. Schooley's testimony (*see* Doc. 74, Motion to Strike Errata Sheet of Ryan Schooley), his expert report remains in the record.  (Doc. 34).  NNA's contention that "Plaintiff's counsel argues the BCM caused the Murano's electrical problems without a whit of evidence" is itself baseless.

**A.      NNA's Technical Expert Ryan Schooley Reported That "Faulty BCMs" Which Do "Not Go To Sleep Thereby Resulting In A Battery Drain" Is A Known Problem "Prevalent On Murano[s]".**

Ryan Schooley is an automotive technician and automotive electrical engineer working in NNA's Field Quality Investigations department.  (Doc. 34, page 1 of 12).  NNA designated Mr. Schooley as its testifying expert witness because Mr. Schooley possesses "unique, form training and on-the-job experience, which qualifies [him] to analyze and diagnose the problems described in the subject Murano's repair orders, as well as in the deposition testimony given by various witnesses in this case."  (Doc. 34, page 1 of 12).

Mr. Schooley's expert report concludes:  "Clear Lake replaced the Body Control Module (BCM) on the Murano.  I am aware of instances where the BCM would not 'go to sleep,' thereby resulting in a battery drain.  Mr. Gore stated that he heard from DTS [NNA] that problems were prevalent on Murano and GT-R vehicles due to faulty BCMs."  (Expert Report of Ryan Schooley, Document 34 at p. 11, ¶ 6).

> **B.**   **Mr. Schooley's Testimony Corroborates His Expert Report and Further Acknowledges the Fact that a Malfunctioning BCM can Cause an Electrical Draw on the Battery.**

When examined, Mr. Schooley testified about the known BCM problem:  "A.  I mean, there's several of them that had done it.   Q. Several BCMs?  A.  Yeah. It's a problem that can happen on them.  Q. When you say there's "several BCMs," are you referring to in the Altima or in different vehicles, different models?  A. Across the board.  There's a BCM in every vehicle. Q. And if I understand your testimony correctly, a malfunctioning BCM can cause a draw on the battery?  A. Correct.  (Deposition transcript of Ryan Schooley, p. 53, line 17 – p. 54, line 5).

> **C.**   **Mr. Barnes, NNA's Designated Corporate Representative, Testified that the Factory Installed BCM Could be the Cause Of The Murano's Battery Drain.**

Neal Barnes concedes that the factory installed body control module could likely be a cause of the parasitic drain found in the Murano:  "Q. If the BCM did not fall asleep, meaning as you and I take it power down, would that also cause a drain on the battery?  A. If the BCM was not powering down, if its still powered up like it would be with the ignition switch turned on, yes, it could."  (Document 70 at pages 19-20) (quoting deposition testimony of Neal Barnes at page.160, lines 8-21, page 161, lines 10-15).

### D. Bob Gore Testified That NNA Informed Clear Lake Nissan That Some Nissan Muranos And GTR Vehicles Experienced A Phantom Battery Drain Because the BCMs were "Waking Up and They're Zapping the Batteries."

Bob Gore testified that NNA, through its Dealer Technical Service department ("DTS"), informed him of the known BCM problem in Nissan Muranos: "I did hear that from D – I did hear that from DTS. . . . And he [DTS]  said, '**When you've got a known issue -- if you got GTR or a Murano with a battery going dead, just fan them, put a BCM in there**, **because they're waking up and they're zapping the batteries**.'  And when he told me that, guess who Bob Gore called?  Q. I don't know.  A. I called Ms. Scarlott [and said] 'Guess what?  I found your problem.' You know, it's like one of the next – It's, like, one more repair order up from this one."  (Deposition Transcript of Bob Gore, page 145, lines 6-20; (Document 71-5)); (*see also* March 29, 2011, Affidavit of Bob Gore (Document 52-5)).

Mr. Gore further testified:  "Be honest with you, I wouldn't even think of aftermarket parts, to be honest with you.  Because one, your never going to have an issue.  It's going to be a rarity, like I said earlier.  Two – and actually, they [NNA] came out with a deal on Muranos and GTRs, **if you got a phantom battery drain**, is to replace the BCM.  On one of these ROs, you'll see that."  (Deposition Transcript of Bob Gore, page 144, line 21 – page 145, line 3).

Mr. Gore also testified:  "There's not a technical service bulletin, but I had a Nissan engineer tell me ['Bob, if you got a GTR or Murano, we're finding out to put BCMs in them'].  **And with me not ever being able to see a drain on this battery**, you know, it made sense to me as a technician."  (Deposition Transcript of Bob Gore, page 148, lines 1-12).

**E.      Ryan Schooley's Testimony Corroborates Mr. Gore's Testimony that During the Course of NNA and Clear Lake Nissan's Joint Repair Efforts NNA Advised Clear Lake that the BCM May be Draining the Murano's Battery.**

Mr. Schooley was examined as to whether he knew why the BCM unit it Ms. Scarlott's Murano was replaced:  "Q.  Do you know why the BCM unit was replaced?  A. Mr. Gore had stated that he got a tip from one of the [Nissan North America] DTSs that they were having a problem on a GTR, and it was known on the Murano from time to time that a BCM not falling asleep could cause a battery drain issue."  (Deposition transcript of Ryan Schooley, p. 96, line 24 – p. 97 line 8) (emphasis added).

**F.      Clear Lake Nissan's Authenticated Business Records State That The   BCM In Ms. Scarlott's Murano Was Replaced Because It Was "NOT FALLING ASLEEP."**

Clear Lake Nissan's authenticated business records were kept by Clear Lake Nissan in the regular course of business, and it was the regular practice of Clear Lake Nissan for an employee with knowledge of the act, event, condition, opinion, or diagnosis recorded, to make the record at or near the time or reasonably soon thereafter.  (*See* Doc. 63-1 ¶3).   On September 16, 2009, with 25,540 miles registered to the odometer of the Murano, Ms. Scarlott tendered the Murano to Clear Lake for repair.   The corresponding repair order states: ELECTRICAL; CUSTOMER STATES THE BATTERY IS DEAD . . . . AGAIN; ATTENTION BOB GORE; BCM NOT FALLING ASLEEP; INSTALLED BCM AND RECONFIG.  (September 16, 2009 Repair Order, Document 63-3 at page 22 of 27) (Business Records Affidavit of Michelle Smith).

**G.      Mr. Schooley's Expert Report States that "Technicians Found the BCM was not Falling Asleep."**

After reviewing at least twenty eight (28) separate pieces of evidence, including the deposition testimony of Mr. Gore and Mr. Barnes, Mr. Schooley concluded in his expert report

that:   "**Technicians found the BCM was not falling asleep** and installed a BCM controller assembly."  (Document 34, page 6 of 12) (Expert Report of Ryan Schooley).

      **H.**    **NNA's Allegation That Ms. Scarlott Fails To Cite Testimony That The BCM Failed To Fall Asleep Is Irrelevant.**

NNA's final argument on this point is that "Ms. Scarlott fails to city to any portion of the record in which any person testified that the BCM in the subject Murano was actually failing to 'fall asleep' and therefore causing the battery to drain."  (Doc. 101, page 19-21).  As an initial matter, Ms. Scarlott notes that the authenticated business records of Clear Lake Nissan, made at the time of the BCM replacement and well before this litigation began, are reliable.  The fact that two NNA employees and the service manager of one of NNA's authorized dealerships may hesitate in providing testimony which directly damages their employer and business partner is unsurprising.   Recall that when asked why his testimony was necessary in this case, Mr. Schooley testified:  "From my side, to show that Nissan stood behind its product and warranted it."  (*See* Doc. 74, page 3 of 12).  If the only form of admissible evidence were testimonial, NNA's argument could, in theory, make some sense.  As it stands it makes none.

**V.**    **Nissan's Vehicle Claims History and the Affidavit of Henry Yu, the Manager of NNA's Warranty Call Center, Prove that the BCM in Ms. Scarlott's Murano was Defective.**

      **A.**    **The Fact that Clear Lake Nissan's Replacement of the Murano's BCM was Eligible for Coverage (As Opposed to Coverage Actually Having Been Provided) Under Ms. Scarlott's Security+Plus® Gold Vehicle Protection Plan Proves that the BCM Suffered from a Defect in Materials or Workmanship for which NNA is Responsible.**

NNA argues that "no claims for repairs or replacement parts have been covered by NESNA under [Ms. Scarlott's] Security+Plus® Gold Vehicle Protection Plan[.]"  (Doc. 101, page 20 of 30).  NNA further argues that "NESNA did not make any reimbursements under the

Security+Plus® Plan."  (Doc.. 30, page 20 of 30).  NNA then alleges that "Ms. Scarlott and her counsel continue to file false pleadings contrary to this."  (Doc. 30, page 20 of 30).

NNA's argument is plainly false as NNA admits that NESNA provided coverage to Ms. Scarlott under her Security+Plus® Gold Vehicle Protection Plan.  (Discussed *infra*).  More importantly, NNA's argument misses the point.  While NESNA did actually provide coverage, the BCM's mere eligibility for coverage under Security+Plus® Gold Vehicle Protection Plan proves that the BCM suffered from a defect in materials or workmanship for which NNA is responsible.

1.    **The Security+Plus® Gold Vehicle Protection Plan Exclusively Limits Coverage to Failures Due Solely to Defects in Nissan Materials or Faulty Workmanship for Which Nissan is Responsible.**

Coverage under the Security+Plus® Gold Vehicle Protection Plan is exclusively limited to mechanical failures due **solely** to defects in Nissan materials or faulty workmanship for which Nissan is responsible.  (Nissan Security+Plus® Vehicle Protection Plan Agreement) (Document 94-5, p. 10 of 16).

> MECHANICAL BREAKDOWN means the inability of a covered part(s) to perform the function(s) for which it was designed, due solely to defects in Nissan materials or faulty workmanship for which Nissan is responsible. MECHANICAL BREAKDOWN does not include damage due to negligence, damage caused by an accident, or the gradual reduction in operating performance due to wear and tear. In addition, this Agreement does not provide any benefit for any mechanical failure or breakdown caused by a noncovered part.

(Nissan Security+Plus® Vehicle Protection Plan Agreement) (Document 94-5, p. 10 of 16).

2. **Mr. Schooley Testified that Clear Lake Nissan's Replacement of the BCM in Ms. Scarlott's Murano was Eligible for Coverage Under The Security+Plus® Gold Vehicle Protection Plan.**

Mr. Schooley's expert report states: "The replacement of the BCM was **eligible for coverage** under the Security+Plus Plan[.]"  Mr. Schooley further testified that the BCM was in fact covered under the Security+Plus Plan.  (Deposition transcript of Ryan Schooley, p. 30, lines 5-9) ("A.  I was just going to say that the part that was covered was the BCM, and that showed it was under the Security Plus.").

3. **Mr. Schooley Testified That The BCM Could Only Be Eligible For Coverage Under The Security+ Plus Plan If Suffered a "MECHANICAL BREAKDOWN."**

Mr. Schooley testified that the BCM was a part that could suffer a "MECHANICAL BREAKDOWN" as defined by the Security+ Plus Plan.  He further testified that only a mechanical defect in the BCM as defined by the term "MECHANICAL BREAKDOWN" could qualify the BCM repair for coverage under the Security+ Plus Plan:

> Q.   [BY MR. RADBIL] Why do you think the replacement for BCM was eligible for coverage under the Security Plus plan?
>
> A.   Because it was a part that could mechanically break down.
>
> Q.   **Well, a BCM would only be eligible for coverage if it actually broke down under the definition of mechanical defect, correct?**
>
> A.   **Correct.**

(Deposition of Ryan Schooley, page 140, lines 16-24).

4.     The Affidavit of Henry Yu Proves that the BCM Suffered a "MECHANICAL BREAKDOWN" Which Rendered its Repair and Replacement Eligible for Coverage Under the Security+Plus® Plan.

Henry Yu is employed by NNA as Manager of NNA's Warranty Call Center in its Assurance Products department.  (Affidavit of Henry Yu, Doc. 94-5 ¶1).  Mr. Yu's Affidavit confirms that the BCM was eligible for coverage and therefore may have been covered under the Security+ Plus Plan:  "The Vehicle Claims History reflects a repair to the Body Control Module ("BCM") **may have been covered** under both the New Vehicle Limited Warranty and the Security+Plus Gold Vehicle Protection Plan."  (Affidavit of Henry Yu ¶5).

Because the plain terms of the Security+Plus Gold Vehicle Protection Plan limit coverage to "MECHANICAL BREAKDOWN," the BCM could not have been covered under this plan unless it suffered a "MECHANICAL BREAKDOWN."  Mr. Yu's affidavit confirms that the BCM was eligible for such coverage and that such coverage was in fact provided.

B.     NNA's Business Records Show That Coverage Was Provided For The BCM Replacement Under The Security+ Plus Agreement; A Fact Corroborated By Mr. Schooley's Testimony and the Affidavit of Henry Yu.

Nissan's Vehicle Claims History confirms that Nissan reimbursed Clear Lake for the September 16, 2009, repairs made under the Nissan Security+Plus® Vehicle Protection Plan. (Document 70, pages 12-13 of 70) ("Servicing Dealer: 3986 Clear Lake Nissan, RO: 40981, 9/10/09, PNC Code Desc: 28492 **Body Control Module**, Miles: 25540, Claim Type: **Service Contract Claim,** Status: Paid") (emphasis added).

Mr. Schooley reported on this topic and was examined about Nissan North America's business records.  His testimony confirms that such records document the fact that the BCM replacement was covered under the Security+Plus Agreement:  ("So the document that indicates

that the BCM was covered in the Security Plus agreement is a Nissan document; is that correct?

A. Yes.").  (Deposition transcript of Ryan Schooley, p. 30, lines 5-23).

**C.     The Affidavit of Henry Yu Proves that the Security+Plus® Gold Vehicle Protection Plan May Provide Coverage While NNA's New Vehicle Limited Warranty Remains in Effect and that Such Coverage was Provided to Ms. Scarlott as a Result of the BCM Suffering a Mechanical Breakdown.**

NNA asks the Court to sanction and suspend Ms. Scarlott's counsel from the practice of law on the ground that "Contrary to Plaintiff's assertions, the Security Security+Plus® Plan does <u>not</u> apply to repairs made subject to the Murano because coverage does not begin until the expiration of the factory warranty."  (Doc. 101, page 20 of 30).  The Affidavit of Henry Yu (submitted by NNA) proves (1) not only that the Security+Plus Gold Vehicle Protection Plan provides certain coverage which overlaps with that provided by NNA's New Vehicle Limited Warranty, (2) it also proves that such coverage was in fact provided to Ms. Scarlott as a result of the BCM suffering a "MECHANICAL BREAKDOWN."

**1.     The Affidavit of Mr. Yu Clarifies that the Security+Plus Gold Vehicle Protection Plan's Overlapping Coverage Applied to Clear Lake Nissan's Replacement of the BCM.**

The Affidavit of Henry Yu clarifies:  "Car rental reimbursement coverage begins, however, on the effective date of Security+Plus Gold Vehicle Protection Plan and continues until the Security+Plus Gold Vehicle Protection Plan expires.  Accordingly, the Security+Plus Gold Vehicle Protection Plan may provide certain coverage for a vehicle during a portion of the same period as the New Vehicle Limited Warranty."  (Affidavit of Henry Yu, Doc. 94-5 ¶3).

2. **The Affidavit of Mr. Yu Confirms that NESNA Paid for a Portion of Ms. Scarlott's Rental Car in Accordance with the Security+Plus Gold Vehicle Protection Plan's Overlapping Coverage When the Murano's BCM Suffered a "MECHANICAL BREAKDOWN."**

The Affidavit of Henry Yu further explains the relationship between the Security+Plus Gold Vehicle Protection Plan and NNA's New Vehicle Limited Warranty. Because the New Vehicle Limited Warranty is considered the vehicle's primary source of coverage, any eligible claim properly submitted to NESNA for coverage under Security+Plus Gold Vehicle Protection Plan — which is also eligible for coverage under the New Vehicle Limited Warranty — would be paid by default under the latter. (*See* Affidavit of Henry Yu ¶6) ("The New Vehicle Limited Warranty is considered the vehicle's primary source of coverage. Any vehicle coverage provided by a subsequent source, such as the Security+Plus Gold Vehicle Protection, would be considered secondary and subsequent.").

Mr. Yu further confirms that in this case, while the BCM replacement was eligible for coverage under the Security+Plus Gold Vehicle Protection Plan, it was also eligible for coverage under the New Vehicle Limited Warranty. Thus, its repair and replacement was covered by default under the New Vehicle Limited Warranty. However, because the New Vehicle Limited Warranty provides no rental car coverage, the rental car needed by Ms. Scarlott as a result of the BCM's "MECHANICAL BREAKDOWN" was covered by the Security+Plus Gold Vehicle Protection Plan.

The Affidavit of Mr. Yu states: "Coverage defaults to the factory warranty before any claims are paid under the service contract, including any claims made under the Security+Plus® Gold Vehicle Protection Plan. **In the case of the BCM repair, the factory warranty had not yet expired, and thus, coverage of the BCM repair was never provided by the subsequent claim source of the Security+Plus® Gold Vehicle Protection Plan**."). (Affidavit of Henry Yu

¶¶6-8) (*See also* Affidavit of Henry Yu ¶9-10) ("Ms. Scarlott also received a rental vehicle.  A portion of the rental vehicle was covered under factory goodwill, 'FG', and the other portion was paid under Security+Plus® Gold Vehicle Protection Plan, 'SC'.  Because a portion of the rental car was paid under the service contract, NNA's Vehicle Claims History reflects same.").

> 3.     **NNA Admits That "A Portion Of A Rental Vehicle Was Covered Under The Security+ Plus® Plan."**

In footnote number seventy (70), on the page following NNA's baseless allegation, the Court will find NNA's admission that "a portion of a rental vehicle was covered under the Security+Plus® Plan in a singular visit to the dealership."  (Doc. 101, page 21 of 30, n. 70).  However, NNA fails to disclose to the Court that Ms. Scarlott's "singular visit to the dealership" for which NESNA paid a claim under the Security+Plus® Plan, was the visit during which Clear Lake Nissan replaced the Murano's BCM.

> C.     **The Express Terms Of The Security+Plus® Gold Vehicle Protection Plan Condition Rental Car Coverage Upon The Occurrence Of A "MECHANICAL     BREAKDOWN."**

NNA argues in its footnote that "covering a portion of the cost of a rental vehicle does not equate to repair coverage for mechanical breakdowns under the Security+Plus® Plan."  Absent any authority and without citing the relevant language of the Security+Plus® Plan, NNA then proclaims:  "Any argument to the contrary by Plaintiff is illogical, unsupported by the plain language of the contract, and not based upon the principles of contractual interpretation."  (Doc. 101, page 21 of 30, n. 70).

The contract is unambiguous.  Rental car reimbursement is expressly limited to rental cars required "due to the MECHANICAL BREAKDOWN of a covered part":

> CAR RENTAL REIMBURSEMENT:  If you require alternate transportation due to the MECHANICAL BREAKDOWN of a covered part, this Agreement will provide reimbursement for the

> actual expenses of substitute transportation up to $35 per day, to a
> maximum of four (4) days, and $140 per breakdown.  Rental must
> be made from an authorized rental agency or your repairing Nissan
> dealer.

(Nissan Security+Plus® Vehicle Protection Plan Agreement) (Document 94-5, p. 10 of 16).

This express limitation is consistent with the primary purpose of the contract in that coverage of any type under the Security+Plus® Gold Vehicle Protection Plan is exclusively limited to mechanical failures due **solely** to defects in Nissan materials or faulty workmanship for which Nissan is responsible, or "MECHANICAL BREAKDOWN".  (Nissan Security+Plus® Vehicle Protection Plan Agreement) (Document 94-5, p. 10 of 16).  Ms. Scarlott further notes that express terms of the Security+Plus® Plan limit the amount of money provided for car rentals which are required due to MECHANICAL BREAKDOWN, which is why only a portion of her cost was covered by NESNA.

NNA requests that the Court sanction and suspend Ms. Scarlott's lawyers upon baseless grounds such as these.  Ms. Scarlott respectfully submits that NNA's conduct is worthy of sanctions.  As Mr. Patterson and Ms. Bingham observe:  "It is one thing to present only evidence that helps one's cause.  It is quite another to present evidence that she knows is false and misleading."  (Doc. 101, page 22 of 30).

Unsurprisingly, NNA has unreasonably refused to respond to Ms. Scarlott's simple request that NNA produce its Seller's Parts and Accessories Manual which "contains the process used by authorized Nissan dealerships for submitting claims under goodwill, the New Vehicle Limited Warranty, the Security Plus Plan contract, and the Maintenance Plus contract." (*See* Document 92, Plaintiff's Motion to Compel).

## VI.   The Evidence Indicates the Battery Failure that Occurred "Days" After the BCM Replacement was the Result of a Battery Worn-Out by the BCM's "Zapping" Its Power Which Required External Charging Just to Keep the Murano Running.

NNA's motion for sanctions alleges that "Plaintiff does not tell the Court that the [BCM] replacement did not work, and that Ms. Scarlott returned days later with the same complaints." (Doc. 101, page 18 of 30).  This accusation reflects the core of NNA's defense — the single piece of circumstantial evidence around which NNA has struggled to tailor an argument of causation.  In sum, NNA argues that because the Murano's battery failed eight (8) days after the BCM was replaced, the BCM could not have caused the Murano's electrical problems.  After examining the evidence and testimony however, it seems more likely that the battery failure which caused Ms. Scarlott to return to Clear Lake Nissan eight (8) days later was the result of Ms. Scarlott being forced to keep the Murano hooked-up to an external charger over the course of the preceding nine (9) months just to keep it running. (*See* Deposition Transcript of Bob Gore, page 87, line 25 – page 88, line 2) ("I mean, you're saying wrecker.  I mean, only way she could drive it was leave a battery charger on it.").

From September 10th through September 16, 2009, the Murano was in Clear Lake Nissan's repair shop.  During this time Clear Lake Nissan replaced the BCM because it was not falling asleep.  (*See* Deposition Testimony of Bob Gore, page 148, lines 8-15) ("Q. Okay How many days was – was she out, was the vehicle out of service at this time?  A. I'd say five days."). (*See also* Doc. 63-3) (BCM NOT FALLING ASLEEP, INSTALLED BCM AND RECONFIGRAD [sic]) (Invoice Date:  9/16/09.  Although Ms. Scarlott requested that Mr. Gore install a new battery during this visit, Mr. Gore did not.  (*See* Expert Report of Ryan Schooley, Doc. 34, page 5 of 12) (no battery replacement); (*See also* Doc. 63-3) (Repair Order showing

same).  At that time, the Murano's battery was nine (9) months old.  (*See* Doc. 34, page 5 of 12) (battery last replaced during December 15-16, 2008, visit); (*See also* Doc. 63-3) (Repair Orders).

Mr. Gore provided his opinion on this particular battery failure:  "A.  Now, the only thing I could think of here, Dennis, what might have been happening, she had to live with a battery charger on this car.  With this battery zapping and her charging all the time, I mean – and it's just my opinion, speculation – something was causing these batteries to go bad.  I mean, they just – you don't put batteries in a car like this.  And that would be only – and that's just an opinion.  I think probably with it getting zapped and being charged all the time, I think it was stressful to the batteries and we would take them out."  (Deposition Transcript of Bob Gore, page 151, line 12 – page 152, line 2).

## VII.   The Evidence Shows that the Mirror Could Not Have Caused the Murano's Electrical Problems Under Any Set of Circumstances.

### A.   The Mirror Draws A Static Amount Of Power When Turned-On And Therefore Could Not Have Caused The Murano's Progressively More Frequent Electrical Problems.

Mr. Schooley testified that, when on, the maximum amount of power drawn by the mirror would not exceed its technical specifications.  (Deposition transcript of Ryan Schooley, p. 95, line 14 – p. 96, line 15).  Mr. Gore testified that the frequency of the Murano's electrical problems increased progressively.  (Deposition testimony of Bob Gore, page 152, lines 18-25). – page 13, line 8; page 136 line 23 – page 137 line 6) ("Toward the end it started getting more – more common.  At first, remember, it was, like, nine months and six months, three months.  And, you know, it was getting worse and worse.  And I know her and I have had that conversation before.  'Its going to have to get worse before I can find it.'").

Mr. Gore further testified that Ms. Scarlott did nothing to cause the electrical problems to worsen.  (*See* Deposition testimony of Bob Gore, page 85, lines 14-16) ("Q.  Okay.  Is there any

indication that Ms. Scarlott drove this vehicle so as to make it worse?  A.  No, Sir.  It's nothing she did.").

Because the mirror uses a constant amount of power when turned-on, had it remained on at all times, which it did not, any battery failures it caused would have occurred at relatively regular intervals.  Mr. Schooley's testimony confirms this simple principle:

> Q.      Okay. So if we have a maximum level of draw and we also know approximately how long it would take for that type of draw to deplete the battery in the 2006 Nissan Murano, we could figure out if it was only this mirror, if the mirror was (inaudible), or if it was something else. It's possible to calculate that, correct?  For example, from the instances of a vehicle dying, and when they die and when batteries are put in?
>
> A.      **I'm sure a calculation could be formed.**
>
> Q.      Did you perform such a calculation?
>
> A.       I did not.
>
> Q.      Is there a reason that you didn't?
>
> A.      I don't have the specs of the mirror. And I didn't even look into them because, like I said, it's a non-Nissan part.

(Deposition transcript of Ryan Schooley, p. 95, line 14 – p. 96, line 15).

**B.      The Testimony Of NNA's Expert Demonstrates That It Is A Mathematical Impossibility That The Homelink Mirror Was The Sole Cause Of The Murano's Electrical Problems.**

Mr. Schooley testified that a draw of 500 milliamps would be required over the course of one week to drain a battery installed on the Murano. (Deposition of Ryan Schooley, page 93, lines 7 – page 94, lines 1-10).  Mr. Schooley testified that he did not know what "level of draw" Clear Lake found in the Murano. (Deposition of Ryan Schooley, page 94, lines 11-17).  Mr. Schooley additionally testified that although he could have, he did not perform a simple

calculation that would allow him to determine whether "it was only this mirror, if the mirror was (inaudible), or if it was something else" that caused the electrical problems that Ms. Scarlott experienced in the Murano. (Deposition of Ryan Schooley, page 95, line 25- page 96,lines 1-15).

The specifications regarding the Homelink mirror – a "GEN-K51 model manufactured by Mito Corporation" (Document 63-1 at 2) – show that the mirror would require more than a full week to drain a battery if it remained on at all times, per Ms. Schooley's testimony. (*See* Doc. 71-24).  Quite noteworthy, on at least one occasion a new battery installed on the Murano was drained completely just three days after being replaced/installed. (*See* Doc. 71-25) (January 28, 2009 Correspondence to Clear Lake).  Thus, according to Mr. Schooley, it is a mathematical impossibility that the mirror was the cause of the electrical defects that Ms. Scarlott experienced in the Murano.

> **C.**   **Mr. Gore Testified that the Amperage Used by The Homelink Mirror Could Discharge a Vehicle's Battery Over Time in Contrast to Whatever Was Draining the  Murano's Battery Which Would "Bam, Zap the Battery."**

Mr. Gore was asked to compare the Homelink mirror to other common devices such as GPS systems which may also draw power from a vehicle's electrical system.  Importantly, he testified that in running mode the devices were similar.  While they could drain the vehicle's battery over time, this was inconsistent with the "zapping" of the Murano's battery:

> Q.   And I guess my question is:  Regarding the – the –the amperage, I wonder if the amperage required by the Home Link System – if that's any different than you average, you know, Garmin GPS or Tom Tom or –
>
> A.   Not in a running mode.  If you – let's say you got a little Garmin or Tom Tom in your car.  If you leave it on, it's going to be milliamps that it's charging. It will discharge a battery – any time you put it on a battery it's going to charge – it's going to discharge over time.  **But this is, whenever it would wake up, it would zap the battery.** And it was so intermittent, so it's like whatever was waking

up or whatever decided – and it might not even be waking up.  It might be a – it might be a loose – it could be in a cracked circuit board in there.  It could have been a loose resistor or something that just a little piece of wire – you know, I'm talking about microscopic piece of wire – that touch the ground **and it would, bam, zap the battery**. And I've seen that before.  Something inside that battery – or in that Home Link would – and it might have been – just been vibration.  Who knows.

(Deposition Transcript of Bob Gore, page 136, line 12 – page 137, line 9) (emphasis added).

Mr. Gore continued:

A.     And it was something inside that mirror.  Of course, we – you know, it was a sealed mirror.  We never looked inside that mirror, but – and we might not have ever seen nothing, because it could have been a resistor inside that radio that's a bad resistor in there.  Resistors carry current, or they drop down or they – drop down voltage; and it's, you know – you know – you know, it could be just getting hot, you know, and just shorting out.  And – and the mirror worked perfect.  **It wasn't nothing wrong with the mirror.  It worked great.  So whatever was coming on, it would go to direct shorting and it would – zappo the battery**.  And with    the battery getting zapped and her charging it, and that – that's the only explanation I could give for those batteries, you know, failing like they were.

(Deposition Transcript of Bob Gore, page 158, line 13 – page 159, line 4) (emphasis added).

Compare to how Mr. Gore describes what an NNA engineer told him about how defective Murano BCMs behave:

A.     Be honest with you, I wouldn't even think of aftermarket parts, to be honest with you.  Because, one, you're never going to have an issue.  It's going to be a rarity, like I said earlier.  Two – and actually, they [NNA] came out with a deal on Muranos and GTRs if you got a phantom battery drain, is to replace the BCM. On one of these ROs, you'll see that.  A BCM is a body control module.

Q.      Right. That was replaced or that was –

A.   It was replaced.  When I heard that, I – actually I heard that from a D -- I did hear that from is a DTS. And not that was involved with this. I was working on another car, and he said, "Bob, if you got" – I was working with him on a GTR that kept having a battery issue go down. And he said, "**When you've got a known issue – if you got GTR or a Murano with a battery going dead, just fan them, put a BCM in there, <u>because they're waking up and they're zapping the batteries</u>**."  And when he told me that, guess who Bob Gore called?

Q.   I don't know.

A.   I called Ms. Scarlott. "Guess what? I found your problem." You know, it's like one of the next – it's, like, one more repair order up from this one. [referring to BCM replacement].

(Deposition Transcript of Bob Gore, page 144, line 21 – page 145 line 20) (emphasis added).

## VIII.  Hurricane Corporate Representative Srinivasa Gogineni Repeatedly Testified that the Mirror Was Installed Correctly According to the Instructions and that He Did Not Believe it Caused the Murano's Electrical Problems.

NNA requests that the Court sanction and suspend Ms. Scarlott's lawyers because:  "Ms. Scarlott, not once, but twice in her Response Brief, quoted Srinivasa "Sam" Gogineni, Hurricane Auto's owner and corporate representative, as having testified the HomeLink mirror was 'installed correctly' and that "Plaintiff made this misleading argument to the Court even though she herself sued Hurricane, and testified in her second deposition that Hurricane was responsible."  (Doc. 101, page 9 of 30).

### A.   Contrary to NNA's Argument Mr. Gogineni Repeatedly Testified that Hurricane Followed the Installation Instructions and Installed the Mirror Correctly.

On April 14, 2011, Hurricane Auto Care & Accessories was deposed through its designated corporate representative, Mr. Srinivasa Gogineni.  Mr. Gogineni firmly asserted his belief that the mirror was installed correctly, according to the instructions:

Q.      (BY MS. BINGHAM) I just want to make sure I have a clear answer to this, and I think you've already answered it: You don't know how Gabriel or Jesus actually installed Ms. Scarlott's rearview mirror, correct?

A.      I do know.

Q.      All you have are the instructions?

A.      **We followed the instructions to install it, though**.

Q.      All you have are the instructions, right?

A.      Huh?

Q.      All you have are these instructions that are marked as exhibit –

A.      Yeah, I do know that –

Q.      (BY MS. BINGHAM) You have no actual knowledge as to the actual steps that they took in installing her rearview mirror because you did not participate in this installation?

A.      **I did participate in it and followed the instructions on what all was done to it, as well. So I do know.**

(Deposition Transcript of Srinivasa Gogineni page 59, lines 10-16) (emphasis added).

During the same line of questioning Mr. Srinivasa reaffirmed that the mirror was installed in accordance with the instructions:

Q.      But because you weren't there when they actually installed it and because –

A.      I was there.

Q.      You were helping in the installation?

A.      I was there just to make sure everything was done correctly.

Q.      Listen to my question. Were you helping in the actual installation of this rearview mirror?

A.      When Ms. Scarlott's car came in the second time?

Q.      No. When the rearview mirror was initially installed, were you helping Gabriel or Jesus actually install it?

A.      **Yes.  Going through the instructions, yes.**

Q.      Then describe for me how it was installed.

A.      **It was installed per the instructions. Let me get –**

Q.      No. I don't want you to refer to the instructions. I understand that you gave your instructions to your employees.

A.      Yes.

Q.      But what I'm asking is: If you were there during the actual installation and you helped actually install this rearview mirror, which in prior testimony you told me you didn't install –

A.      **I was part of it. I was there just checking it.  I always monitor, so …**

(Deposition Transcript of Srinivasa Gogineni, page 60, line 3 – page 61, line 4).

Although Ms. Bingham was persistent, Mr. Srinivasa continued to testify that he installed the mirror correctly the first time:

Q.      And what I'm saying is: You were not there at every step to check over Gabriel or Jesus when they installed Ms. Scarlott's rearview mirror, right?

MR. JUAREZ: Objection, form.

A.      I don't remember exactly to answer a hundred percent what you're trying to ask me.

Q.      (BY MS. BINGHAM) And so that's fair. That's all I wanted to know, whether or not you remember.

A.      Yeah.

Q.      So you don't remember?

A.      **I just – we followed the instructions and installed it. It depends on the diagram, on the vehicle diagram from Nissan.**

MS. BINGHAM: Objection, nonresponsive.

Q.      (BY MS. BINGHAM) You don't know exactly how Gabriel or Jesus installed the rearview mirror in Ms. Scarlott's vehicle, right?

A.      If the customer has any issues, if they bring it, we always check it, so...

MS. BINGHAM: Objection, nonresponsive.

Q.      (BY MS. BINGHAM) Please listen to my question, and we can get through this a lot faster.

A.      Uh-huh.

Q.      You don't know and you don't remember how Gabriel or Jesus installed Ms. Scarlott's rearview mirror in her Murano?

A.      **They just followed the instructions and installed it, so that's all I know.**

MS. BINGHAM: Objection, nonresponsive.

(Deposition Transcript of Srinivasa Gogineni, page 64, line 18 – page 65, line 25).

Mr. Srinivasa testified multiple times that he was told that the mirror remained on at all times despite Ms. Bingham's attempts to lead him into testifying that he agreed with her position:

Q.      On page 5 of 14 the middle of the page, it says: "Note: If mirror remains on at all times, it could eventually drain the car's battery."

A.      Yes.

Q.      **That's what happened here, huh?**

A.      That's what we identified in going through the instructions.  So we see that it is a possibility, so we just go through that and fixed it.

Q.      So let me ask you this: Ms. Scarlott's Murano had a battery drain, right?

A.      Yes.

Q.      **That's what you understand?**

A.      **That's what they told.**

Q.      That's what Clear Lake told you?

A.      Clear Lake – I don't remember exactly who brought the car, but –

Q.      It was either Ms. Scarlott or Clear Lake?

A.      Or Clear Lake, yes.

Q.      And they brought the car; and they said, "Hey, we've identified that the mirror is causing the battery to drain"?

A.      Yes.

Q.      **And you acknowledged that that was a problem, right?**

A.      **That's what they mentioned**. So we just wanted to make sure the mirror was not causing it, so we were going through the mirror on the instructions; and we see the note here.

Q.      And the instructions actually say if the mirror remains on, it can cause a battery drain –

A.      Yes.

Q.      – which will make the vehicle stall, correct?

MR. JUAREZ: Objection, form.

A.      (Nods head.)

Q.      (BY MS. BINGHAM) Right?

A.      Yes.

Q.      **So you acknowledged this was a problem, and you fixed it?**

MR. JUAREZ: Objection, form.

A.      **It is a possibility**, **so we will go through the instructions just to make sure everything was fixed right.**

Q.      (BY MS. BINGHAM) **And this was what happened with Ms. Scarlott's vehicle, right?**

MR. JUAREZ: Objection, form.

A.      **<u>I don't know. It is a possibility, but I don't know</u>.**

(Deposition Transcript of Srinivasa Gogineni, page 66, line 25 – page 69, line 3) (emphasis added).

      Mr. Srinivasa then testified that the mirror was installed correctly the first time:

Q.      **So do you think you installed it incorrectly the first time?**

MR. JUAREZ: Objection, form.

A.      **<u>I don't think so.</u>  We just followed the instructions**.

Q.      (BY MR. RADBIL) But don't the instructions say to check to make sure that the light is –

A.      **That's what they mentioned there, so we checked it that time. When we installed it, I don't notice anything wrong and nobody ever complained about it to us; so we thought that everything was fine.**

(Deposition Transcript of Srinivasa Gogineni, page  94, line 24 – page 95, line 9) (emphasis added).

Mr. Srinivasa also testified that he does not think that the Murano's electrical problems were caused by the mirror's installation:

> Q.      **Okay. Do you think the problems with Ms. Scarlott's vehicle were caused by the installation of the mirror?**
>
> MR. JUAREZ: Objection, form.
>
> A.      **I don't think so.** Nobody ever came to us to say anything about they had problems, so...

(Deposition Transcript of Srinivasa Gogineni, page 99, lines 8-12).

Mr. Srinivasa again testified that he believed the mirror was installed correctly the first time, that Hurricane followed the instructions, and that Hurricane always checks down the instruction list when installing electrical devices:

> Q.      (BY MR. RADBIL) **Do you think the mirror was installed correctly?**
>
> A.      **Yes.**
>
> MS. BINGHAM: Objection, form.
>
> A.      **As far as the instructions say, we just followed the instructions and installed it.**
>
> Q.      (BY MR. RADBIL) And did you check down the instruction list when you installed the mirror the first time?
>
> A.      **Yes. We always do.**

(Deposition Transcript of Srinivasa Gogineni, page 100, lines 4 – 13).

Mr. Srinivasa testified that the mirror was originally hooked-up to the ignition terminal:

> Q.      (BY MR. RADBIL) I'm asking which terminal it was hooked up to originally.
>
> A.      The ignition terminal.
>
> Q.      And afterwards you changed it?

> A.   **No. We hooked up to the same terminal just to make sure that the light is not coming on.**

(Deposition Transcript of Srinivasa Gogineni, page 11, lines 10-13) (emphasis added).

Yet again, Mr. Srinivasa testified that Hurricane properly installed the mirror the first time:

> Q.   My question to you, I guess, is: **The first time that you hooked it up, you're saying you did it incorrectly or you did it properly?**
>
> MR. JUAREZ: Objection, form.
>
> A.   <u>**I did it properly**</u>, <u>**I think**</u>. But when I saw this note right here, just to make sure – so we just wanted to make sure that that mirror is not going to light up.

(Deposition Transcript of Srinivasa Gogineni, page 113, lines 12 – 19) (emphasis added).

**B.   Mr. Gogineni's Testimony Cannot Save NNA's Latest Blame-the-Mirror Defense Because an Overwhelming Amount of Evidence Proves that the Mirror Did Not Remain On At All Times.**

NNA's first theory was: "the installation of the mirror is not the cause of the battery draining; it is the design or manufacture of the mirror itself."   (Discussed *supra* at section II, subsection A).  When it was discovered that no repairs were made to the mirror itself (i.e., no "diode" was ever installed as NNA for more than a year strongly argued), NNA abandoned its first theory of why the mirror was to blame.  Then, without first considering the entire body of evidence to the contrary, NNA hastily sought to use Mr. Gogineni's testimony to support its new theory that "improper installation was causing the mirror to remain on at all times, thereby draining the Murano's battery.") (NNA's reply in support of its amended motion for summary judgment, Doc. 81, page 4 of 16).

As discussed *supra* at section III, subsection B, the evidence proves that the mirror did not remain on at all times.  Mr. Schooley testified that the electrical drain on the Murano's

battery was intermittent, which was why Mr. Gore's tests failed to detect it.  Mr. Barnes testified

that the electrical drain an "intermittent condition" and therefore Clear Lake Nissan was unable

to actually measure it.   Mr. Gore testified that he ran tests and the results of such tests

demonstrated that the mirror always fell asleep.  He further testified that the mirror would remain

asleep for weeks at a time and that it was an "intermittent-type situation."   And Clear Lake

Nissan's authenticated business records document its performance of several tests specifically

designed to detect a parasitic drain on the Murano's battery; these tests detected none.  Clear

Lake Nissan was "unable to duplicate any drain on [the] battery."  (Discussed *supra* at section

III, subsection B).

NNA's current theory of causation fails under the ample weight of the record evidence.

Even if the Court were to consider only those portions of Mr. Gogineni's testimony cited by

NNA, which it should not, NNA's defense cannot succeed.

## IX.    NNA Falsely Claims That Mr. Gore Testified That The Mirror Was Installed Improperly to Downplay the Significance of its Theoretical Shift.

NNA's motion for sanctions states that Mr. Patterson's letter was based on information

provided to NNA by Clear Lake Nissan's service manager, Bob Gore.  (Doc. 101, page 7 of 30).

But NNA also falsely claims:  "At that time, Bob Gore related [sic] the mirror was **installed**

improperly due to a diode."  (Doc. 101, page 7 of 30) (emphasis added).  NNA's claim that Bob

Gore "related [sic] the mirror was installed improperly" is false as Mr. Gore never once testified

that he or Clear Lake Nissan believed that the mirror was improperly installed.  (*See generally,*

Deposition Transcript of Bob Gore).

NNA's claim also makes little sense as Mr. Patterson's letter clearly states "**the**

**installation of the mirror is not the cause of the battery draining**."  (Document 50-6 at pages

3-4).  Mr. Patterson's letter is consistent with Mr. Gore's testimony:  "I kind of expected them

[Hurricane] to put a new mirror on it, because **I knew there was internal failure in that mirror**, but they came back with a diode in it."  (Deposition of Bob Gore, page 158, lines 20-23, attached as Exhibit A).

Mr. Patterson and Ms. Bingham's motion for sanctions also falsely claims:  "Mr. Gore testified that although a diode was allegedly installed in the aftermarket mirror, its improper installation was causing the Murano's battery to drain."  (Doc. 101, page 8 of 30).  Again, Mr. Gore never testified that improper installation of the mirror was causing the Murano's battery to drain.  .  (*See generally,* Deposition Transcript of Bob Gore).  And yet, NNA cites to the following testimony in representing to the Court that he did:

> Q.    Okay. Ultimately, you discovered the problem that was causing the battery failures, right?
>
> A.    Yes.
>
> Q.    And what was that problem?
>
> A.    It was actually the Home Link mirror would come on and it would -- it was an intermittent-type situation.  We was lucky just to even catch it.  We just happened to have the amp meter, we was testing it for parasitic drain.  And to define "parasitic drain," that's the amperage that is going out of the battery.  It's like if you got a light on or you leave something electrical on in the car, the car normally – whenever -- the computers, everything, they – actually, they keep a drain on the car for a while. They actually, in our industry, are styled to go to sleep.  So we have to keep the amp meter on them, watch them.  And that's how we found this.  It actually went to sleep and had been sitting there probably two weeks, and a technician just happened to walked by one day and seen that it was draining; and that's how we caught it, because, there again, it was such an intermittent situation.

(Deposition of Bob Gore, page 28, line 11 – page 29, line 8).

The word "installation" is neither expressly nor implicitly referenced by Mr. Gore in the foregoing portion of his testimony.  Exactly how Mr. Patterson and Ms. Bingham can argue that the foregoing constitutes Mr. Gore's testimony that the mirror's "improper installation was causing the Murano's battery to drain" is unclear.

Mr. Patterson and Ms. Bingham further claim:  "In that same testimony, Mr. Gore explained that Clear Lake believed the electrical problems were caused by the improper installation of the Homelink mirror."  (Doc. 101, page 8 of 30).  This is also demonstrably false as the only mention of improper installation contained in Mr. Gore's deposition transcript comes from Mr. Patterson in the form of a hypothetical question concerning warranty coverage.  NNA first partially quotes the following portion of Mr. Gore's testimony (quoted portion bolded):

> Q.   **[Mr. Patterson] My question is: As a certified master technician, do you have an opinion as to what caused the electrical problems in Ms. Scarlott's vehicle?**
>
> A.   **What caused it was the mirror itself**.
>
> Q.   Now, that wasn't April Scarlott's fault, right?
>
> A.   No, sir.
>
> Q.   And it wasn't Nissan's, either?
>
> A.   No, sir.
>
> Q.   And yet, Nissan paid for all these batteries and all these repairs –
>
> A.   Yes, sir.
>
> Q.   – for over two years?
>
> A.   And rental cars.

(Deposition of Bob Gore, page 35, line 11 – page 36, line 5) (testimony omitted from NNA's quotation in plain text).

Mr. Patterson and Ms. Bingham then quote a separate portion of Mr. Gore's testimony using ellipses to make it appear as Mr. Gore may have testified, at some earlier point, that he believed improper installation of the mirror caused the problems (testimony quoted by NNA in bold):

Q.     [Mr. Patterson] And is there something in the owner's manual that identifies what it covers and what the warranty does not cover?

A.     Yes, sir.

Q.     If you turn to Page 6 of Exhibit 2 –

A.     Are these numbered?

Q.     I think it's the last page.

A.     Okay. I see it. Okay.

Q.     Does this page identify what Nissan's warranty does not cover?

A.     Yes, sir.

Q.     And does it talk about Nissan non-approved aftermarket modifications?

A.     Yes, sir.

Q.     What does it say about that?

A.     "Installation of Non Nissan Approved Accessories or Components," and it's under a listing of what is not covered; and it's highlighted or sub-highlighted "Damages Failures Corrosion Due To Accidents, Misuse or Alterations."

Q.     And would the mirror that Hurricane Glass installed – would that be an alteration?

A.     Yes, sir.

> Q.      In your job, Mr. Gore, do you have to use your discretion to apply and to interpret Nissan's warranty to determine if something is covered under Nissan's warranty or if something is not?
>
> A.      Pretty cut and dry.
>
> Q.      **Okay. If you knew that this mirror were installed improperly or was causing failures in the batteries or problems in the electrical system, would you recognize that that would -- would it be your opinion that it would or would not be covered under the Nissan –**
>
> A.      **It would not be covered.**

(Deposition of Bob Gore, page 21, line 2 – page 22, line 11) (testimony omitted by NNA in plain text).

NNA combines the two separate portions of testimony to make it appear as though Mr. Gore had earlier testified that he or Clear Lake Nissan believed that the installation of the mirror, rather than the mirror itself caused the Murano's electrical problems — when Mr. Gore never so testified.  NNA's quotation appears as follows:

> Q:      My question is: As a certified master technician, do you have an opinion as to what caused the electrical problems in Ms. Scarlott's vehicle?
>
> A:      What caused it was the mirror itself.
>
> ***
>
> Q:      Okay.   If you knew that this mirror were installed improperly or was causing failures in the batteries or problems in the electrical system, would you recognize that that would – would it be your opinion that it would or would not be covered under the Nissan –
>
> A:      It would not be covered.

(Document 101, page 8 of 30)

Contrary to NNA's representations, Mr. Gore never testified that "Clear Lake believed the electrical problems were caused by the improper installation of the Homelink mirror." (Doc. 101, page 8 of 30).    Mr. Gore did however testify that he saw no problem with the wiring of the mirror: "Q:  Did you see any kind of problem with the – the actual wire that we – we talked about that you found from the wiring harness to the Home Link system?  A.  No, sir.  Not at all." (Deposition of Bob Gore, page 161, lines 19-22) (*See also* page 162, lines 17-21) ("Not that that would even be the problem.  So – but we followed that wire up; and when we got to the mirror, there was actually a plug on the back of the mirror, the – you know, so it tells me the wiring they did was okay.").

## X.    Conclusion.

NNA's Rule 11 Motion for Sanctions is frivolous.  NNA's defense has failed as a direct result of Mr. Patterson and Ms. Bingham's fast-and-loose litigation style and utter disrespect for Ms. Scarlott's lawyers.  Mr. Patterson and Ms. Bingham should not be heard to complain about NNA spending $170,000.00 defending claims which have merit and which long ago should have settled.  NNA's unfavorable position was created by Mr. Patterson and Ms. Bingham who could have avoided it by spending more time investigating the facts and less time threatening Ms. Scarlott and her lawyers.  For this neither Counsel for Plaintiff nor Ms. Scarlott can be blamed.

WHEREFORE, Plaintiff April Scarlott respectfully requests that the Court deny Nissan North America, Inc.'s, Motion for Rule 11 Sanctions in its entirety, and award April Scarlott all other relief to which the Court finds her entitled whether in equity or at law.[1]

---

[1] Ms. Scarlott previously requested a hearing on this motion and her lawyers are prepared to present the evidence outlined in this response to the Court if the Court feels that is necessary.

Dated:  November 21, 2011.                    Respectfully submitted,

                                              WEISBERG & MEYERS, LLC

                                              By: s/ Noah D.. Radbil
                                                  Noah D. Radbil
                                                  Texas Bar No. 24071015
                                                  noah.radbil@attorneysforconsumers.com
                                                  Weisberg & Meyers, LLC
                                                  Two Allen Center
                                                  1200 Smith Street, Sixteenth Floor
                                                  Houston, Texas 77002
                                                  Telephone:     (888) 595-9111
                                                  Facsimile:     (866) 317-2674

                                                  *Attorneys for Plaintiff* APRIL SCARLOTT

## CERTIFICATE OF SERVICE

I certify that on November 21, 2011, the foregoing was filed through the Court's EM/ECF system and was served upon all attorneys to be noticed.

Giovanna Tarantino Bingham
Hartline Dacus et al.
6688 N Central Expressway
Ste 1000
Dallas, TX 75206
214-346-3784
Fax: 214-267-4284
Email: gtarantino@hdbdk.com

Jeffrey S Patterson
Hartline Dacus et al.
6688 N Central Expressway
Ste. 1000
Dallas, TX 75206
214-369-3701
Fax: 214-369-2118
Email: jpatterson@hdbdk.com

Leslie Wm. Adams
3900 Essex Lane, Suite 1111
Houston Texas 77027
713-728-6360
Fax: 713-728-6366
Email: LWA@lesliewmadams.com

Paul F Schuster
Locke Lord et al.
2200 Ross Ave
Ste. 2200
Dallas, TX 75201-6776
214-740-8536
Email: pschuster@lockeliddell.com

Christopher Michael Boeck
Locke Lord et al.
2200 Ross Ave
Ste. 2200
Dallas, TX 75201
214-740-8482
Email: cboeck@lockelord.com

Daniel C Pappas
Attorney at Law
4615 S W Fwy
Ste. 600
Houston, TX 77027
713-621-5222
Fax: 713-621-7094
Email: dcp@dcplaw.net