| April Scarlott | § | |
| | § | |
| *versus* | § | Civil Action 4:10−cv−04865 |
| | § | |
| Nissan North America, Inc., *et al*. | § | |

### PLAINTIFF APRIL SCARLOTT'S RESPONSE TO DEFENDANT NISSAN NORTH AMERICA'S MOTION FOR AMENDED JUDGMENT AND FOR FEES AND COSTS

#### Introduction

It is one thing for this court to conclude—after all of the evidence has unfolded—that no genuine issue of material fact exists for summary judgment purposes and to determine that Nissan North America, Inc. ("NNA") is not liable to April Scarlott for the series of mechanical issues she had with her 2006 Nissan Murano ("Murano"). Ms. Scarlott recognizes that this court does not believe her claims had sufficient factual or legal support to prevail. But it does not automatically follow that Ms. Scarlott and her counsel engaged in sanctionable behavior.

This is because the totality of the tendered evidence demonstrates an *arguable* basis in fact and law to support Ms. Scarlott's claims. And it is also because she had a good faith basis to proceed with her claims—claims that she filed neither in bad faith, nor for the purpose of harassment. What's more, neither Ms. Scarlott, nor her attorneys, unreasonably or vexatiously multiplied this proceeding. Quite contrary, at every stage of this case they had evidence, or discovered evidence, that both supported their theory of the case, and that discredited NNA's shifting, and diametrically opposed theories of this case.

In particular, Ms. Scarlott's attorneys believed that the initial documentation she forwarded to them supported her claims against NNA. And before her attorneys even filed Ms. Scarlott's original petition, an independent expert carefully vetted her claims, and endorsed

them. Thereafter, the discovery process revealed more documentation that Ms. Scarlott and her attorneys believed supported her claims. And depositions of NNA's authorized dealership's service director, NNA's designated corporate representative, and NNA's expert, exposed additional evidence that Ms. Scarlott and her attorneys reasonably relied on in litigating this case.

What's more, in the eyes of Ms. Scarlott and her attorneys, the deposition of a third party automobile accessory shop's corporate representative completely discredited NNA's original theory of this case—which NNA proceeded with for well over a year. And that Ms. Scarlott continues to experience problems with the Murano's electrical system, to date, is but one of the many reasons that Ms. Scarlott and her attorneys believed that NNA's new theory of this case failed as well. That NNA's own witnesses testified contrary to its new theory also buttressed their opinion.

So, although this court ultimately dismissed Ms. Scarlott's claims, the procedural history of this matter, as well as the evidence the resulted from the discovery process, both show that neither Ms. Scarlott's actions, nor her attorneys' conduct, warrant the imposition of sanctions.

### Statement of Pre-Filing Events

I.    **Weisberg & Meyers, LLC ("W&M") agreed to represent Ms. Scarlott in connection with her claims against NNA only after one of its founding partners, one of its Texas attorneys, and an independent expert, each carefully vetted her claims.**

Ms. Scarlott initially submitted a written inquiry to W&M regarding problems that she was experiencing with her Murano. Affidavit of Alex Weisberg, attached as Exh. 1 at ¶3. In connection with her inquiry, she completed an intake form that included questions about the Murano's repair history. *Id.* at ¶3. Three days later, Mr. Weisberg reviewed Ms. Scarlott's inquiry, as well as her completed intake form, and called her to request, among other documentation, copies of all repair orders and purchase documents in her possession. *Id.* at ¶4.

Unable to reach Ms. Scarlott, Mr. Weisberg left her a voice message and sent her an email, outlining the documentation he sought. *Id.* at ¶4.

The following day, Ms. Scarlott forwarded forty-five pages of documentation to W&M, which included: (1) a four page handwritten letter to W&M detailing the issues she was experiencing with the Murano; (2) the front and back of the applicable motor vehicle retail installment sales contract; (3) the relevant agreement application; (4) the buyer's order and invoice for the Murano; (5) seven pages of repair history for the Murano; (6) related repair estimates; (7) emails between Ms. Scarlott and a service manager at Clear Lake Nissan, Inc. ("Clear Lake"); (8) an Enterprise rental agreement; (9) correspondence from Farmers Texas County Mutual Insurance Company; and (10) a copy of her driver's license. *Id.* at ¶5.

On the same day, Mr. Weisberg reviewed the documentation Ms. Scarlott submitted. *Id.* at ¶6. He then preliminarily determined that Ms. Scarlott's documentation evidenced potential claims against NNA. *Id.* at ¶6. Mr. Weisberg made this determination based upon his significant experience with consumer protection cases like Ms. Scarlott's—of which he has litigated hundreds, if not thousands, through Florida, Illinois, Texas, New Mexico and Washington. *Id.* at ¶7.

After making his preliminary determination, Mr. Weisberg consulted with Susan Landgraf—then an attorney for W&M firm's Texas office—about Ms. Scarlott's potential claims. *Id.* at ¶8. Ms. Landgraf thereafter contacted Ms. Scarlott, spoke to her, and offered to represent her. *Id.* at ¶8. Later that day, Ms. Scarlott conveyed her interest in W&M's representation. *Id.* at ¶8. And Mr. Weisberg then opened a filed for her. *Id.* at ¶8.

Before sending notice of Ms. Scarlott's claims to NNA, however, Mr. Weisberg sent Ms. Scarlott's documentation to Stephen Weaver—an A.S.E. Master Technician, with over thirty-

three years of experience in both the automotive and motorcycle industry. *Id.* at ¶¶10-11. Mr. Weisberg regularly relied on Mr. Weaver to assist him with pre-suit decisions regarding potential breach of warranty actions, not only because Mr. Weaver has a great deal of experience in the automotive industry, but also because his expert testimony has been found reliable and admissible by Texas courts. *Id.* at ¶¶11, 13-14. Mr. Weaver then concluded that "this is a valid claim for breach of warranty and diminished value." *Id.* at ¶12. And with both Ms. Landgraf's authority, and Mr. Weaver's endorsement, Mr. Weisberg recommended that W&M send a notice letter to NNA. *Id.* at ¶15.

Upon receiving W&M's notice of representation, NNA contacted W&M to discuss a potential pre-suit resolution. *Id.* at ¶16. But after exchanging several small offers and demands, W&M and NNA were unable to resolve this matter. *Id.* at ¶16.

**Statement of Discovery-Related Procedure**

Ms. Scarlott filed her original petition against NNA in the District Court for Harris County, Texas. Doc. 1-3. NNA initially responded via a letter explaining that the cause of the problems Ms. Scarlott experienced with the Murano's electrical system was a HomeLink mirror that Clear Lake directed Hurricane Auto Care & Accessories, Inc. ("Hurricane") to install in the Murano. In particular, NNA stated: "In other words, *the installation of the mirror is not the cause of the battery draining; it is the design or manufacture of the mirror itself.*" Doc. 50-6 at 3-4 (emphasis added).

So, Ms. Scarlott served NNA with discovery requests. And the repair orders, as well as NNA's warranty documentation, that Ms. Scarlott ultimately received from NNA, showed that Clear Lake—one of NNA's authorized repair facilities—performed repeated repairs, *under NNA's warranty*, in an effort correct problems that Ms. Scarlott experienced with the Murano's

electrical system. *See* Document 63-3. In particular, these repair orders detailed a number of Clear Lake's failed repair attempts. *Id*. They also demonstrated that to correct the problems that Ms. Scarlott experienced with the Murano, Clear Lake eventually installed and reconfigured a BCM, because the Murano's BCM was "not falling asleep." Doc. 63-3.

Aware of this, Ms. Scarlott then requested an opportunity to depose David Patin—the "authorized agent of Nissan North America, Inc." who verified NNA's responses to Ms. Scarlott's initial discovery request. *Id*. at ¶¶17-18. NNA, however, refused to allow her to depose Mr. Patin. Doc. 1-2 at 6; *Id*. at ¶19. Notwithstanding, Ms. Scarlott continued her efforts obtain a deposition of *an* NNA representative, if not Mr. Patin. *Id*. at ¶18.

But before NNA provided Ms. Scarlott this opportunity, NNA deposed Frank Gore— service director for Clear Lake Nissan ("Clear Lake"). Transcript of Bob Gore's Deposition ("T. B.G."), attached as Exh. 2. During this deposition Ms. Scarlott learned that Clear Lake repaired the Murano's BCM, and other NNA-factory components, under NNA's warranty because NNA "came out with a deal on Muranos and GTRs if you got a phantom battery drain, is to replace the BCM." T. B.G. at 144: 25; 145: 1-2. Ms. Scarlott also learned from Mr. Gore that an NNA Dealer Technical Specialist—who he later referred to as "a Nissan engineer," T. B.G. at 148: 9-10—advised him: "When you've got a known issue—*if you've got a GTR or a Murano with a battery going dead, just fan them, put a BCM in there, because they're waking up and zapping the batteries*." T. B.G. at 145: 5-14. But despite Mr. Gore's admission that he called Ms. Scarlott to tell her, "Guess what? I found your problem," T. B.G. at 145: 11-19, after he found our about NNA's suggested repair to the Murano's BCM, Ms. Scarlott also learned through Mr. Gore's deposition that he blamed the Murano's electrical problems on the HomeLink mirror.

And almost immediately after Mr. Gore said this, NNA filed its motion to designate "Hurricane Glass"—the facility that NNA believed to have installed the HomeLink mirror—as a responsible third party. Doc. 1-2 at 7; Affidavit of Alex Weisberg, attached as Exh. 1, at ¶20. Accordingly, and due in part to NNA's motion to designate "Hurricane Glass" as a responsible third party, Ms. Scarlott filed her first amended petition against NNA, "Hurricane Glass," Nissan Motor Acceptance Corporation ("NMAC"), and Clear Lake. Doc. 1-11.

About a month later, Ms. Scarlott deposed Neil Barnes—NNA's designated corporate representative. Transcript of Neil Barnes's Deposition ("T. N.B."), attached as Exh. 3. During this deposition, Ms. Scarlott learned that a BCM that is "not falling asleep" is a BCM that "did not power down." T. N.B. at 162: 21-24. She also learned from Mr. Barnes that if the BCM in the Murano didn't fall asleep, it could have caused the drain to the Murano's battery: *If the BCM is not powering down, if it's still powered up like it would be with the ignition switch turned on, yes, it could.* T. N.B. at 163: 8-13.

After this, NNA filed Ryan Schooley's expert report. Doc. 34. Through it, Mr. Schooley opined that the HomeLink mirror was the cause of the problems that Ms. Scarlott experienced with the Murano. He justified his opinion by explaining that when "Hurricane Auto installed a diode in order to prevent the battery drain from occurring," *id*, the Murano's problems ceased to exist. The problems, however, did not cease to exist, and continue to date.

No matter, two months later, NNA deposed Srinivasa "Sam" Gogineni—the owner of Hurricane Auto Care & Accessories, Inc. ("Hurricane"). Transcript of Srinivasa "Sam" Gogineni's Deposition ("T. S.G."), attached as Exh. 4. And during Mr. Gogineni's deposition, NNA discovered that Hurricane *never installed a diode in the HomeLink mirror. See* "T. S.G." at at 79: 8-11; 96: 13-21; 97: 13-15; 98: 10-11. So, NNA's theory that it had relied on for well over

a year—a theory based on which NNA filed a motion for summary judgment explaining that Hurricane corrected the cause of Ms. Scarlott's repeated tow-truck-trips to Clear Lake when it "*installed a diode to correct this problem*, allowing electricity to flow to the aftermarket rear view mirror, but preventing the mirror from draining the battery," Doc. 50-1 at 12—was discredited.

NNA then, and only then, changed course, and began to argue that the *installation* of the HomeLink mirror *was* the cause of the problems that Ms. Scarlott experienced with the Murano—a theory quite contrary to its original hypothesis that "the installation of the mirror is *not* the cause of the battery draining." Doc. 50-6 at 3-4 (emphasis added). Specifically, NNA suggested, through its *amended* motion for summary judgment, that "*[t]he unequivocal evidence shows that due to Hurricane Auto's improper installation, the mirror remained on at all times.*" Doc. 63-1 at 32; *see also* Doc. 104 at 5-9. Not surprisingly, NNA's new theory was in line with Mr. Schooley's opinion that Ms. Scarlott experienced with the Murano's electrical system were due to a "*constant drain from an accessory*," *see* T. R.S. at 147: 20-25.

But when Ms. Scarlott finally got the chance to depose Mr. Schooley, his testimony did not support NNA's new theory. In fact, his testimony not only contradicted his own expert report, but it also cut against NNA's new theory of causation. In particular, he was forced to acknowledge what Mr. Gore had already noted—the HomeLink Mirror did *not* remain on at all times, Doc. 104 at 23-27, 34-35, and that the drain to the Murano's battery was not constant. T. B.G. at 30: 8-9; 24-25; 90: 24; T. B.G. at 136: 23-25.

 Furthermore, Mr. Schooley revealed at his deposition: "I personally have not worked on the vehicle myself. I can only go by the facts, deposition, warranty data, service claims that were given to me." *See* T. R.S. at 105: 21-25. He also conceded not only that that his opinion would

change significantly if no diode was installed in the HomeLink mirror, *see* T. R.S. 92: 2-9—*of course, no diode was installed*—but that his understanding of how diodes function "very much so" factored into his opinion that the HomeLink mirror was the cause of the problems that Ms. Scarlott experienced with the Murano's electrical system. T. R.S. 145: 21-25. *Again, no diode was ever installed in the HomeLink* mirror.

And, on top of all of this, Mr. Schooley testified: *"[T]his BCM, we've seen them in other vehicles not falling asleep . . . ."* T. R.S. at 113: 24-25; 114: 1 (emphasis added). Mr. Schooley subsequently stated—although generally, and without a specific reference to the Murano—that "*a malfunctioning BCM can cause a draw on the battery*." T. R.S. at 54: 2-5 (emphasis added). This coincides with his expert report, through which he confirmed that he was "*aware of instances where the BCM would not 'go to sleep' thereby resulting in a battery drain.*" Doc. 34 at 11 (emphasis added).

But this is still not all, Mr. Schooley then testified that it would take a constant draw of "500 milliamps over the course of a week" to draw the Murano's battery down to the point that it would "not crank." *See* T. R.S. at 93: 23-25; 94: 1-10. And after he did so, Ms. Scarlott conducted additional discovery, and learned that the HomeLink mirror could not have drawn from the Murano's battery more than 450 milliamps at any time, and its typical draw would have been much less. *See* Doc. 71-24 at 4. So, given that she experienced a dead battery in no more than three-day's time, she had yet another reason to proceed with her case.

And sometime later, she had one more reason—she experienced problems with the Murano's electrical system after the date on which Hurricane "fixed" the HomeLink mirror. In particular, the Murano exhibited a "no-start" condition on at least five separate and distinct occasions after Clear Lake deemed the Murano to have been "returned with no electrical draw."

*See* Docs. 108, 108-1. And as a result, Ms. Scarlott had to purchase at least one entirely new battery, in addition to those the Clear Lake installed in the Murano. *Id.*

## Argument

**I. Because Ms. Scarlott's DTPA claims did not lack an "arguable basis in fact and law," this Court should not amend the judgment[1] and award attorneys' fees and costs to NNA.**

Section 17.50(c) of the DTPA provides for an award of "reasonable and necessary" attorneys' fees and costs "[o]n a finding by the court that an action under this section was groundless in fact or law or brought in bad faith, or brought for the purpose of harassment." TEX. BUS. & COMM. CODE § 17.50(c). Seizing on language in this court's summary judgment opinion, *see* Doc. 119 at 6, NNA asserts that it is entitled to recover $180,201 in attorneys' fees and $8,233.42 in taxable court costs under the DTPA. *See* Doc. 123 at 2-3.

It is not. This is, in part, because a claim that does not prevail is not the same as one that is groundless. *Hickman v. Dudensing*, No. 01-06-00458-CV, 2007 WL 1500334 (Tex. App.-Houston [1st Dist.] May 24, 2007, rev. denied). A claim is "groundless" only if it has no reasonable basis in law or fact and is not warranted by a good faith argument for the extension, modification, or reversal of existing law. *Donwerth v. Preston II Chrysler-Dodge, Inc.,* 775 S.W.2d 634, 637 (Tex. 1989). A court must, therefore, ask itself "whether the totality of the tendered evidence demonstrates an *arguable* basis in fact and law for the consumer's claim." *Splettstosser v. Myer,* 779 S.W.2d 806, 808 (Tex. 1989) (emphasis added). Significant, in doing so, a court can consider evidence regardless of whether it is legally inadmissible or subject to

---

[1] To the extent that NNA moved to amend the judgment *after* Ms. Scarlott filed her notice of appeal, this court lacks jurisdiction to grant NNA's specific request, as "under the usual rule, the district court loses all jurisdiction over matters brought to us upon the filing of the notice of appeal." *Winchester v. United States Attorney for S. Dist. of Tex.,* 68 F.3d 947, 948 (5th Cir.1995). Stated otherwise, "the district court is divested of jurisdiction except to take action in aid of the appeal until the case is remanded to it by the appellate court, or to correct clerical errors under Rule 60(a)." *Travelers Ins. Co. v. Liljeberg Enterprises, Inc.*, 38 F.3d 1404, 1408 (5th Cir. 1994).

other defects. *Donwerth,* 775 S.W.2d at 637; *accord Davila v. World Car Five Star*, 75 S.W.3d 537, 544 (Tex. Civ. App.— San Antonio, 2002).

Here, Ms. Scarlott's lawsuit was not "groundless in fact or law or brought in bad faith, or brought for the purpose of harassment." TEX. BUS. & COM. CODE § 17.50(c). Instead, and as demonstrated by the subsections that immediately follow, it rested on an *arguable* basis in fact and law—even though this court ultimately dismissed Ms. Scarlott's claims. Simply, Ms. Scarlott believed that NNA breached its express and implied warranties when it failed to repair defects in the Murano's electrical system, which were covered under warranty, after she afforded NNA a reasonable opportunity to repair these defects. *See* Doc. 70 at 27-51. And because the DTPA affords a consumer a cause of action where a breach of an express or implied warranty constitutes a producing cause of damages, *see* TEX. BUS. & COM. CODE § 17.50(a)(2), she felt that her DTPA claim was sound. *See* Doc. 70 at 56-57.

As well, Ms. Scarlott asserted her claims against NNA based on a good faith belief that they were viable, and not in bad faith or for the purpose of harassing NNA. Indeed, "[t]o prove 'bad faith,' [a party] must have shown that a malicious or discriminatory purpose motivated [the subject action]." *Ocean Transp., Inc. v. Greycas, Inc.*, 878 S.W.2d 256, 270 (Tex.App.—Corpus Christi 1994). Similarly, the Texas Supreme Court has made clear that a suit is brought "for purposes of harassment" only where a court finds the *sole* purpose of the suit was to harass. *Donwerth*, 775 S.W.2d at 638. Quite contrary to these characterizations, Ms. Scarlott sought tangible relief for the problems that plagued her Murano, and did not act with a malicious purpose or to harass.

**A. Ms. Scarlott justifiably believed that a defective NNA factory-component was most likely a cause of the problems that she experienced with the Murano's electrical system—problems that NNA failed to repair after what Ms. Scarlott thought to be reasonable number of attempts.**

Over two-and-one-half years after first tendering the Murano to Clear Lake for repairs to its electrical system—the Murano having been "in the shop" for nearly thirty days during this period, *see* Doc. 63-3 at 7-23—Clear Lake found that the "BCM [was] not falling asleep." *Id.* And in an attempt to correct what it referred to as an "electrical problem," it installed and reconfigured a BCM. Doc. 63-3. Neil Barnes—one of NNA's dealer technical specialists, and also NNA's designated corporate representative in this matter—described the BCM in the Murano as a factory-installed piece of hardware that controls, among other components, "turn signals, dome lights, [and] other lights in the car." T. N.B at 162:9-20. Mr. Barnes then explained that a BCM that is "not falling asleep" is a BCM that "did not power down." T. N.B. at 162: 21-24.

Of the utmost significance to this matter, Clear Lake repaired the Murano's BCM *under NNA's warranty*[2] because, as Mr. Gore noted, NNA "came out with a deal on Muranos and GTRs if you got a phantom battery drain, is to replace the BCM." T. B.G. at 144: 25; 145: 1-2. Mr. Gore then explained that an NNA Dealer Technical Specialist—who he later referred to as "a Nissan engineer," T. B.G. at 148: 9-10—advised him: "When you've got a known issue—*if you've got a GTR or a Murano with a battery going dead, just fan them, put a BCM in there, because they're waking up and zapping the batteries*." T. B.G. at 145: 5-14. Mr. Gore next recalled: "And when he told me that, guess who Bob Gore called? . . . I called Ms. Scarlott. 'Guess what? I found your problem.'" T. B.G. at 145: 11-19.

---

[2]   Ms. Scarott discusses the significance of NNA's *warranty* repairs in the subsection that immediately follows this one.

Similarly, Mr. Schooley confirmed, through his expert report, that he was "*aware of instances where the BCM would not 'go to sleep' thereby resulting in a battery drain.*" Doc. 34 at 11 (emphasis added). And during his deposition, he again acknowledged: "*[T]his BCM, we've seen them in other vehicles not falling asleep . . . .*" T. R.S. at 113: 24-25; 114: 1 (emphasis added). Mr. Schooley subsequently testified—although generally, and without a specific reference to the Murano—that "*a malfunctioning BCM can cause a draw on the battery.*" T. R.S. at 54: 2-5 (emphasis added). His acknowledgement coincides with Mr. Barnes's concession that if the BCM in the Murano didn't fall asleep, it could have caused the drain to the Murano's battery: "*If the BCM is not powering down, if it's still powered up like it would be with the ignition switch turned on, yes, it could.*" T. N.B. at 163: 8-13.

Mr. Schooley did, nonetheless, opine that the defective BCM in the Murano was not the cause of the problems that Ms. Scarlott experienced with its electrical system. He did so, however, after conceding that he never looked at the BCM Clear Lake replaced, *see* T. R.S. at 110: 3-8, and after responding "[n]o, I do not," to the question: "Do you know much about the Murano BCM in 2006." T. R.S. 112: 18-20. Also important, Mr. Schooley admitted that he knew neither what test Mr. Gore performed on the BCM when he determined that it was "not falling asleep," nor "whether the BCM passed or failed that test." T. R.S. at 114: 8-16. And most remarkably, Mr. Schooley revealed that the only reason he did not believe the Murano's factory-installed BCM caused the battery drain at issue is because "*when ultimately the diode was installed with the mirror*, then the current drain went away and the vehicle has not been back since." T. R.S. 54: 11-18 (emphasis added). Of course, no diode was ever installed in the HomeLink mirror. T. S.G. at 79: 8-11; 96: 13-21; 97: 13-15; 98: 10-11.

So despite Mr. Schooley's opinion otherwise, Ms. Scarlott reasonably believed the facts underlying this matter supported her conclusion that the defective BCM caused the problems that she experienced with the Murano. Indeed, NNA's admission that factory-installed BCMs in Muranos were "waking up and zapping the batteries," T. B.G. at 145: 5-14, played a large part in her belief. This is because NNA's admission corresponds perfectly with Mr. Gore's testimony that the Murano's battery was not being "discharge[d] over time;" rather, whenever the cause of the intermittent electrical problems "would wake up, it would zap the battery." T. B.G. at 136:23-25. Stated otherwise, *Mr. Gore concluded that the Murano's electrical problems were caused by the very factors that NNA described as an effect of a defective BCM*.

And what's more, because Mr. Barnes testified that the BCM controls "turn signals, dome lights, [and] other lights in the car," T. N.B. at 162: 9-20, and because Mr. Schooley testified that the BCM controls, among other components, the Murano's interior lights, door locks, remote locks, and windshield wipers, *see* T. R.S. at 107: 25; 108: 1-16, Ms. Scarlott justifiably saw the Murano's "minor" electrical problems not as small aggravations, but instead as part of a much larger problem with the Murano's electrical system—a defective factory-installed BCM. This is because when she took a step back to look at the "electrical" repairs that Clear Lake made to the Murano before it replaced the BCM—for example, repairs to correct a malfunctioning rear wiper, s*ee* Doc. 63-3 at 7 ("ELECTRICAL *** CUST STATES REAR WIPER INOP"), and repairs to correct malfunctioning dome lights, s*ee* Doc. 63-3 at 14 ("ELECTRICAL *** CUSTOMER STATES NON OF THE DOME LIGHTS WORK")—she observed that many of the electrical problems the Murano exhibited were directly related the BCM's function and purpose. So, for this reason, as well as all others, Ms. Scarlott reasonably

believed that a question of fact existed as to whether the BCM drained the battery, even though this court ultimately found the HomeLink mirror to be the culprit.[3]

**B. Ms. Scarlott's reasonable belief that a defective NNA-factory component was most likely the cause of the problems that she experienced with the Murano's electrical system is further supported by the simple fact that NNA repaired the BCM, as well as other electrical components in the Murano, under its warranty.**

A plaintiff may prove the existence of a defect through circumstantial evidence. *Nat'l Dairy Products Corp.*, 414 F.2d 682, 687 (5th Cir. 1969); *Holcomb v. Cessna Aircraft Co.*, 439 F.2d 1150, 1153 (5th Cir. 1971). And because she may do so, her "evidence need not negate all other possible causes." *Porter v. Am. Optical Corp.*, 641 F.2d 1128, 1142 (5th Cir. 1981).

In the case of a defective automobile, a manufacturer's repair to a factory component, under a warranty that covers "repairs or replacements necessary to correct defects in material or workmanship," constitutes circumstantial evidence of a defect. *Milicevic v. Fletcher Jones Imports, Ltd.*, 402 F.3d 912, 919 (9th Cir. 2005). In fact, it means that the manufacturer "admitted the defective nature of these conditions." *Id.*

Here, NNA covered Clear Lake's repairs to correct the problems that Ms. Scarlott experienced with the Murano's electrical system under its warranty. In particular, it covered Clear Lake's repairs to the Murano's batteries, BCM, dome lights, air bag light, and rear wipers—each of which Clear Lake referred to as an "ELECTRICAL" repair—under NNA's warranty. Doc. 63-3 at 7, 12, 14, 19, 22, 25; *see also* T. B.G. at 35:11 to 36:5 (acknowledging that Nissan paid for batteries, repairs, and rental cars for over two years).

Significant, NNA's warranty covers only "repairs needed to correct defects in materials or workmanship of all parts and components of each new vehicle supplied by Nissan . . . ." Doc. 63-8 at 13. So, according to the only United States Court of Appeals to consider this precise

---

[3]     Ms. Scarlott discusses the basis for her belief that the HomeLink mirror was *not* the culprit later in this section.

issue, Ms. Scarlott was justified in believing that the problems she experienced with the Murano were due to defects in NNA's parts or workmanship—defects that remained even after Ms. Scarlott gave NNA a reasonable number of attempts to repair them.[4]

Also important, Mr. Schooley stated through his report that "[t]he replacement of the BCM was eligible for coverage under the Security+Plus Plan." Doc. 34 at 11. This is significant because similar to NNA's warranty, the Security+Plus Plan covers *only* repairs necessary as a result of a "mechanical breakdown," which "means the inability of a covered part to perform the function(s) for which it was designed, *due solely to defects in Nissan materials or faulty workmanship for which Nissan is responsible*." Doc. 70 at 6 (emphasis added). So, Ms. Scarlott believed that she properly filed and proceeded with her case, as she thought—in line with the Ninth Circuit's opinion in *Milicevic*—that NNA's warranty repairs constituted an implied admission that NNA-factory components in the Murano were defective; components that NNA failed to repair in what Ms. Scarlott believed to be a reasonable number of attempts to do so.

C. **Ms. Scarlott's reasonable belief that NNA-factory components in the Murano were defective, and that NNA failed to repair those components after being afforded a reasonable opportunity to do so, is also supported by her expert's testimony.**

Ms. Scarlott's expert witness, Stephen Weaver, advised in his expert report that "[t]he vehicle has had multiple defects since purchase [defective starting system, defective battery, defective supplemental restraint system, defective front suspension, and defective engine control system], and the dealer has needed multiple attempts to repairs said defects." Doc. 4-3 at 1. Quite significant, he represented that "[t]he manufacturer has recognized these defects by issuing bulletins relative to each." *Id*.

---

[4]      What constitutes a "reasonable number of attempts" is a question of fact. Notwithstanding, a manufacturer like NNA is "entitled to at least two, and possibly three, attempts to correct the defect." *Marchionna v. Ford Motor Co.*, No. 94 C 275, 1995 WL 476591, at *11 (N.D. Ill. Aug. 10, 1995). Ms. Scarlott provided NNA many more than three opportunities to repair the defects that she experienced with the Murano's electrical system.

And despite this court's statement that Mr. Weaver's testimony was ultimately not convincing, *see* Doc. 119 at 5,[5] Ms. Scarlott believed that she was entitled to rely on his opinion given his experience in the automotive industry, and, if for no other reason, because two other Texas courts had previously lent credence to his expert opinions. Exh. 1, at ¶¶11, 14. Ms. Scarlott also believed that Mr. Weaver's opinion was trustworthy as he had, in the past, presented reports to W&M explaining that he did not find a defect in a particular vehicle. *Id.* at 13. In other words, he was not someone that simply "rubber stamped" consumers' claims for breach of warranty.

> **D. Ms. Scarlott additionally felt confident in her DTPA claims as her internet research showed that many other Murano owners suffered through the same electrical problems that she did.**

Ms. Scarott's internet search revealed pages of online consumer complaints regarding the very same problems that she experienced with her Murano:

- http://www.nissanmurano.org/forums/83-2nd-gen-2009/18131-draining-battery.html

- http://www.arfc.org/complaints/2007/nissan/murano/electrical_system/problem.aspx

- http://answers.yahoo.com/question/index?qid=20091120024400AAnGwxX

- http://www.justanswer.com/nissan/2u2i7-suspect-parasitic-drain-resulting-battery.html

> **E. Notwithstanding all of her affirmative evidence, Ms. Scarlott also had a reasonable basis to believe that NNA's theory—that the HomeLink mirror was not the cause of the problems she experienced with the Murano's electrical system—was incorrect.**

Months before this matter was removed to this court, NNA mailed a letter to Ms. Scarlott in defense of her claims against it. Through this letter, NNA suggested that the cause of the

---

[5]     This court struck Mr. Weaver's testimony because it was "unverifiable, biased, subjective, and unscientific." Doc. 119 at 5. But when testimony is based on an expert's practical experience and acquired knowledge—as was Mr. Weaver's—the test that this court applied is inapplicable. In other words, a *Frye*-type inquiry is not necessary if an expert's testimony is based on training, experience, professional observations, and acquired knowledge. This is because testimony that does not involve new scientific principles or methods need not meet the stringent requirements of general acceptance.

problems that Ms. Scarlott experienced with the Murano's electrical system was a HomeLink mirror that Clear Lake directed Hurricane to install in the Murano.[6] In particular, NNA stated: "In other words, *the installation of the mirror is not the cause of the battery draining; it is the design or manufacture of the mirror itself.*" Doc. 50-6 at 3-4 (emphasis added).

NNA proceeded with this theory for well over a year. In fact, through its *original* motion for summary judgment, NNA explained that Hurricane corrected the cause of Ms. Scarlott's repeated tow-truck-trips to Clear Lake when it "*installed a diode to correct this problem*, allowing electricity to flow to the aftermarket rear view mirror, but preventing the mirror from draining the battery." Doc. 50-1 at 12 (emphasis added). Hurricane, however, *never* installed a diode in the HomeLink mirror. *See* T. S.G. at 79: 8-11; 96: 13-21; 97: 13-15; 98: 10-11. And upon learning this, NNA's original theory was no more.

So, it shifted gears. NNA began to argue that the *installation* of the HomeLink mirror *was* the cause of the problems that Ms. Scarlott experienced with the Murano—a theory quite contrary to its original hypothesis that "the installation of the mirror is *not* the cause of the

_____

[6]        Contrary to this Court's understanding, NNA did *not* inform Ms. Scarlott that it would have a "mechanic not affiliated with Nissan", *see* Doc. 119 at 1, install the HomeLink mirror. Rather, Ms. Scarlott reasonably believed that Clear Lake had directed her to a "factory-authorized" business to have the HomeLink mirror installed. The evidence presented in this matter shows this to be true.
        The day after Ms. Scarlott took possession of the Murano, she returned it to Clear Lake because it was not equipped with an option for which Clear Lake charged her—a HomeLink mirror. *See* T. B.G. at 102: 23-25; 103: 1-3. Through its motion for summary judgment, Clear Lake made this clear: "The purchase price included a 'Homelink' mirror system. After receiving the vehicle, [Ms. Scarlott] realized the vehicle did not have the Homelink mirror system installed, so [she] returned the vehicle to Clear Lake." Doc. 51 at 2.
        When Ms. Scarlott returned the Murano to Clear Lake, it explained to her that it would have one installed. Transcript of April Scarlott's Deposition ("T. A.S."), attached as Exh. 5, at 28: 3-25; 29: 1-2. *Concerned about her warranty, however, Ms. Scarlott immediately inquired as to whether this installation would invalidate it.* T. A.S. at 29: 3-5. *In response, Clear Lake assured Ms. Scarlott that it would not, as the installation center was "factory-authorized."* T. A.S. at 29: 5-7. Clear Lake subsequently directed Ms. Scarlott to Hurricane, and ultimately paid for the installation. T. S.G. at 57:15; *see also* Draft from Clear Lake to Hurricane, attached as Exh. 6.
        Indeed, Ms. Scarlott's belief that Clear Lake had directed her to a "factory-authorized" business to have the HomeLink mirror installed was reasonable in light of Clear Lake's statements, and given that she purchased a Nissan Maintenance+Plus® Vehicle Service Plan, which stated: "With Maintenance+Plus you'll be hiring Nissan to maintain your vehicle to factory specification by factory trained technicians." Doc. 71-7.

battery draining." Doc. 50-6 at 3-4 (emphasis added). Specifically, NNA suggested, through its *amended* motion for summary judgment, that "*[t]he unequivocal evidence shows that due to Hurricane Auto's improper installation, the mirror remained on at all times*." Doc. 63-1 at 32; *see also* Doc. 104 at 5-9. This is, not surprisingly, in line with the testimony that NNA's expert, Ryan Schooley, provided—through which he opined that the problems Ms. Scarlott experienced with the Murano's electrical system were due to a "*constant drain from an accessory*," *see* T. R.S. at 147: 20-25.

Noteworthy, Mr. Schooley's testimony contradicts his own expert report, in which he referred to an "intermittent electrical draw," "intermittent electrical issues," and "an intermittent drain on the battery." Doc. 34 at 7, 9. 11. And also worth mentioning, Mr. Schooley revealed at his deposition: "I personally have not worked on the vehicle myself. I can only go by the facts, deposition, warranty data, service claims that were given to me." *See* T. R.S. at 105: 21-25. What's more, Mr. Schooley acknowledged not only that that his opinion would change significantly if no diode was installed in the HomeLink mirror, *see* T. R.S. 92: 2-9—of course, no diode was installed—but that his understanding of how diodes function "very much so" factored into his opinion that the HomeLink mirror was the cause of the problems that Ms. Scarlott experienced with the Murano's electrical system. T. R.S. 145: 21-25.

But notwithstanding the inadequacies of Mr. Schooley's report, Ms. Scarlott believed that the biggest problem with NNA's new theory—that the HomeLink mirror remained on at all times and therefore constantly drew power from the Murano's battery—was that the HomeLink Mirror did *not* remain on at all times. *See generally* Doc. 104 at 23-27, 34-35.

Indeed, Bob Gore, Clear Lake Nissan's service director, stated as much. Mr. Gore explained that on each occasion Ms. Scarlott tendered the Murano for repair to its electrical

system, Clear Lake would run tests in an effort to find a parasitic drain on the Murano's battery, but those tests were "always inconclusive." B.G at 25: 22-25; 26: 1-2. He later acknowledged that Clear Lake was not able "to duplicate any drain on the battery." T. B.G. at 142: 6-7. And by way of an example, Mr. Gore recalled: "We never would find a draw. I walked by this car no less than probably a hundred times, personally, looking at that meter myself, because I wanted to catch—you know, I knew something was waking up." T. B.G. at 156: 3-7. He further expounded upon his experience with the Murano in noting that it actually sat at Clear Lake for weeks at a time, while "probably every technician at the shop" watched it closely, *see* T. 30: 8-12, without exhibiting any parasitic drain whatsoever. T. B.G. at 29: 4-8. Mr. Gore then summed up his recollection by noting: "[A]gain, it was such an intermittent situation. We was lucky just to even catch it." T. B.G. at 29: 8.

In short, Mr. Gore made clear that the drain to the Murano's battery was not constant; rather, "it would come on on its own," T. B.G. at 30: 24-25, and even with an "amp meter attached to it, watching for parasitic drains, T. B.G. at 30: 8-9, "it was by luck, by chance," that Clear Lake caught it. T. B.G. at 90: 24. He correspondingly explained that the Murano's battery was not being "discharge[d] over time;" instead, whenever the cause of the intermittent electrical problems "would wake up, it would zap the battery." T. B.G. at 136: 23-25; *see also* Doc. 104 at 25-27. Therefore, from the outset, Ms. Scarlott thought that NNA's new theory fell flat, as the HomeLink mirror which purportedly remained on at all times, and supposedly drained power from the Murano's battery on a consistent basis, neither remained on at all times, nor constantly depleted the Murano's power source.

But that was not the only problem that Ms. Scarlott saw with NNA's new theory. Even if the HomeLink mirror constantly drew power from the Murano's battery, it could not have drawn

enough power to cause the battery failures that she experienced. For example, it could not have depleted the Murano's battery in only three days—a circumstance that Ms. Scarlott experienced. *See* Doc. 71-25. This is because, as Mr. Schooley testified, it would take a constant draw of "500 milliamps over the course of a week" to draw the Murano's battery down to the point that it would "not crank." *See* T. R.S. at 93: 23-25; 94: 1-10. The HomeLink Mirror, however, could not have drawn from the Murano's battery more than 450 milliamps at any time, and its typical draw would have been much less. *See* Doc. 71-24 at 4. So, simple arithmetic—Ms. Scarlott thought—demonstrated that NNA's new theory—that of a "constant draw" from the HomeLink mirror—was not viable, as applied to the facts underlying this matter. *See generally* Doc. 104 at 24-25.

And even if NNA's new theory could have been viable, Ms. Scarlott did not believe it was supported by the circumstances of this case—that the Murano's batteries died at a progressively frequent rate, as Mr. Gore noted: "[T]oward the end it started getting more—more common. At first remember, it was, like nine months and six months, three months. And you know, it was getting worse and worse." T. B.G. at 152: 20-22. So, Ms. Scarlott thought that if NNA's new theory was correct—that the HomeLink mirror's constant power draw drained the Murano's batteries on a consistent basis—the Murano's batteries would have died in a somewhat uniform manner. Her belief was especially reasonable given that Mr. Gore took care to explain that she did not do anything to worsen the problems with the Murano's electrical system—"No, sir. It's nothing she did." T. B.G. at 84: 14-16—and because NNA's counsel agreed with Mr. Gore: "Q. And do you blame Ms. Scarlott for any of this? A. Not at all. Q. And Nissan doesn't either, right? A. I'm emphatic to it, you know." T. B.G. 7-10, s*ee also* Doc. 104 at 23-24.

Therefore, because the Murano's batteries did not die in a somewhat uniform manner, Ms. Scarlott saw yet another reason to believe that NNA's new theory was unsound.

**F. Ms Scarlott believed that the objective evidence disproved NNA's suggestion that the BCM could not have caused the problems that Ms. Scarott experienced with the Murano's electrical system just because one of its batteries died shortly after NNA made a repair to the BCM.**

Mr. Schooley opined that the BCM could not have been the cause of Murano's electrical problems "[b]ecause the car—the Murano came back with the same problems not too much longer after the BCM was replaced." T. R.S. at 114: 22-25. But Mr. Schooley's inference does not hold water. This is because Clear Lake did not replace the Murano's battery on the date it repaired the BCM. *See* Doc. 63-3 at 22. It simply repaired the BCM. *See id*. And in light of Mr. Gore's testimony that the battery "getting zapped and being charged all the time, it was stressful to the batteries and we would take them out," T. B.G. at 151: 25; 152-1-2, Ms. Scarlott thought common sense dictated that this particular battery, which the defective BCM had repeatedly zapped, was stressed, needed to be replaced, and was bound to die in the near future—just as all of the Murano's other batteries had. Accordingly, Ms. Scarlott reasonably disagreed that her theory—that unrepaired, defective NNA-factory components were the cause of the problems that she experienced with the Murano's electrical system—was invalidated simply because one of the Murano's batteries died shortly after NNA made a repair to the BCM.

**G. Similarly, Ms. Scarlott believed that the objective evidence proved false NNA's contention that the Murano's electrical problems must have been caused by the HomeLink mirror simply because Ms. Scarlott did not return the Murano to Clear Lake after Hurricane "fixed" the HomeLink mirror.**

Mr. Schooley summed up his analysis by noting: "The data shows that the vehicle hasn't been back. Until then, you know, it hasn't been back to the dealership. The problem is fixed. That's how it goes." T. R.S. at 107: 6-9. He subsequently reaffirmed that the sole basis of his

belief that the HomeLink mirror was the cause of the Murano's electrical problems was that "[a]ll the evidence shows that after the diode was installed, there has not been another report of a battery failure." T. R.S. 122: 12-17.

This, despite that Mr. Schooley admitted he was "not familiar with the installation of the mirror in this case," T. R.S. at 83: 25; 84: 1, that he had "not seen pictures or photographs or received a model number of the [mirror] that Hurricane installed," T. R.S. at 84: 6-11, and that he had not even "ask[ed] for any information relating to the [mirror] that Hurricane installed." T. R.S. at 84: 12-14.

But no matter the lack of foundation to support Mr. Schooley's opinion, Ms. Scarlott did not believe that the simple fact that she did not return the Murano to Clear Lake after it declared the HomeLink mirror to be the cause of its electrical problems supported NNA's assumption that the HomeLink mirror was, therefore, the end-all-be-all root source of the Murano's electrical problems. *In fact, Ms. Scarlott thought that NNA's assumption was discredited by the fact that she experienced problems with the Murano's electrical system after the date on which Hurricane "fixed" the HomeLink mirror*. In particular, the Murano exhibited a "no-start" condition on at least five separate and distinct occasions after Clear Lake deemed the Murano to have been "returned with no electrical draw." *See* Docs. 108, 108-1. And as a result, Ms. Scarlott had to purchase at least one entirely new battery, in addition to those that Clear Lake installed in the Murano. *Id*.

But by the time she experienced these problems, and needed this battery, NNA's warranty had expired—which is one of the reasons that Ms. Scarlott did not return the Murano to Clear Lake again, as she did want to pay Clear Lake out-of-pocket for the costs of any needed repairs. Thus, Ms. Scarlott did not think her decision not to bring the car back to Clear Lake after

Hurricane re-installed the HomeLink mirror took away from her claim—as it is not correct that "[t]he electrical system has worked since the rewiring." *See* Doc. 119 at 3.

**II.     This court should not award sanctions to NNA under Section 1927 because W&M and its counsel did not unreasonably and vexatiously multiply the proceedings.**

Section 1927—entitled "Counsel's liability for excessive costs"—provides that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. NNA has not satisfied the stringent standards that govern requests for Section 1927 sanctions. It advances only conclusory assertions about counsel's behavior in this case. *See, e.g.*, Doc. 123 at 15. And it then asks this court to infer that counsel must have acted improperly here, based on its conduct in other unrelated cases, *see id.* at 15-19—which, as established in a separate section below, are inaccurate or taken out of context and, in some cases, NNA has explicitly retracted.

To start, because Section 1927 is a means for imposing sanctions on lawyers "who unreasonably extend court proceedings" in an attempt to limit "the abuse of court processes." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 757, 762 (1980), punishment under Section 1927 is "sparingly applied." *Meadowbriar Home for Children, Inc. v. Gunn,* 81 F.3d 521, 535 (5th Cir. 1996). Indeed, "[t]he Fifth Circuit has made clear that § 1927, being penal in nature, should be strictly construed so that only excess costs caused by plaintiff's attorney's vexatious behavior and consequent multiplication of the proceedings should be tabulated." *Rogers v. Kroger Co.*, 586 F. Supp. 597, 602 (S.D. Tex. 1984) (citing *Monk v. Roadway Exp., Inc.,* 599 F.2d 1378, 1382 (5th Cir. 1979)).

Accordingly, the Fifth Circuit has directed that excess costs due to multiplication should be tabulated and that those fees should *not* amount to the total cost of the litigation. *Ratliff v.*

*Stewart*, 508 F.3d 225, 235 (5th Cir. 2007). "Multiply," of course, means "to increase in number especially greatly." http://www.merriam-webster.com/dictionary/multiply.

And prior to imposing sanctions under Section 1927, a court must find that the offending attorney's multiplication of proceedings was both unreasonable and vexatious. *Travelers*, 38 F.3d at 1416-17. "The ordinary meaning of vexatious is 'lacking justification and intended to harass' or '[w]ithout reasonable or probable cause or excuse.'" *U.S. v. Gomez*, No. EP–10–CR–1326–KC, 2012 WL 2899715, at *4 (W.D. Tex. July 9, 2012).

So, to meet the unreasonable and vexatious requirement in the Fifth Circuit, a movant must show that *in filing and maintaining* the proceedings, counsel acted with bad faith, improper motive or reckless disregard for counsel's duty to the court. *Baulch*, 70 F.3d at 817 (emphasis added); *accord Travelers*, 38 F.3d at 1416-17 (Section 1927 sanctions require evidence of recklessness, bad faith, or improper motive) (citing *Hogue v. Royse City, Tex.*, 939 F.2d 1249, 1256 (5th Cir. 1991)); *Gonzales*, 689 F.3d at 479 (Section 1927 sanctions "require 'evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court.'") (quoting *Edwards*, 153 F.3d at 246)).

The evidence set forth above in the preceding section, as well as the procedural history of this case outlined above, demonstrates that Ms. Scarlott and her counsel did not unreasonably and vexatiously multiply the proceedings in this case.

## III.    NNA has not set forth any basis on which this court might award it attorneys' fees under Rule 11.

Rule 11 imposes three affirmative duties upon an attorney who signs a pleading, motion, or other document. *Childs v. State Farm Mut. Auto. Ins. Co.*, 29 F.3d 1018, 1024 (5th Cir.1994); *Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 873-74 (5th Cir.1988) (en banc). The Fifth Circuit outlined these duties: (1) that the attorney has conducted a reasonable inquiry into the

facts which support the document; (2) that the attorney has conducted a reasonable inquiry into the law such that the document embodies existing legal principles or a good faith argument for the extension, modification, or reversal of existing law; and (3) that the modification is not interposed for purposes of delay, harassment, or increasing the costs of litigation. *Childs*, 29 F.3d at 1024 (citing *Thomas,* 836 F.2d at 874).

"Simply put, a lawyer must have a basis for his pleadings." *Southern Leasing Partners, Ltd. v. McMullan,* 801 F.2d 783, 789 (5th Cir. 1986). Or in other words, Rule 11 "establishes an objective standard, intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments." Fed. R. Civ. P. 11 Committee Notes (1993 amendments).

Significant, a motion made under Rule 11 "must describe the *specific* conduct that violates Rule 11(b)." Fed. R. Civ. P. 11(c)(2) (emphasis added). Here, NNA specifically identified only "Plaintiff's Response in Opposition to NNA's First Amended Motion for Summary Judgment," "Plaintiff's Motion to Strike New Summary Judgment Evidence Submitted in Reply, and Plaintiff's Motion to Strike Impertinent and Scandalous Matter." Doc. 101 at 1, 7; *see* Doc. 70; Doc. 83; Doc. 84, as offending documents. This being the case, W&M's reasonable pre-filing inquiry into the facts, as well as the manner in which the facts underlying Ms. Scarlott's claims played out through the discovery process, should preclude this court from awarding attorneys' fees in connection with these documents.

## IV. This court should not exercise its "inherent power" to award NNA fees, costs, and expenses.

In its laundry list of sanction requests, NNA also asks this court to use its "inherent power" to sanction bad faith conduct and award NNA its fees, costs, and expenses. A district court may rely on its inherent power to impose sanctions only "[w]hen a party's deplorable conduct is not effectively sanctionable pursuant to an existing rule or statute." *Toon v.*

*Wackenhut Corrections Corp.*, 250 F.3d 950, 952 (5th Cir. 2001). Even NNA concedes that the court's inherent power to sanction "must be used with great restraint and caution." Doc. 132 at 18; *see also Carroll v. The Jacques Admiralty Law Firm, P.C.*, 110 F.3d 290, 292 (5th Cir. 1997) ("A court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees."). As Ms. Scarlott believed that her claims satisfied Rule 11 standards, and as W&M did not litigate this matter in an unreasonable and vexatious manner, this Court should decline to exercise its inherent power to sanction and award attorneys' fees.

V.    **NNA's motion impugns the professionalism, honesty, and ethics of W&M and its attorneys. Client feedback, court orders, jury verdicts, and the firm's history demonstrate that NNA's attack is unfounded.**

NNA has requested $201,108.81 in its "motion for amended judgment and for fees and costs." It does so, in part, based on false accusations regarding W&M and its attorneys.

A.    **As illustrated by its recent emergency motion to clarify, strike, and seal, NNA did not investigate its baseless "facts" before launching a full-scale character attack in its motion for amended judgment.**

NNA itself cast doubt upon the veracity of all the allegations in its motion for amended judgment by filing a recent emergency motion to clarify, strike, and seal that motion. Through its sealed motion, NNA admitted that it employed an "attack now, investigate later" approach by making unfounded accusations with respect to Noah Radbil's medical history and prescription drug use, and then ultimately recanted them for lack of evidentiary support. *See* Doc. 127 at 1 ("NNA acknowledges it erred, files this clarification, and asks the Court to strike the offending language to correct this error.").

**B. Courts across the country have expressed their confidence in W&M by appointing it, and its attorneys, as class counsel.**

W&M, and its present attorneys, have been appointed as class counsel in the following recent cases, by way of example:

- *Luis Rodriguez, et al. v. Hayt Hayt & Landau, P.L*, No. 1:12-cv-23848-JJO (S.D. Fla. June 21, 2013), Doc. 26 at 4 (appointing Alex Weisberg and Aaron Radbil of Weisberg & Meyers as class counsel for the settlement class);

- *Garo v. Global Credit & Collection Corp.*, No. CV-09-2506-PHX-GMS (D. Ariz.). *See* 2010 WL 5108605, at *9 (D. Ariz. Dec. 9, 2010) (concluding that Weisberg & Meyers could adequately represent class in FDCPA and TCPA class action because "counsel has extensive familiarity with the federal consumer protection laws at issue here and has vigorously represented the interests of the putative class in this litigation," where attorneys of record were Aaron Radbil and Marshall Meyers);

- *Dianne Little-King et al. v. Hayt, Hayt & Landau, LLC,* No. 2:11-cv-05621-MAH (D.N.J.). *See* Doc. 39 (Nov. 8, 2012) at 2 of 5 (appointing Noah Radbil of Weisberg & Meyers as class counsel for the settlement class);

- *Tammie Powell, et al. v. ProCollect, Inc., et al.*, No. 3:11-cv-00846-M (N.D. Tex. July 18, 2012), Doc. 30 (July 18, 2012) at 2-4 (appointing Noah Radbil of Weisberg & Meyers as class counsel for the settlement class, commending his "demonstrated skill and quality of work," recognizing that work was "efficiently performed," and noting that "[t]he quality of Settlement Class Counsels' work on this case was excellent and is reflected in the resulting Settlement obtained against a formidable opponent represented by counsel experienced in the defense of FDCPA class action litigation").

**C. W&M has done a great deal to assist consumers, even if through nothing more than courts of appeals spanning the country**

Before courts of appeals alone, W&M—through Aaron Radbil—has done much to aid consumers across the country in matters of significant interest. Examples, sorted by circuit and jurisdiction, are as follows:

- The United States Court of Appeals for the Fifth Circuit reversed the district court's ruling granting a debt collector's post-trial motions for judgment as a matter of law, to alter or amend the verdict, and for a new trial, and remanded the case to the district court to enter judgment in the consumer's favor. *Guajardo v. GC Services, LP*, No. 11-20269, 2012 WL 5419505 (5th Cir. Nov. 7, 2012).

- The United States Court of Appeals for the Seventh Circuit, *en banc*, affirmed the district court's holding that the United States' sovereign immunity does not protect it, or its agencies, from liability under the federal Fair Credit Reporting Act. *Talley v. U.S. Dept. of Agric.,* 595 F.3d 754 (7th Cir. 2010), *reh'g en banc granted, opinion vacated* (June 10, 2010*), on rehearing en banc (September 24, 2010), decision aff'd,* No. 09-2123, 2010 WL 5887796 (7th Cir. Oct. 1, 2010).

- The United States Court of Appeals for the Eleventh Circuit dismissed a debt collector's appeal for lack of subject matter jurisdiction, finding that settlement of all claims mooted the litigation, and that the debt collector did not adequately preserve its right to appeal an interlocutory order where it ultimately consented to the judgment into which the interlocutory order merged. *Yunker v. Allianceone Receivables Mgmt., Inc.*, 701 F.3d 369 (11th Cir. 2012).

- The United States Court of Appeals for the Eleventh Circuit affirmed the district court's findings that a debt collector violated several provisions of the Fair Debt Collection Practices Act, that the debt collector was unable to take advantage of the bona fide error defense to the consumer's claims, and that the consumer was entitled to the maximum statutory damage award available. *Ponce v. BCA Fin. Services, Inc.,* 467 F. App'x 806, 809 (11th Cir. 2012).

- The United States Court of Appeals for the Eleventh Circuit endorsed a broad interpretation of the Fair Debt Collection Practices Act, finding that a "debt," as statutorily defined, is created where an obligation to pay arises from a transaction, even absent an extension of credit. *Oppenheim v. I.C. System, Inc.,* 627 F.3d 833 (11th Cir. 2010).

- The Florida Supreme Court held that a consumer who resolves a legal action with a warrantor, pursuant to Florida's offer of judgment statute, is a prevailing party under the Magnuson-Moss Warranty Act and may recover attorneys' fees as allowed by that statute. *Mady v. DaimlerChrysler Corp.,* 59 So.3d 1129 (Fla. 2011).

- The Second District Court of Appeals for the State of Illinois reversed an order dismissing an Illinois consumer's case for violation of the federal Magnuson-Moss Warranty Act, holding that an automobile buyer's ineligibility to participate in the manufacturer's dispute resolution process did not deprive him of his right to file suit under the Magnuson-Moss Warranty Act. *Jones v. Nissan N. Am., Inc.,* 385 Ill. App. 3d 740 (2d Dist. 2008).

And through Noah Radbil, W&M has done even more in Texas state courts of appeals.

*See Brown v. Enter. Recovery Sys., Inc.*, No. 02-11-00436-CV, 2013 WL 4506582 (Tex. App.—

Fort Worth Aug. 22, 2013); *In re Whaley*, No. 05-12-01518-CV, 2012 WL 5991789 (Tex.

App.—Dallas Nov. 30, 2012); *Lopez v. RS Clark & Associates, Inc.*, 396 S.W.3d 656 (Tex. App.—Dallas 2013).

**D. W&M has an A+ rating with the Better Business Bureau, with forty-three positive client reviews on file.**

W&M has an A+ rating with the Better Business Bureau ("BBB"). As of now, forty-four customers have posted reviews on the BBB's website: forty-three reviews are positive, and only one is negative. Many of the positive reviews specifically reference the honesty, integrity, and professionalism of the firm and its attorneys. *See* Redacted BBB Reviews, attached as Exh. 7.

**E. Other client feedback in thank you letters and consumer websites also expressly contradicts the negative image painted by NNA.**

Other client feedback, from personal thank you notes to online reviews, is also overwhelmingly positive. For example, a satisfied customer on Avvo.com raves about the services provided by Aaron Radbil and Noah Radbil, complimenting their work on long and complicated filings, and noting their fervor and diligence in pursuing his case and obtaining a positive outcome. http://avvo.com/attorneys/3330-fl-aaron-radbil-1776818/reviews.html; http://www.avvo.com/attorneys/77002-tx-noah-radbil-1903494.html. And hundreds of satisfied clients have written letters and e-mails to the firm, thanking its attorneys for their consumer service and praising their efforts. *See* Thank You Letters, attached as Exhs. 8-17.

**F. The three fee petition orders that NNA cites represent an exceedingly small percentage of the rulings that courts have issued in connection with W&M's petitions for attorneys' fees.**

In connection with its unfounded allegation that W&M vexatiously and unreasonably multiplies proceedings as a general course of action, NNA cites three orders on fee petitions for the proposition that "the firm also makes it a practice to 'over-bill' on their cases to ratchet up its own claim for attorneys' fees." Doc. 123 at 16-17 n.48. Again, this is not true.

To illustrate that NNA's accusation is unfounded, W&M prepared a chart comparing the amounts requested in fee petitions filed to date with the amounts awarded by courts across the country. *See* Attorneys' Fee Petition Chart, attached as Exh. 18. Statistical evidence demonstrates that the three cases NNA attaches to "support" its critique of W&M's practice of law are not representative of typical rulings. In fact, sixty percent of courts have awarded 70% or more of the fees requested. Thirty percent of courts have awarded 90% or more of the fees requested. And twenty percent of courts have awarded 100% of the fees requested.

The cases at the other end of the spectrum are readily explainable. For instance, the Rule 68 offer of judgment in *Sylvia Walker v. A&S Collection Assocs., Inc.*, specifically precluded an award of attorneys' fees, such that the court awarded costs only. *See* No. 09-cv-00601-JO, Doc. 25 (D. Ore. Feb. 24, 2010). And in *Santana v. First American Solutions LLC*, the fee petition did not detail the hourly rate for Attorney Dennis Kurz's services or the total number of hours devoted to the case; thus, the court was unable to assess whether the amount requested was reasonable and necessary as required. No. 11-cv-186-PRM, Doc. 34 (W.D. Tex. June 27, 2011).

**G. NNA's cites three "example[s]" of courts that have found that W&M has "improperly prosecuted groundless claims." W&M was not even counsel in the first example. The other examples omit critical context.**

In its zeal to dig up opinions maligning the character of W&M and its attorneys, NNA's counsel made inaccurate statements about the firm's history.

### 1. W&M was neither counsel nor sanctioned in *Tucker v. CBE Group, Inc.*

NNA ignores the procedural history and misstates the facts in its recount of *Tucker v. CBE Group, Inc.*, 710 F. Supp. 2d 1301, 1307 (M.D. Fla. 2010). NNA represents to this court that the judge in *Tucker* "[found] W&M liable for a defendant's costs and fees in a case regarding debt collection practices." Doc. 132 at 16-17. But W&M was not even mentioned in

the order, nor did the law firm play any role whatsoever on this case. *See generally* 710 F. Supp. 2d at 1301. Instead, the court reprimanded and sanctioned Krohn & Moss, Ltd. and the Law Offices of Theodore F. Greene, LC. *Id.* at 1308.

NNA's misstatement undoubtedly originates from the fact that Aaron Radbil played a very limited role in *Tucker* when he was employed by Krohn & Moss over four years ago. Mr. Radbil filed a verified complaint in *Tucker* on February 13, 2009. *See* No. 09-cv-00134-HLA-MCR, Doc. 1 (M.D. Fla. Feb. 13, 2009). Quite significant, his client swore, under oath, fourteen days before it was filed, that the complaint was "well grounded in fact" and that the facts set forth were "true." *See id.* at 5. Equally significant, Mr. Radbil withdrew from the case barely three months later when he changed employers, with the Court's explicit approval. *Id.* at Doc. 8 (M.D. Fla. May 28, 2009); Doc. 9 (M.D. Fla. May 29, 2009). As of his withdrawal date, the case was literally in its initial stages, with only the complaint and answer on file. *No* discovery had taken place yet. *See gen.,* No. 09-cv-00134-HLA-MCR, (M.D. Fla.).

By omitting these facts in its recount of *Tucker*—even though they are evident from even a cursory glance at the record—NNA has mischaracterized Aaron Radbil's role in that case and his ultimate culpability, which in the court's mind was none. In fact, the *Tucker* court's criticisms of attorney conduct—*which NNA reiterates in bold, italicized text and depicts as criticisms of Aaron Radbil by unilaterally inserting his name in brackets*—related to the plaintiff's continued prosecution of his case and failure to dismiss the case until a summary judgment motion was filed, *despite the fact that the initial allegations were contradicted by evidence obtained during discovery*. Because he withdrew from the case before discovery even began, the *Tucker* case does not demonstrate that Aaron Radbil "improperly prosecuted groundless claims."

And what's more, after counsel in *Tucker* settled the matter in lieu of an appeal, the Eleventh Circuit—the circuit in which *Tucker* was filed—held that the factual scenario underlying *Tucker*, was, in fact, actionable. *See Meadows v. Franklin Collection Serv., Inc.*, 414 F. App'x 230 (11th Cir. 2011).

       **2.**    **The district court in *Danielson-Holland v. Standley & Associates* validated the plaintiff's claim when it denied the defendant's summary judgment motion, motion for directed verdict, and renewed motion for directed verdict. Its subsequent imposition of sanctions under Section 1927 for electing to proceed to trial contradicted its own decision to allow the claim to proceed to a jury verdict.**

NNA also cites only a seemingly damning portion of the court's opinion in *Danielson-Holland v. Standley & Associates*, 512 F. App'x 850, 853-54 (10th Cir. 2013), without providing any context whatsoever.

The court in *Holland* determined that Craig Ehrlich of W&M "elected to proceed to trial without plausible evidence to support the claim made" and awarded $9,350 in attorney's fees to the defendant pursuant to Section 1927. *Danielson-Holland v. Standley & Associates*, 09-cv-01474-RPM-MJW, Doc. 102 (Dec. 21, 2011). It did so, however, after (1) the magistrate judge specifically recommended that the claim survive summary judgment based upon his review of deposition testimony; (2); the district court judge adopted the magistrate judge's report and recommendation; (3) the claim survived the defendant's motion for a directed verdict; (4) the claim survived the defendant's renewed motion for a directed verdict; (5) the district court judge pushed forward with the trial while reassuring the plaintiff that she would not be charged with "abusive litigation"; and (6) the district court judge complimented the attorneys on their "expeditious" submission of the case. *Holland*, 512 F. App'x at 852.

Because the district court continuously pushed the plaintiff's claim under the Fair Debt Collection Practices Act ("FDCPA") from one stage of litigation to the next, and ultimately to

trial, despite multiple opportunities to dismiss it, Mr. Ehrlich reasonably believed at the conclusion of the trial that—although Ms. Holland had lost on her claim—he had proceeded within appropriate judicial boundaries and met the court's expectations throughout the case.

> **3. Weisberg & Meyers did not engage in "gamesmanship" in *Brookter v. GC Services*. It challenged an issue that is destined to go before the Supreme Court due to a split among the Circuits.**

Likewise, NNA briefly references negative language contained in the order granting the motion to dismiss in *Brookter v. GC Servs. Ltd. P'ship*, No. 10-cv-03149, 2011 WL 1584651 (S.D. Tex. Apr. 26, 2011), aff'd, 470 F. App'x 372 (5th Cir. 2012), without providing any context. The issue at the heart of *Brookter* is of tremendous importance to class actions—namely, whether defendants can defeat class actions by tendering Rule 68 offers of judgment to named plaintiffs, directed to their individual claims only, prior to the time they move for class certification. *Id.* at *1. Raising this issue is far from "gamesmanship," as it is the subject of a Circuit split that currently appears bound to end up before the United States Supreme Court.

**VI.    Despite that no basis exists to enter an award of sanctions against Ms. Scarlott and her attorneys, NNA's request for $201,108.81 is unsubstantiated.**

Section 17.50(c) of the Texas Business & Commerce Code provides for an award of "reasonable and necessary" attorneys' fees and costs. Section 1927 likewise contains a reasonableness component, allowing recovery of "excess costs, expenses, and attorneys' fees reasonably incurred" because of counsel's improper conduct. 28 U.S.C. § 1927.

Even though NNA filed its now-pending amended motion and bill of costs *after* Ms. Scarlott detailed the deficiencies in the documentation filed in connection with its original motion, *see* Doc. 126, NNA has made an insufficient effort demonstrate the reasonableness of its request. Rather, it again relies on generalized statements, without a single billing record.

**A. NNA has not provided any supporting documentation for the $188,210 in attorneys' fees requested.**

For the reasons detailed in Ms. Scarlott's objection to NNA's bill of costs, this court should refuse to award—or significantly reduce—the attorneys' fees that NNA seeks to recover. *See* Doc. 126. Even after NNA was put on notice that its submission to this court did not contain the requisite supporting documentation for these fees, NNA failed to correct this deficiency in its amended motion. NNA has failed to attach a single time sheet for its attorneys, or to otherwise articulate the rates, hours, and tasks for which it seeks a recovery.

**B. NNA has requested $8,233.42 in costs that are not fully awardable under Section 1920, without categorizing or sufficiently documenting those costs.**

For the reasons detailed in Ms. Scarlott's objection to NNA's bill of costs, this court should refuse to award—or significantly reduce—the costs that NNA seeks under 28 U.S.C. § 1920. *See* Doc. 126.

**C. NNA has requested $12,655.39 in "other expenses" that are not compensable under Section 1920 or otherwise.**

For the reasons detailed in Ms. Scarlott's objection to NNA's bill of costs, this court should refuse to award—or significantly reduce—the "other expenses" that NNA seeks, which are not available under Section 1920 or otherwise. *See* Doc. 126.

**D. A substantial portion of the attorneys' fees and costs purportedly incurred by NNA were an unnecessary result of NNA's own undefined strategy and inefficiencies.**

NNA argues that it was forced to perform a series of tasks—and thereby incur over $188,000 in attorneys' fees—because of Ms. Scarlott's litigation strategy. But much of NNA's efforts were necessitated by its evolving defense strategy; for example, NNA filed a motion for summary judgment, and then an amended motion for summary judgment when it learned its original causation theory was incorrect. And NNA took an aggressive approach to its defense,

which included setting the depositions of many witnesses very early on in the case, before the roadmap for the case had even been laid out.

The attorneys' fees and costs purportedly incurred were also necessitated by NNA's inefficiencies and duplication of effort—both of which are manifest even in its request for sanctions—which NNA was forced to re-file because of an admitted failure to verify key facts. *See* Docs. 123, 127, 132. NNA also re-filed its bill of costs because of the same error. *See* Docs. 122, 127, 131.

## Conclusion

Ms. Scarott and her attorneys respectfully request that this court deny NNA's motion.

DATED: October 2, 2013.

Respectfully submitted,
WEISBERG & MEYERS, LLC

s/ Aaron D. Radbil
Aaron D. Radbil (*pro hac vice*)
5025 N. Central Ave., #602
Phoenix, AZ 85012
Telephone:     (888) 595-9111
Facsimile:      (866) 317-2674
aradbil@attorneysforconsumers.com
*Attorneys for Plaintiff* APRIL SCARLOTT

## CERTIFICATE OF SERVICE

I certify that on October 2, 2013, the foregoing was filed through the Court's EM/ECF system and was served upon all attorneys of record.

s/Russell S.  Thompson IV
Russell S. Thompson IV