```
 1                  UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
 2                        HOUSTON DIVISION

 3   APRIL SCARLOTT             ()        CIVIL ACTION
                                ()        NO. H-10-4865
 4   VS.                        ()        HOUSTON, TEXAS
                                ()        MARCH 30, 2011
 5   NISSAN NORTH AMERICA, INC.,()        10:00 A.M.
     ET AL                      ()
 6

 7                    TRANSCRIPT OF CONFERENCE
                 BEFORE THE HONORABLE LYNN N. HUGHES
 8

 9
     APPEARANCES:
10

11   FOR THE PLAINTIFF:        Mr. Aaron Radbil
                               Weisberg & Myers, LLC
12                             5025 N. Central Avenue, No. 602
                               Phoenix, Arizona  85012
13

14   FOR DEFENDANT NISSAN
     NORTH AMERICA, INC.:      Mr. Jeffrey S. Patterson (by phone)
15                             Hartline Dacus Barger Dreyer, LLP
                               6688 N. Central Expressway, Suite 1000
16                             Dallas, Texas  75205

17
     FOR DEFENDANT NISSAN
18   MOTOR ACCEPTANCE CORP:    Mr. Christopher M. Boeck
                               Locke Lord Bissell & Liddell
19                             2200 Ross Avenue, Suite 2200
                               Dallas, Texas  75201
20

21   FOR DEFENDANT
     CLEAR LAKE NISSAN:        Mr. Douglas M. Walla
22                             Henslee Schwartz, LLP
                               3200 SW Freeway, Suite 1200
23                             Houston, Texas  77027

24

25
```

COURT REPORTER:            Anita G. Manley
                          Official Court Reporter
                          515 Rusk, 8th Floor
                          Houston, Texas  77002

Proceedings recorded by stenographic means, transcript produced by computer.

1      P R O C E E D I N G S

2           THE COURT:  Mr. Patterson?

3           MR. PATTERSON:  Yes, sir.

4           THE COURT:  I have Aaron Radbil, a different one.

5           MR. PATTERSON:  Good morning, Mr. Radbil.

6           THE COURT:  Chris Boeck and Douglas Walla.

7                Apparently, Pappas has enjoyed all this he could

8      stand and sent Walla to take the abuse.

9           MR. WALLA:  I'm a poor substitute for Mr. Pappas, but

10     I'm here.

11          THE COURT:  All right.  Have we heard from Hurricane?

12          MR. RADBIL:  We have, Your Honor.  I have a document

13     that is a purported answer.  Apparently, it has not been filed

14     with this Court.

15          THE COURT:  That's my impression, but it's not -- it

16     wouldn't be the first time we lost something.

17          MR. RADBIL:  I was not aware that no one had received

18     this but our office.  I don't have a clean copy.  I would have

19     brought one had I known.

20          THE COURT:  That's all right.

21                Make four of them, please, ma'am.

22          THE LAW CLERK:  Yes, sir.

23          THE COURT:  What's it say?

24          MR. RADBIL:  It says --

25          THE COURT:  I'll file it, Mr. Patterson, so you can

1  get yours.

2         MR. RADBIL:  Your Honor, I can e-mail a clean copy to

3  the Court without my underlines and handwriting on it, if you'd

4  like, either way.

5         What it says is:  We, as Hurricane Auto Glass,

6  are not responsible.  We at no point looked at this mirror.  We

7  at no point attempted to fix this mirror.  We at no point were

8  contacted by either Clear Lake or by Nissan in an effort to

9  obtain warranty coverage or repairs to that mirror.  Long story

10 short, we never saw it; it was working when someone who

11 represented themselves as Ms. Scarlott's attorney -- it was not

12 anyone from our office -- showed up to Hurricane Auto.

13        At that point, we did a check.  This is Hurricane

14 Auto saying, We did a check.  It was working.  It was not

15 defective and, for three years thereafter, nobody told us there

16 was a problem with it.

17        That is, effectively, in a page and a half, what

18 the document says.

19        THE COURT:  Okay.  That's more than most answers say.

20        MR. RADBIL:  That is true.

21        THE COURT:  How does the Texas product thing where you

22 have to sue the manufacturer if you're claiming a product

23 defect and not the seller -- would that apply to a car mirror?

24        MR. WALLA:  82 of the Remedies Code, the indemnity,

25 you can --

1    THE COURT:  That's where, you know, you can sue the
2  seller, the retailer, if you don't know who manufactured it.
3  But if you're claiming a product defect, you have to sue
4  somebody who manufactured it unless you can't figure out who
5  they are.

6    MR. WALLA:  Right.  I think in this case, factually,
7  we may be a little bit to the left of that in that I don't know
8  that the mirror itself was defective.  It appears to be
9  installation of the mirror that was the problem because they
10  installed a new diode on it and it's been working for the last
11  two years without draining the battery.  And it wasn't that the
12  mirror itself didn't work.  It was just that it caused
13  electrical problems in the rest of the car.

14    THE COURT:  Right.  So, there was -- well, how do you
15  install a mirror so that it causes the drain or the diode to be
16  weird?

17    MR. WALLA:  I don't know.

18    THE COURT:  Did they give you some documents, Mr.
19  Radbil?

20    MR. RADBIL:  They did.  However, they appear to be
21  simple printouts purporting to show that there was no defect,
22  there was no improper installation.  I don't know if that is
23  true.  I don't know exactly what these attachments prove or
24  don't prove at this point.

25    THE COURT:  It appears -- and I quit messing with

1 automobiles a long time ago -- to be like a material data sheet

2 on the car --

3      MR. RADBIL:  Sure.

4      THE COURT:  -- that they went on so that they could

5 find out what settings are supposed to be on the car from

6 Directechs, whoever that is, which is all fine.  It just

7 doesn't say anything about this car.

8      MR. RADBIL:  Correct.

9      THE COURT:  Is that your sense?

10      MR. RADBIL:  As far as I can tell to date, sure.

11      THE COURT:  It's like seven pages out of a manual.

12      MR. RADBIL:  Sure.  And what Hurricane says that it is

13 is a document or documents showing that they followed the

14 procedures to install this mirror, that they ran the proper

15 checks on the mirror, that everything tested okay, and that, as

16 far as they can tell -- and they should know because they're

17 Hurricane Auto Glass -- there's no defect nor was there any

18 improper installation.  That's what this document says.

19      THE COURT:  Okay.

20      MR. PATTERSON:  Your Honor, I'm sorry.  I can't hear

21 Mr. Radbil.

22      THE COURT:  Hurricane Glass said they installed it

23 right, it worked, worked fine, it's always worked fine, so it

24 couldn't have been installed wrong.

25      But, of course, that doesn't answer the question.

1    If the mirror was causing an improper effect on the rest of the

2    car, it can still be improperly installed.

3         MR. RADBIL:  It could be, sure.

4         THE COURT:  Yeah.  I mean, we know the car works fine

5    once you change this one thing.

6         MR. PATTERSON:  Your Honor, is this the description

7    from an answer they filed or --

8         THE COURT:  Yes.  It's a pro se answer, and it's a

9    page-and-a-half, single-spaced, and then has three or four

10   pages of technical manual off the Internet that they attached.

11        But all that can be true and it doesn't answer

12   the question.  I think we all agree there was something wrong

13   because Clear Lake's mechanics ascertained that there was an

14   extraordinary drain which was running the battery down.  And

15   the only thing that ever got changed was this one part that was

16   related to the mirror.

17        Is that right?

18        MR. RADBIL:  No.  The BCM, body control module, was

19   also changed under warranty.  The body control module is,

20   effectively, a computer for the car and controls electrical

21   systems and power.  The body control module was, as Clear Lake

22   noted, not falling asleep which means, when the car was off, it

23   was still on.  It was still draining power.

24        Now, the power that's been drained was, if I

25   remember correctly, 23 milliamps.  I don't know exactly how

1 much electricity, how much power that is.  But the point being

2 there was more done to the car to fix or attempt to fix this --

3          THE COURT:  Wait a minute.  You said attempt to fix.

4          MR. RADBIL:  Uh-huh.

5          THE COURT:  When they replaced the body control

6 mechanism --

7          MR. RADBIL:  Module.

8          THE COURT:  Module.  I'm sorry.  That's much trendier.

9 Module.  They cross-platformed the module, yes, probably

10 causing a paradigm shift, outside the box.

11          They replaced the body control module.  There was

12 still an extraordinary drain.  Is that right?

13          MR. WALLA:  Yes, sir.

14          Your Honor, may I speak?

15          THE COURT:  Well, I guess so.  Yes, sir.

16          MR. WALLA:  They replaced the BCM not because they

17 found it to be defective but because there had been reports

18 that some BCMs in some vehicles may not fall asleep and may

19 cause a drain.  And they had gone through so many attempts to

20 try to track down this problem because it was an intermittent

21 drain.  And they couldn't find it and they thought, well, out

22 of an abundance of caution, let's change the BCM.

23          They changed the BCM.  It was never found to be

24 defective.  Then they continued to have these problems for a

25 year and a half, two years, after changing the BCM, exact same

1  problem.  So, clearly it wasn't the BCM.

2           Then they had it in Clear Lake's shop for about a

3  month to continue monitoring because it was intermittent, and

4  it just -- at one time, a tech happened to be walking by it

5  during this month while it was hooked up to the sensors and saw

6  this drain and they started pulling fuses and things.  And when

7  they fulled the fuse on the mirror, it stopped the drain.  So,

8  they then said, Oh, it's the mirror.  They then went back and

9  had Hurricane Glass replace this diode in the mirror

10  installation, and that solved the problem.  So, yes, the BCM

11  was replaced.  No, it wasn't the problem.

12           THE COURT:  So, the diode was a component of the

13  mirror?

14           MR. WALLA:  Yes.  Well, I don't know.  I believe it's

15  a component of the mirror, yes, sir.  Or it was something that

16  was replaced on the mirror which fixed the problems.

17           MR. RADBIL:  Your Honor, the BCM was, the best of my

18  understanding, defective per the terms of the warranty, per the

19  terms of the service contract.

20           THE COURT:  Don't talk the law to me.

21           MR. RADBIL:  Okay.

22           THE COURT:  Talk facts.  I got lots of law.

23           MR. RADBIL:  Sure.  Biggest fact, Hurricane as of

24  today says no diode was replaced.  We haven't had a chance to

25  talk to Hurricane.

1     THE COURT:  Because you didn't serve them properly.

2     MR. RADBIL:  In part, I believe, yes, the delay --

3 sure.  Yes, yes, yes, yes.

4     THE COURT:  This case has been going on I don't know

5 how long, but we went all through this.

6     MR. RADBIL:  Yes, Your Honor.

7     THE COURT:  Eventually, the wrong person was served.

8 Or I don't even think they were really served.  Stuff was left

9 for them.

10     But if Scarlott wants to complain about

11 Hurricane --

12     MR. RADBIL:  Uh-huh.

13     THE COURT:  -- sue the person whose name is on the

14 receipt.  Get them properly served.

15     MR. RADBIL:  Right.

16     THE COURT:  Talk to them, things like that.

17     MR. RADBIL:  Right.

18     THE COURT:  But it's not because they're new to the

19 case.

20     MR. RADBIL:  I understand.

21     So, facts.  One, Hurricane says, no, the diode

22 was not replaced, nothing was ever brought back to us for

23 repair.

24     Second fact, it is my understanding that the BCM

25 was deemed defective, so --

1     THE COURT:  No.  Wait.  They replaced it.

2     MR. RADBIL:  Right.

3     THE COURT:  Why do you deem -- "deem" means it's not

4  really but we're going to call it that.  That's like

5  "constructive."  That means "pretend" in legal language.

6  Constructive contract means we're going to pretend there was a

7  contract.

8     We're not deeming anything.  This is raw physical

9  data.  And, in my view, as an old fashioned kind of guy, there

10 aren't any mechanics left.  There are just people who replace

11 things.  Everything is a module.  It's a component.  They hook

12 up a computer.  The computer says this is or isn't working or

13 there's a drain here or something.  They unplug this and plug

14 something else in.  And it's probably good on the long run, but

15 you don't really repair a car.  You replace a component.  Like

16 computers.  You don't fix a computer.  You find out what's

17 broken, replace it.

18     When I first got here, there was a closet in the

19 hall and there was this green wire running diagonally across

20 the middle of the closet impeding its utility somewhat.  So, I

21 got a guy from the General Services Administration.  I said,

22 "Can't that be rerouted?"  And he says, "I don't know what it

23 goes to."  I said, "Well, me either, but find out."

24     They pulled out a pair of clippers and cut the

25 wire.  That's how they tell what something is connected to.

1    And he didn't unplug it.  He clipped it.  Nobody complained, so

2    it was okay.

3            Do we have a chronology of the date of purchase

4    and each visit to Clear Lake?  Merely a naked row of dates with

5    five-word events.

6            MR. RADBIL:  That can be put together, certainly.

7            MR. PATTERSON:  Your Honor, this is Patterson.

8            THE COURT:  Yes, sir.

9            MR. PATTERSON:  I just asked my secretary to send it

10   to me and I can e-mail it to you.

11           THE COURT:  All right.  Thank you.  Actually, when you

12   weren't immediately available early, I voted to have your

13   secretary handle the conference instead of you.

14           MR. PATTERSON:  She can do better than I can.

15           THE COURT:  She's much nicer.

16           MR. PATTERSON:  Yes, I was in the men's room, Your

17   Honor.  I apologize.

18           THE COURT:  We'll call you on your BlackBerry next

19   time.

20           So, you have a simple chronology of when what was

21   done to the car, bought, returned to the dealership, all that?

22           MR. PATTERSON:  Yes, sir.  It's just a chart.

23           THE COURT:  That helps just to get the sequence down.

24           But the car is not defective if during the

25   warranty they replaced.  So, let's assume that the body control

1  module was defective.

2  MR. RADBIL:  Uh-huh.

3  THE COURT:  She mentioned it.  They fixed it.  She has

4  no complaint if that happens.

5  MR. RADBIL:  I don't think that's entirely true.  The

6  specific components may have been repaired or replaced, but the

7  defect in the vehicle --

8  THE COURT:  No.  If that was defective and they fix

9  it, she has no complaint.  That the vehicle continued to be

10  defective is a different question entirely.  But if she says,

11  It looks like there's a cut on the left front tire, and they

12  look at it and say, It's cosmetic but, if you're unhappy,

13  here's a new tire, she has no complaint.  Do you agree with

14  that?

15  MR. RADBIL:  No, I don't, for this reason.  Ms.

16  Scarlott did not go into the dealership and say, I believe the

17  BCM is defective.  Ms. Scarlott went into the dealership and

18  said, My car won't start.

19  THE COURT:  My fact is she makes a complaint and it's

20  fixed.  She has no complaint if they fix it.  In this case, she

21  made a complaint.  They replaced the BCM.  It didn't fix the

22  complaint, but she has no complaint about the BCM.

23  MR. RADBIL:  Specifically about the BCM, no, I would

24  agree.

25  THE COURT:  Okay.  So, whether it was defective or not

1    is irrelevant.  It was replaced and it was not, apparently,

2    causing the harm.  The harm continued.

3              MR. RADBIL:  Sure.

4              THE COURT:  You know, if Mr. Walla is bleeding from

5    his right upper arm and I put a tourniquet around his neck and

6    the bleeding will continue, so apparently the neck arteries

7    weren't the problem.

8              MR. RADBIL:  But as Your Honor noted, we are talking

9    about a car that is built from more than nails and a few pieces

10   of wood and some wheels.  It is a complicated piece of

11   machinery.

12             THE COURT:  No.  Save that for a press release.

13             MR. RADBIL:  Okay.

14             THE COURT:  Mr. Radbil, Ms. Scarlott bought a car.

15             MR. RADBIL:  Yes.

16             THE COURT:  She didn't buy a module.

17             MR. RADBIL:  Correct.  Correct.

18             THE COURT:  Or she bought a transportation module but

19   not a diode or a body control module.

20             MR. RADBIL:  Exactly.

21             THE COURT:  It had -- it has an infinitude of aspects.

22             MR. RADBIL:  That's correct.

23             THE COURT:  Everything from carpet color to these

24   diodes.

25             MR. RADBIL:  Yes.

1          THE COURT:  She brought it back because the battery

2    was running down.

3          MR. RADBIL:  Yes.

4          THE COURT:  That's not supposed to happen.

5          MR. RADBIL:  Uh-huh.

6          THE COURT:  Not for a while or not under normal

7    circumstances.  The dealership replaced one part.  That didn't

8    change it.  So, that's out of the question.

9               Next thing is, it still continues.  She brings it

10   back.  And I don't know how long, but at some point Jim Bob

11   pulls a diode and the drain goes away.  And somebody put a new

12   diode in or something.  It doesn't matter whether Hurricane did

13   it, Nissan did it, or Patterson flies down from Dallas to do

14   it.  The drain stops.  Right?

15         MR. RADBIL:  (Nodding).

16         THE COURT:  It starts.  Battery life is good.  So, her

17   injury is what?

18         MR. RADBIL:  Her injury is that she had a vehicle that

19   did not work.  It was not what she bargained for.  She --

20         THE COURT:  Counsel, give me a real-life

21   quantification.

22         MR. RADBIL:  The difference between the value of the

23   vehicle as accepted and as would have been had it been as

24   warranted and/or promised.

25         THE COURT:  Well, as warranted in terms of what was

1  committed to in fixing it is clear.  And that's why they have

2  the warranty, is to eliminate these problems.

3            MR. RADBIL:  Yes.  Yes.

4            THE COURT:  If they thought it was perfect the day it

5  left Tokyo, Detroit, the Black Forest, --

6            MR. RADBIL:  Yes.

7            THE COURT:  -- you wouldn't need warranties, would

8  you?

9            MR. RADBIL:  No.  You're right.

10            THE COURT:  You can go buy a Swiss Army watch and you

11  don't care whether it's warrantied or not because, for $98, it

12  will last forever.

13            MR. RADBIL:  You're right.

14            THE COURT:  And nobody would pay extra for a warranty,

15  because warranties cost.

16            MR. RADBIL:  Sure.

17            THE COURT:  They're factored into the price of the

18  car.

19            MR. RADBIL:  Sure.

20            THE COURT:  If you gave people a choice of a Swiss

21  Army watch for $98 without a warranty and $102 with a warranty,

22  nobody would pay the $4.  Well, there might be some accountants

23  out there, somebody, an actuary.  The actuary would know

24  better, wouldn't he?

25            But is the method of calculating Scarlott's

1   damage the amount of time she lost taking it back to the

2   dealership?

3           MR. RADBIL:  No.  It could be, an incidental or

4   consequential damage; but the measure of damages with respect

5   to a breach of warranty is codified at 2719, Commercial Code.

6   You go back to the time of the purchase.  And as I noted, the

7   difference between the value of the vehicle as warranted -- as

8   accepted and as it would have been had it been as warranted.

9               So, the Warranty Act, the Federal Warranty Act,

10  says it that must be a defect in the vehicle, it must be

11  repaired within a reasonable number of attempts or a reasonable

12  opportunity to do so.

13          THE COURT:  I know what the law says.

14          MR. RADBIL:  So, whether or not it was fixed generally

15  a thousand times down the line doesn't mean that there was no

16  breach of warranty.

17          THE COURT:  If the warranty that she bought -- we're

18  not talking about the extended warranty.

19          MR. RADBIL:  I understand.  Sure.  I understand.

20          THE COURT:  Although, Patterson is real proud of it.

21  He sent me excerpts of it.

22              What she bought was a limited warranty.

23          MR. RADBIL:  That's correct.

24          THE COURT:  And the warranty is written.  And, so, how

25  did Nissan violate its warranty?

1    MR. RADBIL:  By failing to repair defects in the

2  automobile within a reasonable number of attempts or after

3  being provided a reasonable opportunity to do so.

4    THE COURT:  And how many attempts to find an

5  electrical drain is reasonable?

6    MR. RADBIL:  Federal courts say no less than two but

7  it is an issue of fact.

8    THE COURT:  Well, this federal court may not say that.

9    MR. RADBIL:  May not be this court.  May not be this

10  court.

11    THE COURT:  But two attempts or five attempts --

12    MR. RADBIL:  No.  No less than.  No less than.

13    THE COURT:  I know, but five attempts might be

14  perfectly reasonable for some things and unreasonable for

15  others.

16    MR. RADBIL:  That's correct.

17    THE COURT:  But -- so, that's the sole issue in this

18  case.

19    MR. RADBIL:  With respect to the warranty claim, yes,

20  I believe that is the issue.

21    THE COURT:  And it has to be.  Got to be a claim on

22  the warranty.  The only thing wrong with this car was the

23  unusual drain.

24    MR. RADBIL:  Yes, yes.

25    THE COURT:  Now, there have been a lot of claims made

1  about she was cheated because she didn't get an original

2  equipment mirror.

3         MR. RADBIL:  Sure.  That's separate from the warranty,

4  but yes.

5         THE COURT:  No, it's not because what she got was an

6  original equipment mirror.  It wasn't an automatic dimming --

7  or was it -- it's the car door opener one?

8         MR. RADBIL:  HomeLink to Ms. Scarlott's home, the

9  lights, the garage door, the whole thing.

10        THE COURT:  The integrated opener mirror.

11        MR. RADBIL:  That's fair.

12        THE COURT:  IOM.  Probably ought to be IOMM for

13 module.

14         The original equipment was not one of those.

15        MR. RADBIL:  Uh-huh.

16        THE COURT:  And, so, when she pointed out that she

17 wanted the other one, they gave her a voucher and she went to

18 Hurricane.

19        MR. RADBIL:  Not my understanding.  Nissan took the

20 vehicle to Hurricane.

21        THE COURT:  The data are the dealership gave her --

22 we've got the vouchers.

23        MR. RADBIL:  Right.  We do.  We do.

24        THE COURT:  She took it.

25        MR. WALLA:  Her depo is clear she took it.

1        THE COURT:  No, she did.  Got it.

2              And I'm not as interested in -- it seems, and

3    it's not a ruling, but it seems clear that something in that

4    process went awry.

5              She'd only had it, what, two days?

6        MR. RADBIL:  One day.

7        THE COURT:  One day.  And, so, without knowing -- I'm

8    sure it's easily knowable about where this diode is and what it

9    does, but there developed electrical problems shortly after

10   that.  It apparently was hard to find.  When it was found, it

11   was fixed.  That's what we know.

12             And, so, what's her complaint about the mirror?

13       MR. RADBIL:  With respect to the warranty --

14       THE COURT:  No.

15       MR. RADBIL:  Or with respect to the --

16       THE COURT:  A claim has been made.  I'm not sure Ms.

17   Scarlott made it, but it was made in her name that she was

18   cheated.

19       MR. RADBIL:  Sure.  This is why.  Cut me off if I'm

20   not answering your question.

21       THE COURT:  Oh, I will.  That's not a problem.

22       MR. RADBIL:  Ms. Scarlott had a very particular reason

23   for needing and watching the mirror, which we won't get into

24   now.

25       THE COURT:  We're never going to get into.  She

1  ordered -- she ordered an integrated opener mirror and she
2  didn't get one --
3          MR. RADBIL:  Sure, sure.
4          THE COURT:  -- immediately.
5          MR. RADBIL:  Right.  It was factored into the purchase
6  price of the car.
7          THE COURT:  Right.
8          MR. RADBIL:  Right.
9          THE COURT:  They paid for it, the one she did get.
10         MR. RADBIL:  They paid for, they, they paid for what
11 was supposedly the mirror.  But according --
12         THE COURT:  It's a --
13         MR. RADBIL:  According to Mr. Patterson and according
14 to Clear Lake and according to NMAC, they did not -- the mirror
15 that needed to be installed is not the OEM part, is not the
16 factory part, and therefore --
17         THE COURT:  No, no, no, no.  It's absolutely clear
18 that Hurricane Mirror on the Gulf Freeway is not a Nissan
19 factory.
20         MR. RADBIL:  Right.
21         THE COURT:  There's not much question about that.
22         MR. RADBIL:  Okay.
23         THE COURT:  It is an aftermarket mirror.
24         MR. RADBIL:  Okay.
25         THE COURT:  Do you have any doubt about that?

1    MR. RADBIL:  I have a doubt about the term used,

2  whether or not it's -- but aftermarket, sure.  I have no doubt

3  about that.

4    THE COURT:  It had been sold.  The car had been

5  shipped from -- we figured this out -- Japan.  H'm?

6    MR. RADBIL:  Yes, with that definition, yes, I agree.

7    THE COURT:  It had built, shipped from Japan, with a

8  mirror, delivered to Houston, sold to Ms. Scarlott, and the

9  HomeLink mirror was not on it.

10    MR. RADBIL:  Yes.

11    THE COURT:  Thirty-six hours later, she goes off to

12  this place, which may be a fine place.  It's just not a Nissan

13  factory.

14    MR. RADBIL:  Exactly.

15    THE COURT:  And the dealership pays for the mirror

16  that she picked up.

17    MR. RADBIL:  Yes.

18    THE COURT:  No question about that?

19    MR. RADBIL:  I don't believe so, no.

20    THE COURT:  And, so, how was she cheated?  She knew at

21  the time.

22    MR. RADBIL:  Sure.  She brought the car back to the

23  dealership because the warranty says if you have a problem,

24  bring it back to the dealership.  She can't bring it to --

25    THE COURT:  We're talking about the sale of the

1   mirror.

2           MR. RADBIL:  Yes, yes.

3           THE COURT:  The fact that it was delivered to her

4   without the mirror she specified.

5           MR. RADBIL:  Yes.

6           THE COURT:  She took it back.  She got the mirror she

7   specified.  And then, where is the cheating?

8           MR. RADBIL:  What I am attempting to say, obviously

9   not well enough, is that she did not get the mirror that she

10  specified, according to Nissan, according to NMAC, and

11  according to Clear Lake.  She got a supposed replacement or

12  alternative which should have done the same thing as the one --

13          THE COURT:  She got the aftermarket mirror that -- she

14  specified HomeLink.

15          MR. RADBIL:  Right.

16          THE COURT:  Right?  She specified HomeLink.

17          MR. RADBIL:  I don't know, but okay.  Sure, sure.

18          THE COURT:  She did.  There are occasionally datum

19  here that's clear.

20          MR. RADBIL:  Sure, sure.

21          THE COURT:  And she didn't get one.  She returned the

22  car and got one.

23          MR. RADBIL:  Uh-huh.

24          THE COURT:  She knew at that time at the time she

25  brought the car back that it didn't open her garage.

1       MR. RADBIL:  Yes, yes.

2       THE COURT:  They said, Oh, sorry; here, we'll pay for

3  a replacement, one that does what you said; go get it.  She

4  did.

5       MR. RADBIL:  With the caveat that this was going to be

6  done at a factory-authorized installation center.

7       THE COURT:  And where -- how do you know that?

8       MR. RADBIL:  We know that from Ms. Scarlott's

9  deposition testimony.

10      THE COURT:  And is that in any of the paperwork?

11      MR. RADBIL:  What paperwork?

12      THE COURT:  About the mirror.

13      MR. RADBIL:  I don't understand the question.

14      THE COURT:  When she accepted the IOU, the purchase

15  order, whatever it's called, did she have Jim Bob -- he also

16  sells cars -- write on there that this was a factory-authorized

17  dealer and all that?

18      MR. RADBIL:  I don't think it says that on the slip,

19  no.

20      THE COURT:  She went to an authorized HomeLink dealer.

21      MR. RADBIL:  Possibly.  This would be the way that --

22  it's probably a poor example.  But, for example, Your Honor

23  purchased a new Cadillac.  You want a Cadillac GPS system in

24  the car.  Buy that Cadillac, bring it home, look at the car, no

25  GPS system in the car.

1          You take it back, say, I paid for this Cadillac
2   GPS system.  The Cadillac dealership says, Here's a Garmin GPS
3   system.  Paid 100 bucks for it at the store, stick it on your
4   window, good to go.  That is --

5          THE COURT:  And you say, Okay, and leave.  You've got
6   to finish the transaction.  You don't say, No, I'm rescinding
7   the sale -- because she still had two days to do that -- I'm
8   rescinding the sale; you promised me an original equipment
9   HomeLink; that's not what I got; I don't want the car.

10          MR. RADBIL:  I see what Your Honor is saying.

11          THE COURT:  And, so, when she says, Okay --

12          (Document tendered to the Court)

13          THE COURT:  My brain trust is very responsible.

14          MR. RADBIL:  So, this would be my answer here today.
15   The measure of damages for such an allegation is at the time of
16   acceptance.

17          THE COURT:  No.  There's no cheating.  She knew the
18   condition of the car.  She was not happy.  She negotiated a
19   change in the condition of the car.  She accepted that.  And
20   she did not revoke the sale.  That's her principal remedy.  At
21   the sale, she had three days.  She knew of this problem in the
22   three days.  She accepted a remedy.  She did not rescind the
23   sale.  She stuck with the sale.

24          MR. RADBIL:  If, in fact, she stuck with the sale, you
25   know -- and for the sake of this conversation, we'll say she

1  did.

2      THE COURT:  It's pretty clear.

3      MR. RADBIL:  Sure.  It was at the doing and at the

4  suggestion and the recommendation of the dealership who said,

5  By the way, this is not going to be a problem; we're going to

6  fix that for you.

7      THE COURT:  Counsel, read the slip (indicating).

8      MR. RADBIL:  Frank Pierce, Jr.

9      THE COURT:  No.  The big print that you can read at

10 arm's length, that I can read at arm's length.

11     MR. RADBIL:  "Nothing else promised, nothing else

12 owed."

13     THE COURT:  That's right.

14     MR. RADBIL:  "HomeLink installed by Hurricane Auto."

15     THE COURT:  It doesn't say installed by factory, by

16 Nissan authorized, or anything like that.

17     MR. RADBIL:  Exactly.  It does not, no.

18     THE COURT:  And that's the voucher she accepted to

19 solve the problem.

20     Now, I'm just curious.  What is the measure of

21 damages if you have accepted a substitute, a Garmin, --

22     MR. RADBIL:  Uh-huh.

23     THE COURT:  -- in your example, between the Cadillac

24 original equipment and the Garmin?  What is the measure of

25 damages if that were wrong?

1     MR. RADBIL:  Two.  The difference between the vehicle

2  as accepted value, the vehicle as promised value, because

3  there's a difference between a Garmin and a Cadillac GPS.  Also

4  what about a resale value?

5     THE COURT:  No.  Stop right there, counsel.  That's

6  not damages.  You have -- look, if Boeck promises you 100 tons

7  of 7/8-inch production casing and it's API 12 -- I'm just

8  making that up -- and what he delivers you is API 11-1/2,

9  that's what it says, and you say, Well, shucks, that wasn't

10 what I really wanted, but okay, there is no damage.

11     The "okay" is an acceptance.  You can't accept a

12 product, negotiate a deal, and then say, By the way, if she

13 wanted it, she should have said to Jim Bob, I'll take the

14 HomeLink from Hurricane but you've got to knock 100 bucks off

15 the price.  Did she?

16     MR. RADBIL:  No, she did not, because --

17     THE COURT:  Because she wanted the HomeLink and she

18 wasn't the least bit concerned about anything else other than

19 getting on with getting her car.

20     MR. RADBIL:  She wasn't concerned for the reason that

21 the dealership induced this --

22     THE COURT:  Counsel, you have to stop there.  I've

23 been through it with the other Radbil for hours and hours.

24     MR. RADBIL:  Sure.

25     THE COURT:  And she is an educated, healthy adult.

1    MR. RADBIL:  Right.

2    THE COURT:  She is a responsible person.

3    MR. RADBIL:  Right.

4    THE COURT:  If she's incompetent, just tell me, and

5  the whole thing is over.

6    MR. RADBIL:  She's --

7    THE COURT:  She's not incompetent.

8    MR. RADBIL:  No, she's not.

9    THE COURT:  She's a rational human being who made

10  choices.

11    MR. RADBIL:  Uh-huh.

12    THE COURT:  After making those choices and it all not

13  turning out exactly the way she wanted, she has hired lawyers

14  who have sued for all kinds of things.  This is a very simple

15  transaction.  She bought a car.  She asked for a HomeLink

16  mirror.  She picked it up.  It didn't have a HomeLink mirror.

17  She took it back.  They gave her a voucher for a HomeLink

18  mirror.  She said, Okay.  She got the mirror.

19         The whole problem with the mirror is not that it

20  wasn't factory installed and all that.  The problem is that,

21  apparently, --

22    MR. RADBIL:  Uh-huh.

23    THE COURT:  -- its edition or design or manufacture

24  caused there to be an electrical drain; and that's hard on

25  batteries.  There's nothing about the acquisition of the mirror

1  that is actionable at all.  It's just a simple transaction of a

2  complicated way in which there was an after-acceptance

3  adjustment.  And she accepted the adjustment.

4             So, what she got was what she ordered after

5  having understood there was a glitch in the delivery.  That's

6  all there is to the purchase of -- the question of whether the

7  mirror is defective is entirely a different question.  The sale

8  is straightforward.

9             MR. RADBIL:  I understand exactly what Your Honor is

10  saying.

11             THE COURT:  She had a statutory three-day period to

12  say, Take this back, it's not OEM.  And she now, after having

13  been counseled, has all kinds of imaginings about how she was

14  injured and about how the market price is less.

15             MR. RADBIL:  Uh-huh.

16             THE COURT:  It's too bad.  She accepted something with

17  a lower resale value than she would have had if she made a

18  different deal.  I have a lot of stocks that are that way.

19  They would be a lot more valuable if I made a different deal.

20             MR. RADBIL:  We talk about what is statutory and we

21  have this Deceptive Trade Practices Act.

22             THE COURT:  Counsel, there's no deception.  It was a

23  mistake.  And we're not doing that.  What this is, apparently

24  she's unhappy.  And I understand.

25             MR. RADBIL:  Sure.

1      THE COURT:  I've been told by somebody with your firm
2  that you-all do a whole lot of this stuff.  That's fine.
3      MR. RADBIL:  Uh-huh.
4      THE COURT:  But you have to have facts.  You can't
5  just list me a bunch of legal theories.
6      MR. RADBIL:  I understand.
7      THE COURT:  The statute gives her a three-day
8  rejection period.  No reason at all.  Right?
9      MR. RADBIL:  Sure.
10      THE COURT:  I had a law clerk who bought a car, was
11  almost in a wreck coming back up the freeway from where she
12  bought it, turned around, and took it back.  I didn't think
13  that was terribly rational, but....
14      MR. RADBIL:  I understand.
15      THE COURT:  And the dealership said, Well, shucks,
16  okay.
17      MR. RADBIL:  Uh-huh.
18      THE COURT:  You know, if that's a reason to return a
19  car, anything is a reason to return a car.  The better practice
20  is keep the car and stay off the freeway.
21          The only issue here is whether there is a defect
22  in the car that has not been corrected that reduces the value
23  of the car.  She drives the car.  How long has it been since
24  her batteries run down?
25      MR. RADBIL:  Don't know.

1          MR. WALLA:  Two years.

2          THE COURT:  Two years.  They fixed the defect in the

3     original warranty period.

4          MR. RADBIL:  She experienced the defect for

5     30-some-odd-thousand miles.

6          THE COURT:  Well, yes.  That she had a defect that she

7     lived with for 30,000 miles -- I once had a doctor sue a repair

8     shop that had done a defective brake job, and he drove the car

9     for 40,000 miles before taking it back and sued for his concern

10    for his safety.

11         MR. RADBIL:  You had a case?

12         THE COURT:  I did.  He didn't win.

13         MR. RADBIL:  I'm sure.

14         THE COURT:  I mean, he had claims his children were in

15    the car and they were endangered by this careless act after he

16    knew -- they were soft or something.  It turns out, even worse

17    than that, in that particular case they didn't even work on the

18    brakes.  You know, it was a Jiffy Lube or someplace.

19         MR. RADBIL:  Uh-huh.

20         THE COURT:  They had nothing -- all the paperwork,

21    nothing to do with it.

22         MR. RADBIL:  Right, right.

23         THE COURT:  He had paperwork that showed they had

24    nothing to do with it.  Unhappy doctor.

25         MR. RADBIL:  Uh-huh.

1    THE COURT:  But if she drives the car for 30,000

2  miles, it's not much of a defect.

3         How many times did she have it jump-started?

4    MR. RADBIL:  I want to say five, six, seven times.  It

5  died that many times.  She didn't have a choice whether or not

6  she drove the car or not.  She is not a wealthy woman.  She

7  has --

8    THE COURT:  Wait.  Don't start that.

9    MR. RADBIL:  Okay.

10    THE COURT:  She does have a choice to drive the car.

11  She can also -- she could have taken it back sooner.

12         I don't know what -- do you know what the time

13  elapsed between visits was?

14    MR. WALLA:  Generally, yes, Your Honor.

15         I believe the first time she took it back for

16  this drain issue was about nine months after she bought the

17  car.  Then there was a lapse of another six months.  And every

18  time she took it back, we either replaced the battery for free

19  or did whatever we could, module or what have you, for free and

20  we gave her a loaner car for free.  And every time she was

21  stranded, we paid her wrecker fee if she had to have it towed.

22  You know, any time she brought it in, we fixed it for free and

23  did everything.

24    THE COURT:  And she brought it back for a couple of

25  other problems.

1      MR. WALLA:  She did.  She did.  There was an air flow

2  something that was a mechanical issue, nonelectrical.

3      THE COURT:  What I know is the suspension thing was,

4  apparently, it didn't exist.

5      MR. WALLA:  And we fixed all that.  We inspected it,

6  fixed it, did whatever we could.

7      THE COURT:  How many times do you think she broke

8  down?  They say two.

9      MR. WALLA:  No, Your Honor.  I believe it was more

10 than that.  But it was about nine months before she first

11 brought it back, and then there was like a six-month gap.  Then

12 I think some things kind of snowballed a little bit.  But every

13 time she brought it back, we did everything we could and gave

14 her a rental car.

15     MR. RADBIL:  And if that were the case, Ms. Scarlott

16 could have brought the vehicle back 1,000 times.  All the

17 dealership has to do is throw parts at it and say, We think we

18 got the problem.

19     THE COURT:  Counsel, she didn't do that.  Ms. Scarlott

20 brought it back.  She made claims that were unreproducible

21 about the suspension.

22     MR. RADBIL:  Let's forget the suspension.

23     THE COURT:  She's bringing it back, and they're

24 responding.  They inspected -- they inspected the electrical

25 system.  They didn't just pat her on the head and say, It's all

1  fixed now.  They said, We think we fixed it.

2          MR. RADBIL:  Uh-huh.

3          THE COURT:  It took a while.  But she's not -- what is

4  she asking for for compensation from the dealer?

5          MR. RADBIL:  The difference between --

6          THE COURT:  Or the whole group of them.

7          MR. RADBIL:  The difference between the value of the

8  vehicle as accepted as it would have been had it been as

9  warranted and/or promised, 279 -- 2719, Commercial Code.

10          THE COURT:  Counsel, give me the fact.  What is the

11  differential in value?

12          MR. RADBIL:  Our expert says $7500.

13          THE COURT:  Okay.  Did she ever go to Mr. Nissan-Clear

14  Lake and say, Give me $5,000 back, this car is not what you

15  offered?  I'll keep the car, but give me 5,000 back?  Or, Take

16  it as a trade-in but give me the full value I paid for it?

17          MR. RADBIL:  She did.

18          THE COURT:  When was that?

19          MR. RADBIL:  When she first obtained our services.

20          THE COURT:  That's right.  She didn't do it.  She

21  wasn't that unhappy with it, was she?

22          MR. RADBIL:  She was unhappy.  She took it back from

23  Day 1.  She said, I don't want this.

24          THE COURT:  No, she didn't.  She took it back Day 2.

25          MR. RADBIL:  Day 2.

1    THE COURT: And said she was happy. Nine months later
2  she took it back and she was unhappy.

3    MR. RADBIL: Uh-huh.

4    THE COURT: But do you have any evidence that she
5  asked that you take it back for the purchase price against
6  another car?

7    MR. WALLA: No, Your Honor, that I'm not aware of.

8    THE COURT: I've never heard anything about that, an
9  actual concrete offer, request, that they take the vehicle back
10  even at nine, ten months.

11    MR. RADBIL: There was a letter written on Ms.
12  Scarlott's behalf. There's concrete --

13    THE COURT: No. Once she hires a lawyer, it ceases
14  being reality.

15    MR. RADBIL: Okay.

16    THE COURT: At that point, they had fixed it, hadn't
17  they?

18    MR. RADBIL: No. Had they?

19    MR. WALLA: I believe --

20    MR. BOECK: December of '09, wasn't it?

21    MR. WALLA: December of '09, yes, Your Honor, it was
22  fixed.

23    THE COURT: And, so, when did she retain counsel?

24    MR. RADBIL: I don't know.

25    THE COURT: I don't either, but --

1           MR. RADBIL:  I understand what you're saying.

2           THE COURT:  You know, c'mon.

3           MR. RADBIL:  Sure.

4           THE COURT:  However weird my particular aspect of this

5 profession is, we're all in the same business.

6           MR. RADBIL:  Sure.

7           THE COURT:  And lawyers take positions and make claims

8 that in the preceding, in some cases -- I had an oil and gas

9 case where the guy had gone 31 years without making a complaint

10 about his participation in a well, but --

11           MR. RADBIL:  In a what?

12           THE COURT:  Thirty-one years.  He decided that they

13 cut him out of the deal.  I said he waited too long.

14           And, so -- and you know that what the client

15 believes and what the lawyer says frequently may not conflict.

16 But frequently claims, for instance, in a contract case are

17 made of fraud.  And the two guys in the deal don't actually

18 think they were cheated.  They think something went wrong.  But

19 lawyers -- it gives them a negotiating point.

20           MR. RADBIL:  I understand.

21           THE COURT:  And, so, a demand letter after they fixed

22 it saying she wants to turn it back in or get cash for the

23 differential is not a real-world transaction.  It's a

24 post-litigation claim.

25           We have a lot of hurricane cases around here.

The hurricane is in September of '08 and a lawsuit is filed in
September of '10 and the homeowner never made a claim. It's a
sign.

        MR. RADBIL: Uh-huh.

        THE COURT: Mr. Patterson.

        MR. PATTERSON: Yes, sir.

        THE COURT: Did your client issue the short-term
warranty, the new vehicle warranty?

        MR. PATTERSON: The original factory warranty, yes,
sir. Nissan North America is responsible for that.

        THE COURT: All right. And Nissan Acceptance is just
the secondary?

        MR. BOECK: That's right. We financed the
transaction.

        THE COURT: You didn't know anything?

        MR. BOECK: Didn't issue any warranties.

        THE COURT: All right. Did you tell Hurricane about
today's get-together?

        MR. RADBIL: I personally? No. I received this from
our office late last night.

        THE COURT: Do you know if anybody told them?

        MR. WALLA: I didn't know they answered until he gave
it to me here in chambers. Of course, they really hadn't
answered because it hadn't been filed. They apparently faxed
that to Mr. Radbil's office a week or two ago. This was --

1  we've been checking the website to see if an answer had been

2  filed, and nothing had been filed.

3           THE COURT:  So had we.

4           MR. WALLA:  So, this was all news to me until --

5           THE COURT:  The whole point of this get-together was

6  to bring Hurricane up to speed.  Let me look at this quickly.

7               Well, according to this, somebody saying they

8  were her lawyer took it to them after Nissan had fixed it.

9           MR. RADBIL:  Apparently.

10          THE COURT:  So, what he says is probably true, it

11 worked fine that day.

12          MR. RADBIL:  Sure.  It wasn't our staff.  It wasn't

13 anyone from our office.

14          THE COURT:  I'm not --

15          MR. RADBIL:  Sure, sure.

16          THE COURT:  Whoever.  It could have been a friend.

17          MR. RADBIL:  Whoever represented themselves.

18          THE COURT:  Yeah.  And he might even misremember,

19 although --

20          MR. RADBIL:  That's fine.

21          THE COURT:  -- lawyers scare people.

22              He talks about the manufacturer.  I mean, it was

23 a HomeLink mirror.

24          MR. RADBIL:  Right, but he doesn't say, of course.  He

25 references his manufacturer but doesn't say who it was, right.

1          THE COURT:  Right.  I just want to make sure that

2   didn't turn out to be a problem.  And, you know, the truth is

3   that HomeLink can be a fine company, just like Nissan.  Every

4   once in a while there's a manufacturing defect, there's an

5   error rate.

6          MR. RADBIL:  Of course.

7          THE COURT:  So, it's not, as he takes it, an insult to

8   HomeLink.

9          Do we think it had ever been taken to Hurricane

10  before October of '09?

11         MR. WALLA:  Your Honor, no, we're not aware.

12         THE COURT:  Y'all just messed with -- not with the

13  mirror but with the car?

14         MR. WALLA:  Right.  We had no reason to believe there

15  was a problem with the mirror and went through multiple battery

16  changes and then the BCM that we've talked about.

17         And then finally, in November or early December

18  of '09, it had been at the shop for a month and they finally

19  saw this issue and started pulling fuses and traced it back to

20  the mirror.  And that's the first time that I'm aware of that

21  it was taken back to Hurricane, Hurricane in December, and I

22  don't know what he says --

23         THE COURT:  He says October, '09.

24         MR. WALLA:  Okay.  Well --

25         THE COURT:  Either one of them.

1    MR. WALLA:  Either one.  It was around that time
2  period, fall of '09, let's call it.  Hurricane did put in a
3  diode and it did fix the problem.  And as far as I know, it's
4  been trouble-free since the fall of '09.
5    MR. RADBIL:  Do we have that document?  Do we have the
6  document that shows it was actually taken back on the end date
7  to Hurricane?
8    MR. WALLA:  I believe so, yes.
9    THE COURT:  We have this, don't we (indicating)?
10   MR. RADBIL:  Sure.  That was when it was first taken.
11 Do we have a document from Hurricane on the date when it was
12 allegedly fixed-fixed, that shows --
13   THE COURT:  That they fixed --
14   MR. WALLA:  It was taken back to Hurricane, and I
15 believe Hurricane put the diode in, if I'm not mistaken.
16   THE COURT:  Oh, okay.  You --
17   MR. RADBIL:  And that's the representation.  It just
18 appears that Clear Lake -- not Clear Lake.  I apologize.  It
19 appears that Hurricane is stating otherwise.  And I'm just
20 wondering if we have a document from Hurricane that says, It
21 was taken back to us on this date, and what Hurricane is
22 stating in their answer is incorrect.
23   MR. WALLA:  I believe, if I'm not mistaken, from
24 reading the deposition of -- I want to say Bob Gore -- he says
25 that they took it back to Hurricane and Hurricane put the diode

1  in.

2          MR. RADBIL:  I agree with that.

3          MR. WALLA:  I believe that's what he said.  Now, there

4  may be a service printout saying, but we wouldn't have a

5  Hurricane Glass document.

6          THE COURT:  No, but you would have a note that

7  somebody took it over there.

8          MR. WALLA:  Right, and I think that is in some of our

9  service documents.

10         THE COURT:  Well, I haven't read those and prefer not

11  to, but this is stream of consciousness --

12         MR. RADBIL:  Sure.

13         THE COURT:  -- without apparently researching his

14  documents.

15           You know, I have some sympathy for the poor guy

16  having to deal with y'all, but I'm just going to assume he

17  didn't get the memo to be here today.  Let me -- (dialing

18  phone).  I've got Patterson.

19           Sorry, Patterson.

20         MR. PATTERSON:  That's all right.

21         THE COURT:  I can't just dial Mr. Gogineni with you on

22  the phone.

23         MR. WALLA:  Well, you know what we could do, Your

24  Honor?  We could call him on my cell phone and just put it on

25  speaker.

1          THE COURT:  I should be able to have Kathy patch him

2    in.

3               Kathy.

4       (Discussion off the record)

5          THE COURT:  I'm going to put you on hold while she

6    tries to put you together.  Mr. Patterson, wake up.

7          MR. PATTERSON:  Yes, sir.

8          THE COURT:  I'm going to put you on hold while my

9    secretary tries to get the other guy.

10         MR. PATTERSON:  Okay.

11      (Pause)

12         THE COURT:  Call Patterson and tell him you lost him

13   and we'll tell him what happened.

14              Mr. Gogineni, my name is Lynn Hughes.  I'm a

15   federal judge here, and I have the case where Ms. Scarlott has

16   sued Hurricane.

17         HURRICANE AUTO EMPLOYEE:  You need to speak to Sam.

18   This is Rick.  You need to speak to Sam.

19         THE COURT:  Oh, I'm sorry.

20         HURRICANE AUTO EMPLOYEE:  He's on the other phone, if

21   you want me to put you on hold or....

22         THE COURT:  Well, sure.  Is "Sam" Srinivas....

23         HURRICANE AUTO EMPLOYEE:  Yeah.  Can I put you on

24   hold?

25         THE COURT:  Please, sir.

1          HURRICANE AUTO EMPLOYEE:  Okay.  Thank you, sir.

2    (Pause)

3          MR. GOGINENI:  This is Sam.  How can I help you?

4          THE COURT:  Hi, my name is Lynn Hughes.  I'm a federal

5    judge, and I have the case where Ms. Scarlott has sued you.

6          MR. GOGINENI:  Yes.  Yes, sir.

7          THE COURT:  And we're having a little conference and

8    I'd hoped you'd be here, but apparently you didn't get the

9    notice?

10         MR. GOGINENI:  Yes, yes, uh-huh.  I heard of that one

11   time when the attorney asked -- brought me the car just to

12   check it after two and half years, roughly, if I remember

13   right.  Then we checked it and everything in the mirror was

14   working fine.  And after that, all I hear is a letter saying

15   that they have a case going on.  And recent, some -- one of the

16   attorney representatives -- I mean, the court representatives,

17   or I don't know exactly who they are --

18         THE COURT:  Right.

19         MR. GOGINENI:  -- they came to our house when I'm not

20   there.  My wife received that.  And I sent reply to the office

21   of their attorney, I think.

22         THE COURT:  Right.  We've all got that.  Thank you.

23         MR. GOGINENI:  Oh, okay.  Thank you.  I didn't know.

24         THE COURT:  And do you have a lawyer?

25         MR. GOGINENI:  Right now, we never kept any lawyer

1  actually.

2  THE COURT:  Well, that could be a good thing, but you

3  probably ought to talk to a lawyer about this.

4  MR. GOGINENI:  Uh-huh.

5  THE COURT:  I mean, I can't help you.

6  MR. GOGINENI:  Uh-huh.

7  THE COURT:  I can't help them, either.

8  But the reason I'm calling you, I've got -- all

9  these people are listening to you, the lawyers.

10  MR. GOGINENI:  Yes.

11  THE COURT:  The lawyers for the dealership and Nissan

12  and Ms. Scarlott and everybody.

13  MR. GOGINENI:  Yes.  No problem.  Yeah.

14  THE COURT:  I need you very quickly --

15  MR. GOGINENI:  Uh-huh.

16  THE COURT:  -- to get every record, directly or

17  indirectly, you have about this mirror that you installed back

18  in '08.

19  MR. GOGINENI:  Uh-huh.

20  THE COURT:  '06.

21  MR. WALLA:  December of '06.

22  THE COURT:  And the dealership will tell you the exact

23  dates.  He'll call you this afternoon and tell you the exact

24  dates.

25  MR. GOGINENI:  Uh-huh.

1          THE COURT:  But there may be a repair ticket or just a
2    visit by somebody from Clear Lake with this car where you
3    changed the diode.
4          MR. GOGINENI:  Uh-huh.
5          THE COURT:  That's what the lawyer for the dealership
6    thinks.  But, so, please get all your service records that have
7    anything to do with Ms. Scarlott and this car.
8              Does Clear Lake do a lot of business with you?
9          MR. GOGINENI:  Just a little bit.  Not a lot,
10   actually.
11         THE COURT:  All right.  So, see all the records that
12   you can find from 2006.
13         MR. GOGINENI:  Uh-huh.
14         THE COURT:  That have anything to do with Clear Lake
15   because it would have been a Clear Lake person who brought it
16   back to you the second time, not Ms. Scarlott.
17         MR. WALLA:  That would have been in 2009, Judge.
18         THE COURT:  The lawyer says it would have been 2009
19   when it was brought back, where the dealership thinks it
20   brought it back to you, so --
21         MR. GOGINENI:  Yes, 2009, I remember, too.  Yes, 2009,
22   the car was brought by the person who represented himself as
23   Ms. Scarlott's representative.
24         THE COURT:  Okay.  But, apparently, somebody from
25   Clear Lake Nissan brought it over there.  So, check all your

1  Clear Lake Nissan records for the second half of 2009.

2       MR. GOGINENI:  2009?  Okay.

3       THE COURT:  Just the second half.

4       MR. GOGINENI:  Yes.  Sure.

5       THE COURT:  And it doesn't matter how unimportant you

6  think it may be.  We need everything: phone slips, --

7       MR. GOGINENI:  Yes.

8       THE COURT:  -- cocktail napkins, service orders,

9  invoices, phone, all that stuff.

10       MR. GOGINENI:  Uh-huh.

11       THE COURT:  And if you'd package all that up.  I'm

12  going to tell the dealership to get it, and they will make

13  copies of it for you and all the other lawyers and send it to

14  everybody.

15       MR. GOGINENI:  Uh-huh.

16       THE COURT:  But can you do that by -- have it ready in

17  the morning?  They'll send some messenger by to pick it up.

18       MR. GOGINENI:  Like for 2009 on the second quarter,

19  right?

20       THE COURT:  No.  Second half.

21       MR. GOGINENI:  Second half.  Okay.  Got it.

22       THE COURT:  But then anything else you can come up

23  with that would have anything to do with Ms. Scarlott or this

24  car.  You know, if you -- and you've mentioned in here you got

25  some kind of notice about discovery?

1       MR. GOGINENI:  Uh-huh.

2       THE COURT:  Is that this case?

3       MR. GOGINENI:  Yeah, yeah.  About that case, yes,

4   uh-huh.  About 2009, I think.

5       THE COURT:  I guess that's in the state.

6       MR. RADBIL:  Process server is what he's talking

7   about.

8       MR. GOGINENI:  We found this mirror in 2006, if I

9   remember right.

10      THE COURT:  So, if you'll get the records from the

11  installation and then from any visits from anybody, whether

12  it's Scarlott or Clear Lake Nissan, in 2009, second half of

13  2009.

14      MR. GOGINENI:  Yeah.  I'm going to check it all, the

15  2009, the second half of it.  But from 2006 since 2009, we

16  never got no visits from no one.

17      THE COURT:  That's what -- that's what they think.

18      MR. GOGINENI:  Yes, exactly.  So, that's what we know

19  for -- I know because I've been here all the time on pretty

20  much most of the days.  So, we didn't have no other paperwork

21  or no other evidence of something going on in between Ms.

22  Scarlott -- Ms. Scarlott been visiting there to the Nissan

23  dealership so many times in between, none of that information

24  we're aware of.

25      THE COURT:  Right.  Okay.  If you'll get the

1  documents.  And you might talk to a lawyer.  I --

2          MR. GOGINENI:  Oh, okay.

3          THE COURT:  Because he just needs -- there's some

4  paperwork that would help if he helped you.

5          MR. GOGINENI:  Okay.

6          THE COURT:  And get a good one.  Don't get a cheap one

7  because they'll cost you a lot more than a good one.

8          MR. GOGINENI:  Yeah, yeah.

9          THE COURT:  Okay?

10          MR. GOGINENI:  I'm going to go and talk to them today.

11          THE COURT:  All right.  So, I'm going to assume that

12  tomorrow afternoon the dealership can send a messenger to pick

13  up your documents.  Okay?

14          MR. GOGINENI:  Yes.  If I find anything, I give it to

15  them.  Otherwise, can I have your -- any contact number where I

16  should contact or tell the information?

17          THE COURT:  The lawyer for the dealership will call

18  you and talk to you.

19          MR. GOGINENI:  Sure.  Okay.  Yes.

20          MR. WALLA:  My name is Doug Walla.

21          MR. GOGINENI:  If you want --

22          THE COURT:  His name is Doug Walla.

23          MR. GOGINENI:  Okay.  Can you hold on for a minute?

24  I'm going to get a piece of paper and get the information.

25          THE COURT:  Sure.

1   MR. GOGINENI:  Hello?

2   THE COURT:  Yes.

3   MR. GOGINENI:  Yes.

4   THE COURT:  Okay.

5   MR. WALLA:  Sir, my name is Doug Walla, W-A-L-L-A.

6   MR. GOGINENI:  Uh-huh.

7   MR. WALLA:  My telephone number is 713/552-

8   MR. GOGINENI:  552.

9   MR. WALLA:  -1693.  I will call you this afternoon.

10  MR. GOGINENI:  1693?

11  MR. WALLA:  Yes, sir.

12  MR. GOGINENI:  Okay.  So, I'm going to tell our office

13  to make sure they go through all the 2009, all the second half,

14  and see if we got any paperwork for Nissan.

15  THE COURT:  And for everything you've got about Ms.

16  Scarlott in '06.

17  MR. GOGINENI:  If anything is Ms. Scarlott's, I will

18  just try to get the paperwork.

19  THE COURT:  Get the original paperwork from '06.

20  MR. GOGINENI:  Uh-huh.

21  THE COURT:  And the stuff from the second half of '09.

22  And if they come across something last year easily, then throw

23  it in the pile.  It's better to put more stuff.  But have them

24  check phone messages and anything that's left over.  Okay?

25  MR. GOGINENI:  Yeah.  Sure.

1      THE COURT:  All right.  Thank you, sir.

2      MR. GOGINENI:  Yeah.

3      THE COURT:  Good-bye.

4           Kathy, now get Patterson back, please, ma'am.

5           That ought to move that along.

6           Has there been any discussion about settling

7  this?

8      MR. RADBIL:  There has been.  I have not --

9      THE COURT:  Basically, I don't read all that stuff

10  about the expert depositions and stuff unless I have to.

11      MR. RADBIL:  Let's do it this way.  Mr. Patterson will

12  tell you that he's not going to talk settlement, and he'll tell

13  you that, too.

14      THE COURT:  I've read the warranty.  I wouldn't

15  either.

16      MR. RADBIL:  Mr. -- well, I've spoken with the

17  gentlemen here who had some discussions with my brother, Noah.

18  Talked to Mr. Pappas.  He's had some discussions.  I think

19  that, initially, everyone agreed to talk.  I don't know how far

20  that -- I don't know if it's even feasible that anything is

21  done, but I'm certainly willing to sit in the hallway and find

22  out.

23      MR. WALLA:  Judge, we made an offer.  It was rejected.

24      THE COURT:  Well, make it again, if you want to.  I

25  don't care one way or the other whether you all settle or not.

1   I just -- you know, as sweet as I am, reading technicians'

2   depositions if I don't have to -- you may think this is

3   strange, but I don't take them home and read them on Saturday

4   just for fun.

5            MR. RADBIL:  Not by the pool?

6            THE COURT:  No.  The smartest thing is I don't have a

7   pool.  I owned a pool for ten years.  And give me a second wife

8   before I have a pool.  They're both a lot of trouble.

9            So, I have no idea.  But if there is some utility

10   to a settlement, then let's do it.  I mean, this is five years

11   after the car was bought.  It's not getting any better.  That's

12   the way it is.

13            MS. GRANT:  He's on hold, Your Honor.

14            THE COURT:  Mr. Patterson?

15            MR. PATTERSON:  Yes, sir.

16            THE COURT:  We talked to the apparent owner, Mr.

17   Gogineni of Hurricane, and he's going to gather all his

18   documents and give them to Mr. Walla who will copy them and

19   send them to all the rest of you.

20            MR. PATTERSON:  Okay.

21            THE COURT:  And then I counselled him to get a lawyer.

22            MR. PATTERSON:  Okay.

23            THE COURT:  And I was just talking to them about

24   talking settlement before I have to read all the expert

25   depositions.  And I emphasized I don't care whether anybody

1  settles or not or at what they settle, but I just as soon not

2  read all that stuff if I don't have to.

3      MR. PATTERSON:  I don't blame you.

4      THE COURT:  So, anything else we can usefully do?

5      MR. RADBIL:  Yes.  Your Honor, after an order, I

6  believe at the last conference, dispositive motions were due on

7  the 25th and our response were due this Friday.  I'd ask --

8      THE COURT:  Last Friday.

9      THE LAW CLERK:  No.  This Friday.

10     MR. RADBIL:  This Friday.  Our response will be due

11 this Friday.

12         I'd ask, if not from what we learned today, but

13 simply because my brother Noah -- I will be handling the case.

14 A bit of catch-up.  A week would be great, an extension of a

15 week --

16     THE COURT:  A week is fine.

17     MR. RADBIL:  -- to respond to these motions.  Okay.

18     MR. BOECK:  Your Honor, I'd like to request some

19 clarification of that order as well.  We have a deposition

20 we're trying to set with Ms. Scarlott to try to limit the

21 issues we have to respond to, either 12(c) or a Rule 56 motion.

22     THE COURT:  Hasn't she already been deposed?

23     MR. BOECK:  Well, the reason we didn't set the

24 deposition before was because we anticipated Hurricane Auto

25 entering an appearance, and we didn't believe --

1        THE COURT:  She hadn't been deposed?

2        MR. BOECK:  No, she'd been deposed once before, before

3   Nissan Motor Acceptance Corporation or Clear Lake or Hurricane

4   was part of the case.

5        THE COURT:  Oh, I'm sorry.  So, the Dallas lawyer

6   filed the deposition.  Is that what you're telling me?

7        MR. BOECK:  I'm sorry?

8        THE COURT:  The Dallas lawyer filed the deposition, so

9   it has to be retaken.

10       MR. BOECK:  Well, Your Honor, I'm also a Dallas

11  lawyer, so I would never say that.

12       THE COURT:  Well, denial is useful, I guess.

13  Psychologically, it keeps you from falling completely apart.

14       Mr. BOECK:  Hopefully, we can settle the case.

15       MR. PATTERSON:  If I use it, will I gain credibility?

16       THE COURT:  Absolutely.  That shows good judgment.

17       MR. BOECK:  Hopefully, we can settle the case and we

18  won't need another deposition of Ms. Scarlott.  But I assume

19  that if we did depose her, we would need to wait until there

20  was an appearance or at least past the appearance deadline for

21  Hurricane Auto.

22       THE COURT:  Well, I ordered them to appear, but

23  apparently nobody told them.

24            We can't wait.  And Hurricane is not the problem.

25  I mean, Hurricane has its problem, but....

1    MR. BOECK:  I've already submitted dates, proposed

2  dates for Ms. Scarlott's deposition.  I waited until one week

3  after Hurricane's answer deadline and then submitted dates, and

4  I have not heard back yet from plaintiff's counsel.

5    THE COURT:  I've forgotten.  What does she do for a

6  living?

7    MR. BOECK:  She's a real estate agent.

8    MR. RADBIL:  She's a real estate agent.

9    THE COURT:  So, that's reasonably flexible.  When do

10  you want to do it?

11    MR. BOECK:  I proposed dates within the next two

12  weeks.

13    THE COURT:  Well, give me a date.

14    MR. BOECK:  I believe all of -- not this coming week

15  but all of the next week is available.  I proposed all those,

16  11th through the 18th.

17    THE COURT:  Yes.

18    MR. BOECK:  I think I also proposed the next week

19  after that.

20    MR. RADBIL:  I will let counsel know as soon as I

21  return to my office again.

22    THE COURT:  Where is --

23    MR. RADBIL:  My office?  Fort Lauderdale.  I will be

24  there this afternoon.

25    THE COURT:  Do you know Omar Johansson?

1          MR. RADBIL:  No.

2          THE COURT:  He's an ex-clerk of mine who claims to be

3     a famous criminal defense lawyer.  He's a good fisherman.  He

4     was a great clerk.

5          MR. RADBIL:  Lots of fishing down there.

6          THE COURT:  Probably why he lives there.  All right.

7          MR. PATTERSON:  I have two quick questions, Your

8     Honor.

9          THE COURT:  Yes, sir.  I think the deposition needs to

10    be taken the week of the 11th.  We've got to get on with --

11         MR. RADBIL:  The week of the 11th?

12         THE COURT:  I mean, if you have personal plans or

13    something -- and personal plans include whatever you do for

14    fun, not just being with your family.  So, if want to go to the

15    opening at Hialeah or tarpon fishing or something, that's fine,

16    we'll work around it; but I hope you're very busy in your

17    practice, but that's your problem.  Your personal life, I'll

18    cut you some lack if you want to go see Prince William get

19    married.

20         MR. RADBIL:  By the end of the week, we'll talk

21    without question and, pending some unforeseeable circumstance,

22    certainly.

23         THE COURT:  Okay.  Mr. Patterson.

24         MR. PATTERSON:  To answer my question for, one, do we

25    need permission to take Hurricane's deposition?

1   THE COURT:  No, sir.  But I don't know whether he'll

2   have a lawyer.  So, I would like you-all -- he has to do

3   everything, but be very clear.  Don't send him some eight-page

4   notice letter.  Call him and talk to him and explain what's up

5   and then take his deposition.  You know, he's not evil.  If he

6   put the mirror on wrong, he put the mirror on wrong.  But he

7   probably doesn't even put mirrors on, but he's apparently the

8   owner or manager of the company.  But first look at the

9   records.

10   MR. PATTERSON:  Yes, sir.

11   THE COURT:  And when you see his answer, you've got

12   pretty much a stream-of-consciousness response to the complaint

13   to the extent the records flesh that out.  I just don't think

14   they're going to know much.  I mean, people don't tend to

15   remember every mirror.  And they put it in and there's a

16   three-year gap.  So, why would you remember?

17   But you may depose him if somebody thinks it's

18   useful, but briefly and get organized beforehand so it doesn't

19   waste a lot of everybody's time.

20   MR. PATTERSON:  Yes, sir, we'll do that.

21   THE COURT:  Next question?

22   MR. PATTERSON:  My other question, Your Honor, was how

23   Mr. Radbil is doing.

24   MR. RADBIL:  Could be better.

25   THE COURT:  I don't mean to pry, but is it

1   life-threatening or....

2           MR. RADBIL:  Congestive heart failure is what it

3   was -- what it is.

4       (Discussion off the record)

5           MR. BOECK:  Your Honor, the only reason I raised the

6   deposition of Ms. Scarlott was, in light of your March 14th

7   order, I just wanted to clarify that we would be able to file a

8   dispositive motion after we had a chance to depose Ms.

9   Scarlott.

10          THE COURT:  Well, if you're going to fuss about it, I

11  guess so.

12          MR. RADBIL:  I'm sorry?

13          THE COURT:  Well, he wants to depose her and then move

14  based on what that reveals since he didn't get to ask his

15  counter-questions to start with.

16          MR. RADBIL:  I understand.

17          MR. WALLA:  Your Honor, I'm in the same boat.  I filed

18  my dispositive --

19          THE COURT:  Fine.

20          MR. WALLA:  I filed one on the 25th because the Court

21  said to, so....

22          THE COURT:  I thought y'all were better organized than

23  this.  Next time I'll overestimate.

24          MR. RADBIL:  Let me --

25          MR. WALLA:  Judge, I'm relying on Pappas.  I just got

1  here.

2  MR. RADBIL: So let me, just to be clear, because

3  we've now made it less clear.

4  THE COURT: No. I'm going to clear it up. What did I

5  say, the week of the 11th?

6  MR. RADBIL: Yes.

7  THE COURT: All right. So, dispositive motions will

8  be refiled on the 27th of April, filed or refiled. But don't

9  add to whatever is on file. I don't want to read the original

10  one and the supplement. I want -- whatever you want to say,

11  say it in one document, please.

12  And then you respond on the 11th of May.

13  Does that answer your question?

14  MR. RADBIL: Absolutely.

15  THE COURT: Mr. Radbil, if I didn't hold these pesky

16  Dallas lawyers' feet to the fire, they'd never get anything

17  done.

18  MR. RADBIL: That's what I hear. That's what I hear.

19  THE COURT: Poor Pappas. He had a case last year.

20  (Discussion off the record)

21  THE COURT: All right. Anything else, Mr. Patterson?

22  MR. PATTERSON: No, sir. That's all.

23  THE COURT: Thank you for suffering your discontinuous

24  participation.

25  MR. PATTERSON: Well, thank you for allowing me to

1    attend by phone.

2              THE COURT:  Yes, sir.

3                  Anything else, Mr. Radbil?

4              MR. RADBIL:  I don't think so, no.

5              MR. BOECK:  No, Your Honor.

6              MR. WALLA:  No, Your Honor.

7              THE COURT:  All right.  Thank you, gentlemen.

8         (Concluding at 11:22 a.m.)

9

10

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE
11   RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER, TO THE BEST
OF MY ABILITY.
12
                                        10/7/13
13   ANITA G. MANLEY
OFFICIAL COURT REPORTER
14

15

16

17

18

19

20

21

22

23

24

25